## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Exactech, Inc., *et al.*,[1] | Case No. 24-12441 (LSS) |
| Debtors. | (Joint Administration Requested) |

### DECLARATION OF JESSE YORK,
### CHIEF RESTRUCTURING OFFICER OF EXACTECH, INC.,
### IN SUPPORT OF DEBTORS'CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Jesse York, hereby declare under penalty of perjury to the best of my knowledge, information, and belief:

1.        I am the chief restructuring officer (the "Chief Restructuring Officer") of Exactech, Inc. ("Exactech"), a corporation organized under the laws of Florida, and the above-captioned debtors and debtors in possession (collectively, the "Debtors," and, together with their non-debtor subsidiaries, the "Company").  On October 29, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition in the United States Bankruptcy Court for the District of Delaware (the "Court") for relief under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code").

2.        Prior to becoming the Debtors' Chief Restructuring Officer, I advised the Debtors in my capacity as managing director with Riveron RTS, LLC ("Riveron").  The Riveron team has served as one of the Debtors' principal financial advisors since April 25, 2024.  In that capacity, and in my capacity as the Chief Restructuring Officer of the Debtors, I have been directly involved

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  Osteon Holdings, Inc. (7042); Osteon Intermediate Holdings I, Inc. (7778); Osteon Intermediate Holdings II, Inc. (1292); Exactech, Inc. (3930); and XpandOrtho, Inc. (4250).  The Debtors' service address is 2320 NW 66th Court, Gainesville, Florida 32653.

and obtained first-hand knowledge of the events and circumstances leading to these chapter 11 cases, and I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

3.      I submit this declaration (this "Declaration") to assist the Court and parties in interest in understanding the Debtors' corporate history, business operations, prepetition corporate and capital structure, the circumstances compelling the commencement of these chapter 11 cases, and in support of the Debtors' chapter 11 petitions and first day motions (the "First Day Motions") filed contemporaneously herewith, which seek relief intended to avoid immediate and irreparable harm to the Debtors' estates and to preserve their value.  The first day motions also seek certain procedural relief that will facilitate the Debtors' orderly transition into chapter 11.

4.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management team and other advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.  The statements in this Declaration are accurate and correct to the best of my knowledge, information, and belief.  If called upon as a witness, I could and would testify competently to the facts set forth in this Declaration on that basis.

## PRELIMINARY STATEMENT[2]

5.      The Debtors commence these chapter 11 cases with a restructuring support agreement (the "RSA") supported by significant majority of Prepetition First Lien Lenders.  The RSA follows months of diligence, discussions, and negotiations around a value-maximizing

---

[2]     Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed to them in this Declaration.

transaction that I believe will best position the Debtors for success.  Among other things, the RSA contemplates a sale transaction providing for the sale of substantially all the Debtors' assets as a going concern, which will be consummated pursuant to a chapter 11 plan.  One or more entities to be formed by or on behalf of the Prepetition First Lien Lenders shall serve as the Stalking Horse Purchaser and will, among other things, credit bid all of their DIP Superpriority Claims, and credit bid all of the Prepetition First Lien Claims on behalf of the Prepetition Pari 1L Claims.  The Stalking Horse Bid is subject to higher or otherwise better offers, which the Debtors will seek to obtain pursuant to certain proposed bid procedures.  Importantly, the Debtors enjoy the parties' support under the RSA regardless of whether the Stalking Horse Bid is ultimately the winning bidder.  Moreover, the RSA and Stalking Horse Bid contemplate a wind down amount sufficient for the Debtors to confirm a chapter 11 plan and responsibly wind down their estates, as well as a $500,000 GUC Reserve.  Finally, these cases are supported by a $85 million DIP Facility (all of which is new money financing) provided by or offered to the Debtors' Prepetition First Lien Lenders and Prepetition Sidecar Lenders (collectively, the "Prepetition Pari 1L Lenders"), which I believe will support the Debtors' business through these chapter 11 cases and provide sufficient liquidity to prosecute and successfully consummate a chapter 11 plan and related sale.

6.      Underpinning the RSA parties' support is the strength of the Company's business. The Company is a market-leading developer and manufacturer of orthopedic implant devices, related surgical instruments, and cutting-edge surgical imaging devices known as "Exactech GPS." The Company's devices and instruments can generally be divided into extremities (shoulder, foot, and ankle) and large joints (knee and hip), and the Exactech GPS technology enhances those product offerings with intra-operative surgical guidance and predictive technologies.

7.     The Company is headquartered in Gainesville, Florida and employs approximately 900 employees worldwide, of which approximately 580 are employed in the United States.  With four world-class manufacturing facilities across Gainesville and Sarasota, Florida, and Gieres, France, the Company produces approximately 70% of its own products in-house and then distributes those products to approximately 30 markets throughout Europe, North America, South America, and Asia via a mix of direct sales presence and distributor networks.

8.     The Company delivered strong operational performance over the last several years under the leadership of its management team, financial stakeholders, and surgeon partners, consistently delivering cutting-edge products and driving market innovation.  Unfortunately, the Company has faced significant litigation stemming from certain recalls.  In particular, the Company, in coordination with the Food and Drug Administration ("FDA"), voluntarily recalled all tibial knee inserts, patellar components, and GXL and conventional polyethylene hip liners, as well as all shoulder glenoids and liners distributed in non-conforming packaging. The non-conforming packaging–manufactured and supplied by outside vendors–was missing one of seven specified layers that provides an oxygen barrier to protect the polyethylene components. Placing the interests of its patients above all else, the Company proactively implemented the voluntary recall despite an extensive analysis of the polyethylene components by both internal experts and leading materials science experts, who confirmed through industry-standard lab testing that the packaging would not affect the clinical performance of most of the recalled components. As discussed in detail below, approximately 2,600 patients have lawsuits filed in multiple federal, state, and non-U.S. courts, including a federal multidistrict litigation proceeding (collectively, the "Products Liability Claims"), alleging damages relating primarily to the non-conforming packaging and resulting recalls.  Separately, the Company has been defending *qui tam* claims

originally filed in 2018 in the Northern District of Alabama, which, together with a separate investigation initiated in 2023, involve allegations that the Company's sale of certain knee devices violated the federal False Claims Act and similar state statutes (the "Qui Tam Claims").

9.      Although the Company vigorously disputes the merits of both the Products Liability Claims and the Qui Tam Claims, the costs of litigation became an overwhelming burden for the business, resulting in liquidity constraints in mid- to late-2023.  Recognizing the need for a comprehensive long-term solution, the Company proactively engaged in good-faith negotiations with its prepetition lenders, certain Products Liability Claims representatives, and the United States Department of Justice (the "DOJ") in connection with the Qui Tam Claims with the goal of achieving comprehensive settlements and implementing strategic transactions that would achieve three key, interrelated goals: (1) enhance liquidity and extend maturities; (2) resolve all Qui Tam Claims; and (3) resolve the Products Liability Claims.

10.     To provide the Company with adequate liquidity while it engaged in negotiations with its various stakeholders around value-maximizing alternatives, the Company entered into a sidecar financing facility in September 2023 with its financial sponsor (the "Prepetition Sidecar Facility"), which provided approximately $15 million of incremental liquidity.  The Prepetition Sidecar Facility was permitted under the terms of the Company's other debt documents, and received liens that are *pari passu* with the Company's other secured debt.  Later, in April 2024, the Prepetition Sidecar Facility was amended to provide up to $20 million in additional liquidity.

11.     In November 2023, shortly after receiving the initial portion of the Prepetition Sidecar Facility, the Company commenced exploratory conversations with certain of their prepetition lenders, including providing preliminary proposals to extend maturities and provide the Company with adequate liquidity to execute on its business plan.  It soon became clear to the

Company from initial feedback that any capital provider, whether it be an existing stakeholder or a third party, would be reluctant to invest in the Company with the overhang and magnitude of the potential litigation liabilities, and a degree of certainty regarding such liabilities would be required before any meaningful progress could be made.  As such, the Company focused its efforts on seeking a consensual settlement with the DOJ to resolve the Qui Tam Claims and with certain plaintiffs' representatives (the "Plaintiff Representatives") to resolve the Products Liabilities Claims.  Over the course of many months, the Company made significant efforts to negotiate with the DOJ and the Plaintiff Representatives, including the use of a retired federal magistrate judge as a facilitator.  Notwithstanding the Company's considerable efforts, the Company was unable to make significant progress in its settlement negotiations with the Plaintiff Representatives.

12.    With no clear line of sight to an executable resolution with the Plaintiff Representatives and facing increasingly strained liquidity and imminent maturities (November 2024 for the Revolving Loans and February 2025 for Prepetition First Lien Term Loans), in late July 2024 the Company increased its focus on various restructuring alternatives, including commencing potential chapter 11 proceedings.  As part of this process, after initially appointing Elizabeth Abrams in November 2023 as an independent director on certain of the Company's boards of directors to assist with and review the potential refinancing and settlement alternatives, the Company decided to further supplement its governance process by appointing an additional independent director, Timothy Pohl, and forming a special committee of the boards of directors (the "Special Committee") at Osteon Intermediate Holdings II, Inc, Exactech, Inc., and XpandOrtho, Inc. consisting of Ms. Abrams and Mr. Pohl to, among other things, assist in the evaluation and negotiation of the Company's various restructuring alternatives.

13.    Over the past several months, the Company and its advisors engaged in lengthy, good-faith negotiations with an ad hoc group of Prepetition First Lien Lenders (collectively, the "Ad Hoc Group"), the Prepetition First Lien Agent and certain of the Revolving Lenders, and the Sponsor around restructuring alternatives.  As the Company's liquidity profile and upcoming maturities began to restrict its ability to execute an out-of-court deal, the Company began to focus discussions on the structure of a potential chapter 11 case.

14.    On October 9, 2024, the Company and certain lenders under the Prepetition First Lien Credit Agreement entered into a fourth amendment to the Prepetition First Lien Credit Agreement to provide the Company with approximately $6.5 million of additional liquidity on a super-priority basis while Company and the Ad Hoc Group continued to negotiate a consensual restructuring transaction.

15.    Following several months of discussions, significant diligence with the Ad Hoc Group, and exploring various alternatives, the Special Committee, together with the advice of its restructuring professionals, determined the most appropriate path forward to maximize value of the Company's stakeholders was to commence these chapter 11 cases to avail itself of the "breathing spell" afforded by chapter 11 and pursue a sale of all or substantially all of the Company's assets (the "Sale"), which is to be consummated pursuant to a chapter 11 plan (the "Plan").

16.    As briefly described above, in furtherance of a comprehensive, value-maximizing restructuring, the Company negotiated the RSA, attached hereto as **Exhibit B**, which is supported by approximately 95% of the Company's Prepetition First Lien Lenders and contemplates:

- debtor-in-possession financing (the "DIP Financing" and the claims thereunder, the "DIP Claims"), provided by the Ad Hoc Group, that will provide the Company with up to $85 million in liquidity to fund the Company's operations,

finance the costs of these chapter 11 cases, and allow the Company to run a thorough marketing process;

- a binding commitment from the Ad Hoc Group to (i) serve as a stalking horse bidder for the Sale pursuant to a signed asset purchase agreement, dated October 29, 2024 (the "Stalking Horse APA" and the bid represented therein, the "Stalking Horse Bid"), and (ii) to timely vote to accept the Plan and support the Sale regardless of whether the Stalking Horse Purchaser (as defined herein) is deemed the winning bidder; and

- consummation of the Sale through a Plan that will (i) distribute the proceeds of the Sale to the Company's stakeholders and responsibly wind up the estates of the Debtor entities, (ii) leave behind a wind-down amount equal to any administrative and priority claims that are not assumed by the winning bidder, plus $2,250,000, which shall be enough to fund a responsible winddown of the Debtors' remaining estates post-Sale, and (iii) provide $500,000 of cash to be distributed to allowed general unsecured claims (the "GUC Reserve") on a *pro rata* basis.

17.    The Stalking Horse APA provides for the purchase of substantially all of the Debtors' assets by Stalking Horse Purchaser, including all of the Debtors' equity interests in its non-U.S. entities, which one or more entities to be formed by or on behalf of Prepetition First Lien Lenders shall serve as the Stalking Horse Purchaser and will, among other things, credit bid all of the DIP Superpriority Claims and credit bid all of Prepetition First Lien Claims on behalf of Prepetition Pari 1L Claims.  The Stalking Horse APA does not include a break-up fee or other traditional bid protections other than an expense reimbursement.  To ensure the Debtors achieve the highest or otherwise best bid for their assets, with the assistance of Centerview Partners LLC ("Centerview") and their other restructuring advisors, the Debtors are commencing a comprehensive and robust postpetition marketing process with respect to the Sale and are seeking Court approval of related bid procedures to implement such process.[3]

---

[3]    The Debtors will file a motion seeking Court approval of, among other things, bid procedures and deadlines in connection with the Sale.

18.     As detailed further herein, the Debtors have commenced these chapter 11 cases to gain access to much needed liquidity provided by the DIP Financing, commence a postpetition marketing process with the support of the Ad Hoc Group and a fully executed Stalking Horse APA, resolve prepetition litigation claims, and confirm a Plan that ensures a comprehensive and value maximizing process for the benefit of all stakeholders.

## BACKGROUND

19.     To assist the Court and parties in interest in understanding the Company's business generally, and the Debtors in particular, as well as the relief the Debtors are seeking in the first day motions, this Declaration is organized as follows:

- *Part I* provides a general overview of the Company's corporate history and business operations;

- *Part II* provides an overview of the Company's prepetition corporate and capital structure;

- *Part III* describes the circumstances leading to the filing of these chapter 11 cases; and

- *Part IV* discusses the first day motions.

## II.    CORPORATE HISTORY AND BUSINESS OPERATIONS

### A.    The Company's Corporate History

20.     The Company is a privately held, leading manufacturer and developer of orthopedic implant devices, related surgical instruments, and an AI-based platform of smart technologies to hospitals and physicians.  Founded in 1985 by Dr. Bill Petty, an orthopedic surgeon, Dr. Gary Miller, a biomedical engineer, and Betty Petty, the Company's mission since its inception remains the same—to help people with joint and arthritic diseases and injuries improve their quality of life by maintaining their activity and independence.

21.     In its early stages, the Company exclusively focused on hip-related products.  Its first product was a cemented primary hip system, followed by additional hip joint products.

Building on its success with hip products, in 1992, the Company expanded its scope and developed its first knee implant.  In 1996, in order to support the full commercialization of its knee implants, the Company went public with an IPO on Nasdaq.  The Company further expanded its scope in 2005 by entering the extremities market with the launch of its shoulder products, which quickly gained surgeon acceptance and have been market leaders for more than ten years.  In 2014, the Company acquired an advanced, computer-assisted surgical technology company to develop ExactechGPS, a computer-assisted device that provides surgeons with a 3D view of the patients' joints, which has since changed the way total joint replacement surgeries are performed.

22.    After being a public company for 21 years, in 2018, the Company became privately-held after TPG Capital ("TPG" or the "Sponsor") acquired substantially all of the common stock of Debtor Exactech.

### B.    The Company's Operations

i.    Operations Overview

23.    The Company is vertically integrated with approximately 70% of its products being manufactured in-house across four manufacturing facilities in Gainesville and Sarasota, Florida, and Gieres, France.  The Company employs approximately 900 employees worldwide, of which approximately 580 are employed in the United States.  Further details about the Company's in-house manufacturing capabilities are set forth in the chart below.

| | Gainesville, FL (Headquarters) | Sarasota, FL (Instruments) | Sarasota, FL (Molding) | Gieres, France (Exactech GPS) |
|---|---|---|---|---|
| **Operations** | Manufacturing, distribution, warehouse, and customer service | Instrument and screw manufacturing | Compression molding of ultra-high-molecular-weight polyethylene | Hardware and software development and manufacturing of ExactechGPS |
| **Product Lines** | Implant manufacturing | Knee and shoulder instruments; hip and shoulder screw implants | Tibial bearings, humeral liners, and glenoids | GPS navigation system |
| **Key Manufacturing Capabilities** | Milling, turning, grinding, finishing, sterile and non-sterile packaging | Milling, turning, grinding, finishing, sterile and non-sterile packaging | Compression molding and finishing | Component assembly and testing |

24.     In addition to its manufacturing capabilities, the Company maintains a robust sales force of approximately 34 independent sales consultant agencies which employ approximately 430 individuals as sales representatives in total (collectively, the "Independent Sales Contractors") with well-established global commercial infrastructure, who are key to driving the Company's revenue generation.  These Independent Sales Contractors serve a vital role for the Company's business and to a significant extent, the Company's success depends on its ability to attract and retain qualified personnel.  Loss of services provided by the Independent Sales Contractors will severely impede the Company's operations, and as a result, will have a devastating effect on the Company's ability to successfully implement their bankruptcy strategy.

25.     Certain physicians that maintain royalty programs with the Company are also an essential component of the Company's business.  In the ordinary course, the Company pays a certain percentage of net sales revenue for the sale of specific product line to physicians to compensate for their service and contribution of intellectual property in design and development of the Company's unique products.  The physician's experience, knowledge and know-how developed over years of relationship with the Company enables the Company to develop and

produce the Company's products and maintain a competitive edge amongst its peers in a competitive industry. Maintaining such relationship and the royalty programs with the physicians is a core component of the Company's business.

26.    Since 2010, the Company has focused on global expansion and currently maintains direct sales presence internationally in ten countries. The Company has more than 350 sales representatives in its U.S. sales force, focusing on direct agency support and medical education activities, and a distribution network in approximately 20 other markets throughout Europe, Latin America, and Asia.

27.    In the ordinary course, the Debtors also engage in certain intercompany transactions with its non-Debtor foreign subsidiaries which are vital to the Company's business. Notably, the Debtors (i) manufacture certain products and sell such products to its foreign subsidiaries (the "Intercompany Sales"), which the foreign subsidiaries then sell these products to their local markets, (ii) purchase certain goods and services from Exactech International Operation AG ("Exactech EIO") and Blue Ortho SAS ("BlueOrtho") (such transaction, the "Intercompany Advance"), which the Debtors rely on to maintain much-needed inventory, and (iii) make intercompany loans to certain non-Debtor foreign subsidiaries (the "Intercompany Loan", collectively with Intercompany Sales and Intercompany Advance, the "Intercompany Transactions") to cover various costs including litigation fees, compliance and unforeseen expenses as needs arise on an ad-hoc basis.

28.    The Intercompany Transactions are an essential aspect of the Company's business and the Debtors rely heavily on (i) Intercompany Sales to be able to access and penetrate the foreign markets, (ii) Intercompany Advances to secure inventory and certain services associated with operating and maintaining foreign subsidiaries, and (iii) Intercompany Loans to cover and

fund the various expenses of the foreign subsidiaries. In the absence of Intercompany Transactions, the Company's ability to function as a global enterprise and maintain its ordinary course business without disruption during these chapter 11 cases will severely be limited.

29.    As of 2023, approximately 70% of the Company's net revenue is generated in the U.S. and approximately 30% is generated outside of the U.S. Of the 30% revenue generated outside of the U.S., a majority of the sales are from Western Europe, Japan, and Australia, with approximately 93% of the revenue outside the U.S. generated through the Company's direct global offices and approximately 7% is generated through distributors.



ii.    Product Portfolio

30.    The Company's product portfolio spans three different categories: (i) extremities (shoulder and ankle), (ii) large joints (knee and hip), and (iii) others (ExactechGPS and other supporting materials). The Company's revenue is generated approximately 61% from the sale of its extremities products, 33% from large joint products, and 6% from others.



a.    **Extremities**:  The extremities products include shoulder (Equinoxe) and ankle (Vantage) platforms.

- **Shoulder (Equinoxe)**:  Launched in 2005, Equinoxe provides shoulder arthroplasty solutions, including anatomical, reverse, and fracture implants and instruments. Shoulder products are the Company's leading product category accounting for 57% of the Company's revenue in 2023, and include multiple first-to-market innovations, including first shoulder navigation and first augmented baseplates.

- **Ankle (Vantage)**: Launched in 2017, Vantage accounted for 4% of the Company's revenue in 2023.  Vantage products are manufactured and custom-made with cutting guides 3D-printed based on the patient's anatomy.  In 2023, the Company received FDA clearance for ExactechGPS® Ankle, the first surgical navigation system for total ankle arthroplasty (TAA), which it intends to launch before the end of 2024.

b.    **Large Joints**:  Large joints products include knee (Truliant / TriVerse) and hip (Alteon) platforms.

- **Knee (Truliant and TriVerse)**: Knee products accounted for 17% of the Company's revenue in 2023.  The Company maintains a comprehensive knee portfolio with Truliant (navigated offering) and TriVerse, which was launched in 2023, designed to enable surgical efficiency in hospitals and surgery centers.

- **Hip (Alteon)**:  Hip products accounted for 16% of the Company's revenue in 2023 and provide arthroplasty solutions, including primary and revision hip implants and instruments.  There are multiple recent and near-term product launches including strategic distribution partnerships on the Company's Spartan Stem, Logical system and with JointMedica PolyMotion for hip resurfacing.

c.    **Others**:  ExactechGPS is an iPad-sized computer assisted surgical guide that is provided to surgeons implanting Exactech products and offers surgeons with a 3D view of the patient's joints for the surgical process.  In 2015, ExactechGPS was launched for knees and in 2017 for shoulder arthroplasty.  ExactechGPS augments surgeons with pre-operative planning and intra-operative guidance while the surgeon maintains complete control.

## III.    THE COMPANY'S PREPETITION CORPORATE AND CAPITAL STRUCTURE

31.    The Company's corporate enterprise is depicted on the corporate structure attached hereto as **Exhibit A**.

32.    As of the Petition Date, the Debtors have approximately $352 million of funded principal debt obligations, consisting of obligations under the Prepetition First Lien Credit Agreement (defined herein) and the Prepetition Sidecar Credit Agreement (defined herein).

33.    The following table details the Debtors' prepetition capital structure (as of the Petition Date) with respect to its funded debt:

| Instrument | Approx. Balance Outstanding | Rate | Security |
|---|---|---|---|
| **Prepetition First Lien Credit Agreement** | **$323,644,335.88** | S + Term SOFR Adj. + 3.75% | Substantially all assets subject to Excluded Assets as defined in the Prepetition First Lien Credit Agreement |
| *Revolving Loans* | $52,180,116.32 | | |
| *Prepetition First Lien Term Loan* | $264,917,930.82 | | |
| *2024 Incremental Term Loan* | $6,546,288.74 | S + Term SOFR Adj. + 8.00% | |
| **Prepetition Sidecar Credit Agreement** | **$28,525,064.59** | • 12% per annum on or prior to March 18, 2024 (2% cash, 10% PIK)<br><br>• 18% per annum after March 18, 2024 (2% cash, 16% PIK) | Substantially all assets subject to Excluded Assets as defined in the Prepetition Sidecar Credit Agreement |
| *Original Sidecar Term Loans* | $17,600,993.96 | | |
| *First Amendment Sidecar Term Loans* | $10,924,070.63 | | |
| **Total:** | **$352,169,400.47** | | |

### A.    Prepetition First Lien Credit Facility

34.    On February 14, 2018, Debtor Exactech, Inc. entered into that certain credit agreement dated February 14, 2018 (as amended, restated, supplemented, amended and restated or otherwise modified from time to time prior to the Petition Date, the "<u>Prepetition First Lien Credit Agreement</u>,"), among Exactech, as borrower (the "<u>Borrower</u>"), Osteon Intermediate Holdings II, Inc., as holdings ("<u>Holdings</u>"), Goldman Sachs Bank USA, as administrative and collateral agent (the "<u>Prepetition First Lien Agent</u>")[4], the guarantors party thereto, and the lender parties thereto (the "<u>Prepetition First Lien Lenders</u>", and the outstanding claims thereto the "<u>Prepetition First Lien</u>

---

[4] On October 28, 2024, GLAS Trust Company LLC replaced Goldman Sachs Bank USA as the Prepetition First Lien Agent.

Claims"), pursuant to which the Prepetition First Lien Lenders agreed to provide the Borrower with (i) revolving credit facility with commitments in an aggregate amount of $50,000,000 (the "Revolving Loans" and the holders thereof, the "Revolving Lenders"), and (ii) first lien term loan facility in the aggregate principal amount of $235,000,000 (the "Original First Lien Term Loans").

35.     Under the Prepetition First Lien Credit Agreement, the Revolving Loans have a maturity date of November 15, 2024 and bear interest at SOFR plus 3.75% with a 0.25% step-down depending on the first lien net leverage ratio.  The Original First Lien Term Loans have a maturity date of February 14, 2025 and bear interest at SOFR plus 3.75%.

i.     First Amendment to the Prepetition First Lien Credit Agreement

36.     On December 17, 2019, the Borrower entered into that certain first amendment to the Prepetition First Lien Credit Agreement with the Prepetition First Lien Agent and the Prepetition First Lien Lenders, pursuant to which the Prepetition First Lien Lenders agreed to provide the Borrower with incremental term loans in the aggregate principal amount of $35,000,000 (the "2019 Incremental Term Loans", together with the Original First Lien Term Loans, the "Prepetition First Lien Term Loans").  The 2019 Incremental Term Loans have the same maturity date and interest rate as the Original First Lien Term Loans.

ii.     Second Amendment to the Prepetition First Lien Credit Agreement

37.     On January 19, 2022, the Borrower entered into that certain second amendment to the Prepetition First Lien Credit Agreement with the Prepetition First Lien Agent and the Prepetition First Lien Lenders, pursuant to which the Prepetition First Lien Lenders agreed to extend the maturity date of the Revolving Loans from February 14, 2023 to November 15, 2024.

iii.     Third Amendment to the Prepetition First Lien Credit Agreement

38.     On March 3, 2023, the Borrower entered into that certain third amendment to the Prepetition First Lien Credit Agreement with the Prepetition First Lien Agent, pursuant to which

the LIBOR interest rate on the Prepetition First Lien Term Loans were replaced with SOFR plus Term SOFR Adjustment.

iv.    Fourth Amendment to the Prepetition First Lien Credit Agreement

39.    On October 9, 2024, the Borrower entered into that certain fourth amendment to the Prepetition First Lien Credit Agreement with the Prepetition First Lien Agent acting at the direction of certain Prepetition First Lien Lenders, pursuant to which certain Prepetition First Lien Lenders agreed to provide incremental term loans in an aggregate principal amount of $6,500,000 (the "2024 Incremental Term Loans").  The 2024 Incremental Term Loans have a maturity date of October 10, 2025, bear interest at SOFR + 8.00% to be paid in kind.  The liens and security interests securing the obligations under the Prepetition First Lien Credit Agreement (other than 2024 Incremental Term Loans) and Prepetition Sidecar Credit Agreement are subordinated to the liens and security interests securing the 2024 Incremental Term Loans.[5]

v.    Guaranty and Security Under Prepetition First Lien Credit Agreement

40.    Pursuant to that certain Guaranty dated February 14, 2018, as amended, restated, amended and restated, supplemented, or otherwise modified, the obligations of the Borrower under the Prepetition First Lien Credit Agreement are guaranteed by Holdings and Debtor XpandOrtho, Inc. (in such capacities, the "Prepetition First Lien Guarantors").

41.    The obligations of the Borrower under the Prepetition First Lien Credit Agreement are secured by substantially all of the assets (subject to certain exceptions) of the Borrower and the Prepetition First Lien Guarantors pursuant to that certain Pledge and Security Agreement, dated as of February 14, 2018, by and among Holdings, the Borrower, and the Prepetition First Lien Agent.

---

[5] Pursuant to an *ICA Bridge Side Letter Agreement*, dated October 9, 2024, the Sponsor agreed to subordinate their Prepetition Sidecar Claims (as defined below) to the 2024 Incremental Term Loans.

### B.        Prepetition Sidecar Facility

42.     On September 19, 2023, Debtor Exactech entered into that certain credit agreement dated September 19, 2023 (as amended, restated, supplemented, amended and restated, or otherwise modified from time to time prior to the Petition Date, the "Prepetition Sidecar Credit Agreement") among the Borrower, TPG VII Osteon Holdings, LP, as administrative and collateral agent (the "Prepetition Sidecar Agent"), and as the sole lender (in such capacity, the "Prepetition Sidecar Lender"), pursuant to which the Prepetition Sidecar Lender agreed to provide the Borrower with $15,000,000 of term loans (the "Original Sidecar Term Loans").

43.     The Original Sidecar Term Loans have a maturity date of September 18, 2024 and bear interest at (i) 12% per annum for any interest accrued on or prior to March 18, 2024 (of which (x) 2% per annum is paid cash and (y) 10% per annum is paid in kind), and (ii) 18% per annum for any interest accrued after March 18, 2024 (of which (x) 2% per annum is paid in cash and (y) 16% per annum is paid in kind).

### vi.        First Amendment to the Prepetition Sidecar Credit Agreement

44.     On April 23, 2024 (the "First Amendment Effective Date"), the Borrower entered into that certain amendment to the Prepetition Sidecar Credit Agreement pursuant to which the Prepetition Sidecar Lender agreed to provide the Borrower multi-draw incremental term loans in the aggregate principal amount of up to $20,000,000 (the "Incremental Sidecar Term Loans," together with the Original Sidecar Term Loans, the "Prepetition Sidecar Term Loans", and outstanding claims thereto "Prepetition Sidecar Claims").  On the First Amendment Effective Date, $5,000,000 of the Incremental Sidecar Term Loans was funded to the Company and the remainder of up to $15,000,000 of the Incremental Sidecar Term Loans were to be advanced at the request of the Company, upon consent of the Prepetition Sidecar Lender.  On May 22, 2024, an additional $5,000,000 under the Incremental Sidecar Term Loans was funded to the Company and

$10,000,000 remains undrawn.  The Incremental Sidecar Term Loans have a maturity date of February 14, 2025.

       vii.        <u>Guaranty and Security Under the Prepetition Sidecar Credit Agreement</u>

45.    Pursuant to that certain Guaranty dated September 19, 2023, as amended, restated, amended and restated, supplemented or otherwise modified, the obligations of the Borrower under the Prepetition Sidecar Credit Agreement are guaranteed by Holdings and Debtor XpandOrtho, Inc. (in such capacities, the "<u>Prepetition Sidecar Guarantors</u>").

46.    The obligations of the Borrower under the Prepetition Sidecar Credit Agreement are secured by substantially all of the assets of the Borrower and the equity interests of the Borrower and certain of its affiliates pursuant to that certain Pledge and Security Agreement, dated as of September 19, 2023, by and among Holdings, the Borrower, and the Prepetition Sidecar Agent.  The liens and security interests securing the Prepetition Sidecar Credit Agreement are *pari passu* with those securing the Prepetition First Lien Credit Agreement (other than the 2024 Incremental Term Loans).

### C.    Trade Claims and Other Unsecured Debt

47.    In the ordinary course of business, the Debtors incur obligations to vendors, suppliers, and trade counterparties.  As of the Petition Date, the Debtors estimate they have approximately $33 million in accounts payable outstanding before application of any setoffs, credits, or deductions that may be available to the Debtors.  The Debtors' largest unsecured claims are the Qui Tam Claims and the Products Liability Claims, both of which are unliquidated and disputed.

## III.    EVENTS LEADING TO THESE CHAPTER 11 CASES

48.    Prior to commencing these chapter 11 cases, the Company, with the assistance of their advisors, explored various alternatives for obtaining additional liquidity and consensually

resolving the Qui Tam Claims and the Products Liability Claims, which created, effectively, a "three-legged stool" problem for the Company and its prospects for an out-of-court restructuring. On the one hand, the Company needed access to additional capital, both to refinance its existing indebtedness at maturity and also to provide additional liquidity to address litigation costs (including any consensual resolution of that litigation). On the other hand, no capital providers would invest incremental capital without a resolution of both the Qui Tam Claims and Products Liability Claims. Recognizing the tripartite issue facing the Company, the Company and its advisors diligently sought consensual resolutions of the Qui Tam Claims and Products Liability Claims, with the goal of seeking incremental capital from existing stakeholders to finance the costs of any consensual resolution, and then execute a refinancing prior to upcoming maturities.

49.     However, it became clear that the second leg of the Company's "three-legged stool"—the Products Liability Claims—could not be solved on an out-of-court basis, despite good faith efforts by the Company and substantial support from the Company's existing equity sponsor to facilitate a solution. Accordingly, as the likelihood of an in-court process increased, the Company paused its negotiations with the DOJ regarding a consensual resolution of the Qui Tam Claims and pivoted its focus towards obtaining additional liquidity and preparing for an in-court restructuring. After months of negotiations, the Company was able to secure the support of the Ad Hoc Group to finance a value-maximizing sale process that is supported by (i) the RSA and Stalking Horse Bid, (ii) approximately $85 million in DIP financing, and (iii) a commitment by the Ad Hoc Group to support a Plan, including a wind down amount and GUC Reserve sufficient to ensure the responsible winddown of the Debtors' remaining estates.

A.    **Litigation Claims**

    i.    <u>Qui Tam Claims</u>

50.    In 2018, a *qui tam* lawsuit was filed against Exactech in the United States District Court for the Northern District of Alabama by one former employee and two former sales representatives of Exactech on behalf of themselves (collectively, the "<u>Relators</u>"), the United States of America, and various other States.  These Relators brought various claims under the False Claims Act alleging, among others, that Exactech allegedly caused false claims to be submitted for reimbursement from the federal government by selling allegedly misbranded knee devices and allegedly defective knee devices that were not medically reasonable and necessary.  In August 2019, the DOJ declined to pursue the Qui Tam Claims but the Relators proceeded with the case. The Company expended considerable resources defending the case while also engaging in several attempts to settle the dispute[6], including engagement with the DOJ in settlement negotiations beginning in late-October 2023 and throughout mid-2024.  The Company and its advisors intend to continue working diligently with the DOJ during these chapter 11 cases to fully, fairly, and consensually resolve the Qui Tam Claims.

    ii.    <u>Product Liability Claims</u>

51.    Beginning in June 2021, the Company commenced a recall of its hip product— Connexion GXL Hip Liners—and later expanded its recall to all hip liners, knee, and ankle implants (the "<u>Initial Recalls</u>").  Additionally, in early 2024, the Company voluntarily recalled its shoulder replacement devices and knee patellar components as well (the "<u>Shoulder Recall</u>," and "<u>Patella Recall</u>," together with the Initial Recalls, the "<u>Recalls</u>").  The Initial Recalls covered the vast majority of the conventional and moderately crosslinked polyethylene hip liners, polyethylene

---

[6]    During the pendency of this litigation, in early 2023, the Company also received a Civil Investigative Demand from the DOJ inquiring into a different generation of the Company's knee device.

knee tibial inserts, and polyethylene ankle inserts manufactured by Exactech between 2004 and August 2021.  The Shoulder Recall and the Patella Recall cover most polyethylene shoulder devices and polyethylene patellar components manufactured by the Company between 2004 and 2024.  The Recalls were voluntarily initiated due to Exactech Inc.'s vendor supplying non-conforming bags used to package the Company's affected products.  The non-conforming bags were determined to be missing one of the oxygen barrier layers that was designed to protect the medical devices from oxidation, a chemical reaction with oxygen that could potentially degrade plastic components over time.  Oxidation, if it reaches a certain threshold, may lead to faster device wear or failure, which could potentially lead to revision surgeries.  For the avoidance of doubt, although the Company initiated Recalls in an abundance of caution, it has consistently maintained that the non-conforming bags have not, in fact, led to overall higher rates of revision surgeries beyond industry averages (5-10 percent at 10 years of follow up), and believes that the scientific and clinical data supports the Company's position.

52.    Following the Recalls, approximately 2,600 patients—1.7% of patients across the United States who were potentially affected by a recalled device—have filed lawsuits against the Company in the United States.  On October 7, 2022, all federally-filed lawsuits against the Company were consolidated into a multidistrict litigation before the United States District Court for the Eastern District of New York (the "MDL").  As of the Petition Date, there are approximately 1,840 lawsuits pending in the MDL.

53.    In addition to the MDL, various lawsuits have also been filed against the Company in the state of Florida.  These cases have been consolidated before Judge Donna M. Keim in the Circuit Court of the Eighth Judicial Circuit in and for Alachua County, Florida.  On November 14,

2022, the Company sought to dismiss the cases based on *forum non conveniens* but the request was denied.  As of the Petition Date, there are over 740 lawsuits pending in the Florida state courts.

54.     Since then, the Company has defended its alleged liability and engaged in settlement negotiations with counsel to the Plaintiff Representatives.   In mid-July 2024, the Company made its most recent settlement offer to the Plaintiff Representatives to resolve the MDL litigation out of court.    After further good-faith settlement discussions, the Plaintiff Representatives and the Company were ultimately unable to reach a consensual resolution.

### B.      Engagement of Restructuring Professionals and Governance Changes

55.     In July 2023, the Company retained Centerview as its investment banker and continued to work with Ropes & Gray LLP ("Ropes") as its legal counsel to assist with, among other things, proactively evaluating the Company's capital-structure alternatives and exploring potential strategic options.  On April 25, 2024, the Company also engaged Riveron to assist Ropes and Centerview with prepetition initiatives and engagement with the Company's capital structure. More recently, on August 27, 2024, the Company engaged Young Conaway Stargatt & Taylor, LLP to assist the Company as co-counsel to Ropes.  The Company and its advisors have worked tirelessly for over a year to closely monitor the Company's liquidity and to strategize and implement various strategic initiatives to address liquidity concerns.

56.     In addition to engaging restructuring professionals as the Company's advisors, the Company appointed M. Elizabeth Abrams in November 2023 to the governing bodies of Debtors Osteon Intermediate Holdings II, Inc. and Exactech as an independent director to assist the Company with its restructuring efforts.

57.     On July 24, 2024, the Company furthered its efforts to consider strategic alternatives by (i) establishing the Special Committee with the general authority to review and approve entry into restructuring transactions, (ii) adding Timothy Pohl as the independent director

to the boards of directors of Exactech Inc., Osteon Intermediate Holdings II, Inc. and XpandOrtho, Inc., and adding Elizabeth Abrams to the board of XpandOrtho, Inc., and (iii) appointing Elizabeth Abrams and Timothy Pohl to the Special Committee.  The Special Committee is empowered to review, evaluate, and recommend to the board of directors strategic and/or financial alternatives in light of the Company's cash flow, liquidity, and general financial condition, including the possibility of seeking additional financing or undertaking a sale, recapitalization transaction, or other reorganization or restructuring.  Additionally, the Special Committee has been delegated certain authority to negotiate, approve, or decline restructuring transactions including the entry into the definitive agreements, and to take any other actions as the Special Committee deems necessary to discharge its duties.

58.    The Special Committee retained White & Case LLP as independent counsel to assist in the discharge of its duties.  Prior to the Petition Date, the Special Committee began an independent investigation into certain historical transactions involving the Sponsor and the Company, including the Prepetition Sidecar Credit Agreement.  The Special Committee and its independent counsel recently informed the Company that the Special Committee's investigation remains ongoing and will continue during these chapter 11 cases.

### C.    Restructuring Initiatives

#### i.    Sponsor Discussions

59.    In September of 2023, amidst the ongoing settlement discussions with the Plaintiff Representatives in the Products Liability Litigation, the Sponsor agreed to provide the Company with up to $15 million of incremental term loans under the Prepetition Sidecar Credit Agreement, to support the Company's operational liquidity and provide near-term financial flexibility as settlement negotiations continued.  In April 2024, the Sponsor agreed to amend the Prepetition

Sidecar Credit Agreement to provide up to $20 million of additional funding thereunder to provide additional runway for settlement discussions to continue.

60.    As the possibility of an in-court restructuring became more likely, in mid-June, 2024, the Sponsor delivered a restructuring proposal to the Company and the Ad Hoc Group that contemplated, among other things, debtor-in-possession funding provided by the Sponsor and an equitization of certain prepetition secured debt.  Ultimately, the negotiations between the Company, the Sponsor, and the Ad Hoc Group failed to produce an actionable alternative, and the Company then continued to focus on developing an alternative baseline transaction.

   ii.   <u>Ad Hoc Group Restructuring Negotiations and Forbearance</u>

61.    Simultaneously with the Sponsor negotiations, the Company also actively engaged with the Ad Hoc Group to seek a strategic alternative transaction.  In mid-July 2024, the Company entered into confidentiality agreements with the Ad Hoc Group, which is represented by Milbank LLP as legal counsel and Evercore Inc. as financial advisor.  On August 16, 2024, the Ad Hoc Group delivered a proposal which proposed, among other things, a new money DIP facility to fund the Company's chapter 11 cases and sale process, backed by a stalking horse credit bid by the Ad Hoc Group to purchase substantially all of the Company's assets pursuant to sections 363 and 1123 of the Bankruptcy Code.

62.    As the Company and its advisors continued to negotiate with the Ad Hoc Group, the Company was faced with an approximately $6 million interest payment on the Prepetition First Lien Term Loans due August 31, 2024.  To continue the positive momentum and provide the necessary runway to finalize the restructuring negotiations, the Company and the Ad Hoc Group executed a forbearance agreement with respect to the August 31, 2024  interest payment that

extended the forbearance period to October 2, 2024, whereby the lenders, among other things, agreed to forbear from exercising remedies on account of the default from the missed interest payment. Additionally, on October 9, 2024, the Company, the Ad Hoc Group, and the Sponsor agreed to certain amendments to the Debtors' prepetition debt facilities to permit the 2024 Incremental Term Loans and extend the forbearance period to October 27, 2024.

63.    Subsequently, after lengthy negotiations and significant back-and-forth, the Company and the Ad Hoc Group reached an agreement on the terms of a comprehensive restructuring documented in the RSA. On October 29, 2024, the Company entered into the RSA and Stalking Horse APA with the members of the Ad Hoc Group, and filed these chapter 11 cases shortly thereafter.

64.    The RSA provides a framework for the Debtors' proposed sale process and the commitment of the Ad Hoc Group to be the stalking horse bidder, along with their commitment to fund the administrative expenses and a chapter 11 process. Most importantly, the RSA ensures the Ad Hoc Group's support of the confirmation of the Plan regardless of whether the Stalking Horse Bid prevails at the auction, secures an adequate wind-down budget to responsibly wind-down the Debtors' remaining estates following the closing of the Sale, funds a GUC Reserve which will provide general unsecured claims some recovery, and ensures continued and uninterrupted operations of the Debtors with the proposed DIP Facility.

## IV.    THE PROPOSED DEBTOR IN POSSESSION FINANCING[7]

### A. The Debtors' Immediate Liquidity Need

65.    The Company's need for immediate liquidity in the form of the DIP Facility and access to Cash Collateral is largely driven by litigation expenses and other costs associated with

---

[7]    Any capitalized terms used but not defined within Part IV shall have the meanings ascribed to them in the DIP Motion, as defined in **Exhibit A** hereto.

the Recalls, which, in turn, prevented the Company from refinancing its existing indebtedness or otherwise raising additional capital. Specifically, in the 12 months preceding the Petition Date, the Company incurred costs of approximately $20 million related to the Recalls and the attendant litigation. The Debtors recognized that they would be unable to continue generating sufficient levels of operating cash flow in the ordinary course of business to meet their prepetition debt obligations and operate their business.

66.     In the weeks prior to the Petition Date, the Debtors' management team, Riveron, and the Debtors' other advisors, undertook a detailed analysis of the Debtors' operations and funding needs. From this analysis, it became clear that, absent a substantial infusion of cash through postpetition financing and access to Cash Collateral, the Debtors would be unable to generate sufficient liquidity to cover their operating and capital costs, and the projected costs of these chapter 11 cases, and fund a value-maximizing sale process. The Proposed DIP Facility consists of a super-priority debtor-in-possession multi-draw term loan credit facility that will provide the Debtors with up to $85 million in new funding.

67.     Based on my discussions with the Debtors' management team and the Debtors' advisors, my experience in the restructuring industry, and my familiarity with the Debtors business, I believe the Debtors require immediate access to the DIP Facility to fund the costs of administering these chapter 11 cases and the Debtors' near-term working capital needs and ongoing business operations. Specifically, the DIP Facility will provide the Debtors with the liquidity needed to, among other things, (a) continue to serve their customers and generate revenue during these Chapter 11 Cases; (b) access working capital for their business; (c) fund payments to their workforce and critical third-party vendors; (d) fund the payments authorized by the Court pursuant to the First Day Pleadings filed contemporaneously herewith; (e) operate their Cash

Management System; (f) satisfy administrative costs and expenses of the Debtors incurred in these Chapter 11 Cases.

68.     Without immediate postpetition financing and access to Cash Collateral, the Debtors will lack the necessary funding to meet working capital and business operating needs to ensure a successful marketing and sales process of the Debtors and to administer these chapter 11 cases, causing immediate and irreparable harm to the value of the Debtors' estates and all stakeholders.  As demonstrated by the Initial DIP Budget (as that term is defined in the DIP Motion), the need to access the DIP Facility is further underscored by the fact that it would be imprudent, in fact impossible, to administer these cases without immediate access to additional capital.  Indeed, as of the Petition Date, the Debtors had approximately $4 million in cash on hand.[8] Immediate access to the DIP Facility and continued access to the Cash Collateral is therefore crucial to the Debtors' efforts to preserve value for their stakeholders during these Chapter 11 Cases and to avoid immediate and irreparable harm to the value of the Debtors' estates.

69.     Based on my experience, I believe that a seamless transition into chapter 11 and the ability to continue operations uninterrupted is imperative for the Debtors to maintain operations, preserve the loyalty and goodwill of their long-term customers, suppliers, and employees and maximize value for the sale transaction.  More specifically, the Debtors operate in a highly competitive and sophisticated business, designing and manufacturing joint replacement implants. Due to their nature, these products require carefully sourced third-party vendors and a delicately balanced ecosystem among the Company and its employees, sales agents, and surgeons.  Absent

---

[8]     On average, the Debtors require approximately $4 million per week in operating disbursements to maintain ordinary course operations.  Accordingly, the Debtors analyzed how much postpetition financing would be required to operate the Debtors' business and pay administrative costs during the chapter 11 process.  Based on this analysis, the Debtors determined that they would require postpetition financing of approximately $85 million to operate postpetition and satisfy costs and expenses (inclusive of pre-petition bridge).

an ability to demonstrate that the Debtors have the means available to operate in the ordinary course, pay employees, and procure services that are vital to ongoing business operations, employees, customers, vendors, and suppliers may refuse to do business with the Debtors, which may risk compromising the Debtors' operations, significantly harming the value of the Debtors' estates and drastically chilling any bidding process for the Debtors' assets. I believe that commencing these chapter 11 cases with adequate and necessary financing through the Debtors' access to the DIP Facility and Cash Collateral should communicate to such stakeholders that the Debtors will be able to continue managing their business in a manner as close to the ordinary course as possible.

70.      Accordingly, I believe that the Debtors have an immediate need for the liquidity that would be provided by the DIP Facility.

### B. DIP Sizing Process

71.      In connection with the search for viable postpetition financing, Riveron assisted the Debtors, their management team, and their other advisors in preparing projected cash forecasts for the Debtors' business during these chapter 11 cases. These forecasts take into account anticipated cash receipts and disbursements during the projected period and consider a number of factors, including, but not limited to, the effect of the chapter 11 filing on the operations of the business, fees and interest expenses associated with postpetition financing, professional fees, and customer and vendor obligations, as well as the operational performance of the underlying business.

72.      As of the Petition Date, substantially all of the Debtors' cash is encumbered, driving the Debtors' immediate need to access Cash Collateral to operate their business and continue paying their debts as they come due. Prior to the Petition Date, the Debtors, in consultation with Riveron, reviewed and analyzed their projected cash needs and prepared projections (as updated

from time to time in accordance with the terms of the DIP Facility, the "DIP Budget")[9] of postpetition cash needs for the Debtors' business in the initial 26 weeks of these chapter 11 cases, including detailed line items for categories of cash flows anticipated to be received or disbursed during this period, and, along with the longer term monthly forecasts, was utilized to determine the amount of postpetition financing required to administer these chapter 11 cases. Based on my knowledge, extensive discussions with the Debtors' management team and advisors, and the DIP Budget, I believe that the proposed DIP Facility gives the Debtors sufficient liquidity to stabilize their operations, ensure a robust postpetition marketing process, provide adequate notice to all creditors, and fund the administration of these chapter 11 cases as the Debtors seek to proceed expeditiously toward a value-maximizing resolution. Furthermore, the priming under the DIP Facility is consensual. The requisite Prepetition Secured Parties have consented to the use of Cash Collateral, the priming of the Prepetition Liens on the Prepetition Collateral by the DIP Liens, and the Adequate Protection provided herein, in each case on the terms set forth in the Interim Order and the DIP Documents.

73.    Accordingly, the relief requested in the DIP Motion is necessary and appropriate to avoid immediate and irreparable harm to the Debtors' estates.

## V.    FIRST DAY MOTIONS AND RELATED RELIEF REQUESTED

74.    In connection with the filing of their chapter 11 petitions, the Debtors filed the below-listed first day motions requesting relief that the Debtors believe is necessary to enable them

---

[9]    A copy of the DIP Budget is attached as **Exhibit B** to the proposed Interim DIP Order.

to administer their estates with minimal disruption and loss of value during these chapter 11 cases.

The facts set forth in each of the First Day Motions are incorporated herein in their entirety.[10]

### A.    Administrative Motions:

i.    <u>Joint Administration Motion</u>.    *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Related Chapter 11 Cases and (II) Granting Related Relief*;

ii.    <u>Claims and Noticing Agent Application</u>.    *Debtors' Application for Appointment of Kroll Restructuring Administration LLC as Claims and Noticing Agent*; and

iii.    <u>Creditor Matrix Motion</u>.    *Debtors' Motion for Entry of an Order (I) Authorizing Debtors to File a Consolidated (A) Creditor Matrix and (B) Top 50 Creditors List, (II) Authorizing Redaction of Certain Personal Identification Information, and (III) Granting Related Relief.*

### B.    Operational Motions:

i.    <u>Cash Management Motion</u>.    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue Certain Intercompany Transactions, and (II) Granting Related Relief*;

ii.    <u>DIP Financing Motion</u>.    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status,, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "<u>DIP Motion</u>");

iii.    <u>Insurance Motion</u>.    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Maintain Existing Insurance Policies and Pay All Insurance Obligations Arising Thereunder, and (B) Renew, Supplement, Modify, or Purchase Insurance Coverage, (II) Authorizing Continuation of Insurance Premium Financing Agreement, and (III) Granting Related Relief*;

---

[10]    Capitalized terms used in this section but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Motions.

    iv.      <u>Taxes Motion</u>. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Fees and (II) Granting Related Relief*;

    v.      <u>Utilities Motion</u>. *Debtors' Motion for Entry of Interim and Final Orders (I)(A) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (B) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (C) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services; and (II) Granting Related Relief*, and

    vi.      <u>Wages Motion</u>. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Employee Benefits Obligations and Other Compensation, and (B) Continue Employee Benefits Programs and Pay Related Administrative Obligations and (II) Granting Related Relief.*

**C.    Payment of Claims Motions:**

    i.      <u>Customer Programs</u>. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Honor Certain Prepetition Obligations to Customers and (B) Otherwise Continue Certain Customer Programs in the Ordinary Course of Business and (II) Granting Related Relief*;

    ii.      <u>Critical Vendors</u>. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Claims of Certain Prepetition Claims of Critical Vendors, (II) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests, and (III) Granting Related Relief*; and

    iii.      <u>Lien Claimants</u>. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Claims of Lien Claimants and Related Obligations, (II) Authorizing Debtors to Pay Certain Section 509(b)(9) Claimants, (III) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto, and (IV) Granting Related Relief.*

75.    The First Day Motions request authority to, among other things, honor workforce-related compensation and benefits obligations, pay claims of certain taxing authorities, continue to honor certain customer programs, and continue the Debtors' cash management system and other operations in the ordinary course of business to ensure minimal disruption of the Debtors' business operations during these chapter 11 cases. For the avoidance of doubt, the Debtors request

authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in the First Day Motions.

76.    The Debtors have tailored their requests for immediate relief to those circumstances when the failure to receive such relief would cause immediate and irreparable harm to the Debtors and their estates.  I believe an orderly transition into chapter 11 is critical to the viability of the Debtors' operations and that any delay in granting the relief described below could hinder the Debtors' operations and cause irreparable harm.  Other requests for relief will be deferred for consideration at a later hearing.

77.    I have reviewed each of the First Day Motions and am familiar with the content and substance contained therein.  The facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief with appropriate reliance on other corporate officers and advisors and I can attest to such facts.  I believe the relief requested in each of the First Day Motions listed above (a) is necessary to allow the Debtors to operate with minimal disruption and productivity losses during these chapter 11 cases, (b) is critical to ensure the maximization of value of the Debtors' estates, (c) is essential to achieving a value-maximizing sale of the Assets, and (d) serves the best interests of the Debtors' stakeholders.

## CONCLUSION

78.    The Debtors' ultimate goal in these chapter 11 cases is to achieve a value-maximizing result for the Debtors' stakeholders.  To minimize any loss of value, the Debtors' immediate objective is to maintain a business-as-usual atmosphere during the course of these chapter 11 cases, with as little interruption or disruption to the Debtors' operations as possible.  I believe that if the Court grants the relief requested by the First Day Motions, the prospect for achieving these objectives will be substantially enhanced.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: October 29, 2024                    */s/ Jesse York*_____
                                           Jesse York
                                           Chief Restructuring Officer

## EXHIBIT A

### Simplified Corporate Structure Chart



# EXHIBIT B

**Restructuring Support Agreement**

*Execution Version*

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE SUPPORT EFFECTIVE DATE ON THE TERMS DESCRIBED IN THIS AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES TO THIS AGREEMENT.

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms hereof, including all exhibits, this "***Agreement***") dated October 28, 2024 is entered into by and among (each of the following described in sub-clauses (a) through (b) of this preamble, individually, a "***Party***" and, collectively, the "***Parties***"):[1]

(a)     Exactech, Inc. (the "***Company***"), and each of its Affiliates listed on **Exhibit A-1** to this Agreement that have executed and delivered counterpart signature pages to this Agreement (collectively, the "***Company Parties***" and, Osteon Holdings, Inc. and Osteon Intermediate Holdings I, Inc., the "***HoldCo Parties***" and, Osteon Intermediate Holdings II, Inc., Exactech, Inc., and XpandOrtho, Inc., the "***OpCo Parties***") to counsel to the Consenting Lenders;

(b)     the undersigned beneficial holders of, or investment advisors, sub-advisors, or managers of discretionary accounts or funds that beneficially hold, Prepetition First Lien Claims that have executed and delivered counterpart signature pages to this Agreement (in each case solely in their capacity as such, together with each Prepetition First Lien Lender that executes and delivers a Joinder Agreement, in the form attached hereto as **Exhibit A-2**, from time to time after the date hereof, the "***Consenting Lenders***") to counsel to the Company Parties, and counsel to the Consenting Lenders.

The terms of the Restructuring Term Sheet are hereby incorporated and included in the terms of this Agreement. In the event of any inconsistencies between the terms of this Agreement and the Restructuring Term Sheet, the terms of the Restructuring Term Sheet shall govern.

## RECITALS

**WHEREAS**, the Parties consent to and have agreed to consummate and support the transactions contemplated by this Agreement to be memorialized in the Approved Plan (such transactions, the "***Transactions***") on the terms set forth in this Agreement, including the Restructuring Term Sheet attached hereto as **Exhibit B** (the "***Restructuring Term Sheet***") and all other exhibits to this Agreement;

---

[1]     Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in <u>Section 1</u>.

**WHEREAS**, the Transactions are to be consummated through voluntary chapter 11 cases (the "***Chapter 11 Cases***") under the Bankruptcy Code in the Bankruptcy Court on the terms set forth in this Agreement;

**WHEREAS**, the Transactions will include a sale of all or substantially all of the assets of the OpCo Parties to the Winning Bidder (as defined in the Bidding Procedures (as defined herein)) pursuant to sections 363, 1123(b)(4), and 1129 of the Bankruptcy Code (the "***Sale Transaction***"), which shall be consummated pursuant to a joint chapter 11 plan of the Company Parties filed by the Company Parties that is consistent with this Agreement and otherwise contains terms and conditions reasonably acceptable to the Required Consenting Lenders and is approved by the Bankruptcy Court (the "***Approved Plan***"); *provided*, for the avoidance of doubt, that the Approved Plan will provide for either (a) the sale of substantially all of the assets of the OpCo Parties to the Stalking Horse Purchaser or (b) payment in full in cash on the Effective Date (including prepetition and postpetition interest) of all (i) allowed DIP Claims and (ii) allowed Prepetition Pari 1L Claims (as defined in the Restructuring Term Sheet) with net proceeds of the sale (any such sale transaction the "***Approved Sale Transaction***");

**WHEREAS**, in connection with the Sale Transaction, the OpCo Parties will continue to conduct a sale and marketing process in accordance with this Agreement (the "***Sale Process***"), pursuant to which the OpCo Parties will solicit bids with respect to the Sale Transaction in accordance with bidding procedures, which shall be materially consistent with the form attached hereto as **Exhibit C** and otherwise reasonably acceptable to the applicable Company Parties and the Required Consenting Lenders (the "***Bidding Procedures***");

**WHEREAS**, as part of the Sale Process, an Entity or entities formed by or on behalf of the Consenting Lenders will serve as the Stalking Horse Purchaser and agree to credit bid (including via a direction to the applicable agent) certain of the Consenting Lenders' Claims (including DIP Obligations) pursuant to section 363(k) of the Bankruptcy Code and as set forth in the Stalking Horse APA attached hereto as **Exhibit D**, which bid will be subject to higher or otherwise better offers submitted pursuant to the Sale Process and the Bidding Procedures;

**WHEREAS**, (a) the Consenting Lenders have further agreed, subject to the terms and conditions herein, to consent to the use of Cash Collateral and (b) certain of the Consenting Lenders and/or their Affiliates, as set forth on Schedule I hereto (such Consenting Lenders and/or their Affiliates, the "***Backstop DIP Lenders***") have agreed, subject to the terms and conditions herein, to provide the OpCo Parties with debtor in possession financing (the "***DIP Facility***") pursuant to that certain postpetition credit agreement (the "***DIP Credit Agreement***") substantially in the form attached hereto as **Exhibit E**;

**WHEREAS**, pursuant to the Milestones set forth in <u>Section 3.01</u> of this Agreement, the OpCo Parties will seek Bankruptcy Court approval of their entry into the DIP Credit Agreement pursuant to the Interim DIP Order (as defined herein) no later than the date that is five (5) days after the Petition Date, which order shall be consistent with the form attached hereto as **Exhibit F** and otherwise reasonably acceptable to the Company Parties and the Required Consenting Lenders;

2

**WHEREAS**, this Agreement is the product of arm's-length, good-faith negotiations among the Parties and each of their respective advisors and sets forth the material terms and conditions of the Transactions; and

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and the covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, on a several but not joint basis, agree as follows:

*AGREEMENT*

1.    **Certain Definitions.**

As used in this Agreement, the following terms have the following meanings:

"***Ad Hoc Group***" means the ad hoc group of certain secured lenders (and/or investment advisors to secured lenders) under the Prepetition First Lien Credit Agreement represented by the Ad Hoc Group Advisors.

"***Ad Hoc Group Advisors***" means (i) Milbank, LLP ("***Milbank***"), as counsel to the Ad Hoc Group, (ii) Evercore Group L.L.C., as investment banker to the Ad Hoc Group, (iii) Richards, Layton & Finger, P.A., as co-counsel to the Ad Hoc Group, and (iv) any other counsel or professional advisor retained by or on behalf of the Ad Hoc Group in the Ad Hoc Group's reasonable discretion and as communicated to the Company Advisors prior to the date of such retention.

"***Affiliates***" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such Entity were a debtor in a case under the Bankruptcy Code.

"***Agreement***" has the meaning set forth in the preamble to this Agreement.

"***Alternative Restructuring***" means any reorganization, merger, consolidation, tender offer, exchange offer, business combination, joint venture, partnership, sale of all or any material portion of assets, financing (debt or equity), plan proposal, recapitalization, restructuring, or liquidation of the OpCo Parties, or any other transaction of similar effect; *provided that*, for the avoidance of doubt, the Transactions, including any higher or otherwise better offers submitted in accordance with the Sale Process and Bidding Procedures that provide for the payment in full in cash on the Effective Date (including prepetition and postpetition interest) of all (i) allowed DIP Claims (as defined in the Restructuring Term Sheet) and (ii) allowed Prepetition Pari 1L Claims (as defined in the Restructuring Term Sheet), shall not constitute an Alternative Restructuring.

"***Approved Plan***" has the meaning set forth in the recitals to this Agreement.

"***Backstop DIP Lenders***" has the meaning set forth in the recitals to this Agreement.

3

"***Bankruptcy Code***" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended.

"***Bankruptcy Court***" means the United States Bankruptcy Court for the District of Delaware.

"***Bar Date Order***" means the motion seeking approval of the Bar Date.

"***Bidding Procedures***" has the meaning set forth in the recitals to this Agreement.

"***Bidding Procedures Motion***" means the motion seeking approval of the Bidding Procedures.

"***Bidding Procedures Order***" means the final order granting the Bidding Procedures Motion.

"***Business Day***" means any day, other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

"***Cash Collateral***" has the meaning set forth in section 363(a) of the Bankruptcy Code.

"***Chapter 11 Cases***" has the meaning set forth in the recitals to this Agreement.

"***Claim***" has the meaning ascribed to such term under section 101(5) of the Bankruptcy Code.

"***Company***" has the meaning set forth in the preamble to this Agreement.

"***Company Advisors***" means the Company's advisors and professionals, including (i) Ropes & Gray LLP ("***Ropes & Gray***") and Young Conaway Stargatt & Taylor, LLP, as co-counsel to the Company Parties, (ii) Centerview Partners LLC, as investment banker to the Company Parties, (iii) Riveron RTS, LLC, as financial advisor to the Company Parties, and (iv) Kroll Restructuring Administration LLC, as claims agent to the Company Parties.

"***Company Party***" has the meaning set forth in the preamble to this Agreement.

"***Company Termination Event***" has the meaning set forth in <u>Section 8.03</u>.

"***Confirmation and Sale Order***" means the order entered by the Bankruptcy Court approving the Sale Transaction and confirming the Approved Plan pursuant to sections 363 and 1129 of the Bankruptcy Code, which order shall be consistent with this Agreement and reasonably acceptable to the applicable Company Parties and the Required Consenting Lenders.

"***Consenting Claims***" means all Claims against any Company Party held by Consenting Lenders from time to time.

"***Confirmation Date***" means the date that the Confirmation and Sale Order is entered by the Bankruptcy Court.

4

"***Consenting Lenders***" has the meaning set forth in the preamble to this Agreement.

"***Consenting Lender Termination Event***" has the meaning set forth in <u>Section 8.02</u>.

"***Debtors***" means the Company Parties that commence the Chapter 11 Cases.

"***Definitive Documents***" means all of the definitive documents implementing the Transactions, including: (a) this Agreement; (b) the Approved Plan (and any Plan Supplement or other related documents); (c) the Sale Documents; (d) the Disclosure Statement and the Solicitation Materials; (e) the Disclosure Statement Approval Order; (f) the Confirmation and Sale Order; (g) the DIP Facility Documents; (h) the Wind-Down Budget; (i) the motion seeking approval by the Bankruptcy Court of the use of cash collateral and of the DIP Facility and the DIP Orders; (j) the DIP Credit Agreement; and (k) any documents, instruments, schedules, or exhibits described in, related to, contemplated in, or necessary to implement.

"***DIP Budget***" means that certain "rolling" 26-week budget prepared by the Company Parties in accordance with the DIP Facility Documents.

"***DIP Credit Agreement***" has the meaning set forth in the recitals to this Agreement.

"***DIP Facility***" has the meaning set forth in the recitals to this Agreement.

"***DIP Facility Documents***" means, collectively, the DIP Credit Agreement, the DIP Orders, the security and guaranty documents, fee letters, notes, the DIP Budget, and any other ancillary documents entered into in connection therewith.

"***DIP Motion***" means any motions filed with the Bankruptcy Court seeking the use of Cash Collateral or approval of the DIP Facility or DIP Credit Agreement.

"***DIP Orders***" means, collectively, the Interim DIP Order and the Final DIP Order.

"***Disclosure Statement***" means the disclosure statement in respect of the Approved Plan, including all exhibits and schedules thereto, as approved or ratified by the Bankruptcy Court pursuant to sections 1125 and 1126 of the Bankruptcy Code.

"***Disclosure Statement Approval Order***" means the order of the Bankruptcy Court approving the Disclosure Statement and solicitation procedures in connection thereto.

"***Effective Date***" means the effective date of the Approved Plan.

"***Electing DIP Lenders***" has the meaning set forth in <u>Section 3.03(b)</u>.

"***Election Deadline Date***" has the meaning set forth in <u>Section 3.03(b)</u>.

"***Entity***" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"***Fiduciary Out***" has the meaning set forth in <u>Section 8.03(f)</u>.

"***Fiduciary Out Notice***" has the meaning set forth in <u>Section 7.01</u>.

"*Final DIP Order*" means the final order in the Chapter 11 Cases authorizing the Company's entry into the DIP Facility and use of Cash Collateral on a final basis.

"*HoldCo Parties*" has the meaning set forth in the preamble to this Agreement.

"*Interim DIP Order*" means the interim order attached hereto as **Exhibit F** authorizing the Company's entry into the DIP Facility and use of Cash Collateral on an interim basis.

"*Joinder Agreement*" has the meaning set forth in Section 4.03.

"*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"*Milestones*" has the meaning set forth in Section 3.01(a).

"*OpCo Parties*" has the meaning set forth in the preamble to this Agreement.

"*Outside Date*" has the meaning set forth in Section 3.01(a)(7).

"*Party*" or "*Parties*" has the meaning set forth in the preamble to this Agreement.

"*Permitted Transferee*" has the meaning set forth in Section 4.03(c).

"*Petition Date*" has the meaning set forth in Section 3.01(a).

"*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Approved Plan that may be filed by the Company with the Bankruptcy Court from time to time.

"*Prepetition Equity Interests*" means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in a Debtor, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

"*Prepetition First Lien Claim*" means any claim against any Company Party arising under, derived from, based on or related to the loans under the Prepetition First Lien Credit Agreement, including, for the avoidance of doubt, any Term Loans, any Revolving Loans (each as defined in the Prepetition First Lien Credit Agreement), and any guarantees thereof.

"*Prepetition First Lien Credit Agreement*" means that certain first lien credit agreement dated as of February 14, 2018 (as amended supplemented, restated, replaced, or otherwise modified from time to time) among Exactech, Inc., Osteon Intermediate Holdings II, Inc. as the

holding company guarantor, the other parties thereto as borrowers and guarantors, the Prepetition First Lien Lenders, and Goldman Sachs Bank USA, as administrative and collateral agent.

"***Prepetition First Lien Lenders***" means the lenders under the Prepetition First Lien Credit Agreement and any party that becomes a lender thereunder thereto from time to time.

"***Prepetition Side Car Claim***" means any claim against any Company Party arising under, derived from, based on or related to the loans under the Prepetition Side Car Credit Agreement, including any guarantees thereof.

"***Prepetition Side Car Credit Agreement***" means that certain first lien credit agreement dated as of September 19, 2023 (as amended supplemented, restated, replaced, or otherwise modified from time to time) among Exactech, Inc., Osteon Intermediate Holdings II, Inc. as the holding company guarantor, the other OpCo Parties thereto as borrowers and guarantors, TPG VII Osteon Holdings, L.P. as lender and administrative and collateral agent.

"***Prepetition Side Car Lenders***" means the lenders under the Prepetition Side Car Credit Agreement and any party that becomes a lender thereunder thereto from time to time.

"***Qualified Marketmaker***" has the meaning set forth in <u>Section 4.03(d)</u>.

"***Qualified Marketmaker Joinder Date***" has the meaning set forth in <u>Section 4.03(d)</u>.

"***Related Fund***" means, with respect to a Consenting Lender, any fund, account, or investment vehicle that is controlled or managed by (i) such Consenting Lender, (ii) an Affiliate of such Consenting Lender, or (iii) the same investment manager, advisor or subadvisor as such Consenting Lender or an Affiliate of such investment manager, advisor, or subadvisor, in each case, to the extent such entity can be legally bound to this Agreement.

"***Required Consenting Lenders***" means, as of the date of determination, Consenting Lenders holding at least 66.67% in aggregate outstanding principal amount of the Prepetition First Lien Claims held by the Consenting Lenders.

"***Sale Documents***" means collectively, the Bidding Procedures, the Bidding Procedures Order, the Confirmation and Sale Order, the Stalking Horse APA, and any ancillary documents to effectuate the Sale Transaction.

"***Sale Transaction***" has the meaning set forth in the recitals to this Agreement.

"***Securities Act***" means the U.S. Securities Act of 1933, as amended and any rules and regulations promulgated thereby.

"***Sellers***" means each of the Company Parties who shall be signatories to the Stalking Horse APA.

"***Solicitation***" means the solicitation of votes on the Approved Plan (including any non-voting election forms with respect to releases).

"***Solicitation Materials***" has the meaning set forth in the Approved Plan.

"***Sponsor***" means TPG VII Osteon Holdings, LP and its Affiliates, in each case, in their capacities as direct or indirect equityholders, managers, consultants, and lenders, as applicable, with respect to the Company Parties.

"***Stalking Horse APA***" means the stalking horse asset purchase agreement attached hereto as **Exhibit D** to be entered into on the Support Effective Date by the Sellers, on the one hand, and the Consenting Lenders (or a designee thereof) on the other hand, together with its Schedules (as defined therein) and each of the documents delivered pursuant to Sections 2.3 and 2.4 thereto.

"***Stalking Horse Purchaser***" shall mean the "Buyer" as set forth in the Stalking Horse APA.

"***Support Effective Date***" means the date on which counterpart signature pages to this Agreement shall have been executed and delivered by (i) each Company Party and (ii) Consenting Lenders holding at least 66.67% of the aggregate outstanding principal of Prepetition First Lien Claims.

"***Support Period***" means the period commencing on the Support Effective Date and ending on the Termination Date.

"***Termination Date***" means the date on which termination of this Agreement is effective as to a Party in accordance with Section 8 of this Agreement.

"***Transfer***" has the meaning set forth in Section 4.03.

"***Transactions***" has the meaning set forth in the recitals to this Agreement.

"***Transaction Expenses***" means all reasonable and documented fees, costs and expenses (whether incurred at any point before or after the commencement of the Chapter 11 Cases) incurred by the Ad Hoc Group Advisors, and any advisors thereto (a) in connection with the negotiation, formulation, preparation, execution, delivery, implementation, and consummation of this Agreement, the Restructuring Term Sheet, the Transactions, and/or any of the other Definitive Documents, and/or the transactions contemplated hereby or thereby, and/or any amendments, waivers, consents, supplements, or other modifications to any of the foregoing.

"***Wind-Down Budget***" has the meaning set forth in the Restructuring Term Sheet.

2.    **Passage of Time.**

With respect to any Milestone or other reference of time herein, if the last day of such period falls on a Saturday, Sunday, or a "legal holiday," as defined in Rule 9006(a) of the Federal Rules of Bankruptcy Procedure, such Milestone or other reference of time shall be extended to the next such day that is not a Saturday, Sunday, or a "legal holiday," as defined in Rule 9006(a) of the Federal Rules of Bankruptcy Procedure; *provided*, for the avoidance of doubt, that any Milestone with respect to a hearing date shall be subject to the Bankruptcy Court's availability.

3. **Restructuring.**

Section 3.01    The Transactions.

(a)    The Approved Plan and the Sale Transaction.  Subject to the terms of this Agreement, the Company Parties will consummate the Sale Transaction pursuant to the Approved Plan after the Petition Date in accordance with the Bankruptcy Code and on terms consistent with this Agreement and in all respects in accordance with the following milestones (the "**Milestones**"); *provided* that, subject to the Outside Date, any Milestone may be extended or waived upon the mutual written consent (with email from counsel being sufficient) of the Company and the Required Consenting Lenders:

(1)    *Commencement of the Chapter 11 Cases*. Provided that the Support Effective Date has occurred, the Company Parties agree that, as soon as reasonably practicable, but in no event later than October 28, 2024, each Company Party shall file with the Bankruptcy Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code and any and all other documents necessary to commence the Chapter 11 Cases (such date, the "**Petition Date**").

(2)    *Entry of the Interim DIP Order*. As soon as practicable, but in no event later than the date that is five (5) days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order.

(3)    *Entry of the Final DIP Order and Bidding Procedures Order*. As soon as practicable, but in no event later than the date that is thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered (A) the Final DIP Order, and (B) the Bidding Procedures Order.

(4)    By the date that is 35 days following the Petition Date, the Company Parties will begin discussions with a proposed Voluntary Administrator(s) of Exactech Australia Pty Ltd in relation to the Australian Corporate Restructuring, and will promptly provide to the Ad Hoc Group any oral or written feedback provided by the proposed voluntary administrator in connection with the potential voluntary administration process.

(5)    *Entry of the Bar Date Order*.  As soon as practicable, but in no event later than the date that is forty-five (45) days after the Petition Date, the Bankruptcy Court shall have entered the Bar Date Order.

(6)    *Australian Proceedings*. If, by the date that is 75 days after the Petition Date, the Company Parties have not either (1) reached a settlement in respect of Federal Court of Australia proceedings number NSD1224/2024 and any matters the subject of those proceedings, that is acceptable to the Ad Hoc Group or (2) appointed one or more voluntary administrators to Exactech Australia Pty Ltd to pursue the voluntary administration of Exactech Australia Pty Ltd in Australia, then such failure shall constitute a Consenting Lender Termination Event; *provided that* if at such time, the relevant governing bodies of the Company Parties, Exactech International Operations AG, or Exactech Australia Pty Ltd. determine that such

9

actions are inconsistent with their fiduciary duties based on the advice of external counsel, such milestone shall be extended through (a) the Bid Deadline if there are no higher or better bids than the Stalking Horse Bid, or (b) in the event of an Auction, through the date that the Stalking Horse Purchaser is declared the Winning Bidder;

(7)     *UK Corporate Restructuring Steps Plan*. By the date that is 60 days following the Petition Date, the Company Parties and the Ad Hoc Group shall agree on a detailed steps plan to effectuate the corporate restructuring of Exactech UK Limited, including a budget and estimate for fees, costs, taxes, and other expenses resulting from any such steps plan (the "***UK Corporate Restructuring Steps Plan***").

(8)     If the Stalking Horse Purchaser is determined to be the Winning Bidder, subject to the Stalking Horse Purchaser providing the UK Restructuring Funding, the Company Parties will begin to effectuate the UK Corporate Restructuring Steps Plan on the date the Winning Bidder is declared;

(9)     *Entry of the Disclosure Statement Order*.  As soon as reasonably practicable, but in no event later than the date that is one hundred (100) days from the Petition Date, the Bankruptcy Court shall have entered the Disclosure Statement Approval Order.

(10)    *Commencement of Solicitation*.  As soon as reasonably practicable, but in no event later than fifteen (15) days after entry of the Disclosure Statement Approval Order, the Company Parties shall have commenced Solicitation.

(11)    *Entry of the Confirmation and Sale Order*. As soon as reasonably practicable, but in no event later than one hundred-fifty (150) days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation and Sale Order.

(12)    *Outside Date*. The Effective Date shall occur as soon as reasonably practicable but in no event later than the date that is fourteen (14) calendar days after entry of the Confirmation and Sale Order (the "***Outside Date***"). Notwithstanding the foregoing, solely in the event that the Stalking Horse Bidder is the Winning Bidder or there is an Approved Sale Transaction, the Outside Date may be extended:

(A)    automatically up to three (3) times, in each instance by up to one (1) month, solely to the extent necessary to satisfy any conditions to closing the Sale Transaction requiring regulatory approvals to transfer licenses, registrations, certifications or other permits held by the Company Parties that are required for the sale or use of their products or otherwise for the lawful conduct of their business in the European Union (the "***E.U. Regulatory Conditions***"); *provided*, that such automatic extension shall apply solely to the extent that (i) all other conditions to closing the Sale Transaction have been met, (ii) no Company Party is then in breach of this Agreement, the DIP Credit Agreement, or the Stalking Horse APA, and (iii) the E.U. Regulatory Conditions have not been waived by the Winning Bidder; and

(B)    one time by up to three months, with the prior written consent of the Required Consenting Lenders;

in each case, subject to the terms and conditions of the DIP Credit Agreement (including any fees set forth therein).

Each of the Parties shall use commercially reasonable efforts to cooperate fully and coordinate amongst each other in connection with the Approved Plan, the Sale Transaction, and the Milestones.  Further, each of the Parties shall take such action (including executing and delivering any other agreements) as may be reasonably necessary or as may be required by order of the Bankruptcy Court to carry out the purpose and intent of this Agreement (including to provide any reasonably necessary or reasonably requested information to federal, state, local, or foreign regulators), to obtain required regulatory approvals necessary for confirmation of the Approved Plan, including consummation of the Sale Transaction in connection therewith.

Section 3.02    Definitive Documents.

(a)    The Definitive Documents not executed or in a form attached to this Agreement as of the Support Effective Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter, or instrument related to the Transactions shall contain terms, conditions, representations, warranties, and covenants materially consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 10.  Further, the Definitive Documents not executed or in a form attached to this Agreement as of the Support Effective Date shall be materially consistent with this Agreement and otherwise be in form and substance reasonably acceptable to the Company Parties and the Required Consenting Lenders.

Section 3.03    DIP Commitment.

(a)    Commitments.  Each of the Backstop DIP Lenders confirms its commitment to provide (itself or through their respective affiliates), and hereby commits to provide, severally but not jointly, to the OpCo Parties the Loans (as defined in the DIP Credit Agreement) in the amounts allocated to the Backstop DIP Lenders in accordance with the percentages set forth in Schedule I hereof opposite each Backstop DIP Lender's name as its "Backstop Commitment Percentage," on the terms and subject to the conditions set forth herein and in the DIP Credit Agreement, including, without limitation, Article IV of the DIP Credit Agreement  (the "Backstop Commitments").  The Backstop Commitments (and/or the related Backstop Commitment Premium) may be assigned among the Backstop DIP Lenders from time to time, without the consent of the Company Parties, by the assignor and assignee Backstop DIP Lenders providing written notice to Evercore (email being sufficient) of such assignment, and Schedule I hereto shall be updated to reflect such assignment (and shall be deemed amended solely with respect to such assigned amount upon delivery of such updated version to the Company Parties).  Evercore may from time to time make *de minimis* adjustments to Schedule I to reflect corrections to the beneficial ownership of the Backstop Commitments with the written approval of the affected Backstop DIP Lenders (email being sufficient).

(b)      Election Procedures. The parties hereto agree that each Prepetition First Lien Lender that is not a Backstop DIP Lender (in such capacity, each an "***Electing DIP Lender***") may participate (itself or through an affiliate) in providing its *pro rata* portion of Loans (which Loans shall be Final Loans (as defined in the DIP Credit Agreement)) by providing written notice to Evercore (email being sufficient) of its election to participate and signing a Joinder Agreement (and such other documents as may be reasonably requested by the Company) evidencing such Electing DIP Lenders' commitment to provide the Loans by no later than November 12, 2024 (the "***Election Deadline Date***").[2]  Such participation shall be on a *pro rata* basis in accordance with the proportion of (1) the obligations under the Prepetition First Lien Credit Agreement beneficially owned by each such Electing DIP Lender to (2) the obligations owed to all Prepetition First Lien Lenders under the Prepetition First Lien Credit Agreement on the Election Deadline Date.  The Loans of the Backstop DIP Lenders under the DIP Credit Agreement will be reallocated and/or assigned by the amount of the Loans provided by the Electing DIP Lenders on a pro rata basis based on the amount of each Backstop DIP Lender's Backstop Commitments.

(c)      Premium.  As consideration for the agreements and commitments under this Section 3.03, subject to the entry of the Interim DIP Order, the OpCo Parties collectively agree to pay, to the Backstop DIP Lenders the Backstop Commitment Premium pursuant to the terms of (and as defined in) the DIP Credit Agreement, according to the percentages set forth in Schedule I hereof.

## 4.      **Agreements of the Consenting Lenders.**

Section 4.01    Support. Each Consenting Lender, with respect to each of its respective Consenting Claims, hereby covenants and agrees, severally and not jointly, during the Support Period to:

(a)      support and not object to the Approved Plan, the Sale Process, or any of the Transactions (including those contemplated by this Agreement, the Restructuring Term Sheet, the DIP Credit Agreement, the Approved Plan, the Sale Documents, and the other Definitive Documents), and use commercially reasonable efforts to take any reasonable action necessary or reasonably requested by the Company in a timely manner to effectuate the Transactions in a manner materially consistent with this Agreement;

(b)      pursue, consummate, and implement the Transactions on the terms set forth in this Agreement, including by negotiating, entering into, and effectuating the Definitive Documents (subject to the terms and conditions herein) in good faith and supporting the obtention of the necessary Bankruptcy Court approvals of the Definitive Documents to consummate the Transactions;

(c)      when properly solicited to do so, timely vote or cause to be voted, consistent with the Solicitation Materials, all of its Claims (or Claims under its control) in support of the Approved Plan, including any Claims that are impaired under the Approved Plan and not change or withdraw (or cause or direct to be changed or withdrawn) any such vote described in this clause (c); *provided* that, except with respect to the termination rights provided in the Company

---

[2] To insert 10 B.D. after first day hearing. Note that Master Consent provides mechanics for joinder/reallocating for Electing DIP Lenders.

Termination Events under Section 8.05 (a), (d) and (e) herein, a Consenting Lender's vote shall be immediately and automatically without further action of any Consenting Lender revoked (and, upon such revocation, deemed void *ab initio*) upon termination of this Agreement pursuant to the terms hereof with respect to such Consenting Lender;

       (d)      consent to, support, grant, and, as applicable, opt-in or not opt-out of the releases set forth in the Approved Plan, including the release of third-party claims pursuant to the Approved Plan and Confirmation and Sale Order;

       (e)      not directly or indirectly (i) object to, delay, impede, or take any other action to interfere with the Chapter 11 Cases, the consummation of the Transactions, or acceptance, confirmation, and implementation of the Approved Plan (including encouraging another person to undertake any action prohibited by this Agreement), (ii) propose, support, vote for, encourage, seek, file, solicit, pursue, initiate, assist, join in, participate in the formulation of or enter into negotiations or discussions with any Entity regarding any Alternative Restructuring, including, for the avoidance of doubt, making or supporting any filings with the Bankruptcy Court or any regulatory agency, or making or supporting any press release, press report, or comparable public statement or filing with respect to any Alternative Restructuring and timely vote (or cause to be voted) its Claims against any Alternative Restructuring, or (iii) otherwise take any action that would interfere with, delay, or postpone the consummation of the Transactions as set forth herein, as applicable;

       (f)      (i) not direct any administrative agent or collateral agent (as applicable) to take any action inconsistent with such Consenting Lender's obligations under this Agreement or the Approved Plan, the Sale Documents, or any other Definitive Document, as applicable, and (ii) if any applicable administrative agent or collateral agent takes any action inconsistent with such Consenting Lender's obligations under this Agreement, the Approved Plan, the Sale Documents, or any other Definitive Document, as applicable, such Consenting Lender will use commercially reasonable efforts to direct such administrative agent or collateral agent (A) to cease, desist, and refrain from taking any such action, and (B) to take such action as may be necessary to effect the Transactions; *provided* that in no instance shall any Consenting Lender be required to (1) provide any indemnity to, or (2) initiate or participate in any litigation against, any administrative agent or collateral agent in connection with the requirements of this Section 4.01(f); *provided*, *further*, that it is acknowledged and agreed that actions taken by any administrative agent and/or collateral agent under the Prepetition First Lien Credit Agreement may constitute a Company Termination Event unless the Required Consenting Lenders have directed such agent to cease taking such action consistent with this section 4(f);

       (g)      (i) act in good faith with regard to the successful consummation of the Transactions materially consistent with this Agreement and (ii) use commercially reasonable efforts to support or pursue, as applicable, any necessary federal, state, local, and foreign regulatory approvals to enable consummation of the Transactions, including approvals from any regulatory body whose approval or consent is reasonably determined by the applicable Company Parties and the Required Consenting Lenders to be necessary to consummate the Transactions;

(h)     the extent any legal, regulatory, or structural impediment arises that would prevent, hinder, or delay the consummation of the Transactions, negotiate in good faith appropriate additional or alternative provisions to address any such impediment;

(i)     refrain from, directly or indirectly, taking any action that would be inconsistent with this Agreement in any material respect or that would materially interfere with or materially delay the consummation of the Transactions (including encouraging another person to undertake any action prohibited by this Agreement);

(j)     promptly notify the Company Parties in writing (email being sufficient) after becoming aware of the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that would reasonably be expected to prevent the consummation of a material portion of the Transactions;

(k)     inform the Company Parties reasonably promptly after becoming aware of any matter or circumstance which it knows, or believes is likely, to be a material impediment to the implementation or consummation of the Transactions; and

(l)     some or all of the Consenting Lenders shall commit to provide additional financing reasonably necessary to satisfy all payments required to be made in connection with effectuating the UK Corporate Restructuring Steps Plan, (the "*UK Restructuring Funding*"), which financing will be on terms and conditions reasonably acceptable to the Company Parties and the Required Consenting Lenders.

Section 4.02    Additional Provisions Regarding the Consenting Lenders' Agreements.  Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) affect the ability of any Consenting Lender to consult with any other Consenting Lender, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee); (b) impair or waive the rights of any Consenting Lender to assert or raise any objection permitted under this Agreement or any Definitive Document in connection with the Transactions; (c) prevent any Consenting Lender from (i) enforcing this Agreement, (ii) contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or any Definitive Document, or (iii) exercising any rights or remedies under this Agreement or any Definitive Documents; (d) limit the rights of a Consenting Lender under the Chapter 11 Cases, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, so long as the exercise of any such right is not inconsistent with such Consenting Lender's obligations hereunder; (e) limit the ability of a Consenting Lender to purchase, sell or enter into any transactions regarding the Claims or Prepetition Equity Interests, subject to the terms hereof, and any applicable agreements governing such Claims and Prepetition Equity Interests; (f) constitute a waiver or amendment of any term or provision of the Prepetition First Lien Credit Agreement; (g) require any Consenting Lender to incur, assume, or become liable for any financial or other liability or obligation other than as expressly stated in this Agreement or any Definitive Document to which such consenting lender is a party and that remains in full force and effect; (h) prevent any Consenting Lender from taking any customary perfection step or other action as is necessary to preserve or defend the validity, existence, and priority of its Claims or Prepetition Equity Interests or any lien securing

14

any such Claims or Prepetition Equity Interests (including the filing of proofs of claim); or (i) require any Consenting Lender to (A) take, or refrain from taking, any action where to do so would breach (x) any law or regulation, (y) any order or direction of any relevant court or governmental body, or (z) the terms of any non-disclosure agreement to which they are subject, in each case, or (B) fail to comply with any antitrust or regulatory obligations as such Consenting Lender may reasonably determine.

Section 4.03    Transfers.

(a)    Each Consenting Lender agrees that during the Support Period, it shall not sell, assign, transfer, or otherwise dispose of ("*Transfer*"), directly or indirectly, any Claims against or in the OpCo Parties, any option thereon, or any right or interest therein (including by granting any proxies, depositing any Claims into a voting trust or entering into a voting agreement with respect to such Claims), and any purported Transfer shall be void and without effect unless the transferee thereof:

(1)    is a Consenting Lender or a Related Fund; or

(2)    before such Transfer, agrees in writing for the benefit of the Parties to become, effective prior to or upon the consummation of such Transfer, a Consenting Lender for all purposes hereunder and to be bound by all of the terms of this Agreement applicable to a Consenting Lender (including with respect to any and all Claims it already may hold before such Transfer) by executing a joinder agreement in the form attached hereto as **Exhibit A-2** (a "*Joinder Agreement*") and delivering an executed copy of such Joinder Agreement to (i) Ropes & Gray and (ii) Milbank as promptly as practicable, but in no event later than three (3) Business Days following, consummation of such Transfer. For the avoidance of doubt, a Consenting Lender may make a Transfer to a Related Fund without notice and with no requirement that the Related Fund execute a Joinder Agreement; *provided* that, following such Transfer, such Related Fund shall be deemed a Consenting Lender subject to the terms and conditions of this Agreement.

Each Consenting Lender agrees that any Transfer of any Claim that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and each other Party shall have the right to enforce the voiding of such Transfer.

(b)    Notwithstanding anything to the contrary in this Agreement, a Consenting Lender may Transfer Claims to an Entity that is acting in its capacity as a Qualified Marketmaker (as defined below) without the requirement that the Qualified Marketmaker be or become an Entity that meets the requirements of Section 4.03(a)(1) and (2) hereof (a transferee that meets such requirements, a "*Permitted Transferee*"); *provided* that (i) any such Qualified Marketmaker may only subsequently Transfer the right, title, or interest to such Claims to a transferee that is or becomes a Permitted Transferee at the time of such Transfer, (ii) such transferor shall be solely responsible for the Qualified Marketmaker's failure to comply with the requirements of this Section 4.03, (iii) subject to Section 4.03(d), such Qualified Marketmaker must (A) subsequently Transfer the right, title or interest to such Claims within five (5) Business Days of its acquisition to a transferee described in the foregoing clause (i) that is not an affiliate, affiliated fund, or

15

affiliated Entity with a common advisor of such Qualified Marketmaker or (B) sign a Qualified Marketmaker Joinder (as defined below) on or before the Qualified Marketmaker Joinder Date (as defined below), and (iii) the Transfer documentation between such Consenting Lender and such Qualified Marketmaker shall contain a covenant providing for the requirement in the preceding clause (i); *provided*, *further*, that if a Consenting Lender is acting in its capacity as a Qualified Marketmaker, it may Transfer any Claims that it acquires that are not Consenting Claims (*i.e.*, received by such Qualified Marketmaker from a holder that is not a Consenting Lender) without such Transfer being subject to this <u>Section 4.03</u>.

(c)     If at the time of a proposed Transfer of any Claims to a Qualified Marketmaker, such Claims (i) may be voted or their consent solicited with respect to the Transactions, then the proposed transferor must first vote or consent such Claims in accordance with <u>Section 4.01</u>, or (ii) have not yet been and may yet be voted or yet have their consent solicited with respect to the Approved Plan or the Transactions and such Qualified Marketmaker does not Transfer such Claims to a Permitted Transferee before the third Business Day before the expiration of an applicable voting or consent deadline (such date, the "***Qualified Marketmaker Joinder Date***"), such Qualified Marketmaker shall be required to (and the Transfer documentation to the Qualified Marketmaker shall have provided it shall), on the first Business Day immediately after the Qualified Marketmaker Joinder Date, become a Consenting Lender with respect to such Claims in accordance with the terms hereof (such signed Joinder Agreement, the "***Qualified Marketmaker Joinder***"); *provided*, *further*, that the Qualified Marketmaker shall automatically, and without further notice or action, no longer be a Consenting Lender with respect to such Claim or Interest at such time as such Claim or Interest has been Transferred by such Qualified Marketmaker to a transferee that is a Permitted Transferee in accordance with this Agreement.

(d)     For these purposes, "***Qualified Marketmaker***" means an Entity that (i) holds itself out to the market as standing ready in the ordinary course of business to purchase from and sell to customers Consenting Claims (including debt securities or other debt), or enter with customers into long and/or short positions in Consenting Claims (including debt securities or other debt), in its capacity as a dealer or market maker in such Consenting Claims (including debt securities or other debt) and (ii) is in fact regularly in the business of making a market in claims, interest, or securities of issuers or borrowers

<u>Section 4.04</u>    <u>Additional Claims</u>. To the extent any Consenting Lender (a) acquires additional Claims entitled to vote on the Approved Plan; or (b) Transfers any Claims, then, in each case, each such Consenting Lender shall promptly notify Ropes & Gray of such acquisition (which notification may be by email from the Ad Hoc Group Advisors), and each such Consenting Lender hereby agrees that such additional Claims shall be subject to this Agreement, and that, for the duration of the Support Period, it shall vote (or cause to be voted) any such additional Claims entitled to vote on the Approved Plan (to the extent still held by it or on its behalf at the time of such vote), in a manner consistent with <u>Section 4.01</u> hereof.

5.    **Agreements of the Company Parties.**

The Company Parties hereby covenant and agree during the Support Period to:

(a)    support and not object to the Approved Plan, the Sale Process, or any of the Transactions (including those contemplated by this Agreement, the Restructuring Term Sheet, the DIP Credit Agreement, the Approved Plan, the Sale Documents, and the other Definitive Documents), and take any reasonable action necessary in a timely manner to effectuate the Transactions in a manner materially consistent with this Agreement;

(b)    pursue, consummate, and implement the Transactions on the terms set forth in this Agreement, including by negotiating, entering into, and effectuating the Definitive Documents in good faith and by obtaining the necessary Bankruptcy Court approvals of the Definitive Documents to consummate the Transactions;

(c)    consent to, support, and grant, as applicable, the releases set forth in the Approved Plan, including the release of third-party claims pursuant to the Approved Plan and the Confirmation and Sale Order;

(d)    not directly or indirectly (i) object to, delay, impede, or take any other action to interfere with the Chapter 11 Cases, the consummation of the Transactions, or acceptance, confirmation, and implementation of the Approved Plan (including encouraging another person to undertake any action prohibited by this Agreement), or (ii) otherwise take any action that would interfere with, delay, or postpone the consummation of the Transactions as set forth herein, as applicable;

(e)    (i) act in good faith with regard to successful consummation of the Transactions consistent with this Agreement; and (ii) use commercially reasonable efforts to support or pursue, as applicable, any necessary federal, state, local, and foreign regulatory approvals to enable consummation of the Transactions, including approvals from any regulatory body whose approval or consent is determined by the Required Consenting Lenders to be necessary to consummate the Transactions;

(f)    to the extent any legal, regulatory, or structural impediment arises that would prevent, hinder, or delay the consummation of the Transactions, negotiate in good faith appropriate additional or alternative provisions to address any such impediment;

(g)    refrain from, directly or indirectly, taking any action that would be inconsistent with this Agreement in any material respect or that would materially interfere with or materially delay the consummation of the Transactions (including encouraging another person to undertake any action prohibited by this Agreement); *provided that* none of the foregoing affect the Company Parties' right to exercise the Fiduciary Out or limit the Company Parties' rights under Section 6 (subject in all respects to the rights of the Required Consenting Lenders to terminate this Agreement pursuant to Section 8);

(h)    provide the Ad Hoc Group Advisors a reasonable opportunity to review draft copies of all first day pleadings and use commercially reasonable efforts to provide the Ad

17

Hoc Group a period of at least three (3) calendar days prior to the Petition Date to review such draft copies;

(i)    act in good faith with regard to the successful consummation of the Transactions consistent with this Agreement;

(j)    negotiate in good faith, execute, deliver, and perform its obligations under the Definitive Documents in accordance with the terms of this Agreement and any other required agreements to effectuate and consummate the Transactions and the transactions contemplated by the Definitive Documents;

(k)    use commercially reasonable efforts to obtain additional support for the Transactions from their other material stakeholders;

(l)    timely object to, and not file, as applicable, any motion or other pleading before the Bankruptcy Court (i) seeking to challenge the validity, enforceability, perfection or priority of, or any action seeking avoidance, claw-back, recharacterization or subordination of, any portion of the Prepetition First Lien Claims or any liens or collateral securing such Prepetition First Lien Loan Claims to the extent of any stipulations or waivers granted by any of the Company Parties pursuant to the DIP Orders, or (ii) requesting relief that is inconsistent with this Agreement in any material respect or would reasonably be expected to frustrate the purposes of this Agreement, including by preventing or delaying the consummation of the Restructuring Transactions;

(m)    promptly notify the Consenting Lenders, the Ad Hoc Group Advisors in writing (email being sufficient) after becoming aware of the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that would reasonably be expected to prevent the consummation of a material portion of the Transactions;

(n)    inform the Consenting Lenders, the Ad Hoc Group Advisors reasonably promptly after becoming aware of: (i) any matter or circumstance which it knows, or believes is likely, to be a material impediment to the implementation or consummation of the Transactions; (ii) any notice of any commencement of any involuntary insolvency proceedings, legal suit for payment of material debt, or securement of material security from or by any person in respect of any Company Party or any of its subsidiaries; or (iii) the occurrence of any termination event under this Agreement of which any Company Party is reasonably aware;

(o)    in each case taking into account the Transactions (i) use commercially reasonable efforts to conduct its businesses and operations only in the ordinary course in a manner that is consistent with past practices and in compliance with applicable law, (ii) use commercially reasonable efforts to maintain its physical assets, properties, and facilities in their working order condition and repair, in the ordinary course, in a manner that is consistent with past practices, and in compliance with applicable law (ordinary wear and tear and casualty and condemnation excepted), (iii) maintain its books and records in the ordinary course, in a manner that is consistent with past practices, and in compliance with applicable law, (iv) maintain all insurance policies, or suitable replacements therefor, in full force and effect, in the ordinary course, in a manner that is

consistent with past practices, and in compliance with applicable law, (v) maintain its good standing under the laws of the state or other jurisdiction in which it is incorporated, organized or formed; and (v) use commercially reasonable efforts to preserve intact its business organizations and relationships with third parties (including creditors, lessors, licensors, suppliers, distributors, and customers) and employees in the ordinary course, in a manner that is consistent in all material respects with past practices, and in compliance with applicable law;

        (p)     pay and reimburse in full in cash in immediately available funds (i) after the Petition Date, subject to any applicable orders of the Bankruptcy Court but without the need to file fee or retention applications, all Transaction Expenses incurred prior to (to the extent not previously paid), on, and after the Petition Date, by the date that is five (5) Business Days of delivery to the Company Parties of any applicable invoice or receipt (or such other date as ordered by the Bankruptcy Court), and (ii) on the Effective Date, all Transaction Expenses incurred and outstanding in connection with the Restructuring Transactions (including any estimated fees and expenses estimated to be incurred through the Effective Date);

        (q)     (i) provide the Ad Hoc Advisors a reasonable opportunity to review Definitive Documents and other material pleading (but excluding monthly or quarterly operating reports, retention applications, fee applications, fee statements, and any declarations in support thereof or related thereto) any Company Party intends to file with the Bankruptcy Court, (ii) provide Ad Hoc Advisors a period of at least three (3) calendar days prior to the date when the Company Parties intend to file any Definitive Document or other material pleading to review, and (iii) consult in good faith with the Ad Hoc Group Advisors regarding the form and substance of any such proposed filing (in addition to any consent rights set forth herein);

        (r)     consult with the Consenting Lenders on a regular basis during the Chapter 11 Cases with respect to any strategic, regulatory, and other material transactions (including with respect to any settlements) impacting the Company Parties and their material affiliates;

        (s)     promptly, provide all due diligence and other information reasonably requested by the Ad Hoc Group Advisors in connection with; *provided that* the Company will have no obligation to provide any due diligence or other information to the extent that the Company reasonably determines that doing so would waive attorney-client privilege, the protection of any attorney work product doctrine, or any similar privileges or doctrines under applicable law:

        (i)    the Federal Court of Australia proceedings number NSD1224/2024 ("***Australian Class Action Proceeding***") and any related settlement negotiations with the Australian Class Action Proceeding plaintiffs;

        (ii)   the potential restructuring of Exactech Australia Pty Ltd (which may include, among other things, a voluntary administration process together with a Deed of Company Arrangement ("***DOCA***") or asset sale) in form and substance acceptable to the Ad Hoc Group in their reasonable discretion (the "***Australian Corporate Restructuring***") including without limitation, in relation to any material contracts, assets, and

liabilities of Exactech Australia, and any relevant regulatory and tax considerations; or

(iii) comments and/or information (as applicable), in respect of the proposed Australian Corporate Restructuring including in respect of any documentation relevant to the effectuation of such a transaction, such as the form of any DOCA or asset sale agreement;

(t)    If requested in writing by the Ad Hoc Group Advisors, within 20 days of such request, the Company Parties will use commercially reasonable efforts to:

(i) obtain legal advice from local Australian counsel in relation to the nature and scope of claims to be compromised by way of any: (a) voluntary administration process in respect of Exactech Australia Pty Ltd; (b) settlement in respect of the Australian Class Action Proceeding, and to provide to the Ad Hoc Group Advisors copies of any such advice *provided* that the Company Parties will have no obligation to provide copies of any such advice to the extent that the Company Parties reasonably determines that doing so would waive attorney-client privilege, the protection of any attorney work product doctrine, or any similar privileges or doctrines under applicable law; and

(ii) provide analysis to the Ad Hoc Group outlining the Company Parties' reasonable view regarding the nature of any claims that may arise from the matters connected with the Australian Class Action Proceeding that may not be compromised by (a) or (b) above, including with respect to the potential number and quantum of such claims.

(u)    promptly upon request from the Ad Hoc Group take such reasonable steps as requested in writing by the Ad Hoc Group to develop a detailed plan with respect to the preparation for the Australian Corporate Restructuring including a budget and estimate for fees, costs, taxes, and other expenses resulting from any such detailed plan;

(v)    consult with the Ad Hoc Group with respect to the identity of any proposed voluntary administrator to Exactech Australia Pty Ltd and will seek the Ad Hoc Group's consent to the identity of such voluntary administrator (such consent not to be unreasonably withheld) (the "***Voluntary Administrator(s)***");

(w)    consult with the Ad Hoc Group in relation to the identity of any directors proposed to be appointed to Exactech Australia Pty Ltd;

(x)    not undertake any steps to amend, assign, terminate or provide any consents, or notices with respect to the license between Exactech Inc. and Exactech Australia Pty Ltd without consent from the Required Consenting Lenders;

(y)    seek recognition of the Chapter 11 Cases with respect to Exactech Inc and an associated stay of the class action in Australia with respect to Exactech Inc.;

(z)    use commercially reasonable efforts, and will procure that its direct and indirect subsidiaries including, without limitation, Exactech International Operations AG, use their commercially reasonable efforts, from time to time to take all steps to support the Australian Corporate Restructuring; *provided that* in no event shall any Company Party, Exactech International Operations AG, or Exactech Australia Pty Ltd. or any director, officer, manager, or member of any such entity be required to take any action or to refrain from taking any action to the extent inconsistent with applicable Law or its fiduciary obligations under applicable Law (as determined in good faith after consultation with outside legal counsel);

(aa)    if Voluntary Administrator(s) are appointed to Exactech Australia Pty Ltd, the Company will request that the Voluntary Administrator(s) consult with the Ad Hoc Group with respect to the voluntary administration of Exactech Australia Pty Ltd.;

(bb)    after the Company Parties and the Ad Hoc Group agree on the UK Corporate Restructuring Steps Plan and if the Stalking Horse Purchaser is declared the Winning Bidder, Exactech UK Limited shall promptly commence discussions with contract counterparties regarding its restructuring and corporate reorganization and consult with and provide regular updates to the Ad Hoc Group in connection therewith;

(cc)    after the Company Parties and the Ad Hoc Group agree on the UK Corporate Restructuring Steps Plan and if the Stalking Horse Purchaser is declared the Winning Bidder, the Company Parties shall use all commercially reasonable efforts to complete the UK Corporate Restructuring Steps Plan as expeditiously as possible and shall consult with and provide regular updates to the Ad Hoc Group in connection therewith; and

(dd)    to the extent that the Ad Hoc Group commences a proceeding in the Bankruptcy Court to seek a determination that all of Exactech, Inc.'s rights and interests (including membership interests and other equity interests) in JointMedica Limited can be transferred (and the relevant agreements, including without limitation that certain Amended and Restated Exclusive Distribution Agreement, dated as of August 24, 2023, between JointMedica Limited and Exactech, Inc., can be assumed and assigned) without the consent of JointMedica Investment Holdings, L.P. (and/or the Sponsor) (the "*JV Proceeding*"), the Debtors will use commercially reasonable efforts to support (i) the Ad Hoc Group's position in all respects with respect to such JV Proceeding, including by making any and all relevant information available to the Ad Hoc Group, and (ii) prosecution of such proceeding on the timeline proposed by the Ad Hoc Group.

6.    **Additional Provisions Regarding Company Parties' Commitments.**

Section 6.01    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement will require the Company Parties or any directors, officers, managers, or members of the Company Parties, each in their capacities as a director, officer, manager, or member of the Company Parties, to take any action, including the Fiduciary Out, or to refrain from taking any action, to the extent such person reasonably determines, after consulting with counsel, such action or inaction would be inconsistent with their fiduciary duties under applicable law (as determined by them in good faith after consultation with outside legal counsel), and any such action or inaction taken or not taken pursuant to this Section 6.01 shall not be deemed to constitute a breach of this Agreement; *provided* that such determination shall not impede, limit, or otherwise

alter any Party's termination rights set forth herein or in any Definitive Document. The Company Parties shall promptly notify each of the Consenting Lenders of any such determination within twenty-four (24) hours following such determination. Notwithstanding anything to the contrary herein, each Consenting Lender reserves its rights to challenge any action taken in the exercise of such fiduciary duties.

Section 6.02    Notwithstanding anything to the contrary in this Agreement, each Company Party and its respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to, up and until the Bid Deadline: (a) consider, respond to, and facilitate Alternative Restructurings; (b) provide access to non-public information concerning any Company Party to any Entity or enter into nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructurings; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructurings; and (e) enter into or continue discussions or negotiations with holders of Claims against or equity interests in a Company Party (including any Party to this Agreement), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Transactions or Alternative Restructuring; *provided*, that (i) the Company Parties shall as soon as practicably reasonable notify the Consenting Lenders if the Company Parties (or their affiliates or agents) respond to any Alternative Restructuring proposal with a counter proposal (or other response) in writing and (ii) notwithstanding the foregoing, nothing herein shall impede, limit, or otherwise alter any Party's termination rights set forth herein or in any Definitive Document.

Section 6.03    Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

7.    **[Reserved]**

8.    **Termination of Agreement.**

Section 8.01    Generally. This Agreement will automatically terminate (as to all Parties) upon (i) the Effective Date or (ii) three (3) Business days following the receipt of written notice, delivered in accordance with Section 22 hereof, from (a) the Required Consenting Lenders (which, for the avoidance of doubt, may be delivered by e-mail by Milbank on behalf of any or all entities constituting the Consenting Lenders) to the other Parties at any time after the occurrence of any Consenting Lender Termination Event or (b) each of the Company Parties (which for the avoidance of doubt, may be delivered by e-mail by Ropes & Gray on behalf of any or all entities constituting the Company Parties) to the other Parties at any time after the occurrence of any Company Termination Event.  No Party may terminate this Agreement based on a Consenting Lender Termination Event or Company Termination Event, as applicable, caused by such Party's failure to perform or comply in all material respects with the terms and conditions of this Agreement (unless such failure to perform or comply arises as a result of another Party's prior failure to perform or comply in all material respects with the terms and conditions of this Agreement).

Section 8.02    If the Chapter 11 Cases are commenced, each of the Parties waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required. The Company Parties acknowledge that after the Petition Date, the giving of notice of termination and the exercise of any rights under this Agreement by any Party shall not be considered a violation of the automatic stay of section 362 of the Bankruptcy Code.

Section 8.03    Each of the dates and time periods in this Section 8 may be extended by mutual agreement (which may be evidenced by e-mail confirmation, including from respective counsel) among the Company Parties and the Required Consenting Lenders.

Section 8.04    A "***Consenting Lender Termination Event***" will mean any of the following:

(a)    failure of a Company Party to meet any Milestone, unless such Milestone is satisfied prior to delivery of a notice to the Company Parties from the Ad Hoc Group notifying the Company Parties of the failure to meet the Milestone, or waived or extended in accordance with Section 3.01(a) of this Agreement, or unless such failure is the result of any act, omission, or delay on the part of the terminating Consenting Lenders in material breach of their obligations under this Agreement;

(b)    any Company Party withdraws or modifies the Bidding Procedures, any Sale Document, the Approved Plan, or the Disclosure Statement or files or supports any motion or pleading with the Bankruptcy Court that is in any material respect inconsistent with this Agreement, the Sale Documents or the Approved Plan and such withdrawal, modification, motion, or pleading has not been revoked or withdrawn (as applicable) before the date that is three (3) Business Days after the Company Parties receives written notice from the Required Consenting Lenders that such withdrawal, modification, motion, or pleading is inconsistent with this Agreement, the Sale Documents or the Approved Plan;

(c)    any Company Party files a motion seeking to approve or support any Alternative Restructuring, modification, motion, or pleading with the Bankruptcy Court or take any action that is materially inconsistent with this Agreement, the Sale Documents, or the Approved Plan, as applicable, and such Alternative Restructuring, modification, motion, or pleading has not been revoked before the date that is three (3) Business Days after the filing or supporting party receives written notice from the Required Consenting Lenders that such withdrawal, modification, motion, or pleading is inconsistent with this Agreement, the Sale Documents, or the Approved Plan, as applicable;

(d)    the material breach by a Company Party of any of the representations, warranties, covenants, or other obligations of the Company Parties set forth in this Agreement, which breach has not been cured (if curable) within five (5) Business Days of written notice from the Required Consenting Lenders; *provided*, that this termination right may not be exercised by any Consenting Lender that is in material breach of this Agreement;

(e)      (i) entry of a DIP Order, Bidding Procedures Order, Disclosure Statement Approval Order, or Confirmation and Sale Order that is not consistent with this Agreement or otherwise reasonably acceptable to the Required Consenting Lenders or (ii) the filing of a motion by any Company Party seeking an order (without the prior written consent of the Required Consenting Lenders) vacating or modifying a DIP Order, Bidding Procedures Order, Disclosure Statement Approval Order, or Confirmation and Sale Order;

(f)      (i) the occurrence of a termination event under, or the maturity date of, the DIP Documents, (ii) the occurrence of any Event of Default under (and as defined in) the DIP Credit Agreement that has not been cured (if subject to cure) in accordance with the terms of the DIP Credit Agreement and where the obligations outstanding under the DIP Credit Agreement have been accelerated, (iii) the termination or modification of any of the DIP Orders in a manner that is inconsistent with the Restructuring Term Sheet or the DIP Credit Agreement; or (iv) the termination of any order or agreement permitting the use of cash collateral in the Chapter 11 Cases, in each case, without the consent of the applicable terminating Consenting Lenders;

(g)      a Company Party files or directly or indirectly supports another party in filing any motion, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any First Lien Claims held by Consenting Lenders in manner inconsistent with the stipulations and waivers granted by any Company Party pursuant to the Final DIP Order;

(h)      any Company Party loses the exclusive right to file a chapter 11 plan or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(i)      a Company Party fails to maintain their good standing under the laws of the state or other jurisdiction in which they are incorporated or organized, except to the extent that any failure to maintain such Company Party's good standing arises solely from the filing of the Chapter 11 Cases or is otherwise consented to by the Required Consenting Lenders;

(j)      the Bankruptcy Court enters an order denying the Sale Transaction or denying confirmation of the Approved Plan or, in each case, disallowing any material provision thereof (without the consent of the Required Consenting Lenders) and such order remains in effect for fifteen (15) calendar days after entry of such order;

(k)      any Company Party proposes or supports an Alternative Restructuring pursuant to a pleading filed in the Bankruptcy Court or publicly announces its intention to pursue an Alternative Restructuring, which proposal, support, or announcement has not been withdrawn after three Business Days' written notice from the Required Consenting Lenders;

(l)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final ruling, judgment or non-appealable order enjoining the consummation of or rendering illegal the Transactions, and such ruling, judgment or order has not been reversed or vacated by the later of (i) the entry of the Confirmation and Sale Order and (ii) three (3) Business Days after the Required Consenting Lenders provide written notice to the other Parties that such final ruling, judgment, or non-appealable order is materially inconsistent with this Agreement, unless in each case such ruling, judgment or order arises

24

primarily from the actions of a Consenting Lender or from the failure of a Consenting Lender to comply with its obligation hereunder;

(m)    the Bankruptcy Court or a court of competent jurisdiction enters an order (i) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (ii) dismissing one or more of the Chapter 11 Cases, (iii) rejecting this Agreement, or (iv) appointing a trustee or examiner for the Chapter 11 Cases, which order in each case has not been reversed, stayed, or vacated within three (3) Business Days after the Required Consenting Lenders provide written notice to the other Parties that such order is materially inconsistent with this Agreement;

(n)    any Company Party exercises the Fiduciary Out, provides a Fiduciary Out Notice, or otherwise gives notice of termination of this Agreement pursuant to this <u>Section 8</u>; or

(o)    any of the Definitive Documents, after completion, (i) contain terms, conditions, representations, warranties, or covenants that are inconsistent with this Agreement (including the Restructuring Term Sheet), (ii) shall have been amended or modified, other than in accordance with their terms, or (iii) shall have been withdrawn, in each case without the consent of the Required Consenting Lenders.

Section 8.05    A "***Company Termination Event***" will mean any of the following:

(a)    the Consenting Lenders entitled to vote on the Approved Plan have (i) failed to timely vote their Claims in favor of the Approved Plan when properly solicited to do so, (ii) at any time change their votes to constitute rejections to the Approved Plan, or (iii) either fail to opt into the releases set forth in the Approved Plan or elect to opt out of the releases set forth in the Approved Plan, in each case in a manner inconsistent with this Agreement and, solely to the extent that the Consenting Lenders who have failed to meet the requirements in the foregoing clauses (i)-(ii) hold 33.33% or more of the aggregate outstanding principal amount of Prepetition First Lien Claims; *provided* that the Company Parties shall be entitled to pursue any and all other remedies against such Consenting Lender(s) for any such breach, including specific performance, injunctive, or other equitable relief;

(b)    if, during the pendency of the Chapter 11 Cases, the Ad Hoc Group no longer constitutes "Required Lenders" under the Prepetition First Lien Credit Agreement;

(c)    if the Required Consenting Lenders give notice of termination of this Agreement pursuant to this <u>Section 8</u>;

(d)    one or more of the Consenting Lenders, or the collateral agent or administrative agent under the Prepetition First Lien Credit Agreement (unless the Required Consenting Lenders direct such agent to withdraw or cease such actions consistent with section 4(f) hereof) file or support any Alternative Restructuring, modification, motion, or pleading with the Bankruptcy Court or take any action that is materially inconsistent with this Agreement, the Sale Documents, or the Approved Plan, as applicable, and such Alternative Restructuring, modification, motion, or pleading has not been revoked before the date that is three (3) Business Days after the filing or supporting party receives written notice from the Company or Ropes &

Gray that such Alternative Restructuring, modification, motion, or pleading is inconsistent with this Agreement, the Sale Documents, or the Approved Plan, as applicable;

(e)     the material breach by one or more of the Consenting Lenders of any of the representations, warranties, covenants, or other obligations of the Company set forth in this Agreement solely to the extent that (i) such breach would result in non-breaching Consenting Lenders holding less than 66.67% of the aggregate outstanding principal amount of Prepetition First Lien Claims and (ii) such breach has not been cured (if curable) before the date that is five (5) Business Days after receiving written notice from the Company Parties; *provided*, that this termination right may not be exercised by any Company Party that is in material breach of this Agreement and such breach would give rise to a Consenting Lender Termination Event;

(f)     the board of directors, board of managers, or such similar governing body of any applicable Company Party determines in good faith, based on the advice of outside counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under any applicable law (the "***Fiduciary Out***"); *provided* that counsel to such applicable Company Party shall provide notice of such determination (the "***Fiduciary Out Notice***") not later than one (1) Business Day thereafter (email being sufficient) to the Ad Hoc Group Advisors; *provided, further*, for the avoidance of doubt, that the Required Consenting Lenders may terminate this Agreement in accordance with <u>Section 8.04(m); or</u>

(g)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final ruling, judgment or non-appealable order enjoining the consummation of or rendering illegal the Transactions, and such ruling, judgment or order has not been reversed or vacated by the later of (i) the entry of the Confirmation and Sale Order and (ii) fifteen (15) Business Days after the Company provides written notice to the other Parties that such final ruling, judgment, or non-appealable order is inconsistent with this Agreement.

Section 8.06     <u>Mutual Termination</u>. This Agreement may be terminated by mutual written agreement of the Company and the Required Consenting Lenders.  The Company will deliver written notice of any such termination to all Parties in accordance with <u>Section 22</u> hereof.

Section 8.07     <u>Effect of Termination</u>. Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Lenders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Party or the ability of any Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any other Party.   Nothing in this <u>Section 8.07</u> shall restrict any Company Party's

right to terminate this Agreement in accordance with the Fiduciary Out, subject in all respects to the rights of the Required Consenting Lenders to terminate this Agreement pursuant to this <u>Section 8</u>.

Section 8.08    <u>Automatic Termination</u>. This Agreement shall terminate automatically without any further required action or notice (a) with respect to all Parties, immediately after the Effective Date and (b) solely with respect to an individual Consenting Lender, upon the receipt of written notice from such Consenting Lender (which, for the avoidance of doubt, may be delivered by e-mail by Milbank on behalf of any Consenting Lender) to (i) Milbank and (ii) the other Parties representing and certifying that it no longer beneficially owns or has investment authority or discretion over any Consenting Claims; *provided* that such Consenting Claims were validly Transferred in accordance with <u>Section 4.03</u>.

Section 8.09    <u>No Waiver</u>. If the Transactions are not consummated, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, and the Parties expressly reserve any and all of their respective rights as if the Parties had not entered this Agreement. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the Agreement's terms.

9.    **Additional Documents.**

Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and will exercise commercially reasonable efforts with respect to, the negotiation, drafting, and execution and delivery of the Definitive Documents. In the case of any conflict or inconsistency between the Approved Plan and any form of or term sheet for a Definitive Document attached as an exhibit hereto, the terms of the Approved Plan shall control. In the case of any conflict or inconsistency between the Confirmation and Sale Order and the Approved Plan or any other Definitive Document, the Confirmation and Sale Order shall control.

10.    **Representations and Warranties.**

Section 10.01    Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct, and complete as of the date hereof (or such later date that such Party first becomes bound by this Agreement) and solely with respect to the Company Parties, subject to any limitations or approvals arising from or required by the commencement of the Chapter 11 Cases:

(a)    such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(b)    the execution, delivery and performance by such Party of this Agreement does not and will not (i) violate (x) in any material respect any provision of law, rule or regulation

27

applicable to it or (y) its charter or bylaws (or other similar governing documents) or (ii) in the case of the Consenting Lenders, conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party;

(c)    the execution, delivery and performance by such Party of this Agreement does not and will not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state, or governmental authority or regulatory body, except such filings that may be necessary in connection with the Chapter 11 Cases and such filings as may be necessary or required for disclosure to any applicable regulatory body whose approval or consent is determined by the Company Parties to be necessary to consummate the Transactions; and

(d)    this Agreement is the legally valid and binding obligation of such Party, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of a court.

Section 10.02    Each Consenting Lender severally (and not jointly), represents and warrants to the other Parties that as of the date hereof (or such later date that such Party first becomes bound by this Agreement), such Consenting Lender:

(a)    (i) is the beneficial owner of the Prepetition First Lien Claims set forth below its name on the applicable signature page of this Agreement or (ii) has, with respect to such beneficial ownership of such Prepetition First Lien Claims, (A) investment or voting discretion with respect to such Prepetition First Lien Claims, (B) full power and authority to vote on and consent to matters concerning such Prepetition First Lien Claims, and (C) full power and authority to bind or act on the behalf of, such beneficial owners.

(b)    does not own or control any other "claims", "equity security" or "security" in respect of the Company Parties (including as such terms are defined in section 101 of the Bankruptcy Code) other than as set forth below its name on the signature page to this Agreement;

(c)    other than related to the Transaction, is not a party to any other agreement, arrangement, or understanding with respect to the subject matter hereof with another Consenting Lender;

(d)    by entering into this Agreement and performing its obligations hereunder is not taking any action that would constitute a breach of any law or regulation or violation of any order or direction of any relevant court or governmental body.

## 11.    **Amendments and Waivers.**

This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 11.

This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, only in a writing signed by: (a) each OpCo Party or (b) the Required Consenting Lenders.

Any proposed modification, amendment, waiver, or supplement that does not comply with this <u>Section 11</u> shall be ineffective and void *ab initio*.

The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

12.    **Effectiveness.**

This Agreement will become effective and binding (i) as to the Company Parties and the Consenting Lenders on the Support Effective Date; (ii) as to any Consenting Lender that enters into a Joinder Agreement, upon delivery to the Company of such validly completed Joinder Agreement and the occurrence of the Support Effective Date; and (iii) as to any Permitted Transferee, upon delivery of a validly completed Joinder Agreement and the occurrence of the Support Effective Date.

13.    **GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL.**

THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT OR PROCEEDING, MAY BE BROUGHT IN ANY FEDERAL OR STATE COURT IN NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE RESTRUCTURING CONTEMPLATED HEREBY. NOTWITHSTANDING THE FOREGOING, DURING THE PENDENCY OF THE CHAPTER 11 CASES, ALL PROCEEDINGS CONTEMPLATED BY THIS <u>SECTION 13</u> SHALL BE BROUGHT IN THE BANKRUPTCY COURT.

14.    **Remedies/Specific Performance.**

It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to promptly comply with any of its obligations hereunder.

15.    **Survival.**

Notwithstanding the termination of this Agreement pursuant to Section 8 hereof, Sections 5(n) and 13-22 (and, to the extent applicable to the interpretation of such surviving sections, Section 1) will survive such termination and will continue in full force and effect for the benefit of the Parties in accordance with the terms hereof.

16.    **Headings.**

The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and will not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

17.    **Successors and Assigns; Severability; Several Obligations.**

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable. There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or Entity.

18.    **Prior Negotiations; Entire Agreement.**

This Agreement, including the exhibits and schedules hereto, constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof, except that the Parties acknowledge that any confidentiality agreements or agreements with respect to shared or common interest heretofore executed between the Company Parties, any Consenting Lender (or the Ad Hoc Group Advisors) will continue in full force and effect in accordance with the terms thereof.

19.    **Counterparts.**

This Agreement may be executed in several counterparts, each of which will be deemed to be an original, and all of which together will be deemed to be one and the same agreement. Execution copies of this Agreement may be executed via PDF or other electronic means and may be delivered by electronic mail, which will be deemed to be an original for the purposes of this Section 19.

20.    **Interpretation.**

Except as otherwise expressly provided in this Agreement, the term "including" shall mean "including, without limitation," and the words "include" and "includes" shall have corresponding meanings.

21.    **Notices.**

All notices, requests, demands, document deliveries, and other communications under this Agreement shall be in writing and shall be deemed to have been duly given, provided or made (a) when delivered personally; (b) when sent by electronic mail ("e-mail"); or (c) two business days after deposit with an overnight courier service, with postage prepaid to the Parties at the following addresses (or at such other addresses for a Party as shall be specified by like notice):

(1)    If to the Company Parties, to:

Exactech, Inc.
2320 NW 66th Court,
Gainesville, Florida 32653
Attention:  Donna Edwards, General Counsel and Senior Vice President
(donna.edwards@exac.com)

with a copy (which will not constitute notice) to:

Ropes & Gray LLP
191 North Wacker, 32 Floor
Chicago, IL 60606
Attention:  Ryan Preston Dahl (ryan.dahl@ropesgray.com)
Benjamin M. Rhode (benjamin.rhode@ropesgray.com)
Luke Smith (luke.smith@ropesgray.com)

(2)    If to the Consenting Lenders, to the addresses or electronic mail addresses set forth below the Consenting Lender's signature, with a copy (which will not constitute notice) to:

Milbank LLP
55 Hudson Yards
New York, NY 10001
Attention:  Evan Fleck (efleck@milbank.com)
Nelly Almeida (nalmeida@milbank.com)

Any notice given by delivery, mail, or courier will be effective when received. Any notice given by electronic mail will be effective upon confirmation of transmission.  Any notice or consent to be provided by the Required Consenting Lenders may be delivered by e-mail by Milbank on behalf of any or all entities constituting the Consenting Lenders.

22.    **No Solicitation; Representation by Counsel; Adequate Information.**

(a)    This Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a chapter 11 plan for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.

(b)    Each Party acknowledges for the benefit of the other Parties and their respective advisors that it has the requisite knowledge and experience in financial and business matters so that it is capable of evaluating the merits and risks of the securities that may be acquired by it pursuant to the transactions contemplated hereby and has had an opportunity to receive information from the Company Parties and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel will have no application and is expressly waived. Each Party hereby further confirms for the benefit of the other Parties and their respective advisors that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties and/or the Transactions, and without reliance on any statement of any other Party (or such other Party's financial, legal or other professional advisors), other than such express representations and warranties of the Company Parties set forth in this Agreement.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

32

**Company Signature Page to**
**the Restructuring Support Agreement**

**AUTHORIZED SIGNATORY OF**
**OSTEON HOLDINGS, INC.**

Name: Donna Edwards
Title:  Secretary


**AUTHORIZED SIGNATORY OF**
**OSTEON INTERMEDIATE HOLDINGS I, INC.**

Name: Donna Edwards
Title:  Secretary


**AUTHORIZED SIGNATORY OF**
**OSTEON INTERMEDIATE HOLDINGS II, INC.**

Name: Donna Edwards
Title:  Secretary


**AUTHORIZED SIGNATORY OF**
**EXACTECH, INC.**

Name: Donna Edwards
Title:  Secretary


*[Signature Page to Restructuring Support Agreement]*

**AUTHORIZED SIGNATORY OF**
**XPANDORTHO, INC.**

Name: Donna Edwards
Title:  Secretary

*[Signature Page to Restructuring Support Agreement]*

[*Lender Signature Pages on File*]

*Execution Version*

**Schedule I**

**Backstop DIP Commitment**

| Backstop DIP Lenders | Backstop Commitment Percentage | DIP Commitment Amount |
|---|---|---|
| [*On File*] | [*On File*] | [*On File*] |

## **Exhibit A-1**

**Company Parties**

Osteon Holdings, Inc.

Osteon Intermediate Holdings I, Inc.

Osteon Intermediate Holdings II, Inc.

Exactech, Inc.

XpandOrtho, Inc.

**EXHIBIT A-2**

**Form of Joinder Agreement**

This joinder agreement to the Restructuring Support Agreement, dated as of October 29, 2024 (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Agreement***"), between the Company Parties and the Consenting Lenders, each as defined in the Agreement, is executed and delivered by _____ (the "***Joining Party***") as of _____, 2024.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1. Agreement to be Bound.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as **Annex I** (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions thereof).

2. Effectiveness.  Upon (i) delivery of a signature page for this joinder and (ii) written acknowledgement by the Company Parties, the Joining Party shall hereafter be deemed to be a "Subsequent Consenting Lender" and a "Party" for all purposes under the Agreement and with respect to any and all Claims held by such Joining Party.

3. Representations and Warranties.  With respect to the aggregate principal amount of Claims set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Consenting Lenders, as set forth in Section 10 of the Agreement to each other Party to the Agreement.

4. Election; Electing DIP Lender.  The Joining Party hereby elects to become an Electing DIP Lender and hereby commits to provide its pro rata portion of the Loans, by so indicating on the signature page hereto and by executing a signature page to the [DIP Credit Agreement][Master Consent to Assignment to the DIP Credit Agreement] by the Electing Deadline Date.

4. Governing Law.  This joinder agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.

**JOINDER PARTY:** _____

Date Executed: _____

By:_____
Name:
Title:

Address:

E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| Prepetition First Lien Claims (Revolving Facility) | |
| Prepetition First Lien Claims (Term Facility) | |
| Other Claims | |

**Indicate here if Joining Party's intention is to commit to its pro rata of the Loans under the DIP Credit Agreement by the Electing Deadline Date.**

*Execution Version*

# EXHIBIT B

## Restructuring Term Sheet

*Execution Version*

**EXACTECH, INC., ET AL.**

**RESTRUCTURING TERM SHEET**

This transaction term sheet (this "Restructuring Term Sheet") sets forth all material terms of a proposed comprehensive restructuring of the existing claims and indebtedness of Exactech, Inc. ("Exactech" or the "Company"), XpandOrtho, Inc., Osteon Intermediate Holdings II, Inc. (together with Exactech and XpandOrtho, Inc., the "OpCo Parties"), Osteon Intermediate Holdings I, Inc., and Osteon Holdings, Inc. (together with Osteon Intermediate Holdings I, Inc., the "HoldCo Parties"[1] and, the OpCo Parties and the HoldCo Parties, collectively, the "Company Parties" or, after the Petition Date, the "Debtors") which will be consummated through one or more in-court transactions (such transactions with respect to the Company Parties, the "Restructuring Transactions"). This is the Restructuring Term Sheet referred to in, and appended to, that certain Restructuring Support Agreement, dated as of October 28, 2024, by and among the Company Parties and the other Parties signatory thereto (as amended, supplemented, or otherwise modified from time to time in accordance with the terms therein, the "RSA"). Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the RSA.

There shall be no consent right nor condition to the respective obligations and commitments of the Parties other than as expressly set forth in the RSA (including all exhibits thereto, including this Restructuring Term Sheet) or the Definitive Documents (including all exhibits thereto). In the event of any inconsistency between this Restructuring Term Sheet and the RSA, the Restructuring Term Sheet shall control. The Parties may supplement or replace this Restructuring Term Sheet with Definitive Documents with respect to all or any part of their respective obligations hereunder.

THIS RESTRUCTURING TERM SHEET IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE RSA EFFECTIVE DATE, DEEMED BINDING ON ANY OF THE PARTIES.

| Overview | |
|---|---|
| **Implementation** | This Restructuring Term Sheet contemplates: |
| | i.  the commencement of chapter 11 cases (the "Chapter 11 Cases") by the Company Parties under the Bankruptcy Code in the Bankruptcy Court no later than October 28, 2024, in accordance with the RSA to pursue implementation of the Restructuring Transactions (the date of such commencement, the "Petition Date"); |
| | ii.  the funding of the DIP Facility by certain of the Prepetition Pari 1L Lenders, which DIP Facility will be used to (a) repay in full, in cash, the Prepetition Bridge Claims and (b) finance the Chapter 11 Cases on the terms and conditions set forth in the DIP Documents (as further described herein and in the RSA); |
| | iii.  the Sale Transaction, providing for the sale of all or substantially all of the assets of the OpCo Debtors pursuant to sections 363 and 1123(b)(4) of the Bankruptcy Code, which shall be consummated pursuant to the Approved Plan (subject to the terms and conditions herein and in the Stalking Horse APA); |
| | iv.  in connection with the Sale Transaction, a Sale Process conducted by the OpCo Debtors in accordance with the Bidding Procedures, pursuant to which the OpCo Debtors shall |

---

[1] From and after the Petition Date, the OpCo Parties and the HoldCo Parties will be the OpCo Debtors and the HoldCo Debtors, respectively.

1

| | | |
|---|---|---|
| | | solicit bids with respect to the proposed sale of all or substantially all of the OpCo Debtors' assets; |
| | v. | as part of the Sale Process, one or more entities to be formed by or on behalf of the Prepetition First Lien Lenders shall serve as the Stalking Horse Purchaser (such bid, the "Stalking Horse Bid"), which Stalking Horse Bid will include, among other things, (a) a "credit bid" of all of the DIP Superpriority Claims, (b) a "credit bid" of all of the Prepetition First Lien Claims on behalf of all of the Prepetition Pari 1L Claims; (c) the Credit Bid Wind-Down Amount and (d) the assumption of the Assumed Liabilities (as defined in the Stalking Horse APA), and which Stalking Horse Bid will be subject to higher or otherwise better bids for the OpCo Parties' assets pursuant to the Sale Process and the Bidding Procedures; and |
| | vi. | following the Effective Date, the OpCo Debtors shall use (a) if the Stalking Horse Purchaser is the Winning Bidder, the Credit Bid Wind-Down Amount, or (b) if the Stalking Horse Purchaser is not the Winning Bidder, the Wind-Down Amount, and, in each case, any other assets not purchased in connection with the Sale Transaction to commence and effectuate an orderly wind-down of the Debtors' estates in accordance with the Approved Plan. |
| **Claims and Interests Subject to Restructuring** | The claims and interests that will be restructured or otherwise addressed pursuant to the Restructuring Transactions include the following, to the extent such claims and interests have not otherwise been satisfied in whole or in part as of the Effective Date: <ul><li>"DIP Superpriority Claims": $85,000,000.00 in outstanding principal amount, plus all accrued and unpaid interest, fees, and other charges and expenses arising and payable under the DIP Credit Agreement.</li><li>"Prepetition Bridge Claims": $6,500,000.00 in outstanding principal amount, plus all accrued and unpaid interest, fees, and other charges and expenses arising and payable under that certain Amendment No. 4 to the Prepetition First Lien Credit Agreement, dated as of October 9, 2024, and all other loan documents in connection therewith.</li><li>"Prepetition First Lien Claims": $303,497,779.19 in outstanding principal amount, plus all accrued and unpaid interest, fees, and other charges and expenses arising and payable under the Prepetition First Lien Credit Agreement and all other loan documents in connection therewith but excluding, for the avoidance of doubt, the Prepetition Bridge Claims.</li><li>"Prepetition Sidecar Claims": $27,842,435.52 in outstanding principal amount plus all accrued and unpaid interest, fees, and other charges and expenses arising and payable under the Prepetition Sidecar Credit Agreement and all other loan documents in connection therewith; *provided* that the Consenting Lenders reserve all rights (such reservation, the "Exit Fee/MOIC ROR") to object to the Exit Fee and/or the Applicable Premium (each as defined in the Prepetition Sidecar Credit Agreement (as amended)) (such Prepetition Sidecar Claims, together with the Prepetition First Lien Claims, the "Prepetition Pari 1L Claims").</li><li>"General Unsecured Claims": prepetition claims against the Company Parties that, as of the Petition Date, are neither secured by collateral nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court, including, for the avoidance of doubt, any claims arising from any actions that have been or could be brought against, threatened, asserted, or commenced against any of the Company Parties under the False Claims Act, 31 U.S.C. §§ 3729-3733 (the "Qui Tam Claims").</li><li>"510(b) Claims": any claims against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code.</li><li>"Prepetition Equity Interests": all Prepetition Equity Interests in Osteon Holdings, Inc.</li></ul> | |

| | |
|---|---|
| **Sale Transaction** | The Sale Transaction will be consummated following the conclusion of the Sale Process to effectuate a sale of all, or substantially all, of the OpCo Debtors' assets pursuant to sections 363, 1123(b)(4), and 1129 of the Bankruptcy Code, which sale shall be consummated pursuant to the Approved Plan (subject to the terms and conditions herein and in the Stalking Horse APA). |
| | On the Support Effective Date, the Sellers and the Stalking Horse Purchaser (or, to the extent that the Stalking Horse Purchaser has not yet been formed as of the Support Effective Date, another entity for the benefit of the Stalking Horse Purchaser) will enter into the Stalking Horse APA attached to the RSA as **Exhibit D**. The Stalking Horse Purchaser will serve as a stalking horse bidder in connection with the Sale Process, and the Stalking Horse APA will be subject to higher or otherwise better bids for the OpCo Parties' assets pursuant to the Sale Process and the Bidding Procedures. |
| | No later than the Support Effective Date, the Required Consenting Lenders will direct the DIP Agent and GLAS USA LLC, as the administrative agent and collateral agent under the Prepetition First Lien Credit Agreement, to exercise their rights, including pursuant to section 9.13 of the DIP Credit Agreement and section 9.14 of the Prepetition First Lien Credit Agreement, to form, prior to entering into the Stalking Horse APA, the Stalking Horse Purchaser for the purpose of "credit bidding" the DIP Superpriority Claims and the Prepetition Pari 1L Claims to purchase the Acquired Assets (as defined in the Stalking Horse APA) pursuant to sections 363(k) and 1129(b)(2)(A)(ii) of the Bankruptcy Code, as documented in the Approved Plan and Stalking Horse APA, with the consummation of the transactions to occur on the Effective Date of the Approved Plan, which date will occur as soon as reasonably practicable following the Confirmation Date, subject to any regulatory approvals or waiting periods. |
| | Following the Petition Date, and in accordance with the RSA and the DIP Facility, the OpCo Debtors will file with the Bankruptcy Court the Bidding Procedures, which shall be consistent with the form attached to the RSA as **Exhibit C** and otherwise reasonably acceptable to the OpCo Debtors and the Required Consenting Lenders, and shall commence the Sale Process consistent with the Bidding Procedures to broadly market the OpCo Debtors' assets in an effort to obtain a higher or otherwise better bid for such assets. The OpCo Debtors will continue such process on the timeline contemplated in accordance with the Bidding Procedures. |
| | At the conclusion of the Sale Process, the OpCo Debtors will sell the Acquired Assets (as defined in the Stalking Horse APA) to the Stalking Horse Purchaser (or one or more of its designees) or to one or more third-party purchaser(s) determined by the OpCo Debtors to have submitted the highest or otherwise best offer(s) (such successful purchaser, the "Winning Bidder" and such Winning Bidder's asset purchase agreement, the "Winning APA") in accordance with the Bidding Procedures Order and the Confirmation and Sale Order, which shall be reasonably acceptable to the Company Parties and Required Consenting Lenders. |
| | All assets owned by the OpCo Debtors' estates immediately prior to the Effective Date and identified as "Excluded Assets" pursuant to the terms of the Winning APA will remain assets of the respective OpCo Debtors' estates (subject to the terms and conditions herein and therein). All liabilities of the Company Debtors explicitly designated as "Assumed Liabilities" pursuant to the terms of the Winning APA will be assumed by the Winning Bidder, in each case, upon the Effective Date. The Excluded Assets and all liabilities of the Company Debtors (other than the Assumed Liabilities) and any proceeds of the Sale Transaction received by the Company Debtors (subject to any requirements set forth herein, under the DIP Facility Documents, Winning APA, or order of the Bankruptcy Court) will be transferred on the Effective Date by the Debtors to the Wind-Down Entity (as defined below). |
| | For the avoidance of doubt, regardless of whether the Stalking Horse Purchaser is the Winning Bidder, the Consenting Lenders shall (a) timely vote each of their Prepetition First Lien Claims to accept the Approved Plan, (b) consent to and, as applicable, opt in or not opt out of the releases set forth in the Approved Plan; and (c) not change, withdraw, amend, or revoke (or cause to be |

3

| | |
|---|---|
| | changed, withdrawn, amended, or revoked) any vote or election referred to in clause (a) or (b) above (subject to the terms and conditions herein and in the RSA). |
| **DIP Financing** | The proceeds of the DIP Facility shall be used to (a) repay in full, in cash, the Prepetition Bridge Claims as of the date of funding of the Interim Loans (as defined in the DIP Credit Agreement) and (b) finance the Chapter 11 Cases in accordance with the terms and conditions set forth in the DIP Documents (the claims arising thereunder, the "<u>DIP Superpriority Claims</u>", and the lenders thereunder, the "<u>DIP Lenders</u>"). The DIP Commitments (as defined in the DIP Order) will be backstopped by certain members of the Ad Hoc Group, (in such capacity, the "<u>DIP Backstop Parties</u>") pursuant to the terms and conditions set forth in the RSA. |
| **Takeback Credit Facility** | If the Stalking Horse Purchaser is the Winning Bidder, on the Effective Date, the Stalking Horse Purchaser (or the entity that will own the Acquired Assets) and the holders of DIP Superpriority Claims, Prepetition First Lien Claims, and Prepetition Sidecar Claims shall receive new indebtedness of the Stalking Horse Purchaser (or the entity that will own the Acquired Assets) under a new credit agreement (the "<u>Takeback Facility Credit Agreement</u>") providing for the following: <br><br> <u>Takeback Credit Facility</u>: <br><br> • Principal Amount: $130 million (inclusive of all of the DIP Superpriority Claims being exchanged into the Takeback Facility Credit Agreement *plus* all accrued interest thereon) (the "<u>Takeback Debt</u>") <br><br> • Maturity: September 2029 <br><br> • Rate: S+600 (cash) <br><br> • Amortization: 1% p.a. <br><br> Prior to the Effective Date, the Company Debtors and their advisors will use commercially reasonable efforts to assist the Ad Hoc Group (or any other Winning Bidder if such assistance is requested by such Winning Bidder) in raising a new $50 million Super Senior Revolving Credit Facility (a "<u>New Revolving Facility</u>"). |
| **Treatment of Claims and Interests** | |
| **Administrative Claims** | On the Effective Date, or as soon as practicable thereafter (including following the occurrence of any bar date fixed by the Bankruptcy Court), each holder of an allowed claim for the costs and expenses of administration of the Debtors' estates under sections 503(b) or 507(b) the Bankruptcy Code that is not assumed by the Winning Bidder in the Sale Transaction ("<u>Administrative Claims</u>") other than professional fee claims, shall be paid in full in cash. |
| **Professional Fee Claims** | On or before the Effective Date, the Company Debtors shall establish and fund a professional fee escrow account (the "<u>Professional Fee Escrow Account</u>"), which may be the same account as the Funded Reserve Account (as defined in the DIP Order), in an amount sufficient to pay all estimated fees of the Company Debtors' estate professionals and those of any statutory committee that may have been appointed (collectively, the "<u>Retained Professionals</u>") through the Effective Date of the Approved Plan (the "<u>Professional Fee Escrow Amount</u>"). <br><br> For the avoidance of doubt, the Professional Fee Escrow Account shall be maintained in trust solely for the Retained Professionals. Such funds shall not be considered property of the Estates of the Company Debtors, the Winning Bidder, or the Wind-Down Entity, as applicable; *provided* that any amounts funded into the Professional Fee Escrow Account that remain after all allowed Professional Fee Claims have been indefeasibly paid in full shall be considered (i) in the event that the Stalking Horse Bidder is not the Winning Bidder, Wind-Down Distributable Consideration to be distributed in accordance with the Approved Plan and (ii) in the event that the Stalking Horse |

| | |
|---|---|
| | Bid is the Winning Bidder, property of the Winning Bidder. |
| **DIP Superpriority Claims** | In full and final satisfaction, settlement and release of and in exchange for release of all allowed DIP Superpriority Claims, each allowed DIP Superpriority Claim shall receive either (i) if the Stalking Horse Purchaser is the Winning Bidder, then $1.00 of Takeback Debt for each $1.00 of DIP Superpriority Claim (the "<u>DIP Takeback Exchange</u>"), or (ii) if the Stalking Horse Purchaser is not the Winning Bidder, then payment in full in cash in accordance with the DIP Credit Agreement on the Effective Date of the Approved Plan. Upon satisfaction of all DIP Superpriority Claims in accordance with the DIP Credit Agreement, all Liens and security interests granted by the Company Debtors to secure the obligations under the DIP Facility shall be of no further force or effect. |
| **Priority Tax Claims** | On or before the Effective Date, or as soon as practicable thereafter, except to the extent that a holder of an allowed claim of a Governmental Unit, as defined in section 101(27) of the Bankruptcy Code, against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code ("<u>Priority Tax Claim</u>") agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each allowed Priority Tax Claim, each holder of such allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. |
| **Other Secured Claims** | *Treatment*: On the Effective Date, or as soon as practicable thereafter, except to the extent that a holder of a secured claim that is not a Prepetition Pari 1L Claim and that is not assumed by the Winning Bidder in the Sale Transaction ("<u>Other Secured Claims</u>") agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such allowed Other Secured Claim, each holder of an allowed Other Secured Claim shall receive, at the option of the applicable Debtor or the Plan Administrator, as applicable: <br><br> (i)      payment in full in cash, <br><br> (ii)      the collateral securing such holder's Other Secured Claim, or <br><br> (iii)      such other treatment as to render such holder's Other Secured Claim unimpaired. <br><br> *Voting*: This class is unimpaired under the Approved Plan. Holders of Other Secured Claims will be conclusively presumed to have accepted the Approved Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims will not be entitled to vote to accept or reject the Approved Plan. |
| **Priority Non-Tax Claims** | *Treatment*: On the Effective Date, or as soon as practicable thereafter, except to the extent that a holder of a claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim, that is not assumed by the Winning Bidder in the Sale Transaction ("<u>Priority Non-Tax Claims</u>") agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such allowed Other Priority Claim, each holder of an allowed Other Priority Claim shall receive, at the option of the applicable Debtor or the Plan Administrator, as applicable: <br><br> (i)      payment in full in cash, or <br><br> (ii)      such other treatment as to render such holder's Priority Non-Tax Claim unimpaired. <br><br> *Voting*: This class is unimpaired under the Approved Plan. Holders of Priority Non-Tax Claims will be conclusively presumed to have accepted the Approved Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Priority Non-Tax Claims will not be entitled to vote to accept or reject the Approved Plan. |

| | |
|---|---|
| **Prepetition Pari 1L Claims**[2] | *Treatment*: On the Effective Date, except to the extent that a holder of a Prepetition Pari 1L Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Prepetition Pari 1L Claim, each holder of a Prepetition Pari 1L Claim shall receive either:<br><br>(i)    **if the Stalking Horse Purchaser is the Winning Bidder**, then with respect to the Prepetition Pari 1L Claims its *pro rata* share of (A) the amount of Takeback Debt remaining after the DIP Takeback Exchange, and (B) 100% of the membership interests in the Stalking Horse Purchaser, subject to dilution by the MIP; or<br><br>(ii)    **if the Stalking Horse Purchaser is not the Winning Bidder**, then each such holder shall be paid in cash in full (including prepetition and postpetition interest) on the Effective Date from the Wind-Down Distributable Consideration.<br><br>*Allowance*: The Prepetition Pari 1L Claims shall be deemed Allowed, as of the Petition Date, in the aggregate principal amount of not less than $337,840,214.71 *plus* accrued and unpaid interest, fees, and other amount arising and payable under and in accordance with the Prepetition First Lien Credit Agreement and the Prepetition Sidecar Credit Agreement, as applicable, subject in all respects to the Exit Fee/MOIC ROR.<br><br>*Voting*: This class will be impaired under the Approved Plan. Holders of Prepetition Pari 1L Claims may vote to accept or reject the Approved Plan. |
| **General Unsecured Claims** | *Treatment*: On the Effective Date or as soon as practicable thereafter, except to the extent that a holder of an allowed general unsecured claim (including any Qui Tam Claim) that is not assumed by the Winning Bidder in the Sale Transaction, agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such General Unsecured Claim (in each case, to the maximum extent permitted under the Bankruptcy Code), each holder of an allowed General Unsecured Claim shall receive its aggregate *pro rata* share of (i) the Wind-Down Distributable Consideration; *minus* any amount of the Wind-Down Distributable Consideration distributed to holders of Prepetition Pari 1L Claims and (ii) $500,000 (the "GUC Reserve").<br><br>*Voting*: This class is impaired under the Approved Plan. Holders of General Unsecured Claims may vote to accept or reject the Approved Plan. |
| **510(b) Claims** | *Treatment:* Allowed Section 510(b) Claims, if any, shall be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and a holder of allowed Section 510(b) Claims will not receive any distribution on account of such allowed Section 510(b) Claims.<br><br>*Voting:* This class is impaired under the Approved Plan. Holders (if any) of Section 510(b) Claims will be conclusively deemed to have rejected the Approved Plan under section 1126(g) of the Bankruptcy Code. Therefore, such holders (if any) will not be entitled to vote to accept or reject the Approved Plan. |
| **Intercompany Claims** | *Treatment:* Each allowed Intercompany Claim shall, with the consent of the Winning Bidder, either be cancelled, released, reinstated, contributed, distributed, or transferred such that Intercompany Claims are, to the extent reasonably practicable, treated in a tax-efficient manner. |

---

[2]    For the avoidance of doubt, the Prepetition Pari 1L Claims include, and are to be classified with for purposes of voting on the Approved Plan, any claims under the Prepetition First Lien Credit Agreement or the Prepetition Sidecar Credit Agreement that are unsecured pursuant to section 506(a) of the Bankruptcy Code, if any.

146802370_40

| | No distributions shall be made on account of any Intercompany Claims. |
| --- | --- |
| | *Voting*: Holders of allowed Intercompany Claims will be conclusively deemed to have rejected the Approved Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of allowed Intercompany Claims will not be entitled to vote to accept or reject the Approved Plan. |
| **Intercompany Interests** | *Treatment:* On the Effective Date, each Intercompany Interest shall, with the consent of the Winning Bidder, either be cancelled, released, extinguished, reinstated, or transferred pursuant to the Sale Transaction such that Intercompany Interests are, to the extent reasonably practicable, treated in a tax-efficient manner. Each holder of an Intercompany Interest shall not receive or retain any distribution, property, or other value on account of its Intercompany Interest. |
| | *Voting*: Holders of allowed Intercompany Interests will be conclusively deemed to have rejected the Approved Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of allowed Intercompany Claims will not be entitled to vote to accept or reject the Approved Plan. |
| **Prepetition Equity Interests** | *Treatment*: Prepetition Equity Interests shall be cancelled, and the holders thereof shall not receive or retain any property on account of such interests under the Approved Plan. |
| | *Voting*: Holders of Prepetition Equity Interests will be conclusively deemed to have rejected the Approved Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Exiting Equity Interests will not be entitled to vote to accept or reject the Approved Plan. |
| **Other Terms Relevant to Restructuring** | |
| **Executory Contracts** | The treatment (e.g., assumption, assumption and assignment, and/or rejection) of all executory contracts and unexpired leases to which the company is a party shall be subject to the reasonable consent of the Required Consenting Lenders so long as the RSA remains in full force and effect. |
| | Notwithstanding anything to the contrary herein, the Company Parties will seek to have the TPG MSA and similar agreements, including any separation, transition, or side letter agreements rejected, with rejection effective as of the Petition Date. |
| **Key Employee Incentive / Retention Plans** | Key Employee Retention Plan ("KERP"): The Company Debtors may seek authority from the Bankruptcy Court to pay up to 20 key employees retention bonuses in an aggregate amount not to exceed $1,267,622.02, *plus* the employer portion of any related payroll taxes pursuant to a Bankruptcy Court order authorizing approval of the KERP. |
| | The definitive documents relating to the KERP will be consistent with the following, and otherwise reasonably acceptable to the Company and the Required Consenting Lenders. |
| | • *"Claw-back Period"* means: The period ending on the latest to occur of (a)(i) the consummation of the Approved Plan, or (ii) a refinancing of the Company, (b) consummation of a sale of all or substantially all of the OpCo Parties' assets (other than a Lender Transaction), and (c) the one year anniversary of the Petition Date; *provided* that if a sale or other disposition of assets is consummated with any member of the existing Ad Hoc Group (a "Lender Transaction"), or if the Winning Bidder is an entity other than the Stalking Horse Purchaser and provides an offer of employment materially and substantially consistent with such employees current terms of employment, then the Claw-back Period will end no earlier than the sixth month anniversary of such Lender Transaction or such Winning Bidder transaction. |
| | • The KERP bonuses will be subject to repayment to the Company or the Stalking Horse Purchaser, as applicable, if, during the Claw-back Period, the KERP bonus recipient's employment is terminated (a) by the KERP bonus recipient for any reason, or (b) by the Company, any of its subsidiaries, or any of their respective successors or assigns for |

7

| | |
|---|---|
| | Cause (as defined in the definitive documents relating to the KERP). Claw-back is not triggered if (a) the employee is terminated by the Company, any of its subsidiaries, or any of their respective successors or assigns without Cause or (b) successor to substantially all of the business or assets of the Company does not offer the KERP Bonus recipient continued employment with such successor or an Affiliate. |
| | • Key Employee Incentive Plan ("<u>KEIP</u>"): The Company Debtors may seek authority from the Bankruptcy Court to pay certain members of the executive leadership team a KEIP bonus in form and substance to be reasonably satisfactory to the Company and the Required Consenting Lenders; provided, that the Required Consenting Lenders shall be deemed to have consented to any KEIP which provides for payments only upon the consummation of a sale of all or substantially all of the assets of the Company with a third-party (i.e., a person other than any member of the existing Ad Hoc Group) where cash proceeds from such sale are in excess of the amount necessary to result in payment in full (in cash) of all DIP Superpriority Claims and Prepetition Pari 1L Claims, and only payable following consummation of such sale and satisfaction of the DIP Superpriority Claims and Prepetition Pari 1L claims in full in cash. |
| | For the avoidance of doubt, the Debtors shall not implement or seek approval of any other employee incentive plan or employee retention plan without the prior consent of the Required Consenting Lenders, which consent shall not be unreasonable withheld. |
| **MIP** | If the Stalking Horse Purchaser is the Winning Bidder, the new board of directors of the Stalking Horse Purchaser (the "<u>New Board</u>") shall adopt a management incentive plan that reserves for issuance a pool of equal to 10% of the membership interests in the Stalking Horse Purchaser (the "<u>MIP Pool</u>") for awards to employees, non-employee directors and other service providers in the form of appreciation rights or other equity-linked instruments, as determined by the New Board in its discretion (the "<u>MIP</u>"). |
| | No later than 120 days following the Effective Date, the New Board shall allocate a portion of the MIP Pool (as determined by the New Board) for awards to management, with the form, size, participation, vesting, and other terms and conditions of such awards to be determined by the New Board in its discretion and in consultation with the chief executive officer. |
| **Wind-Down Distributable Consideration** | The consideration distributable to holders of Prepetition Pari 1L Claims and General Unsecured Claims, as applicable and in accordance with the priorities and procedures set forth in the Approved Plan (the "<u>Wind-Down Distributable Consideration</u>") shall be equal to the excess, if any, of the sum of cash on hand and any cash proceeds received by the Company Debtors after the closing of the Sale Transaction *minus* the amount of cash necessary to: |
| | (a)  fund the Professional Fee Escrow Amount; |
| | (b)  pay any fees required to be paid with respect to the DIP Facility in accordance with the DIP Orders; |
| | (c)  satisfy the following claims of the OpCo Debtors: Allowed (i) Administrative Claims, (ii) Priority Tax Claims, (iii) Priority Non-Tax Claims, and (iv) Other Secured Claims (in each case, to the extent Allowed and required to be paid in cash and to the extent that the OpCo Debtors or the Plan Administrator, as applicable, elect to satisfy Other Secured Claims in cash); |
| | (d)  fund the GUC Reserve; and |
| | (e)  fund the Wind-Down Amount. |
| | For the avoidance of doubt, in the event that the Stalking Horse Purchaser is not the Winning Bidder, the Wind-Down Distributable Proceeds shall be sufficient to satisfy the DIP Superpriority Claims and the Prepetition Pari 1L Claims in full, in cash, as of the Effective Date. |

8

| | |
|---|---|
| **Wind-Down Amount** | On or prior to the Effective Date, the Debtors shall fund into a segregated account (the "Wind-Down Account") held in trust by the Wind-Down Entity that is administered by the Plan Administrator:<br><br>(a) **if the Stalking Horse Purchaser is the Winning Bidder**, $2,225,000 (the "Credit Bid Wind-Down Amount").<br><br>(b) **if the Stalking Horse Purchaser is not the Winning Bidder**, an amount (the "Wind-Down Amount") equal to all amounts necessary to pay all costs, fees, and expenses related to the wind-down of the Company Debtors' estates.  The Wind-Down Amount shall be in addition to the Professional Fee Escrow Amount held in the Professional Fee Escrow Account. |
| **Wind-Down Entity** | One or more liquidating trusts or other entities (which may be one or more of the post-Effective Date Debtors) established for the purpose of winding down the Debtors' estates and otherwise implementing the Approved Plan (subject to the terms and conditions set forth herein) (such entity, the "Wind-Down Entity").  The trustee, administrator, manager, or other similar position with respect to the Wind-Down Entity (the "Plan Administrator") shall be selected by the Debtors and the Required Consenting Lenders. |
| **Conditions Precedent to Effective Date** | The occurrence of the Effective Date shall be subject to the satisfaction of the following conditions precedent, which conditions may be waived by mutual written consent of the Company Parties and the Required Consenting Lenders:<br><br>(i) The RSA shall not have been terminated and shall remain in full force and effect;<br><br>(ii) The Definitive Documents (as defined in the RSA) shall be consistent with the RSA and otherwise approved by the parties thereto consistent with their respective consent and approval rights set forth in the RSA and any conditions precedent set forth therein shall have been satisfied or waived in accordance with the terms therein;<br><br>(iii) The Bankruptcy Court shall have entered an order approving the Disclosure Statement, which order shall be in full force and effect and not have been stayed, modified, or vacated on appeal;<br><br>(iv) The Confirmation and Sale Order confirming the Approved Plan and approving the Sale Transaction shall have been entered by the Bankruptcy Court, which orders shall be in full force and effect and not have been stayed, modified, or vacated on appeal;<br><br>(v) Any and all requisite regulatory approvals, and any other authorizations, consents, rulings, or documents required to implement and effectuate the Transactions and the Approved Plan shall have been obtained (including as set forth in the APA);<br><br>(vi) No court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing, or prohibiting the consummation of the Transactions, the Approved Plan, or any other transaction contemplated thereby;<br><br>(vii) The conditions precedent to closing the Sale Transaction and the Approved Plan becoming effective shall have been satisfied or shall be satisfied contemporaneously with the occurrence of the Effective Date and any documents governing the Takeback Debt and the New Revolving Facility, if applicable, shall be in form and substance reasonably acceptable to the Required Consenting Lenders;<br><br>(viii) The Professional Fee Escrow Account shall have been established and funded with the Professional Fee Escrow Amount; |

| | |
|---|---|
| | (ix)  All Transaction Expenses and any other fees, expenses, and other amounts required to be paid pursuant to the RSA pursuant to an order of the Bankruptcy Court shall have been paid in full in cash. |
| **Tax** | The Restructuring Transactions shall be implemented in a tax-efficient and cost-effective manner, as agreed among the Company Parties and the Required Consenting Lenders. |
| | Unless otherwise instructed by the Required Consenting Lenders, the Company shall treat the Credit Bid as a taxable transfer of the Company's assets for U.S. federal income tax purposes (and the Parties shall cooperate to cause such transactions to be so treated) and will report the worthless stock deduction available to the U.S. consolidated federal income tax group as an ordinary loss that arises in the same taxable year as any income or gain from the Credit Bid. |
| **Fees and Expenses** | The Debtors shall pay all Transaction Expenses in full and in cash (as defined in the RSA).[3] |
| **Releases, Exculpation Set Forth in the Approved Plan[4]** | Subject to the MOIC/Exit ROR, each Consenting Lender shall consent to support, grant and, as applicable, opt-in or not opt-out of, and the Company Debtors agree to seek court approval of, customary and mutual releases in favor of the Debtors, the DIP Lenders, the Consenting Lenders, the Stalking Horse Purchaser, and the Sponsor and, with respect to each of the foregoing entities, their Related Parties,[5] in each case in their capacities as such, for any claims, demands, liabilities, disputes, remedies, causes of action, indebtedness, or obligations related to or arising out of the Company Parties (and the Sponsor's ownership thereof), of the Prepetition First Lien Credit Agreement, the Prepetition Sidecar Credit Agreement, the DIP Facility, the Bridge Facility, and the Restructuring Transactions; *provided* that (a) such releases will not apply to any person or entity with respect to any claims, demands, liabilities, disputes, remedies, causes of action, indebtedness, or obligations arising from fraud, willful misconduct, or gross negligence by any such person or entity; (b) the Debtors and the Consenting Lenders will not be obligated to provide releases or support any plan that releases claims (if any) that the Company Parties or the Consenting Lenders may be able to assert against the Sponsor or its Related Parties for any Company Party's liability (if any) in any *qui tam* action; (c) notwithstanding anything to the contrary herein, to the extent that the Special Committee of the OpCo Board of Directors determines to recommend that any Company Party should not grant releases in favor of the Sponsor or its Related Parties with respect to any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, or obligations, including those that are proposed to be released herein by the Debtors or the Consenting Lenders, any such releases given by the Company and the Consenting Lenders will be null and void and the Consenting Lenders will have no obligation to offer or consent to such releases of the Sponsor or any of its Related Parties; and (d) no party hereto will be obligated to grant releases consistent with this paragraph unless such releases are mutual and consensual. |

---

[3]  For the avoidance of doubt, Transaction Expenses shall not include fees, costs, or expenses of any counsel or other professional retained by the Sponsor or its Affiliates in connection with the Chapter 11 Cases or otherwise.

[4]  Notwithstanding anything to the contrary herein, any releases of the Sponsor and its Related Parties are subject to review and approval by the Special Committee upon completion of its analysis.

[5]  "**Related Parties**" shall mean, with respect to an entity, each of, and in each case solely in its capacity as such, (a) such entity's current and former Affiliates and (b) such entity's respective current and former directors, managers, officers, shareholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, associated entities, managed or advised entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, fiduciaries, trustees, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants and other professionals, representatives, advisors, predecessors, successors, and assigns, and the respective heirs, executors, estates, servants, and nominees of the foregoing.

| | |
|---|---|
| | For the avoidance of doubt, an Entity shall not be a Released Party (as defined in the Approved Plan) if it elects to opt out of the releases contained in the Approved Plan or does not otherwise provide a release.<br><br>Parties consent to, and agree to seek court approval of, customary exculpation provisions in favor of the Company Debtors and any other estate fiduciaries and their respective directors and officers solely to the extent of and for conduct within the scope of their duties. |
| **Special Committee** | The Special Committee will (i) consult with the Consenting Lenders in connection with its ongoing analysis and, (ii) as soon as reasonably practicable, provide the Consenting Lenders any and all non-privileged documents and information received in connection with its investigation, including with respect to JointMedica Investment Holdings, L.P., and, in any case, in advance of any determination regarding releases with respect to the Sponsor or its Related Parties. |
| **Indemnification and D&O Insurance** | In the event the Stalking Horse Purchaser is the Winning Bidder, all indemnification obligations set forth in the organizational documents of the Debtors consistent with applicable law and in place as of the Effective Date for the current and former directors and officers of the Debtors (solely in their capacity as such) (such obligations subject to the terms and conditions herein, the "Indemnification Obligations") shall be honored, or caused to be honored, by the Winning Bidder, reinstated, and otherwise remain intact, irrevocable, and shall survive the effectiveness of the Transactions on terms no less favorable to such current and former directors and officers of the Debtors than the indemnification provisions in place prior to the Restructuring Transactions; *provided* that the Winning Bidder shall not be required to indemnify or advance any expenses in connection with any claim made against any such director or officer under the following circumstance:  (i) arising out of or relating to any Excluded Litigation, including any Excluded Product Liability Claims (each as defined in the Stalking Horse APA) in an amount that exceeds $500,000 in the aggregate, (ii) for which payment is available under or has actually been made to or on behalf of such director or officer under any insurance policy issued to or for the benefit of the Debtors or other indemnity from the Acquired Entities, except with respect to any excess beyond the amount paid under any insurance policy issued to or for the benefit of the Debtors or other indemnity from the Acquired Entities (provided, however, that except as set forth herein no Indemnified Person shall be required to pursue any other insurance or indemnity prior to seeking indemnity from the Acquired Entities), and (iii) to the extent any claim or suit is finally adjudicated to have arisen out of or resulted from such director or officer's fraud, gross negligence, or willful misconduct.<br><br>Notwithstanding anything to the contrary herein, with respect to any Indemnification Obligations to be assumed or honored for the current and former directors and officers of the HoldCo Debtors, such obligations will be assumed or honored solely to the extent such obligations arise on account of actions taken by the applicable directors and officers solely in their capacity as officers and directors of the HoldCo Parties and solely to the extent relating to such HoldCo Parties' ownership and operation of Exactech (and its subsidiaries).<br><br>From and after the Effective Date, the directors, officers, and employee liability insurance policies shall remain in place on terms for coverage and amounts no less favorable than the Company Parties' and their Affiliates current directors' and officers' insurance policies.<br><br>The Company Debtors, the Winning Bidder, and the Wind-Down Entity shall not terminate or otherwise reduce the coverage under any directors, officers, and employee liability insurance policies (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) in effect on or prior to the Effective Date, and any current and former directors, officers, managers, and employees of the Company Parties and their Affiliates who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy or policies for the full term of such policy or policies regardless of whether such directors, officers, managers, and employees remain in such positions after the Effective Date.<br><br>Under the Approved Plan, each directors, officers, and employee liability insurance policy |

|  | (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) shall be a retained asset of the Company Debtors' bankruptcy estates and shall be maintained for the benefit of the beneficiaries thereunder. |
|---|---|
| **Plan Confirmation** | The Approved Plan shall provide that, in the event that any of the HoldCo Debtors is unable to confirm a chapter 11 plan on the terms and conditions set forth herein, such plan (or plans) shall be withdrawn, and such HoldCo Debtor's (or Debtors') inability to confirm a plan will not affect the agreements set forth herein and in the RSA regarding the Approved Plan with respect to the OpCo Debtors or the ability to confirm the Approved Plan with respect to the OpCo Debtors. |
| **Amendments** | This Term Sheet may be amended only as permitted pursuant to the RSA. |

*Execution Version*

# EXHIBIT C

**Bidding Procedures**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| Exactech, Inc., *et al.*,[1] | Case No. 24-12441 (LSS) |
| Debtors. | (Jointly Administered) |
|  | **Re: Docket No. ___** |

### BIDDING PROCEDURES

On October 29, 2024 (the "Petition Date"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"). The Debtors are maintaining their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

On [●], 2024, the United States Bankruptcy Court for the District of Delaware (the "Court") entered an order [Docket No. ●] (the "Bidding Procedures Order"), among other things, granting certain relief requested in the related motion [Docket No. ●] (the "Bidding Procedures Motion"), including authorizing the Debtors to solicit bids and approving the procedures set forth herein (collectively, the "Bidding Procedures") to be employed by the Debtors in connection with the proposed sale (the "Sale") of all or substantially all of the Debtors' assets (the "Assets") through a chapter 11 plan (the "Plan") pursuant to sections 105, 363, 365, and 1123 of the Bankruptcy Code, free and clear of all Encumbrances[2] other than Assumed Liabilities and Permitted Encumbrances to EI BIDCO, LLC (the "Stalking Horse Purchaser"), pursuant to an Asset Purchase Agreement dated as of October 29, 2024 (the "Stalking Horse APA") with the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Winning Bidder, then an Alternative APA with the Winning Bidder. The Stalking Horse APA is attached to the Bidding Procedures Order as Exhibit 4.

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  Osteon Holdings, Inc. (7042); Osteon Intermediate Holdings I, Inc. (7778); Osteon Intermediate Holdings II, Inc. (1292); Exactech, Inc. (3930); and XpandOrtho, Inc. (4250).  The Debtors' service address is 2320 NW 66th Court, Gainesville, Florida 32653.

[2]   Capitalized terms used but not yet defined herein shall have the meaning ascribed to such terms below. Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Bidding Procedures Order.

**ANY PARTY INTERESTED IN BIDDING ON ALL OR ANY COMBINATION OF THE ASSETS SHOULD CONTACT:**

**(A)    THE INVESTMENT BANKER FOR THE DEBTORS, KARN S. CHOPRA (212-429-2321; KCHOPRA@CENTERVIEW.COM) AND BOB BEASLEY (212-429-2356; BBEASLEY@CENTERVIEW.COM) OF CENTERVIEW PARTNERS LLC; AND**

**(B)    RYAN    PRESTON    DAHL    (212-596-9144; RYAN.DAHL@ROPESGRAY.COM) AND BENJAMIN M. RHODE (312-845-1293; BENJAMIN.RHODE@ROPESGRAY.COM) OF ROPES & GRAY LLP, COUNSEL FOR THE DEBTORS.**

### *Summary of Key Dates Established by Bidding Procedures*

| Event | Proposed Deadline |
|---|---|
| Entry of the Bidding Procedures Order | On or before Tuesday, November 26, 2024 |
| Disclosure Statement Hearing | On or before Monday, February 3, 2025 |
| Qualifying Bid Deadline | Monday, February 24, 2025 at 4:00 p.m. (prevailing Eastern Time) |
| Auction Date (if necessary) | Monday, March 3, 2025 |
| Deadline to file Notice of Winning Bidder | One (1) day following the closing of the Auction, or as soon as reasonably practicable |
| Deadline to Object to Confirmation and the Sale | Monday, March 17, 2025 at 4:00 p.m. (prevailing Eastern Time) |
| Plan Voting Deadline | Monday, March 17, 2025 at 4:00 p.m. (prevailing Eastern Time) |
| Deadline to Reply to Confirmation and Sale Objections | Tuesday, March 25, 2025 at 4:00 p.m. (prevailing Eastern Time) |
| Hearing to Consider the Confirmation and Sale Order | On or before Thursday, March 27, 2025 (subject to the Court's availability) |
| Entry of the Confirmation and Sale Order | No later than Thursday, March 27, 2025 |

The Debtors may adjourn any of the key dates or deadlines herein without further order of the Court; *provided* that the Debtors shall promptly file a notice with the Court of any changes to the key dates or deadlines herein. Any such adjournment shall not itself modify any milestones related to debtor in possession financing provided to the Debtors and approved by the Court.

146040901_39

1.      **Stalking Horse Purchaser**

On October 29, 2024, the Debtors entered into the Stalking Horse APA with the Stalking Horse Purchaser.  As set forth more fully in the Stalking Horse APA, the Stalking Horse Purchaser is (i) credit bidding all of the Prepetition Secured Obligations existing as of the Closing Date (\$[●] principal) and all of the DIP Obligations existing as of the Closing Date (\$[●] principal) (as each term is defined in the DIP Order)[3] (ii) assuming certain liabilities and certain executory contracts and unexpired leases of the Debtors, and (iii) satisfying cure costs (collectively (i), (ii), and (iii), the "Stalking Horse Bid").  The Stalking Horse APA also includes various customary representations, warranties, and covenants by and from the Debtors and the Stalking Horse Purchaser, and certain conditions to closing and rights of termination related to the Sale and these chapter 11 cases generally.

Notwithstanding anything herein to the contrary, the Stalking Horse Purchaser is deemed to be a Qualifying Bidder (as defined below), and the Stalking Horse Bid (including as it may be modified at the Auction (if any) in accordance with the terms therein and herein) is deemed to be a Qualifying Bid (as defined below).  The Stalking Horse Purchaser is credit bidding pursuant to 11 U.S.C. § 363(k), and thus is not required to make a Deposit (as defined below) with the Debtors. Subject to the DIP Order, the Stalking Horse Purchaser shall have the unqualified right at any time to credit bid on a dollar-for-dollar basis up to the full amount of the Prepetition Secured Obligations and the DIP Obligations.

2.      **Assets to be Sold**

The Debtors shall offer for sale the Assets, *provided* that the Debtors, in consultation with the Consultation Parties, determine that the aggregate consideration offered by any bid, or combination of bids, for the Assets, satisfies the requirements set forth in these Bidding Procedures.  Potential Bidders (as defined herein) may bid on all or any number or combination of the Assets.  The Debtors propose to consummate the proposed Sale transaction pursuant to a chapter 11 plan, subject to Court approval.

3.      **Participation Requirements**

Any interested party that wishes to participate in the bidding process for the Assets other than in the case of the Stalking Horse Purchaser (each, an "Interested Bidder") must first become a potential bidder (a "Potential Bidder").  To become a Potential Bidder, an Interested Bidder must submit to the Debtors and their advisors the following documents (collectively, the "Preliminary Bid Documents"):

---

[3]    For purposes of these Bidding Procedures, the "DIP Order" means that certain *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Priming Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. ●], together with any other orders approving the DIP Facility on an interim or final basis.

(a)     documentation identifying the Interested Bidder, its principals, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction, including the Auction, if any;

(b)     an executed confidentiality agreement ("<u>Confidentiality Agreement</u>") in form and substance satisfactory to the Debtors;

(c)     a statement and other factual support demonstrating to the Debtors' reasonable satisfaction, after consultation with the Consultation Parties, that the Interested Bidder has a *bona fide* interest in consummating the Sale; and

(d)     sufficient information, as determined by the Debtors, after consultation with the Consultation Parties, to allow the Debtors to determine that the Interested Bidder (x) has, or can obtain, the financial wherewithal and any required internal corporate, legal or other authorizations to close the Sale, including, but not limited to, current audited financial statements of the Interested Bidder (or such other form of financial disclosure acceptable to the Debtors in their discretion), and (y) can provide adequate assurance of future performance under any executory contracts and unexpired leases to be assumed by the Debtors and assigned to the Stalking Horse Purchaser or other Winning Bidder, as applicable, in connection with the Sale, pursuant to section 365 of the Bankruptcy Code, in connection with the Sale.

Each Interested Bidder shall comply with all reasonable requests for information and due diligence access by the Debtors or their advisors regarding the ability of such Interested Bidder to consummate its contemplated transaction.   The Debtors reserve the right to work with any Interested Bidder to cure any deficiencies in the Preliminary Bid Documents or, waive any of the foregoing requirements in the Debtors' reasonable business judgment.   The Debtors reserve all rights to determine in their business judgment whether a party that has submitted Preliminary Bid Documents shall be deemed a Potential Bidder.

**4.      Bankruptcy Court Jurisdiction**

Any Interested Bidders, Potential Bidders, and Qualifying Bidders (as defined herein) shall: (a) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating to the Bidding Procedures, the Sale, the Auction, and the construction and enforcement of the contemplated transaction documents of such parties; (b) be deemed to have waived any right to bring any such action or proceeding in the Court; and (c) be deemed to have consented to (i) the Court entering a final order or judgment determining any such action or proceeding and (ii) such final order or judgment in any such action or proceeding, including all appeals, being conclusive and enforceable in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law.

**5.      Form of Agreement**

Potential Bidders should reference the Stalking Horse APA in connection with their bids. As set forth below, Potential Bidders intending to submit bids must include with their bids:

146040901_39

(a)     a statement that such Potential Bidder offers to (i) purchase the Assets, or a number or combination of the Assets, and (ii) assume liabilities, upon substantially the same terms as, or terms more favorable to the Debtors and their estates than, the terms set forth in the Stalking Horse APA; and

(b)     a clean and duly executed asset purchase agreement (an "Alternative APA") and a marked copy of the Alternative APA and an alternative Confirmation and Sale order that reflects any variations from the Stalking Horse APA or the Confirmation and Sale Order, as applicable.

## 6.     Due Diligence

The Debtors will provide Potential Bidders with reasonable access to a data room and any other additional information that the Debtors believe to be reasonable and appropriate under the circumstances.   All due diligence requests shall be directed to: (a) the Debtors' proposed investment banker, Karn S. Chopra (212-429-2321; kchopra@centerview.com) and Bob Beasley (212-429-2356; bbeasley@centerview.com) of Centerview Partners LLC; or (b) the Debtors' proposed counsel, Ryan Preston Dahl (212-596-9144; ryan.dahl@ropesgray.com) and Benjamin M. Rhode (312-845-1293; Benjamin.Rhode@ropesgray.com) of Ropes & Gray LLP.

The due diligence period shall extend through and include the Bid Deadline.  The Debtors, in their business judgment, may, but shall not be obligated to, furnish any due diligence information after the Bid Deadline.

The Debtors reserve the right, in their reasonable discretion, to withhold or limit access to any due diligence information that the Debtors determine is not appropriate for disclosure to a Potential Bidder (including its affiliates and any related persons) at any time and for any reason, including, without limitation, if (a) any due diligence information is determined to be business sensitive, proprietary, or otherwise not appropriate for disclosure to a Potential Bidder by the Debtors, including, but not limited to, Potential Bidders who are customers or competitors of the Debtors or affiliates thereof, and other industry participants, (b) the Potential Bidder does not become, or the Debtors determine that the Potential Bidder is not likely to become, a Qualifying Bidder (each as defined below), (c) the Potential Bidder violates the terms of its Confidentiality Agreement, (d) the Debtors become aware that the information set forth on the Potential Bidder's Preliminary Bid Documents is inaccurate or misleading or of any other reason to doubt such Potential Bidder's ability to close its contemplated transaction, (e) the Potential Bidder (including its affiliates and any related persons) uses information obtained from the Data Room or the diligence process in connection with, or related to, any litigation or other legal action related to any Debtor, any current or former directors and officers of the Debtors, the Debtors' non-Debtor affiliates, and the Debtors' primary creditors as identified by the Debtors, (f) such disclosure would jeopardize protections afforded any Debtor or primary creditor as identified by the Debtors under the attorney-client privilege or the attorney work product doctrine, or (g) the bidding process is terminated in accordance with its terms.  Notwithstanding any prepetition limitations, including, without limitation, any non-disclosure, confidentiality, or similar provisions relating to any due diligence information, the Debtors and their estates shall be authorized to provide due diligence information to Potential Bidders; *provided* that such Potential Bidders have delivered an executed confidentiality agreement in form and substance acceptable to the Debtors (a "Confidentiality

Agreement"). Subject to the terms and conditions of each Confidentiality Agreement, the Debtors and their estates are not responsible for, and shall have no liability with respect to, any information obtained by, or provided to, any Potential Bidders in connection with the Bidding Procedures and the Sale.

**7.    Bid Requirements**

Other than in the case of the Stalking Horse Purchaser and the Stalking Horse APA, which shall be considered a Qualifying Bidder and a Qualifying Bid, respectively, for all purposes under the Bidding Procedures, without any regard to any of the requirements or conditions set forth therein and without any other or further action by the Stalking Horse Purchaser, to be deemed a "Qualifying Bid," a bid must be received from a Potential Bidder before the Bid Deadline and satisfy each of the following requirements (each, a "Bid Requirement"):

a.    be in writing;

b.    include a clean and duly executed asset purchase agreement (an "Alternative APA") and a marked copy of the Alternative APA and an alternative Confirmation and Sale order showing any variations from the Stalking Horse APA or the Confirmation and Sale Order, as applicable;

c.    fully disclose the identity of the Potential Bidder (and to the extent that the Potential Bidder is a newly formed acquisition entity or the like, the identity of the Potential Bidder's parent company or sponsor), and provide the contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors have any questions or wish to discuss the bid submitted by the Potential Bidder;

d.    set forth the purchase price to be paid by such Potential Bidder, which purchase price shall include an aggregate amount of cash sufficient to pay all DIP Obligations (as defined in the DIP Order) in cash in full at closing;

e.    identify separately any cash and non-cash components, which non-cash components shall be limited only to credit bids in accordance with section 363(k) of the Bankruptcy Code and assumed liabilities;

f.    state the liabilities proposed to be paid or assumed by such Potential Bidder;

g.    specify the Assets that are included in the bid and state that such Potential Bidder offers to (i) purchase the Assets, or a number or combination of the Assets, and (ii) assume liabilities, upon substantially the same terms as, or terms more favorable to the Debtors and their estate than, the terms set forth in the Stalking Horse APA;

h.    state that such Potential Bidder's offer is formal, binding and unconditional, and is irrevocable until two (2) business days after the closing of the Sale with respect to the applicable Assets;

i.      to the extent that a bid is not accompanied by evidence of a Potential Bidder's capacity to consummate the applicable Sale with cash on hand, the bid must include unconditional committed financing from a reputable financing institution, documented to the satisfaction of the Debtors in consultation with the Consultation Parties, including appropriate contact information for such financing sources, that demonstrates that the Potential Bidder has: (i) received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's purchase price and other obligations under its bid; and (ii) adequate working capital financing or resources to finance going concern operations for the Assets. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions reasonably acceptable to the Debtors, in consultation with the Consultation Parties;

j.      contain such financial and other information to allow the Debtors to make a reasonable determination, after consultation with the Consultation Parties, as to the Potential Bidder's financial and other capabilities to close the transactions contemplated by the applicable Alternative APA, including, without limitation, such financial and other information supporting the Potential Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code, including the Potential Bidder's financial wherewithal and willingness to perform under any contracts and leases that are assumed and assigned to the Potential Bidder, in a form that allows the Debtors to serve such information on any counterparties to such contracts or leases in connection with the Sale within one (1) business day after the Debtors' receipt of such information. To the extent that the Potential Bidder (other than the Stalking Horse Purchaser) is a newly formed acquisition entity or the like, the financial and other information supporting the Potential Bidder's financial wherewithal shall include financial and other information supporting the financial wherewithal of the Potential Bidder's parent company or sponsor;

k.      identify with particularity each and every executory contract and unexpired lease, the assumption and assignment of which is a condition to close the transactions contemplated by the Alternative APA;

l.      include closing conditions that are no less favorable to the Debtors than the closing conditions contained in the Stalking Horse APA (and specify such closing conditions in the applicable Alternative APA);

m.      include a statement that the bid does not request or entitle such Potential Bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement;

n.      not contain any contingencies of any kind, including, without limitation, contingencies related to financing, internal approval, or due diligence;

7

o.  contain a written acknowledgement and representation that the Potential Bidder (i) has had an opportunity to conduct any and all due diligence regarding the Assets, (ii) has relied solely upon its own independent review, investigation or inspection of any documents and other information in making its bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any documents or other information provided in connection with the Bidding Procedures and the Sale;

p.  set forth (i) a statement or evidence that the Potential Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable, and pay the fees associated with such filings, and (ii) any regulatory and third-party approvals required for the Potential Bidder to close the transactions contemplated by the Alternative APA, and the time period within which the Potential Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than five (5) days following execution and delivery of such Potential Bidder's Alternative APA, those actions the bidder will take to ensure receipt of such approval(s) as promptly as possible); *provided* that a Potential Bidder agrees that its legal counsel will coordinate in good faith with the Debtors' legal counsel to discuss and explain the Potential Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable, and in no event later than the time period contemplated in the Alternative APA; *provided*, *further* that the bid contains a covenant to cooperate with the Debtors to provide pertinent factual information regarding the bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements;

q.  provide for a binding commitment of the Potential Bidder to serve as a backup bidder (the "Back-Up Bidder") if the Potential Bidder's bid is the next highest and best bid (the "Back-Up Bid") after the Winning Bid, with respect to the applicable Assets;

r.  include written evidence of authorization and approval from the Potential Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of the Alternative APA;

s.  provide a good faith cash deposit (the "Deposit") in an amount equal to ten percent (10%) of the aggregate purchase price provided for in the Alternative APA (or such additional amount as may be determined by the Debtors in their reasonable discretion);

t.  state or otherwise estimate the types of, and costs or charges for, transition services, if any, the Potential Bidder would require of or provide to the Debtors, including an estimate of the time any such transition services would be required of or provided to the Debtor; and

8

u.    provide that in the event of the Potential Bidder's breach of, or failure to perform under, the Alternative APA, the Debtors and their estates shall be entitled to pursue all available legal and equitable remedies, including, without limitation, retention of the Deposit as part of the damages resulting to the Debtors and their estates for such breach or failure to perform.

A bid from a Potential Bidder satisfying all of the above requirements, as determined by the Debtors, in consultation with the Consultation Parties, shall constitute a Qualifying Bid. The Debtors reserve the right, in their business judgment and in consultation with the Consultation Parties, to waive any of the Bid Requirements or work with any Potential Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualifying Bid.

Each Potential Bidder submitting a bid shall be deemed to: (a) acknowledge and represent that it is bound by all of the terms and conditions of the Bidding Procedures; and (b) have waived the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its bid, the Bidding Procedures, the Auction, or the Sale.

**8.    Bid Deadline**

A Potential Bidder, other than the Stalking Horse Purchaser, that desires to make a bid shall deliver a written and electronic copy of its bid in both PDF and MS-WORD format to the Bidding Procedures Notice Parties (as defined herein) and the Consultation Parties so as to be received on or before **Monday, February 24, 2025 at 4:00 p.m. (ET)** (the "Bid Deadline"); *provided* that the Debtors may extend the Bid Deadline without further order of the Court, after consultation with the DIP Agent and the Consultation Parties. To the extent that the Bid Deadline is extended for all parties, the Debtors shall file a notice on the docket of their chapter 11 cases indicating the same. **Any party that does not submit a bid by the Bid Deadline will not be allowed to (a) submit any bids after the Bid Deadline or (b) participate in the Auction.**

**9.    Evaluation of Qualifying Bids**

The Debtors will deliver, within one (1) business day after receipt thereof, copies of all bids from Potential Bidders to the Consultation Parties.

The Debtors, in consultation with the Consultation Parties, shall make a determination regarding whether a timely submitted bid from a Potential Bidder is a Qualifying Bid. In determining whether any bids constitute Qualifying Bids, the Debtors may consider a combination of bids for various subsets of the Assets.

No later than **Tuesday, February 25, 2025**, the Debtors shall: (i) notify all Potential Bidders whether their respective bids have been determined to be Qualifying Bids and those Potential Bidders that have submitted Qualifying Bids will be considered to be qualifying bidders (the "Qualifying Bidders") and (ii) determine, in consultation with the Consultation Parties, which of the Qualifying Bids, at such time, is the highest or best Qualifying Bid for purposes of constituting the opening bid of the Auction (which must be at least equal to the value of the Stalking Horse Bid, plus $10,000,000.00, for the applicable Assets the "Baseline Bid" and the Qualifying Bidder submitting the Baseline Bid, the "Baseline Bidder"), and shall promptly notify

9

the Stalking Horse Purchaser and all Qualifying Bidders of the Baseline Bid for each subset of Assets, if applicable.  To the extent reasonably practicable, counsel for the Debtors shall provide summaries of the material terms of each Qualifying Bid to the Consultation Parties on a professionals' eyes-only basis subject to the terms of the applicable Confidentiality Agreement at least twenty-four (24) hours prior to the Auction (if any).

Notwithstanding anything to the contrary herein, and for the avoidance of doubt, for all purposes under the Bidding Procedures:  (i) the Stalking Horse Purchaser shall be considered a Qualifying Bidder, and the Stalking Horse APA shall be considered a Qualifying Bid, for all purposes under the Bidding Procedures, without regard to any of the requirements or conditions set forth therein and without any other or further action by the Stalking Horse Purchaser; and (ii) in determining whether the Potential Bidders constitute Qualifying Bidders, the Debtors may consider a combination of bids for the Assets.

**10.    No Qualifying Bids**

If no timely Qualifying Bids other than the Stalking Horse Bid are submitted on or before the Bid Deadline, the Debtors shall not hold an Auction and shall request at the Confirmation and Sale Hearing that the Court approve the Sale to the Stalking Horse Purchaser on the terms of the Stalking Horse APA and the transaction contemplated thereunder.

**11.    Auction**

If the Debtors timely receive one or more Qualifying Bids other than the Stalking Horse Bid, then the Debtors shall conduct an auction (the "Auction").  Following the Auction, the Debtors will determine, in consultation with the Consultation Parties, which Qualifying Bid or combination of Qualifying Bids is the highest or otherwise best bid for the Assets, which will be determined by considering, among other things, the following non-binding factors:  (a) the number, type and nature of any changes to the Stalking Horse APA requested by each Qualifying Bidder; (b) the extent to which such modifications are likely to delay closing of the Sale and the cost to the Debtors and their estates of such modifications or delay; (c) the total consideration to be received by the Debtors and their estates (provided, for the avoidance of doubt, that a credit bid shall not be considered inferior to a comparable cash or other non-cash bid because it is a credit bid); (d) the transaction structure and execution risk, including conditions to, timing of and certainty of closing, termination provisions, availability of financing and financial wherewithal to meet all commitments, and required governmental or other approval; (e) the net benefit to the Debtors' estates; (f) the certainty of the Debtors being able to confirm a chapter 11 plan; and (g) any other factors the Debtors may reasonably deem relevant in their business judgment.

Bidders and their representatives may not communicate or coordinate with one another for purposes of submitting a Bid or Bids or participating in the Auction without the prior consent of the Debtors.  All parties are prohibited from (i) engaging in any collusion with respect to the bidding or sale of any of the Assets described herein or (ii) taking any other action to prevent a transparent and competitive auction process.

The Auction shall be governed by the following procedures:

(a)    the Auction shall be held on **Monday, March 3, 2025 at 11:00 a.m. (ET)** or such other date as may be determined by the Debtors in consultation with the Consultation Parties (which information will be timely provided by the Debtors to the Auction Participants (as defined below)) at the offices of Ropes & Gray LLP, 1211 6th Avenue, New York, NY 10036 or virtually via telephone or video conference;

(b)    only the Stalking Horse Purchaser and the other Qualifying Bidders (together, the "Auction Bidders") shall be entitled to make any subsequent bids at the Auction;

(c)    the Auction Bidders shall appear at the Auction, or through a duly authorized representative;

(d)    only the Debtors, the Auction Bidders, the Consultation Parties, the DIP Agent, and any creditors of the Debtors, together with the professional advisors to each of the foregoing parties, may attend the Auction (collectively, the "Auction Participants"); *provided* that any such creditors provide counsel for the Debtors written notice of their intent to attend the Auction no later than 5:00 p.m. (ET) two days prior to the Auction;

(e)    the Debtors and their professional advisors shall direct and preside over the Auction, which shall be transcribed;

(f)    prior to the start of the Auction, each of the Auction Bidders shall confirm that they have not engaged in any collusion with respect to the Bidding Procedures, the Auction or the Sale;

(g)    the Auction shall be conducted in an open cry format (and not by way of sealed bids). Bidding shall commence at the amount of the Baseline Bid(s), and the Auction Bidders may submit successive bids in increments of at least $2,500,000.00, *provided* that: (i) each such successive bid must be a Qualifying Bid; and (ii) the Debtors shall retain the right to modify the bid increment requirements at the Auction;

(h)    the Auction may include individual negotiations with any of the Auction Bidders, but all bids shall be made on the record and in the presence of all of the Auction Bidders;

(i)    all material terms of the bid that is deemed to be the highest and best bid for each subset of Assets, if applicable, for each round of bidding shall be fully disclosed to the Auction Bidders, and the Debtors shall use reasonable efforts to clarify any and all questions that the Auction Bidders may have regarding Debtors' announcement of the then-current highest and best bid(s);

(j)      except as specifically set forth herein, for the purpose of evaluating the value of the purchase price provided by each successive bid (including any successive bid by the Stalking Horse Purchaser), the Debtors, in consultation with the Consultation Parties, may give effect to any additional liabilities to be assumed by a Qualifying Bidder, and any additional costs which may be imposed on the Debtors;

(k)      each Auction Bidder shall (i) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating to the Bidding Procedures, the Sale, the Auction and the construction and enforcement of the contemplated transaction documents of the Auction Bidders, (ii) be deemed to have waived any right to bring any such action or proceeding relating to the Bidding Procedures, the Auction, or the Sale in the Court, and (iii) be deemed to have consented to (A) the Court entering a final order or judgment determining in any such action or proceeding and (B) a final order or judgment in any such action or proceeding, including all appeals, being conclusive and enforceable in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law;

(l)      throughout the Auction, the Stalking Horse Purchaser (i) shall have the continuing right to credit bid the DIP Obligations then outstanding, or any part thereof, to purchase the Assets, and (ii) shall have the continuing right to credit bid any Prepetition Secured Obligations then outstanding, or any part thereof, to purchase the Assets;

(m)      the Auction Bidders shall have the right to make additional modifications to the Stalking Horse APA or any Alternative APA, as applicable, in conjunction with each Qualifying Bid submitted in each round of bidding during the Auction, *provided* that (i) any such modifications on an aggregate basis and viewed in whole, shall not, in the Debtors' discretion, in consultation with the Consultation Parties, be less favorable to the Debtors and their estates than the terms of the Stalking Horse APA, and (ii) each Qualifying Bid shall constitute an irrevocable offer and shall be binding on the Auction Bidder submitting such bid until such Auction Bidder shall have submitted a subsequent Qualifying Bid at the Auction, unless such bid is selected as the Winning Bid or the Back-Up Bid, which shall remain binding as provided for herein;

(n)      the Debtors and the Consultation Parties shall have the right to request any additional financial information that will allow the Debtors and the Consultation Parties to make a reasonable determination as to an Auction Bidder's financial and other capabilities to consummate the transactions contemplated by the Stalking Horse APA or any Alternative APA, as applicable, as may be amended during the Auction, and any further information that the Debtors may believe is reasonably necessary to clarify and evaluate any bid made by an Auction Bidder during the Auction;

(o)     upon the conclusion of the Auction, the Debtors shall determine, in consultation with the Consultation Parties, and subject to Court approval, the offer or offers for the Assets (or any subset thereof, if applicable) that is or are the highest or otherwise best from among the Qualifying Bids submitted at the Auction (the "<u>Winning Bid</u>"). In making this decision, the Debtors shall consider, in consultation with the Consultation Parties, the amount of the purchase price, the assumption of liabilities, the likelihood of the bidder's ability to close the proposed transaction and the timing thereof, the number, type and nature of any changes to the Stalking Horse APA or the applicable Alternative APA(s), as applicable, requested by each bidder, and the net benefit to the Debtors' estates. The bidder(s) submitting such Winning Bid at the Auction shall become the "<u>Winning Bidder</u>," and shall have such rights and responsibilities of the purchaser as set forth in the Stalking Horse APA or any Alternative APA, as applicable. The Debtors shall designate a Back-Up Bid (and the corresponding Back-Up Bidder) to purchase the Assets (or any subset thereof, if applicable) in the event that the Winning Bidder does not close the applicable Sale;

(p)     within one day after the conclusion of the Auction or as soon as reasonably practicable, the Debtors will file with the Court and serve on the Confirmation and Sale Notice Parties a notice setting forth the results of the Auction (the "<u>Notice of Winning Bidder and Back-Up Bidder</u>"), which will (a) identify the Winning Bidder and the Back-Up Bidder with respect to each subset of the Assets; (b) include a copy of the Winning Bid(s) and the Back-Up Bid(s) or a summary of the material terms of such bids, including any proposed assumption and assignment of contracts and leases contemplated thereby; and (c) set forth the Adequate Assurance Objection Deadline, the date, time, and location of the Confirmation and Sale Hearing and any other relevant dates or other information necessary to reasonably apprise the Confirmation and Sale Notice Parties of the outcome of the Auction;

(q)     within one (1) business bay of the close of the Auction, in the event the Stalking Horse Purchaser is not the Winning Bidder, the Winning Bidder shall supplement the Winning Bidder's Deposit such that the Deposit shall be equal to an amount that is ten (10%) percent of the Winning Bid; and

(r)     prior to the Confirmation and Sale Hearing, the Winning Bidder(s) shall complete and execute all agreements, contracts, instruments, and other documents evidencing and containing the terms and conditions upon which the Winning Bid was made.

THE WINNING BID AND ANY BACK-UP BID AND THEIR RELATED PURCHASE AGREEMENTS SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE WINNING BIDDER(S) AND THE BACK-UP BIDDER(S), RESPECTIVELY, FROM THE TIME THE APPLICABLE BID IS SUBMITTED UNTIL TWO (2) BUSINESS DAYS AFTER THE SALE WITH RESPECT TO THE APPLICABLE ASSETS HAS CLOSED. EACH QUALIFYING BID THAT IS NOT THE WINNING BID OR THE BACK-UP BID SHALL BE DEEMED WITHDRAWN AND TERMINATED AT THE CONCLUSION OF THE CONFIRMATION AND SALE HEARING.

12.     **Confirmation and Sale Hearing**

The Winning Bid(s) and any Back-Up Bid(s) (or if no Qualifying Bid other than that of the Stalking Horse Purchaser is received, then the Stalking Horse APA, which will be deemed to be the Winning Bid) will be subject to approval by the Court.  The Confirmation and Sale Hearing to approve the Winning Bid(s) and any Back-Up Bid(s) (or if no Qualifying Bid other than that of the Stalking Horse Purchaser is received, then the Stalking Horse APA) shall take place on **Thursday, March 27, 2025 at [●] (ET)**.  The Confirmation and Sale Hearing may be adjourned by the Debtors, in consultation with the DIP Agent and the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Winning Bidder, then in consultation with the DIP Agent, and the Winning Bidder(s), from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Confirmation and Sale Hearing, or by filing a hearing agenda or notice on the docket of these chapter 11 cases.

At the Confirmation and Sale Hearing, the Debtors will seek entry of  their forthcoming Confirmation and Sale Order that, among other things:  (i) confirms the Debtors' proposed chapter 11 plan, (ii) authorizes and approves the Sale to the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Winning Bidder, then to the Winning Bidder(s), pursuant to the terms and conditions set forth in the Stalking Horse APA or Alternative APA submitted by the Winning Bidder, as applicable, free and clear of all liens, claims, interests, and encumbrances, except certain permitted encumbrances and assumed liabilities as determined by the Debtors and any Winning Bidder(s); (iii) finding that the Stalking Horse Purchaser or Winning Bidder(s), as applicable, is a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code; (iv) authorizes the assumption and assignment of certain Contracts in connection with the Sale(s); and (v) as appropriate, exempting the Sale(s) and conveyance(s) of the Assets from any transfer tax, stamp tax or similar tax, or deposit under any applicable bulk sales statute.

**Any party who fails to file an objection to the Sale with the Court and serve it on the Bidding Procedures Notice Parties (as defined herein) on or before Monday, March 17, 2025 at [•] (ET) will be forever barred from asserting, at the Confirmation and Sale Hearing or thereafter, any objection to the consummation of the applicable Sale and any related relief requested by the Debtors.**

13.     **Back-Up Bidder**

Notwithstanding any of the foregoing, in the event that a Sale to the applicable Winning Bidder is terminated or fails to close by the outside date identified in the Winning Bid (or such date as may be extended by the Debtors in consultation with the DIP Agent and the Consultation Parties, the applicable Back-Up Bid will be deemed to be the Winning Bid with respect to the Applicable Assets, the applicable Back-Up Bidder will be deemed to be the applicable Winning Bidder, and the Debtors shall be authorized to close the Sale of the applicable Assets to such Back-Up Bidder on the terms of its Back-Up Bid without the need for further order of the Court and without the need for further notice to any interested parties.

146040901_39

14.    **Return of Deposits**

All Deposits shall be returned to the bidders not selected by the Debtors as the Winning Bidder or Back-Up Bidder no later than five (5) business days following the closing of the Sale(s). The deposit of the Winning Bidder or, if the Sale is closed with the Back-Up Bidder, the deposit of the Back-Up Bidder, shall be applied to the purchase price at the closing of the Sale.  If the Winning Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) fails to consummate the Sale because of a breach or failure to perform on the part of such bidder, then, subject to the terms of the Stalking Horse APA or any Alternative APA, as applicable, the Debtors and their estates shall be entitled to retain the Deposit of the Winning Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) as part of the damages to the Debtors and their estates for such breach or failure to perform.  For the avoidance of doubt, the Debtors' retention of a Deposit shall not constitute a waiver or limitation of any of the Debtors' legal or equitable rights relating to a Winning Bidder's or Back-Up Bidder's breach or failure to perform, and all such rights and remedies are preserved.

15.    **No-Shop or No-Solicitation Provisions**

The Bidding Procedures Order and Bidding Procedures do not limit the Debtors' ability or right to solicit higher or otherwise better bids for the Assets.  The Motion, the Bidding Procedures, and the Bidding Procedures Order call for a fair and open bidding and auction process.

16.    **Notice and Consultation Parties**

(a)    The term "Bidding Procedures Notice Parties" as used in these Bidding Procedures shall mean: (a) proposed counsel to the Debtors, Ropes & Gray LLP, 191 N. Wacker Drive, 32nd Floor, Chicago, Illinois 60606 (Attn: Ryan Preston Dahl (ryan.dahl@ropesgray.com) and Benjamin M. Rhode (benjamin.rhode@ropesgray.com)); (b) proposed co-counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801 (Attn: Ryan M. Bartley (RBartley@ycst.com) and Elizabeth S. Justison (EJustison@ycst.com)); (c) counsel to the Prepetition First Lien Agent and DIP Agent, ArentFox Schiff LLP, 1301 Avenue of the Americas, 42nd Floor, New York, New York 10019 (Attn: Jeffrey Gleit (jeffrey.gleit@afslaw.com)); (d) counsel to the Sponsor, Kirkland & Ellis LLP, 333 West Wolf Plaza, Chicago, IL 60654 (Attn: Chad J. Husnick (chusnick@kirkland.com) and Dave Gremling (dave.gremling@kirkland.com)); (e) counsel to the Stalking Horse Purchaser, Milbank LLP, 55 Hudson Yards, New York, New York 10001 (Attn: Evan Fleck (EFleck@milbank.com) and Nelly Almeida (NAlmeida@milbank.com)); and (f) the United States Trustee for the District of Delaware.

(b)    The term "Consultation Parties" as used in these Bidding Procedures shall mean any official committee of unsecured creditors appointed in the Debtors' chapter 11 cases (the "Creditors' Committee") and in the event that the Stalking Horse Purchaser terminates its credit bid, the DIP Agent and the Stalking Horse Purchaser.

For the avoidance of doubt, any consultation rights provided to the Consultation Parties by these Bidding Procedures shall not limit the Debtors' discretion in any way and shall not include the right to veto any decision made by the Debtors in the exercise of their business judgment.

15

In the event that any Consultation Party or any member of any Creditors' Committee or an affiliate of any of the foregoing submits a bid that is a Qualifying Bid, any obligation of the Debtors to consult with the bidding party established under these Bidding Procedures will be waived without further action; *provided* that the bidding party will have the same rights as any other Qualifying Bidder set forth above; *provided further* that in the event the Stalking Horse Purchaser is no longer a bidding party, the Stalking Horse Purchaser and the DIP Agent shall be Consultation Parties.

## 17.    Sale Is As Is/Where is

Except as may be set forth in the Stalking Horse APA or any Alternate APA, the Assets sold pursuant to the Bidding Procedures shall be conveyed at the closing in their then-present condition, **"AS IS, WITH ALL FAULTS, AND WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED."**

## 18.    Reservation of Rights

Notwithstanding any of the foregoing, the Debtors, in consultation with the Consultation Parties, may (a) after consultation with the DIP Agent, extend the deadlines set forth in the Bidding Procedures Order or the Bidding Procedures, and (b) adopt, implement, and waive such other, additional or existing procedures or requirements that, in their business judgment, will encourage an orderly Auction and bid process, including, but not limited to, the imposition of a requirement that all Qualifying Bidders submit sealed Qualifying Bids during the Auction, all without further notice except to the Auction Participants, as appropriate; *provided*, however, that the prior written consent of the DIP Agent is required to modify the minimum amount of consideration required for an Alternative APA to be the Baseline Bid pursuant to Section 9.

The Debtors, in consultation with the Consultation Parties, may (a) determine which Qualifying Bid(s), if any, is the Winning Bid(s) with respect to any subset of Assets, and (b) reject at any time before entry of the Confirmation and Sale Order approving the Winning Bid(s), any bid (other than the Stalking Horse Bid) that, in the discretion of the Debtors, in consultation with the Consultation Parties, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures, or (iii) contrary to the best interests of the Debtors' estates and their creditors.  At or before the conclusion of the Auction, the Debtors, in consultation with the Consultation Parties, may impose such other terms and conditions upon Qualifying Bidders as the Debtors determine to be in the best interests of the Debtors' estates in these cases.

## 19.    Fiduciary Out

Nothing in these Bidding Procedures will require the Debtors to take any action, or refrain from taking any action, with respect to these Bidding Procedures to the extent the Debtors determine that taking such action, or refraining from taking such action, as applicable, is required or appropriate to comply with applicable law or their fiduciary obligations.

*Execution Version*

## Exhibit D

**Stalking Horse APA**

**ASSET PURCHASE AGREEMENT**

**DATED AS OF OCTOBER 29, 2024**

**BY AND AMONG**

**EI BIDCO, LLC, AS PURCHASER,**

**AND**

**EXACTECH, INC.**

**AND ITS SUBSIDIARIES NAMED HEREIN, AS SELLERS**

# TABLE OF CONTENTS

**Page**

ARTICLE I PURCHASE AND SALE OF THE ACQUIRED ASSETS;  ASSUMPTION OF
     ASSUMED LIABILITIES..................................................................................1

  1.1    Purchase and Sale of the Acquired Assets ..............................................1
  1.2    Excluded Assets ......................................................................................4
  1.3    Assumption of Certain Liabilities ...........................................................6
  1.4    Excluded Liabilities ................................................................................7
  1.5    Assumption/Rejection of Certain Contracts ............................................7

ARTICLE II CONSIDERATION; PAYMENT; CLOSING .................................................10

  2.1    Consideration .........................................................................................10
  2.2    Closing ..................................................................................................11
  2.3    Closing Deliveries by Sellers .................................................................11
  2.4    Closing Deliveries by Purchaser ............................................................11
  2.5    Withholding ...........................................................................................12

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLERS ...............................12

  3.1    Organization and Qualification ..............................................................12
  3.2    Authorization of Agreement ...................................................................12
  3.3    Conflicts; Consents ...............................................................................13
  3.4    Equity Interests of Acquired Entities. .....................................................13
  3.5    Financial Statements .............................................................................14
  3.6    Title to Properties..................................................................................14
  3.7    Title to Acquired Assets; Sufficiency .....................................................15
  3.8    Contracts ..............................................................................................15
  3.9    No Litigation .........................................................................................16
  3.10   Permits; Compliance with Laws .............................................................17
  3.11   Environmental Matters...........................................................................17
  3.12   Intellectual Property ..............................................................................17
  3.13   Tax Matters ...........................................................................................20
  3.14   Seller Plans ...........................................................................................21
  3.15   Employees .............................................................................................22
  3.16   Affiliate Transactions............................................................................23
  3.17   Brokers .................................................................................................23
  3.18   Accounts Receivable; Accounts Payable ................................................23
  3.19   Inventory ...............................................................................................23
  3.20   Material Customers; Material Suppliers .................................................23
  3.21   Government Contracts ...........................................................................24
  3.22   Product Liability ...................................................................................25
  3.23   No Other Representations or Warranties .................................................25

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER ...........................25

  4.1    Organization and Qualification...............................................................25

i

# TABLE OF CONTENTS

**Page**

4.2    Authorization of Agreement ....................................................................26
4.3    Conflicts; Consents ................................................................................26
4.4    Financing.................................................................................................27
4.5    Brokers ....................................................................................................27
4.6    Investment Representation; Investigation...............................................27
4.7    No Litigation ...........................................................................................27
4.8    Certain Arrangements .............................................................................27
4.9    No Foreign Person ..................................................................................27
4.10   No Additional Representations or Warranties ........................................27
4.11   No Outside Reliance ...............................................................................28

**ARTICLE V BANKRUPTCY COURT MATTERS** ..............................................................**29**

5.1    Bankruptcy Actions ................................................................................29
5.2    Cure Costs ...............................................................................................30
5.3    Plan Confirmation and Sale Order..........................................................30
5.4    Approval ..................................................................................................31

**ARTICLE VI COVENANTS AND AGREEMENTS** ...........................................................**31**

6.1    Conduct of Business of Sellers ..............................................................31
6.2    Access to Information .............................................................................34
6.3    Employee Matters ...................................................................................36
6.4    Regulatory Approvals .............................................................................38
6.5    Competition and FDI Notifications ........................................................39
6.6    Reasonable Efforts; Cooperation ...........................................................41
6.7    Further Assurances..................................................................................41
6.8    Insurance Matters ...................................................................................41
6.9    Receipt of Misdirected Assets; Liabilities.............................................41
6.10   Directors' and Officers' Indemnification................................................42
6.11   Manufacture of Medical Devices............................................................43
6.12   Australian Proceedings ...........................................................................43
6.13   UK Proceedings. .....................................................................................44

**ARTICLE VII CONDITIONS TO CLOSING**......................................................................**45**

7.1    Conditions Precedent to the Obligations of Purchaser and Seller .........45
7.2    Conditions Precedent to the Obligations of Purchaser ..........................45
7.3    Conditions Precedent to the Obligations of Seller.................................47
7.4    Waiver of Conditions..............................................................................47

**ARTICLE VIII TERMINATION** .......................................................................................**47**

8.1    Termination of Agreement......................................................................47
8.2    Effect of Termination.............................................................................49

## TABLE OF CONTENTS

**Page**

ARTICLE IX TAXES ...................................................................................................51

9.1   Transfer Taxes ...........................................................................................51
9.2   Allocation of Purchase Price.....................................................................51
9.3   Cooperation ...............................................................................................51
9.4   Retroactive Tax Elections .........................................................................52
9.5   Tax Treatment ...........................................................................................52

ARTICLE X MISCELLANEOUS .................................................................................52

10.1   Non-Survival of Representations and Warranties and Certain Covenants;
       Certain Waivers .......................................................................................52
10.2   Expenses ..................................................................................................52
10.3   Notices .....................................................................................................53
10.4   Binding Effect; Assignment.....................................................................54
10.5   Amendment and Waiver ...........................................................................54
10.6   Third Party Beneficiaries .........................................................................54
10.7   Non-Recourse ..........................................................................................54
10.8   Severability ..............................................................................................54
10.9   Construction .............................................................................................55
10.10  Schedules .................................................................................................55
10.11  Complete Agreement ...............................................................................55
10.12  Specific Performance ...............................................................................56
10.13  Jurisdiction and Exclusive Venue ...........................................................56
10.14  Governing Law; Waiver of Jury Trial ......................................................57
10.15  Counterparts and PDF..............................................................................57
10.16  Publicity ...................................................................................................58
10.17  Bulk Sales Laws.......................................................................................58
10.18  Time of Essence .......................................................................................58
10.19  Sellers' Representative..............................................................................58

ARTICLE XI ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS ...................58

11.1   Certain Definitions...................................................................................58
11.2   Index of Defined Terms ...........................................................................68
11.3   Rules of Interpretation .............................................................................69

## INDEX OF EXHIBITS

EXHIBIT A    FORM OF BILL OF SALE
EXHIBIT B    FORM OF TRADEMARK ASSIGNMENT AGREEMENT
EXHIBIT C    FORM OF COPYRIGHT ASSIGNMENT AGREEMENT
EXHIBIT D    FORM OF PATENT ASSIGNMENT AGREEMENT

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of October 29, 2024, is made by and among EI Bidco, LLC, a Delaware limited liability Company ("Purchaser"), Exactech, Inc., a Florida corporation ("Exactech"), and the Subsidiaries of Exactech that are indicated on the signature pages attached hereto (together with Exactech, each a "Seller" and collectively "Sellers"). Purchaser and Sellers are referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used herein shall have the meanings set forth herein or in Article XI.

WHEREAS, on October 29, 2024 (the "Petition Date"), Sellers, together with other of Sellers' Subsidiaries and Affiliates (the "Debtors"), commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes under Case No. Case No. 24-12441 (LSS) (collectively, the "Bankruptcy Cases"); and

WHEREAS, in accordance with the Bidding Procedures and subject to the terms and conditions set forth in this Agreement and the entry of the Plan Confirmation and Sale Order, the Sellers desire to sell to Purchaser all of the Acquired Assets and to assign to Purchaser all of the Assumed Liabilities, Purchaser desires to purchase from the Sellers all of the Acquired Assets and assume all of the Assumed Liabilities, and the Parties intend to effectuate the transactions contemplated hereby, upon the terms and conditions hereinafter set forth;

WHEREAS, the Acquired Assets and Assumed Liabilities shall be purchased and assumed by Purchaser pursuant to the Plan Confirmation and Sale Order, free and clear of all Encumbrances (other than Permitted Encumbrances), pursuant to Sections 105, 363, 365, 1123(a)(5)(D), 1129, 1141 and 1146, of the Bankruptcy Code, and Rules 4001, 6004, 6006, 3020 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules");

WHEREAS, the performance under this Agreement and the Sellers' ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Plan Confirmation and Sale Order by the Bankruptcy Court and such transactions are expected to be consummated concurrently with the effective date of the Plan;

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, intending to be legally bound hereby, Purchaser and Sellers hereby agree as follows.

## ARTICLE I
## PURCHASE AND SALE OF THE ACQUIRED ASSETS;
## ASSUMPTION OF ASSUMED LIABILITIES

1.1    <u>Purchase and Sale of the Acquired Assets</u>. Pursuant to sections 105, 363, 365 and 1123(a) of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and subject to the entry and terms of the Plan Confirmation and Sale Order, at the Closing, Sellers shall sell, transfer, assign, convey and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Sellers, all of Sellers' right, title and interest in and to, as of the Closing, the Acquired

Assets, free and clear of all Encumbrances other than Permitted Encumbrances. "<u>Acquired Assets</u>" means, subject to Section 1.5(b), all of the properties, rights, interests and other assets of each Seller as of the Closing, whether tangible or intangible, real, personal or mixed, wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP, including any such properties, rights, interests and other assets acquired by any Seller after the date hereof and prior to the Closing, and including Sellers' right, title and interest in and to, as of the Closing, the following assets of each Seller, but excluding in all cases the Excluded Assets:

      (a)     subject to <u>Section 1.5</u>, all Available Contracts that Purchaser has designated as Assigned Contracts pursuant to <u>Section 1.5</u>, and all purchase orders of any Seller, to the extent assignable under applicable Law, excluding, for the avoidance of doubt, the Excluded Contracts;

      (b)     all accounts receivable, notes receivable, negotiable instruments and chattel paper owing from Persons that are not Sellers, together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto;

      (c)     all Documents;

      (d)     the Leased Real Property listed on <u>Schedule 1.1(d)</u> (the "<u>Acquired Leased Real Property</u>"), including any Leasehold Improvements;

      (e)     all tangible assets (including Equipment) of Sellers, including the tangible assets of Sellers located at any Acquired Leased Real Property and any tangible assets on order to be delivered to any Seller;

      (f)     all rights against third parties (including customers, suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Assigned Contract), including causes of action, claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds (other than Excluded Tax Refunds), causes of action, rights of set off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities made by such third parties, in each case, arising out of or relating to events or circumstances with respect to any of the Acquired Assets or Assumed Liabilities (in each case, other than against any Seller);

      (g)     all shares of capital stock and other equity interests that any Seller owns in those Subsidiaries of Exactech set forth on <u>Schedule 1.1(g)</u> (the "<u>Transferred Subsidiaries</u>" and, together with the Subsidiaries of any Transferred Subsidiary, the "<u>Acquired Entities</u>"), including any securities convertible into, or exchangeable or exercisable for, any such shares of capital stock or other equity interests in such Persons set forth on <u>Schedule 1.1(g)</u>; *provided*, that prior to Closing, Purchaser may notify Sellers in writing of any Acquired Entities which Purchaser no longer wishes to acquire, and any such excluded entities shall be Excluded Assets (such excluded entities, the "<u>Excluded Entities</u>", and such an election, an "<u>Acquired Entities Election</u>"); *provided*, further, that, if Purchaser makes an Acquired Entities Election, Purchaser and Seller shall negotiate in good faith an increase to the Wind-Down Amount sufficient to wind-down any entities that become Excluded Assets pursuant to such Acquired Entities Election and such Acquired Entities Election shall not be effective unless and until Purchaser and Seller mutually agree upon such increased Wind-Down Amount;

(h)   all of Exactech's rights and interests (including membership interests and other equity interests) in JointMedica Limited and any all agreements between the Sellers and Jointmedica Limited, including that certain Distribution Agreement;

(i)   to the extent transferable under applicable Law, all of the rights, interests and benefits (if any) accruing under all Permits and Governmental Authorizations, and all pending applications therefor (and Purchaser and Sellers hereby acknowledge and agree that the EU Certifications are not transferable under applicable Law);

(j)   the sponsorship of, and all rights, title, interests and assets of and associated with, the Seller Plans set forth on Schedule 1.1(j), which schedule shall be delivered to Sellers by Purchaser no later than 30 (thirty) Business Days prior to the Closing Date, including any funding arrangements related thereto (including all trusts, insurance policies, and administrative services Contracts relating thereto), and all rights thereunder (collectively, the "Assumed Benefit Plans");

(k)   all Intellectual Property of Sellers, including copies and tangible embodiments thereof, in whatever form or medium, together with all goodwill associated therewith, all rights to collect royalties and proceeds in connection with such Intellectual Property, all rights to sue and recover for infringements, dilutions, misappropriations of, or other conflicts with, such Intellectual Property and any and all corresponding rights that, now or hereafter, may be secured throughout the world;

(l)   (i) all Cash and Cash Equivalents ("Acquired Cash"), all bank accounts except for the bank accounts set forth on Schedule 1.1(l) (other than, for the avoidance of doubt, any Cash held in such bank accounts, which shall be included), and all deposits (including maintenance deposits and security deposits for rent, prepaid or deferred charges and expenses and all lease and rental payments that have been prepaid by any Seller, but excluding the Wind-Down Amount and GUC Reserve; provided, that, any portion of the remaining Wind-Down Amount upon entry of a final decree of the Plan Confirmation and Sale Order shall be distributed to the Purchaser (the "Purchaser's Reversionary Interest") and (ii) the GUC Reserve;

(m)   all demands, credits, statements, allowances, refunds, rebates (including any vendor or supplier rebates), rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, credits, causes of action, rights of set off, rights of recovery or rights of recoupment relating to or arising against suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Acquired Contract;

(n)   other than any claims or causes of action against the Sellers' current or former officers or directors that have been released, (i) all preference or avoidance claims or actions arising under the Bankruptcy Code or other applicable Law, and (ii) all other rights, claims, causes of action, rights of recovery, rights of set-off and rights of recoupment as of the Closing of any Seller, in each case, solely related to the Acquired Assets or Assumed Liabilities.

(o)   all rights under or arising out of all insurance policies and binders relating to the business of the Seller or the Acquired Assets, except for such policies (i) maintained that

3

relate solely to Excluded Assets or Excluded Liabilities and (ii) all directors' and officers' insurance policies or binders of the Sellers;

(p)    all goodwill, payment intangibles and general intangible assets and rights of Sellers;

(q)    all Inventory, supplies and materials to the extent used or held for use in, or related to, the business of the Seller, including all rights of the Sellers to receive such Inventory, supplies and materials that are on order;

(r)    all current assets, including all accounts receivable and trade receivables existing on the Closing Date, of Sellers; and

(s)    copies of all Tax Returns of each Seller.

1.2    <u>Excluded Assets</u>. Notwithstanding anything to the contrary in this Agreement, in no event shall Sellers be deemed to sell, transfer, assign, convey or deliver, and Sellers shall retain all right, title and interest to, in and under the following properties, rights, interests and other assets of Sellers (collectively, the "<u>Excluded Assets</u>"):

(a)    all Contracts of Sellers listed on <u>Schedule 1.2(a)</u> (the "<u>Excluded Contracts</u>");

(b)    all Documents (including information stored on the computer systems, data networks or servers of any Seller) (i) to the extent they relate to any of the Excluded Assets or Excluded Liabilities, (ii) that are Sellers' financial accounting Documents, all minute books, organizational documents, stock certificates, stock registers and such other books and records of any Seller as pertaining to ownership, organization or existence of such Seller, corporate seal, checkbooks and canceled checks, (iii) that any Seller is required by Law to retain or (iv) that are governed under GDPR or collected from natural persons with addresses in the European Union or European Economic Area; <u>provided</u>, that Purchaser shall have the right to make copies of any portions of such Documents to the extent not prohibited by applicable Law;

(c)    all documents prepared or received by any Seller or any of its Affiliates or on their behalf in connection with the sale of the Acquired Assets, this Agreement or the other Transaction Agreements, the transactions contemplated hereby or thereby or the Bankruptcy Case, including (i) all records and reports prepared or received by Sellers or any of their respective Affiliates or Advisors in connection with the sale of the Acquired Assets and the transactions contemplated hereby, including all analyses relating to the business of Purchaser or its Affiliates so prepared or received, (ii) all bids and expressions of interest received from third parties with respect to the acquisition of any of Sellers' businesses or assets (including, for the avoidance of doubt, any bids and expressions of interest unrelated to the sale process undertaken by the Sellers in connection with this Agreement), (iii) all privileged materials, documents and records of any Seller or any of its Affiliates, including any privileged materials, documents and records that are in the possession of any Acquired Entity, (iv) confidentiality agreements with prospective purchasers of the Acquired Assets or the Assumed Liabilities or any portion thereof, and (v) any

other files or records to the extent relating exclusively to any Excluded Assets, Excluded Liabilities or the Bankruptcy Case;

(d)    all shares of capital stock and other equity interests of any Seller or any of their respective Subsidiaries or securities convertible into, or exchangeable or exercisable for, any such shares of capital stock, or other equity interests, in all cases, other than any of the foregoing issued by any Acquired Entity or otherwise set forth on Schedule 1.5(g);

(e)    all claims that any Seller may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities;

(f)    Sellers' claims, causes of action or other rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument or other document executed and delivered between any Seller and Purchaser in connection with the transactions contemplated hereby, or any other agreement between any Seller and Purchaser entered into on or after the date hereof;

(g)    all Excluded Tax Refunds;

(h)    every asset of Sellers that would otherwise constitute an Acquired Asset (if owned immediately prior to the Closing) if conveyed or otherwise disposed of during the period from the date hereof until the Closing Date (i) to the extent constituting sales of inventory in the Ordinary Course, or (ii) as otherwise permitted by the terms of this Agreement and the DIP Orders;

(i)    the sponsorship of, and all rights, title, interests and assets of and associated with, the Seller Plans that are not Assumed Benefit Plans, including any funding arrangements related thereto (including all trusts, insurance policies, and administrative services Contracts relating thereto), and all rights thereunder;

(j)    all materials, documents and records, in any form, whether written, electronic or oral, containing or reflecting any communications to or from, or the work product of, legal counsel to any Seller or any of its Affiliates to the extent solely or primarily relating to the Excluded Liabilities;

(k)    any retainers or similar amounts paid to or on behalf of Sellers' Advisors or other professional service providers on behalf of Sellers' estate (other than Purchaser's Reversionary Interest) including, for the avoidance of doubt, any professional fee reserve account and carve-out escrow account established pursuant to orders of the Bankruptcy Court approving the DIP Facility;

(l)    any adequate assurance account reserved for Sellers' utility providers pursuant to an order of the Bankruptcy Court in accordance with Section 363 of the Bankruptcy Code (other than Purchaser's Reversionary Interest in such reserved cash);

(m)    all directors' and officers insurance policies or binders of the Sellers;

(n)    all claims or causes of action, if any, against the Sellers' current and former officers, directors, managers, Representatives, and other agents that are released;

(o)     the Wind-Down Amount (subject to the Purchaser's Reversionary Interest);; and

(p)     the properties, rights, interests and assets set forth on Schedule 1.1(k) and Schedule 1.2(p).

1.3     Assumption of Certain Liabilities. On the terms and subject to the conditions set forth herein and subject to the entry and terms of the Plan Confirmation and Sale Order, effective as of the Closing, Purchaser shall irrevocably assume from each Seller (and from and after the Closing pay, perform, discharge or otherwise satisfy in accordance with their respective terms), and Sellers (or with respect to Taxes, if applicable, Seller's applicable Affiliate) shall irrevocably transfer, assign, convey and deliver to Purchaser, only the following Liabilities, without duplication and only to the extent not paid on or prior to the Closing (collectively, the "Assumed Liabilities"):

(a)     without duplication of any Cure Costs, all Liabilities and obligations of any Seller under the Assigned Contracts (as of and following the time Purchaser designates such Contracts as Assigned Contracts pursuant to Section 1.5;

(b)     all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "Cure Costs");

(c)     all Liabilities (including all Taxes, government charges or fees) arising out of the conduct of the business or the ownership or operation of the Acquired Assets, in each case, by Purchaser from and after the Closing Date;

(d)     all current Liabilities (other than Taxes and without duplication of Cure Costs), to the extent such current Liabilities are existing on the Closing Date and result from the accounts set forth on Schedule 1.3(d);

(e)     all Liabilities relating to amounts required to be paid, or actions required to be taken or not to be taken, by Purchaser under this Agreement and all Transfer Taxes;

(f)     all Liabilities related to, resulting from or arising out of, on or after the Closing, any (i) unredeemed refund amounts or similar items, (ii) customer deposits or (iii) customer promotions and related programs, as set forth on Schedule 1.3(f);

(g)     all non-income Taxes with respect to the Acquired Assets for any Straddle Period;

(h)     all Liabilities relating to Purchaser's employment of the Transferred Employees and all Liabilities relating to the Assumed Benefit Plans, in each case, solely to the extent such Liabilities relate to periods following the Closing;

(i)     all Liabilities agreed to be assumed by Purchaser or for which Purchaser has agreed to be responsible in accordance with this Agreement;

(j)      all Liabilities arising under section 503(b)(9) of the Bankruptcy Code;

(k)      all Liabilities relating to any intercompany payables owing from any Seller to any Acquired Entity; and

(l)      the obligations of Sellers under the DIP Credit Agreement to cause to be issued to the Backstop Commitment Parties the Backstop Commitment Premium (each such term as defined in the DIP Credit Agreement) as contemplated by Section 2.09(3) of the DIP Credit Agreement.

1.4      Excluded Liabilities. Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, any Seller of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission or circumstances taking place on or prior to the Closing, other than the Assumed Liabilities, including, without limitation, all Excluded Environmental Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities"). Excluded Liabilities includes but is not limited to liabilities, however arising, from any and all foreign or domestic: claims, causes of action, lawsuits, class action lawsuits, consolidated proceedings, arbitrations, government investigations, and any proceeding or investigation based on successor or transferee liability (collectively, "Excluded Litigation"). For the avoidance of doubt, Excluded Liabilities includes any (i) product liability or similar claims for injury to a person or property arising from or related to any express or implied representation, warranty, or agreement made by Seller, claims arising from or related to the improper performance or malfunctioning of any product, the improper design or manufacture of any product, failure to adequately package, label or warn of hazards or other related defects of any products, or any service performed by Seller; (ii) any claims arising from or related to the recall or design defect of any products manufactured or sold by Seller or any service performed by Seller; and (iii) any claims, proceedings, or investigations pursued under the False Claims Act 31 U.S.C. §§ 3729 – 3733, whether brought by the United States Government or by another on its behalf (collectively, "Excluded Product Liability Claims"). Purchaser hereby acknowledges and agrees that no Liability of any Acquired Entity shall be an Excluded Liability and that all Liabilities of any Acquired Entity as of the Closing shall continue to be the Liabilities of such Acquired Entity following the Closing.

1.5      Assumption/Rejection of Certain Contracts.

(a)      Assumption and Assignment of Executory Contracts.

(i)      Schedule 1.5(a) sets forth a list of all executory Contracts to which any Seller is a party that is subject to assumption or rejection pursuant to Section 365 of the Bankruptcy Code (the "Available Contracts") to the best of Sellers' information and belief. No later than 10 Business Days following entry of the Bidding Procedures Order, Seller shall provide purchaser with a Schedule of the estimated Cure Costs for each Available Contract. No later than five (5) Business Days prior to Closing, Purchaser shall designate in writing (a "Designation Notice") the Available Contracts that Purchaser

7

wishes for Sellers to assume and assign to Purchaser (the "Assigned Contracts"). All Available Contracts that Purchaser does not designate as Assigned Contracts pursuant to this Section 1.5 (such Contracts, the "Rejected Contracts") shall not constitute Assigned Contracts or Acquired Assets and shall automatically be deemed Excluded Contracts; *provided, however*, that if there is a Cure Cost dispute with respect to an Available Contract or any other dispute as to the assumption or assignment of such Available Contract (such Available Contract, a "Disputed Contract") that has not been resolved to the mutual satisfaction of Purchaser and Sellers prior to the Designation Deadline, then the Designation Deadline shall be extended (but only with respect to such Disputed Contract) to no later than the earlier of (A) the date on which such Available Contract is deemed rejected by operation of section 365 of the Bankruptcy Code, and (B) the date upon which such dispute is finally determined by the Bankruptcy Court (the "Extended Contract Period"). If a Designation Notice with respect to a Disputed Contract is not delivered by Purchaser in writing by the date which is five (5) Business Days following the expiration of such Extended Contract Period, such Disputed Contract shall not constitute an Assigned Contract or Acquired Asset.

(ii)     Sellers shall cause a timely and proper written notice of the motion seeking entry of the Plan Confirmation and Sale Order to be provided to all counterparties (the "Counterparties") to all Available Contracts in accordance with the procedures set forth in the Bidding Procedures Order.  Such notice shall identify each Available Contract by the name or appropriate description and date (if available), the Counterparty, and the address of such Counterparty for notice purposes. Such notice shall also (A) set forth Sellers' good faith estimate of the applicable Cure Costs for each Available Contract as determined by Sellers based on their books and records and (B) be filed with the Bankruptcy Court.

(iii)     Purchaser shall have the right to notify Sellers in writing up to five (5) Business Day prior to Closing (the "Designation Deadline"), of any Available Contract (other than purchase orders) that it does not wish to assume or any Excluded Contract that Purchaser wishes to designate as an Assigned Contract, and (A) any such Available Contract that Purchaser no longer wishes to assume shall be automatically deemed added to Schedule 1.5(a), in each case, without any adjustment to the Purchase Price, and (B) any such previously Excluded Contract shall automatically become an Assigned Contract, in each case, without any adjustment to the Purchase Price.  If any previously Excluded Contract becomes an Assigned Contract, Sellers shall promptly (and in no event later than two Business Days following its designation as an Assigned Contract), notify the Purchaser and the applicable Counterparty of Sellers' good faith estimate of the applicable Cure Costs. Counterparties shall have ten Business Days to object, in writing, to the proposed Cure Costs or the assumption of its Contract. If the Counterparties, Sellers, and Purchaser are unable to reach a consensual resolution with respect to any objection, the Sellers shall seek an expedited hearing before the Bankruptcy Court to determine the Cure Costs and approve the assumption. If no objection is timely served, the Plan Confirmation and Sale Order shall approve the assumption of such Contract and its assignment to Purchaser.

(iv)     At the Closing (or, with respect to Available Contracts that remain Disputed Contracts, at such later date when all disputes have been resolved to the mutual

8

satisfaction of Sellers and Purchaser), subject to any adjustment pursuant to <u>Section 1.5</u>, the applicable Sellers shall, subject to Purchaser's payment of the applicable Cure Costs, assume and assign to Purchaser all Assigned Contracts that may be assigned by such Seller to Purchaser pursuant to sections 363, 365 and 1123 of the Bankruptcy Code, and Purchaser shall assume such Assigned Contracts.  Purchaser shall be solely responsible for the payment, performance and discharge when due of the Liabilities under the Assigned Contracts arising or that are otherwise payable from the time of and after the Closing.

(b)    <u>Non-Assignment</u>.

(i)    Notwithstanding anything to the contrary in this Agreement, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is rejected by a Seller under section 365 of the Bankruptcy Code, solely with Purchaser's prior written consent, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract hereunder.

(ii)    The Plan Confirmation and Sale Orders shall provide, pursuant to sections 365(e) and 365(f) of the Bankruptcy Code, that any provision in any Assigned Contract that purports to prohibit, restrict, or condition Sellers' assignment of such Assigned Contract to Purchaser or provide for the termination or modification of such Assigned Contract based on the filing of a bankruptcy case, the financial condition of Sellers or similar circumstances shall be unenforceable and of no force and effect.

(iii)    Notwithstanding anything to the contrary in this Agreement, to the extent an Acquired Asset (including all Permits and Governmental Authorizations that may not be transferable or transferred as of Closing) requires a Consent or Governmental Authorization (other than, (i) in addition to and determined after giving effect to any order of the Bankruptcy Court, including the Plan Confirmation and Sale Order and (ii) any Consent or Governmental Authorization required under Competition and FDI Laws) in order to permit the assignment, sale or transfer to Purchaser of the applicable Seller's right, title and interest in and to such asset, and such Consent or Governmental Authorization has not been obtained prior to such time as such right, title and interest is to be assigned, sold or transferred by Sellers as an Acquired Asset hereunder, such asset shall not be an Acquired Asset hereunder and shall not be assigned, sold or transferred to Purchaser. If any Acquired Asset is deemed not to be assigned, sold or transferred pursuant hereto, the Closing shall nonetheless take place subject to the terms and conditions set forth herein (notwithstanding any terms and conditions requiring the assignment, sale or transfer of such asset) and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and six months following the Closing (or the closing of the Bankruptcy Cases, if shorter), Sellers and Purchaser shall use reasonable best efforts to (A) secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement mutually agreed by Purchaser and Sellers, including (in each case to the extent lawful and commercially reasonable and mutually agreed by Purchaser and Sellers) (1) Sellers maintaining and providing Purchaser with use of any such Acquired Assets for the benefit of Purchaser and (2) subcontracting, licensing or

9

sublicensing to Purchaser any or all of any Seller's rights and obligations with respect to any such Acquired Asset, under which (x) Purchaser shall obtain (without infringing upon the legal rights of the applicable Governmental Body or violating any Law) the economic rights, benefits and proceeds (net of the amount of any related Tax costs imposed on Sellers or their respective Affiliates or any direct costs associated with the retention and maintenance of such Acquired Asset incurred by any Seller or its Affiliates) with respect to such Acquired Asset with respect to which the Consent or Governmental Authorization has not been obtained, and (y) Purchaser shall assume and timely discharge any related burden and obligation with respect to such Acquired Asset. In the case of the EU Certifications, "reasonable best efforts" as used in the immediately preceding sentence shall mean that Sellers shall, promptly after the date hereof and in any event prior to Closing, seek written guidance from the applicable Notified Body as to arrangements that will, in the view of such Notified Body, (i) allow the devices to continue being commercialized during the applicable extension or transitional period from the European Union ("EU") Medical Device Directive to the EU Medical Device Regulation ("MDR") and for the MDR reviews to continue under Purchaser's ownership and (ii) otherwise satisfy the criteria  in clause (B) of the immediately preceding sentence (it being understood that no arrangement that would conflict with such Notified Body's guidance will be considered "lawful" or "commercially reasonable" for purposes of the immediately preceding sentence); provided that Purchaser shall not engage in any communication with the applicable Notified Bodies in respect of the Transaction unless Sellers have given their prior written consent consistent with the confidentiality requirement under Directive 93/42/EEC and its replacement Regulation (EU 2017/745). Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Acquired Asset after the Closing, Sellers' right, title and interest in and to such Acquired Asset shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement and the Plan Confirmation and Sale Order. Notwithstanding anything herein to the contrary, (x) the provisions of this Section 1.5(b) shall not apply to any consent or approval required under any Competition Laws, which consent or approval shall be governed by Section 6.4, and (y) no Seller will be obligated to expend any money (other than their own reasonable attorneys' fees), incur liabilities or otherwise pay any consideration to any Person from whom Consent or Governmental Authorization is requested, or offer or grant any accommodation (financial or otherwise) or to initiate or participate in any litigation to obtain any Consent or Governmental Authorization.

## ARTICLE II
## CONSIDERATION; PAYMENT; CLOSING

2.1    Consideration. The aggregate consideration (collectively, the "Purchase Price") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) the assumption of Assumed Liabilities; (ii) the Wind-Down Amount; (iii) a credit bid (the "Credit Bid") pursuant to Section 363(k) of the Bankruptcy Code in an amount equal to (x) all of the Pre-petition Obligations, and (y) the full amount of the outstanding obligations of Sellers under the DIP Facility as of the Closing Date (the amounts set forth in the preceding clauses (x) and (y) collectively, the "Credit Bid Amount"); (iv) the GUC Reserve; and (v) the payment of Cure Costs. In the event the sum of the Cash Payment and the Wind-Down Amount exceed the amount of aggregate unrestricted Cash and Cash Equivalents as of the Closing (excluding all maintenance deposits and

security deposits for rent, prepaid or deferred charges and expenses, and all lease and rental payments that have been prepaid by any Seller), Purchaser shall increase the amount of the Purchase Price, payable in Cash as of the Closing, by the amount of such excess.

2.2    Closing. The closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement (the "Closing") will take place by telephone conference and electronic exchange of documents at 9:00 a.m. Eastern Time on the second Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at the Closing), or at such other place and time as the Parties may agree in writing. The date on which the Closing actually occurs is referred to herein as the "Closing Date."

2.3    Closing Deliveries by Sellers. At or prior to the Closing, Sellers shall deliver to Purchaser (or to one or more Affiliates designated by Purchaser (each, a "Purchaser Designee")):

(a)    a bill of sale substantially in the form of Exhibit A (the "Bill of Sale") duly executed by the applicable Sellers;

(b)    a trademark assignment agreement substantially in the form of Exhibit B (the "Trademark Assignment Agreement"), duly executed by the applicable Sellers;

(c)    a copyright assignment agreement substantially in the form of Exhibit C (the "Copyright Assignment Agreement"), duly executed by the applicable Sellers;

(d)    a patent assignment agreement substantially in the form of Exhibit D (the "Patent Assignment Agreement"), duly executed by the applicable Sellers;

(e)    instruments of transfer of the equity interests of the Transferred Subsidiaries and JointMedica Limited (in each case to the extent they are Acquired Assets at Closing), in customary form, duly executed by the applicable Sellers;

(f)    an IRS Form W-9, executed by each Seller or each Seller's regarded owner for U.S. federal income Tax purposes; and

(g)    a certificate, dated as of the Closing Date, executed by a duly authorized officer of Exactech, certifying that the conditions set forth in Sections 7.2(a) and 7.2(b) have been satisfied.

2.4    Closing Deliveries by Purchaser. At the Closing, Purchaser shall deliver to (or at the direction of), or shall cause the applicable Purchaser Designee to deliver to, Sellers:

(a)    the Bill of Sale, duly executed by Purchaser or the applicable Purchaser Designee;

(b)    the Trademark Assignment Agreement, duly executed by Purchaser or the applicable Buyer Designee;

(c)     the Copyright Assignment Agreement, duly executed by Purchaser or the applicable Buyer Designee;

(d)     the Patent Assignment Agreement, duly executed by Purchaser or the applicable Buyer Designee;

(e)     a payoff letter, release letter or other similar document acknowledging the conversion of the Credit Bid Amount as consideration for the transfer of the Acquired Assets and cancellation and discharge of the same amount of the Prepetition Obligations; and

(f)     a certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser, certifying that the conditions set forth in Sections 7.3(a) and 7.3(b) have been satisfied.

2.5     Withholding. Purchaser shall not be entitled to deduct and withhold any Taxes from any amounts otherwise payable pursuant to this Agreement, except to the extent resulting from any Seller's failure to satisfy its obligations under Section 2.3(f).

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the Schedules delivered by Sellers concurrently herewith and subject to Section 10.10, Sellers jointly and severally represent and warrant to Purchaser as of the date hereof and as of the Closing as follows:

3.1     Organization and Qualification.

(a)     Each Seller is a corporation, limited liability company or limited partnership, as applicable, duly incorporated or organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation.

(b)     Each Seller is duly qualified or authorized to do business and is in good standing (if applicable) in each jurisdiction in which the property and assets owned, leased or operated by it, or the nature of the business conducted by it, makes such qualification or authorization necessary.

3.2     Authorization of Agreement. The execution, delivery and performance by each Seller of this Agreement and the other Transaction Agreements to which such Seller is a party, and the consummation by such Seller of the transactions contemplated hereby and thereby, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate action, limited liability company action or limited partnership action on the part of such Seller, as applicable, and no other organizational proceedings on such Seller's part are necessary to authorize the execution, delivery and performance by such Seller of this Agreement or the other Transaction Agreements and the consummation by it of the transactions contemplated hereby and thereby. Subject to requisite Bankruptcy Court approvals, this Agreement and the other Transaction Agreements to which each Seller is a party have been, or will be, duly executed and delivered by such Seller and, assuming due authorization, execution and delivery hereof and thereof by Purchaser and Sellers, as applicable, constitutes, or will constitute, legal, valid and

binding obligations of such Seller, enforceable against such Seller in accordance with its and their terms, except that such enforceability (a) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (b) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "Enforceability Exceptions").

3.3     Conflicts; Consents. Assuming that (a) requisite Bankruptcy Court approvals are obtained, (b) the notices, authorizations, approvals, Orders, Permits or consents set forth on Schedule 3.3 are made, given or obtained (as applicable), and (c) the requirements of any applicable antitrust, competition, merger control or foreign investment Laws promulgated by any Governmental Body ("Competition and FDI Laws") are complied with, neither the execution and delivery by Sellers of this Agreement or the other Transaction Agreements, nor the consummation by Sellers of the transactions contemplated hereby or thereby, nor performance or compliance by Sellers with any of the terms or provisions hereof or thereof, will (i) conflict with or violate any provision of a Seller's certificate of incorporation or bylaws, certificate of formation or limited liability company agreement, certificate of limited partnership, partnership agreement or other governing documents, as applicable, (ii) (x) conflict with, violate or constitute a breach of or default (with or without notice or lapse of time, or both) under, (y) give rise to a right of termination, modification, acceleration or cancelation of any obligation or to the loss of any benefit, under, or (z) accelerate any Seller's obligations under, any Material Contract, (iii) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any Acquired Asset or (iv) violate any Law, except, in the case of clauses (ii) and (iv), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.4     Equity Interests of Acquired Entities.

(a)     The authorized and outstanding capital stock or other equity interests of each of the Acquired Entities are as set forth on Schedule 3.4(a). All of the outstanding capital stock or other equity interests of each Acquired Entity have been duly authorized, validly issued, fully paid and are non-assessable (where such concepts are legally recognized with respect to such Acquired Entity in the jurisdiction of organization of such Acquired Entity). Except as set forth on Schedule 3.4(a), there are no outstanding options, warrants, convertible, exercisable or exchangeable securities, "phantom" equity rights, equity appreciation rights, equity-based performance units, rights to subscribe to, purchase rights, calls or commitments relating to the issuance, purchase, sale or repurchase of any capital stock or other equity interests issued by the Acquired Entities containing any equity features, or Contracts, commitments, understandings, arrangements or other obligations by which any of the Acquired Entities is bound to issue, deliver or sell, or cause to be issued, delivered or sold, additional capital stock or other equity interests, or options, warrants, convertible, exercisable or exchangeable securities, "phantom" equity rights, equity appreciation rights, equity-based performance units, rights to subscribe to, purchase rights, calls or commitments relating to any capital stock or other equity interests of the Acquired Entities, or that otherwise give any Person the right to receive any benefits or rights similar to any rights enjoyed by or accruing to the holders of shares of capital stock or other equity securities of any Acquired Entity (including any rights to receive any payment in respect, or based on the price or value, thereof). Except as set forth on Schedule 3.4(a), none of the Sellers or the Acquired Entities is a party to any equityholders' agreement, voting trust agreement, registration rights agreement

13

or other similar agreement or understanding relating to any such securities or any other agreement relating to the disposition, voting or dividends with respect to any such securities. Except as set forth on <u>Schedule 3.4(a)</u>, the Sellers own all of the outstanding capital stock or other equity interests of the Acquired Entities, free and clear of all Encumbrances (other than Permitted Encumbrances).

(b)    Except as set forth on <u>Schedule 3.4(b)</u>, as of the date of this Agreement, there are no other corporations, limited liability companies, partnerships, joint ventures, associations or other entities or Persons in which the Acquired Entities own, of record or beneficially, any direct or indirect equity or other interest or any right (contingent or otherwise) to acquire the same.

3.5    <u>Financial Statements</u>. Attached to <u>Schedule 3.5</u> are the audited consolidated balance sheets as of December 31, 2023 and as of December 31, 2022, and the related consolidated statements of operations, changes in preferred stock and stockholders' deficit and cash flows for each fiscal year then ended, of Exactech (collectively, the "<u>Audited Financial Statements</u>") and unaudited consolidated balance sheets as of March 31 2024 and March 31, 2023, and the related unaudited consolidated statements of operations, changes in preferred stock and stockholders' (deficit) and cash flows for the portion of each fiscal year then ended, of Exactech (collectively, the "<u>Unaudited Financial Statements</u>" and, together with the Audited Financial Statements, the "<u>Financial Statements</u>"). The Financial Statements have been prepared in accordance with GAAP applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto and, in the case of Unaudited Financial Statements, subject to normal year-end audit adjustments, the effect of which will not be materially adverse to any of the Sellers in the aggregate, to the absence of notes and to any other adjustments described therein, including in any notes thereto) and fairly present in all material respects the consolidated financial position of the Sellers and their respective consolidated Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods shown, except as may be indicated in the notes thereto.

3.6    <u>Title to Properties</u>.

(a)    <u>Schedule 3.6</u> sets forth the address of all real property leased, subleased or licensed to, or for which a right to use, possess or occupy has been granted to, the Sellers, together with all rights, easements and privileges appertaining or relating to such interest in real property, and all improvements located on such real property (the "<u>Leased Real Property</u>"), and a true and complete list of leases for the Leased Real Property. One or more of the Sellers has a good and valid leasehold interest to all real property leased by Sellers (the "<u>Leased Real Property</u>"), free and clear of all Encumbrances (other than Permitted Encumbrances). Sellers have not subleased or otherwise granted any Person the right to use or occupy any Leased Real Property which is still in effect. None of the Sellers own any real property.

(b)    Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (subject to satisfaction of any applicable Cure Costs by Purchaser) and except as a result of the commencement of the Bankruptcy Cases, Sellers hold good title to, or a valid leasehold interest in, all of the material tangible property necessary in the conduct of their business as now conducted,

14

free and clear of all Encumbrances, except for Permitted Encumbrances, other than any failure to own or hold such tangible property as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.7    <u>Title to Acquired Assets; Sufficiency</u>. Except for Permitted Encumbrances, Sellers own each of the Acquired Assets and hold good and valid title to the Acquired Assets, and, at the Closing, Purchaser will be vested with good title to such Acquired Assets, free and clear of all Liens, other than Permitted Encumbrances. The Acquired Assets, after giving effect to <u>Section 1.5(b)</u>, constitute all of the properties used in or held for use in the business of Sellers and are sufficient for the Purchaser to conduct the business of Sellers from and after the Closing Date without interruption and in the ordinary course of business as it has been conducted by Sellers; provided, that any effects resulting from any Person becoming an Excluded Entity and any Contract becoming a Rejected Contract shall not constitute a breach of the representation set forth in this <u>Section 3.7</u>. No Affiliates of Sellers hold any material assets, other than Excluded Assets, used or held for use in, and necessary for, the operation of the business of Sellers as presently operated.

3.8    <u>Contracts</u>.

(a)    <u>Schedule 3.8</u> sets forth a list of each Material Contract as of the date of this Agreement. For purposes of this Agreement, "<u>Material Contract</u>" means any Contract (x) by which any of the Acquired Assets are bound or affected or (y) to which any Seller is a party or by which it is bound in connection with the Acquired Assets (in each case, excluding any Seller Plan) that:

(i)    relates to the formation, creation, governance, economics or control of any joint venture, partnership or other similar arrangement, other than Contracts entered into in the Ordinary Course;

(ii)    provides for indebtedness for borrowed money of Sellers having an outstanding or committed amount in excess of $500,000, other than letters of credit;

(iii)    relates to the acquisition or disposition of any business (whether by merger, sale of stock, sale of assets or otherwise) for aggregate consideration under such Contract in excess of $1,000,000 pursuant to which any earn-out, indemnification or deferred or contingent payment obligations remain outstanding that would reasonably be expected to involve payments by or to Sellers of more than $1,000,000 after the date hereof (in each case, excluding for the avoidance of doubt, acquisitions or dispositions supplies, merchandise, products, Equipment, properties or other assets in the Ordinary Course, or of supplies, merchandise, products, Equipment, properties or other assets that are obsolete, worn out, surplus or no longer used or useful in the Ordinary Course);

(iv)    is a Contract (other than purchase orders) for the purchase of materials, supplies, goods, services, Equipment or other assets pursuant to which Sellers would reasonably be expected to make payments of more than $500,000 during any fiscal year;

15

(v)    (A) is a Contract pursuant to which any Seller receives any license, sublicense, covenant not to sue, release, or waiver under any Intellectual Property of any third party (other than agreements for any third-party commercially available or off-the-shelf software with annual, aggregate fees of less than $250,000); or (B) is Contract pursuant to which any Seller grants any license, sublicense, covenant not to sue, release, or waiver under any Seller Intellectual Property, other than any non-exclusive outbound license entered into in the ordinary course of business, but excluding, in the case of each of clauses (A) and (B), any standard non-disclosure, end-user, customer, Open Source Software license, confidentiality or consulting agreement, in each case as entered into in the ordinary course of business;

(vi)    any Contract for the sale of any of the assets of any Seller (whether by merger, sale of stock, sale of assets or otherwise) for consideration in excess of $500,000 pursuant to which any Seller has continuing obligations that are material (other than (A) any Contract that is solely among the Sellers and (B) any Contract for the sale of obsolete or unused inventory, equipment or similar assets); or

(vii)    contains any provision (A) limiting, in any material respect, the right of Sellers to engage in any business, make use of any Seller Intellectual Property that is material to Sellers, compete with any Person, or operate anywhere in the world, or (B) granting any exclusivity right to any third party or containing a "most favored nation" provision in favor of any third party, in each case of clauses (A) and (B), other than (1) a Contract that can be terminated on 90 days' notice or less without resulting in a breach or violation of, or any acceleration of any rights or obligations or the payment of any penalty under, such Contract, or (2) Contracts entered into in the Ordinary Course granting non-exclusive rights to Seller Intellectual Property.

(b)    Subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (subject to satisfaction by Purchaser of any applicable Cure Costs) and except (i) as a result of the commencement of the Bankruptcy Cases and (ii) with respect to any Contract that has previously expired in accordance with its terms, been terminated, restated, or replaced, (A) each Material Contract is valid and binding on the Seller party thereto and, to the Knowledge of Sellers, each other party thereto, and is in full force and effect, subject to the Enforceability Exceptions, (B) the applicable Seller, and, to the Knowledge of Sellers, any other party thereto, have performed all obligations required to be performed by it under each Material Contract, (C) Sellers have received no written notice of the existence of any breach or default on the part of any Seller under any Material Contract, (D) there are no events or conditions that constitute, or, after notice or lapse of time or both, will constitute, a default on the part of a Seller, or to the Knowledge of Sellers, any counterparty under such Material Contract and (E) to the Knowledge of Sellers, Sellers have not received any written or oral notice from any Person that such Person intends to terminate, or not renew, any Material Contract.

3.9    No Litigation. There are no, and for the past three (3) years there have not been any, material Actions pending or, to the Knowledge of Sellers, threatened against the Sellers or the Acquired Assets that would not be subject to a free and clear sale under Section 363 and/or 1123(a) of the Bankruptcy Code.

3.10     Permits; Compliance with Laws. Each Seller is, and has been since January 1, 2023, in compliance in all material respects with all state or federal laws, statutes, ordinances, codes, rules or regulations ("Laws") or Orders, applicable to such Seller, and each Seller holds all licenses, franchises, permits, certificates, approvals and authorizations from Governmental Bodies necessary for the lawful conduct of its respective business (collectively, "Permits"). Each Seller and each of their respective directors, officers and employees acting in such capacity and, to the Knowledge of Sellers, each of its and their other agents acting on its or their behalf, is, and has been since January 1, 2024, in material compliance with (i) the Foreign Corrupt Practices Act of 1977 and any rules and regulations promulgated thereunder, (ii) applicable Information Privacy and Security Laws and (iii) Laws administered by the FDA or other comparable Governmental Body.

3.11     Environmental Matters. Except as would not, individually or in the aggregate, reasonably be expected to result in the Sellers incurring material Liabilities, (a) Sellers and the Acquired Entities are, and have been, in compliance with all applicable Environmental Laws, (b) neither Sellers nor any Acquired Entity has received any written notice alleging that any Seller or Acquired Entity is in violation of or liable under, any Environmental Law that is unresolved, (c) Sellers and the Acquired Entities possess and are and have been in compliance with all Permits required under Environmental Laws for the operation of their businesses as currently conducted ("Environmental Permits"), (d) there is no Action under or pursuant to any Environmental Law or Environmental Permit that is pending or, to the Knowledge of Sellers, threatened in against any Seller or Acquired Entity, (e) neither Sellers nor any Acquired Entity are subject to any Order imposed by any Governmental Body pursuant to Environmental Laws under which there are uncompleted, outstanding or unresolved obligations on the part of any Seller or Acquired Entity, and (f) there are no Hazardous Substances present at, in, on or under the Leased Real Property or any real property owned, leased or occupied by any Acquired Entity in quantities or concentrations in excess of those permitted under Environmental Laws.

3.12     Intellectual Property; IT and Data Security and Privacy.

(a)     Section 3.12(a) of the Schedules sets forth a complete and accurate list of all Seller Intellectual Property that is the subject of any issuance, registration, or a pending application for registration with the U.S. Patent and Trademark Office, the U.S. Copyright Office or any similar governmental office or agency, or registrar anywhere in the world ("Registered Seller Intellectual Property "). All of the Registered Seller Intellectual Property that have been the subject of an application filed with, are issued by, or registered with, as applicable, the U.S. Patent and Trademark Office, the U.S. Copyright Office or any similar governmental office or agency, or registrar anywhere in the world, are (or will be, as of the Closing) registered in the name of a Seller. All Registered Seller Intellectual Property are subsisting, and to the Knowledge of Sellers, valid and enforceable. Sellers own all of the rights, title and interest in and to the Seller Intellectual Property, including all Registered Seller Intellectual Property, free and clear of all Encumbrances (other than Permitted Encumbrances) and have valid licenses to all other material Intellectual Property used in or held for use in the conduct of the business of Sellers. The consummation of the transactions contemplated herein shall not adversely impact, restrict, or otherwise impair the Purchaser's ownership rights in and to any Seller Intellectual Property.

17

(b)      Sellers have taken commercially reasonable steps in accordance with industry practice to maintain the confidentiality of non-public Seller Intellectual Property. Except as would not reasonably be expected to be material to the business of Sellers, taken as a whole, each present or past employee, officer, consultant or any other Person who developed any Seller Intellectual Property has executed a Contract with a Seller that conveys to such Seller any and all right, title and interest in and to all Seller Intellectual Property developed by such Person in connection with such Person's employment or engagement by such Seller, and where applicable with respect to Persons currently employed by or engaged with Sellers, provides that such Person irrevocably waives all moral rights in respect to all Seller Intellectual Property created or contributed in the course of their employment or engagement.

(c)      No Actions are pending or, to the Knowledge of Sellers, threatened against any Seller, and in the past three (3) years, Sellers have not received any written notice or claim, (i) challenging the ownership, validity, enforceability or use by any Seller of any Seller Intellectual Property or (ii) alleging that any Seller is infringing, misappropriating or otherwise violating the Intellectual Property of any Person.

(d)      In the past three (3) years, (i) no Person has infringed, misappropriated or otherwise violated any Seller Intellectual Property and (ii) to the Knowledge of Sellers, the operation of the business of Sellers has not violated, misappropriated or infringed the Intellectual Property of any other Person.

(e)      No Business Software contains or is derived from, linked with, called by, or combined or distributed with third-party Open Source Software in a manner that, according to the terms of the license for such Open Source Software, requires that such Business Software (excluding the Open Source Software) be (i) distributed or made available to any third party in source code form; (ii) licensed to any third party for the purpose of modification or redistribution; (iii) licensed to any third party at no charge; or (iv) made subject to the terms and conditions of any Open Source Software license. Without limiting the foregoing, the Sellers have been in compliance, in all material respects, with all terms and conditions of any license for Open Source Software. Sellers have not (i) granted, directly or indirectly, to any other Person, any current or contingent rights, licenses or interests in or to any source code of any Business Software or (ii) provided or disclosed any source code of any Business Software to any person or entity.

(f)      Except as would not reasonably be expected to be material to the business of Sellers, taken as a whole, the Business Software does not contain any viruses, undocumented or unauthorized portals or other access (including backdoors), worms, time-bombs, key-locks, key-logs, or any other devices, codes or commands that could materially disrupt or interfere with the operation of the Business Software or equipment upon which the Business Software operates, or the safety, security or integrity of the data, information or signals the Business Software produces in a manner adverse to any customer, licensee or recipient.

(g)      The consummation of the transactions contemplated hereby will not result in the grant of any right or license to any third party of any Seller Intellectual Property that is material to any such Seller. The consummation of the transactions contemplated herein shall not adversely impact, restrict, or otherwise impair the Purchaser's ownership rights in and to any Seller Intellectual Property or any Intellectual Property licensed to Sellers pursuant to an Assigned

18

Contract. The Seller Intellectual Property and Intellectual Property licensed to Sellers pursuant to an Assigned Contract constitutes all the Intellectual Property that is used in, or necessary for, the conduct of the business of Sellers as currently conducted and currently contemplated to be conducted by Sellers.

(h)    Except as would not reasonably be expected to be material to the business of Sellers, taken as a whole, (i) all IT Assets (x) are configured in accordance with generally accepted industry security standards, and (y) are maintained in accordance with standards set by the manufacturers or otherwise in accordance with generally accepted standards prudent in the industry, and (ii) Sellers have not experienced, within the past three (3) years, any disruption to, or interruption in, the conduct of the business of Sellers attributable to a defect, bug, breakdown or other failure or deficiency of the IT Assets that has not been remediated in all material respects. Sellers have taken commercially reasonable measures to provide for the back-up and recovery of the data and information necessary to the conduct of the business of Sellers without material disruption to, or material interruption in, the conduct of the business of Sellers. Except as would not reasonably be expected to be material to the business of Sellers, taken as a whole, in the past three (3) years Sellers have taken commercially reasonable steps to remediate any critical or high risk threats and deficiencies identified in any security risk assessments.

(i)    Sellers take and have taken commercially reasonable efforts designed to protect the confidentiality, integrity and security of its Personal Data against any Security Breach or unauthorized access, interruption, modification or compromise of the IT Assets. Except as would not reasonably be expected to be material to the business of Sellers, taken as a whole, Sellers have implemented and maintained an information security program that (i) materially complies and has at all times in the past three (3) years complied in all material respects with all applicable Information Privacy and Security Laws; (ii) identifies reasonably foreseeable internal and external risks to the security of any  Personal Data in its possession; (iii) monitors and is designed to protect Personal Data, Business Software and all IT Assets against any unauthorized use, access, interruption, modification or corruption; (iv) implements, monitors, and maintains appropriate administrative, organizational, technical, and physical safeguards and controls with respect to the risks described above in (ii) and (iii); and (v) maintains incident response and notification procedures in the case of any Security Breach.

(j)    Except as would not reasonably be expected to be material to the business of Sellers, taken as a whole in the past three (3) years there has been no Security Breach.

(k)    Except as would not reasonably be expected to be material to the business of Sellers, taken as a whole, in connection with Sellers' collection, storage, transfer (including any transfer across national borders) and/or use of any Personal Data, Sellers are and at all times in the past three (3) years have been in material compliance with (i) all Information Privacy and Security Laws, (ii) all applicable Privacy Policies and internal policies and procedures relating to Sellers' collection, storage, transfer of Personal Data, and (iii) the requirements of any Contract to which any Seller is a party.

(l)    The execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby do not and will not conflict with or result in a violation or breach of any Information Privacy and Security Laws or applicable Privacy

19

Policies (as currently existing or as existing at any time during which any Personal Data was collected or processed by or for Sellers).

(m)     Sellers (i) are not or, to the Knowledge of Sellers, have not in the past three (3) years been under investigation by any Governmental Body for a violation of any Information Privacy and Security Laws; or (ii) have not at any time in the past three (3) years received any written notice of any claim or lawsuit from any Person alleging any violation of Information Privacy and Security Laws.

3.13    <u>Tax Matters</u>.

(a)     Each Seller has prepared (or caused to be prepared) and timely filed (taking into account valid extensions of time within which to file) all income and other material Tax Returns with respect to the Acquired Assets required to be filed by it, and all such filed Tax Returns (taking into account all amendments thereto) are true, complete and accurate in all material respects.

(b)     All material Taxes with respect to the Acquired Assets owed by a Seller that are due (whether or not shown on any Tax Return) have been timely paid or have been adequately reserved against in accordance with GAAP.

(c)     To the Knowledge of the Sellers, there are no Encumbrances for Taxes on any of the Acquired Assets other than Permitted Encumbrances.

(d)     None of the Sellers has waived any statute of limitations in respect of material Taxes with respect to the Acquired Assets or agreed to any extension of time with respect to an assessment or deficiency for material Taxes with respect to the Acquired Assets (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course).

(e)     Except to the extent that doing so would not adversely impact the Acquired Assets or the Purchaser's ownership of the Acquired Assets, none of the Sellers has participated in any "listed transaction" within the meaning of section 1.6011-4(b)(2) of the Treasury Regulations.

(f)     No deficiencies for Taxes of any Seller with respect to the Acquired Assets or Assumed Liabilities has been asserted, claimed, proposed or assessed by any Governmental Body.  There are no pending or threatened audits or other proceedings for or relating to any Liability of any Seller in respect of Taxes with respect to the Acquired Assets or Assumed Liabilities.

(g)     Each Seller has deducted and withheld and paid over to the appropriate Governmental Body all amounts of Taxes with respect to the Acquired Assets required to have been deducted and withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, equityholder or other party.

(h)     The Sellers (i) do not have any liability for Taxes of any other Person other than as a result of being a member of a consolidated, combined, unitary, affiliated, aggregate or similar Tax group that includes each Seller and the Transferred Subsidiaries, including, as a result

20

of such of having been (or ceasing to be) a member of a consolidated, combined, unitary, affiliated, aggregate or similar Tax group with such Person on or prior to the Closing Date (including under section 1.1502-6 of the Treasury Regulations or any comparable provisions of state, local or foreign Law), as a transferee or successor of such Person or as a result of any secondary liability or any express or implied obligation to indemnify such Person whether by Contract or otherwise; or (ii) are not a party to or bound by, or has any Liability under, any Tax indemnity agreement, Tax sharing agreement or Tax allocation agreement (other than an agreement entered into in the Ordinary Course of business the principal subject of which is not Taxes).

(i)     Notwithstanding anything in this Agreement to the contrary, the representations and warranties in this <u>Section 3.13</u> and <u>Section 3.14</u> (insofar as they relate to Taxes) shall constitute the sole representations and warranties with respect to Taxes. No representation or warranty is made with respect to the validity of any Tax position or the availability of any Tax attribute for any Tax period (or any portion thereof) following the Closing.

3.14    <u>Seller Plans</u>.

(a)     Schedule 3.13(a) sets forth a true and complete list of each Seller Plan.  With respect to each material Seller Plan, Sellers have made available to Purchaser true and complete copies (to the extent applicable) of (i) the current plan document or a written description of the material terms thereof, including any amendments thereto, other than any document that any Seller is prohibited from making available to Purchaser as the result of applicable Law relating to the safeguarding of data privacy, (ii) the most recent annual report on Form 5500 filed with the Department of Labor, (iii) the most recent IRS determination or opinion letter received by each Seller, (iv) the most recent summary plan description and (v) each current material related insurance Contract or trust agreement.

(b)     Each Seller Plan intended to be "qualified" within the meaning of Section 401(a) of the Tax Code has received a favorable determination letter from the IRS or is entitled to rely upon a favorable opinion letter issued by the IRS. To the Knowledge of Sellers, there are no existing circumstances or any events that have occurred that would reasonably be expected to cause the loss of any such qualification status of any such Seller Plan. As of the date hereof, there are no pending, or to the Knowledge of Sellers, threatened in writing, claims (other than routine claims for benefits) by, on behalf of or against any Seller Plan which could reasonably be expected to result in any material Liability to Purchaser and no material audit or other proceeding by a Governmental Body is pending, or to the Knowledge of Sellers, threatened with respect to such plan. The Seller Plans comply in all material respects in form and in operation in all material respects with their terms and applicable Laws, including the applicable requirements of the Tax Code and ERISA.

(c)     None of the Sellers or any of their respective ERISA Affiliates maintains, contributes to, or has (or in the past six (6) years has had) any Liability with respect to any (i) pension plan that is subject to Title IV of ERISA or Section 412 of the Tax Code or (ii) "multiemployer plan" (as defined in Section 4001(a)(3) of ERISA).

(d)     Except as set forth on <u>Schedule 3.14(d)</u>, no Seller Plan provides benefits or coverage in the nature of health or life insurance following retirement or other termination of

21

employment, other than coverage or benefits required to be provided under Part 6 of Subtitle B of Title I of ERISA or section 4980B of the Tax Code, or any other applicable Law.

(e)    The consummation of the transactions contemplated hereby, either alone or in connection with any other event, will not (i) accelerate the time of payment or vesting, or increase the amount, of compensation due to any director, officer, employee or other individual service provider of any Seller under any Seller Plan, (ii) cause a Seller to transfer or set aside any assets to fund any benefits under any Seller Plan or (iii) result in any "disqualified individual" with respect to any Seller receiving any "excess parachute payment" (each such term as defined in Section 280G of the Tax Code), determined without regard to any arrangements that may be implemented by Purchaser or any of its Affiliates.

3.15    Employees.

(a)    Schedule 3.15(a) sets forth a complete and accurate list, as of the date of this Agreement, of each employee of Seller, by name or employee identification number, including each such employee's direct employing entity, position or title, annualized base salary or hourly wage (as applicable), 2024 annual bonus or commission opportunity (as applicable), date of hire, work location (city, state and country), amount of accrued and unused vacation or paid time off (if applicable), part-time, full-time, temporary or other status, exempt or non-exempt status, leave status and anticipated return-to-work date (if applicable), and visa status (if not a United States citizen or lawful permanent resident) and date of visa expiration (the "Employee Census").

(b)    Except as set forth on Schedule 3.15(b), none of the Sellers is party to any collective bargaining agreements or similar labor-related Contracts with any labor union covering any employees of a Seller.   To the Knowledge of the Sellers, (i) no written demand for recognition as the exclusive bargaining representative of any employees made to any Seller by or on behalf of any labor union is currently outstanding and (ii) there is no pending or, to the Knowledge of Sellers, threatened in writing, strike, lockout, organized labor slowdown, or concerted work stoppage by or with respect to the employees of any Seller. To the Knowledge of the Sellers, each Seller is, and for the last three years has been, in compliance in all material respects with all applicable Laws respecting employment and employment practices, including Laws concerning terms and conditions of employment, wages and hours, exempt and non-exempt employee and individual independent contractor classification and occupational safety and health.

(c)    For the past three (3) years, no Seller has had any liability for non-compliance with or failed to provide advance notice of any mass layoff or plant closing as required by the WARN Act.

(d)    To the Knowledge of the Sellers, in the course of the performance of their employment duties, no employee of Seller holding a management-level position or higher has engaged in any conduct, has been or is being investigated for any conduct, has been or is being subjected to any disciplinary action in connection with any conduct, that would reasonably be expected to cause or has caused any material damage to the reputation of Seller, including but not limited to, any conduct constituting sexual misconduct, harassment (including sexual harassment), discrimination, or retaliation.

(e)    Except as set forth on Schedule 3.15(e), there are no, and within the last three (3) years have been no, pending or threatened material actions or other lawsuits, grievances, unfair labor practice charges, arbitrations, charges, investigations, hearings, claims, or proceedings (including any administrative investigations, charges, claims, actions, or proceedings), against Seller brought by or on behalf of any applicant for employment, or current or former employee of Seller, or any group or class of the foregoing, alleging violation of any labor or employment Laws, breach of any express or implied contract of employment, wrongful termination of employment, or any other discriminatory, wrongful, or tortious conduct in connection with the employment or working relationship.

3.16    _Affiliate Transactions_. Except as set forth on Schedule 3.16, no Affiliate of any Seller, nor any officer or director of Exactech or any Seller, (a) is a party to any agreement that constitutes an Acquired Asset having a potential or actual value or a contingent or actual Liability exceeding $250,000, other than (i) loans and other extensions of credit to directors and officers of a Seller for travel, business or relocation expenses or other employment-related purposes in the Ordinary Course, (ii) employment arrangements in the Ordinary Course and (iii) the Seller Plans, or (b) has any material interest in any Acquired Asset.

3.17    _Brokers_. Except for Centerview, the fees and expenses of which will be paid by Sellers, no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Sellers.

3.18    _Accounts Receivable; Accounts Payable_.

(a)    All accounts receivable, inclusive of unbilled receivables, held by the Sellers were acquired or arose from sales actually made or services actually performed in the Ordinary Course that represent bona fide transactions and valid claims, are not subject to any setoff, counterclaim or action and are enforceable in accordance with their terms, subject to the Enforceability Exceptions, except to the extent of any specific reserves against such accounts receivable are reflected on the most recent Audited Financial Statements.

(b)    All accounts payable related to Assumed Liabilities arose in bona fide, arm's-length transactions in the Ordinary Course, and, except to the extent of any specific reserves against such accounts receivable are reflected on the most recent Audited Financial Statements, no such account payable is delinquent more than thirty (30) days in its payment.

3.19    _Inventory_. All Inventory of Sellers is, in all material respects, in good, merchantable and useable condition and consists of a quality and quantity usable and saleable in the Ordinary Course. All such inventory is owned by the Sellers free and clear of all Liens other than Permitted Liens, and no inventory is held on a consignment basis. The amounts of inventory reflected in the Financial Statements have been determined in accordance with GAAP consistently applied.

3.20    _Material Customers; Material Suppliers_.

23

(a)      Schedule 3.20(a) sets forth a true, correct and complete list of the 10 largest customers (each, a "Material Customer") of the business of the Sellers based on revenue generated by such customers during the 12 months ended on December 31, 2023 showing the aggregate sales to each such Material Customer and the percentage of total revenue of the business of the Sellers attributable to such Material Customer during such period. Since January 1, 2024, no Seller has received any written communication from any Material Customer of any intention or threat to terminate or materially reduce purchases from, or otherwise adversely change in any material respect their relationship with, the Sellers and, to the Knowledge of the Sellers, no such action is being considered.

(b)      Schedule 3.20(b) sets forth a true, correct and complete list of the 10 largest vendors (each, a "Top Vendor") of the business of the Sellers based on expenditures incurred by the Sellers during the 12 months ended on December 31, 2023 showing aggregate amount invoiced by each such Top Vendor and the percentage of total vendor expenditures of the Sellers attributable to such Top Vendor during such period.  No Seller has been, or is currently, engaged in any material dispute with any Top Vendor.  Since January 1, 2024, no Seller has received any written communication from any Top Vendor of any intention or threat to terminate or materially reduce its provision of goods or services to, or otherwise adversely change in any material respect their relationship with, the Sellers and, to the Knowledge of the Sellers, no such action is being considered.

3.21    Government Contracts.

(a)      Schedule 3.21 sets forth a list of (i) each Government Contract with an aggregate annual value exceeding $250,000, identifying each instance in which such Government Contract by its terms or under applicable Law requires the consent of a Governmental Body or any other Person to consummate the transactions contemplated hereunder and (ii) each Transferred Government Bid. Each of the Government Contracts is valid, binding and enforceable on Sellers, and, to Seller's Knowledge, each other party thereto, and is in full force and effect.  Sellers have provided true, correct and complete copies of each Government Contract to Purchaser.

(b)      Since January 1, 2023, no Seller has: (i) breached or violated, in any material respect, any Law, term or condition, certification or representation pertaining to any Government Contract or Government Bid, (ii) made any material false representations or certifications in connection with a Government Contract or Government Bid, (iii) had any Government Contract terminated by any Governmental Body or any other Person for default or failure to perform or otherwise received a cure, show cause or similar notice; (iv) conducted any internal investigation or initiated or made a voluntary or mandatory disclosure (or been required to make such a disclosure) to a Governmental Body with respect to any alleged or possible irregularity, misstatement or omission related to a Government Contract; or (v) received a written performance evaluation from a Governmental Body containing a materially adverse or negative performance rating related to a Government Contract.

(c)      Except for matters that have taken place in the Ordinary Course and were closed without any liability or finding of non-compliance, since January 1, 2023, no Seller has undergone and is not undergoing any audit, review, inspection, investigation, survey or examination of records and, to Seller's Knowledge, there are no outstanding or unsettled

allegations of fraud, false claims or overpayments nor any basis for any such investigations or audits by any Governmental Body with regard to any of the Government Contracts. Since January 1, 2023, there have been no actual or, to Seller's Knowledge, threatened disputes asserted by or against a Governmental Body or other Person related to a Government Contract or Government Bid.

3.22    <u>Product Liability</u>. The Sellers have no material Liability (and, to the Knowledge of the Sellers, there is no basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand against any of them giving rise to any material Liability) arising out of any injury to individuals or property as a result of the ownership, possession, or use of any product manufactured, sold, leased, or delivered by the Sellers that would not be subject to a free and clear sale under Section 363 and/or 1123(a) of the Bankruptcy Code.

3.23    <u>No Other Representations or Warranties</u>. Except for the representations and warranties expressly contained in this <u>Article III</u> (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "<u>Express Representations</u>") (it being understood that Purchaser and the Purchaser Group have relied only on such express representations and warranties), no Seller nor any other Person on behalf of any Seller makes any express or implied representation or warranty with respect to any Seller, the Acquired Assets, or the Assumed Liabilities or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including in any presentations or other materials prepared by Sellers, Centerview, or Riveron) (the "<u>Information Presentation</u>") or in that certain datasite administered by Sellers, Centerview, or Riveron (the "<u>Dataroom</u>") or elsewhere to Purchaser or any of its Affiliates or Advisors on behalf of Sellers or any of their Affiliates or Advisors. Without limiting the foregoing, no Seller nor any other Person will have or be subject to any Liability whatsoever to Purchaser, or any other Person, resulting from the distribution to Purchaser or any of its Affiliates or Advisors, or Purchaser's or any of its Affiliates' or Advisors' use of or reliance on, any such information, including the Information Presentation, the Projections, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise in expectation of the transactions contemplated by this Agreement or any discussions with respect to any of the foregoing information.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Sellers as of the date hereof and as of the Closing as follows.

4.1    <u>Organization and Qualification</u>. Purchaser is a limited liability company, duly formed, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority necessary to carry on its business as it is now being conducted, except (other than with respect to Purchaser's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the transactions contemplated by this Agreement. Purchaser is duly licensed or qualified to do business and is in good standing (where such concept is recognized

under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets leased by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the transactions contemplated by this Agreement.

4.2     <u>Authorization of Agreement</u>. Purchaser has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance by Purchaser of this Agreement, and the consummation by Purchaser of the transactions contemplated hereby, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on Purchaser's part are necessary to authorize the execution, delivery and performance by Purchaser of this Agreement and the consummation by it of the transactions contemplated hereby. Subject to requisite Bankruptcy Court approvals, this Agreement has been duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery hereof by the other Parties, constitutes a legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except that such enforceability may be limited by the Enforceability Exceptions.

4.3     <u>Conflicts; Consents</u>.

(a)     Assuming that (i) requisite Bankruptcy Court approvals are obtained, (ii) the notices, authorizations, approvals, Orders, Permits or consents set forth on <u>Schedule 4.3(a)</u> are made, given or obtained (as applicable), and (iii) the requirements of Competition and FDI Laws are complied with, neither the execution and delivery by Purchaser of this Agreement, nor the consummation by Purchaser of the transactions contemplated hereby, nor performance or compliance by Purchaser with any of the terms or provisions hereof, will (A) conflict with or violate any provision of Purchaser's articles of incorporation or bylaws or similar organizational documents, (B) (w) violate any Law or Order applicable to Purchaser, (C) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under, (x) give rise to a right of termination, modification or cancelation of any obligation or to the loss of any benefit under, (y) accelerate any of the terms or provisions of any loan or credit agreement or other Contract to which Purchaser is a party or (z) accelerate Purchaser's obligations under any such Contract, or (D) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Purchaser or any of its Subsidiaries, except, in the case of <u>clauses (C)</u> and <u>(D)</u>, as would not, individually or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Purchaser to consummate the transactions contemplated hereby.

(b)     Except as set forth on <u>Schedule 4.3(a)</u>, Purchaser is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Purchaser of this Agreement or the consummation by Purchaser of the transactions contemplated hereby, except (i) any filings required to be made under Competition and FDI Laws, or (ii) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Purchaser to consummate the transactions contemplated hereby.

26

4.4     Financing. The Purchaser has, or at the time of Closing will have access to, sufficient assets necessary to fully discharge all of its obligations under this Agreement. At the Closing, the Purchaser will have available sufficient assets to satisfy its obligation to pay in full all amounts contemplated by Section 2.1.

4.5     Brokers. Except for Evercore, all of whose fees and expenses will be borne solely by Purchaser, there is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

4.6     Investment Representation; Investigation. Purchaser is acquiring the capital stock or other equity interests of the Acquired Entities for its own account with the present intention of holding such securities for investment purposes and not with a view to, or for sale in connection with, any distribution of such securities in violation of any federal or state securities Laws. Purchaser is an "accredited investor" within the meaning of Regulation D promulgated pursuant to the Securities Act. Purchaser is knowledgeable about the industries in which the Acquired Entities operate and is capable of evaluating the merits and risks of the transactions contemplated by this Agreement and is able to bear the substantial economic risk of such investment for an indefinite period of time. Purchaser has been afforded full access to the books and records, facilities and personnel of the Acquired Entities for purposes of conducting a due diligence investigation and has conducted a full due diligence investigation of the Acquired Entities and is satisfied with the access and materials made available to it in connection with such investigation and the scope and results of such investigation.

4.7     No Litigation. There are no Actions pending or, to Purchaser's knowledge, threatened against or affecting Purchaser that will adversely affect Purchaser's performance of its obligations under this Agreement or the consummation of the transactions contemplated by this Agreement.

4.8     Certain Arrangements. As of the date hereof, there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any member of the Purchaser Group, on the one hand, and any member of the management of any Seller or its respective governing body (or applicable governing body of any Affiliate of any Seller), any holder of equity or debt securities of any Seller, or any lender or creditor of any Seller or any Affiliate of any Seller, on the other hand, (a) relating in any way to the acquisition of the Acquired Assets or the transactions contemplated by this Agreement or (b) that would be reasonably likely to prevent, restrict, impede or adversely affect the ability of any Seller or any of its Affiliates to entertain, negotiate or participate in any such transactions.

4.9     No Foreign Person. As of the Closing, Purchaser will not be a "foreign person," as defined in Section 721 of the U.S. Defense Production Act of 1950, including any implementing regulations thereof.

4.10     No Additional Representations or Warranties. Except for the representations and warranties contained in this Article IV, neither Purchaser nor any other Person on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to Sellers by Purchaser.

4.11    No Outside Reliance. Notwithstanding anything contained in this Article IV or any other provision of this Agreement to the contrary, Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the Express Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser and the Purchaser Group may rely in connection with the transactions contemplated by this Agreement. Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the Acquired Assets are being acquired by Purchaser "as is" and "where is" and with all faults and all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations), including in the Information Presentation, the Dataroom, the Projections or in any meetings, calls or correspondence with management of Seller or any other Person on behalf of any Seller or any of their respective Affiliates or Advisors, (b) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of any Seller, or the quality, quantity or condition of any Seller's assets, (c) any implied representation of merchantability or fitness for any particular use or purpose, (d) any implied representation regarding the use or operation of the Acquired Assets after the Closing in any manner, and (e) any implied representation regarding the probable success or profitability of the Acquired Assets after the Closing, are, in each case, specifically disclaimed by each Seller and that neither Purchaser nor any member of the Purchaser Group has relied on any such representations, warranties or statements. Purchaser acknowledges, on its own behalf and on behalf of the Purchaser Group, that it has conducted to its full satisfaction an independent investigation and verification of the business including its financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Sellers, and, in making its determination to proceed with the transactions contemplated by this Agreement, Purchaser has relied solely on the results of the Purchaser Group's own independent investigation and verification, and has not relied on, is not relying on, and will not rely on, any Seller, the Information Presentation, the Projections or any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or any Seller or any of their respective Affiliates or Advisors, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations (it being understood that Purchaser and the Purchaser Group have relied only on the Express Representations). Without limiting the foregoing, Purchaser acknowledges, on behalf of itself and the Purchaser Group, that no Seller nor any other Person will have or be subject to any Liability whatsoever to Purchaser, or any other Person, resulting from the distribution to Purchaser or any of its Affiliates or Advisors, or Purchaser's or any of its Affiliates' or Advisors' use of or reliance on, any such information, including the Information Presentation, the Projections, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in the Dataroom or otherwise in expectation of the transactions contemplated by this Agreement or any discussions with respect to any of the foregoing information.

## ARTICLE V
## BANKRUPTCY COURT MATTERS

5.1    Bankruptcy Actions.

(a)    Within two Business Days following the Petition Date, Sellers shall file a motion with the Bankruptcy Court seeking approval of the Bidding Procedures and attaching the proposed forms of the Bidding Procedures Order and Plan Confirmation and Sale Orders approving the execution, delivery and performance of this Agreement by Sellers (including payment of the Expense Reimbursement pursuant to Section 8.2(b)), other than the performance of those obligations to be performed at or after the Closing, which Bidding Procedures, Bidding Procedures Order, and Plan Confirmation and Sale Orders shall be in form and substance acceptable to Purchaser and Sellers. Purchaser agrees that it will, in accordance with the RSA, promptly take such actions as are reasonably requested by Sellers to assist in obtaining Bankruptcy Court approval of the Bidding Procedures and Plan Confirmation and Sale Orders.

(b)    The Bidding Procedures to be employed with respect to this Agreement shall be those approved by the Bidding Procedures Order. Purchaser agrees and acknowledges that Sellers, including through their representatives, are and may continue soliciting inquiries, proposals or offers from third parties with respect to an Alternative Transaction pursuant to the terms of the Bidding Procedures Order, consistent with this Agreement and the RSA. If an Auction is conducted, the initial overbid must comply with the Bidding Procedures Order.

(c)    From the date hereof until the earlier of (i) the termination of this Agreement in accordance with Article VIII and (ii) the Closing Date, the Parties shall use their respective commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Bidding Procedures and Plan Confirmation and Sale Orders. Purchaser shall us commercially reasonable efforts as reasonably requested by Sellers to assist in obtaining the Bankruptcy Court's entry of the Bidding Procedures and Plan Confirmation and Sale Orders and any other Order reasonably necessary in connection with the transactions contemplated by this Agreement as promptly as practicable, including furnishing  financial information or other documents or information for filing with the Bankruptcy Court, and providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, did not engage in collusive bidding under section 363(n) of the Bankruptcy Code, as well as demonstrating Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(d)    Each Seller and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement, including, upon reasonable request, promptly furnishing the other with copies of notices or other communications received by Sellers or Purchaser, as applicable, from the Bankruptcy Court with respect to the transactions contemplated by this Agreement.

(e)    Sellers and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to higher and better bids in accordance with the Bidding Procedures

and Bankruptcy Court approval. Purchaser acknowledges that Sellers must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to their creditors and other interested parties, providing information about Sellers to prospective bidders, entertaining higher and better offers from such prospective bidders and, in the event that additional qualified prospective bidders desire to bid for all or substantially all of the Acquired Assets, conducting an Auction.

(f)    Purchaser shall provide adequate assurance of future performance under the Assigned Contracts as required under section 365 of the Bankruptcy Code. Purchaser agrees that it will take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Purchaser's Advisors available to testify before the Bankruptcy Court.

(g)    Nothing in this Section 5.1 shall prevent Sellers from modifying the Bidding Procedures in accordance with the terms of the Bidding Procedures Order as necessary or appropriate to maximize value for Sellers' estate in accordance with Sellers' fiduciary obligations.

(h)    Sellers shall have the right to elect, in their sole discretion, subject to the satisfaction of applicable provisions of the Bankruptcy Code and Bankruptcy Rules, and subject to prior consultation with the Purchaser, to effectuate the transactions contemplated by this Agreement pursuant to the Plan of Liquidation for the Sellers or outside of such plan pursuant to section 363 of the Bankruptcy Code, in each case, on terms and conditions consistent with this Agreement, the DIP Orders and the RSA.

5.2    Cure Costs. Subject to entry of the Plan Confirmation and Sale Order, Purchaser shall, on or prior to the Closing (or, in the case of any Contract that is to be assigned following the Closing pursuant to Section 1.5(a), on or prior to the date of such assignment), pay the Cure Costs with Acquired Cash and cure any and all other curable defaults and breaches under the Assigned Contracts so that such Contracts may be assumed by the applicable Seller and assigned to Purchaser in accordance with the provisions of section 365 (or 1123, as applicable) of the Bankruptcy Code and this Agreement.

5.3    Plan Confirmation and Sale Order. The Plan Confirmation and Sale Order shall, among other things: (a) approve, pursuant to sections 105, 363, 365 and 1123 of the Bankruptcy Code, (i) the execution, delivery and performance by Sellers of their obligations under this Agreement and (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances); (b) authorize and empower Sellers to assume and assign to Purchaser the Assigned Contracts; (c) declare any provisions in any Assigned Contract that purport to prohibit, restrict, or condition the assignment of such Contract to Purchaser or provide for the termination or modification of an Assigned Contract based on the filing of a bankruptcy case, the financial condition of the Debtors or similar circumstances to be unenforceable and of no force an effect; (d) find that Purchaser is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code and grant Purchaser the protections of section 363(m) of the Bankruptcy Code; (e) find that Purchaser is not a successor to any Seller; (f) find that Purchaser shall have no

Liability or responsibility for any obligation of any Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liability of any kind or character, including any theory of antitrust, environmental, successor or transferee Liability, labor law, de facto merger or substantial continuity; (g) include robust findings that the Sellers provided adequate actual and constructive notice to holders of claims and interests impacted by the Plan Confirmation and Sale Order, sufficient to sell the Acquired Assets free and clear of any such claims or interests; (h) find that Purchaser has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance under the Assigned Contracts; and (i) find that Purchaser shall have no Liability for any Excluded Liability.

5.4     Approval. Sellers' obligations under this Agreement and in connection with the transactions contemplated hereby are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Bidding Procedures and Plan Confirmation and Sale Orders). Nothing in this Agreement shall require Sellers or their respective Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to their respective stakeholders or the Bankruptcy Court.

**ARTICLE VI**
**COVENANTS AND AGREEMENTS**

6.1     Conduct of Business of Sellers.

(a)     Except (i) as required by applicable Law, Order or a Governmental Body, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code or agreements governing Sellers' debtor-in-possession financing or use of cash collateral, as the case may be, (ii) as expressly contemplated, required or permitted by this Agreement, (iii) to the extent solely related to an Excluded Asset or an Excluded Liability, and (iv) as set forth on Schedule 6.1, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII) unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, conditioned or delayed), Sellers shall, with respect to the Acquired Assets and Assumed Liabilities (A) carry on their business in the Ordinary Course, and (B) other than as appurtenant to the exclusion of the Excluded Assets and Excluded Liabilities, preserve the present business operations, organization and goodwill of the business of Sellers and the present relationships with customers and suppliers of the business of Sellers.

(b)     Except (i) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code or agreements governing Sellers' debtor-in-possession financing or use of cash collateral, as the case may be, (ii) as expressly contemplated, required or permitted by this Agreement, (iii) to the extent solely related to an Excluded Asset or an Excluded Liability, or (iv) as set forth on Schedule 6.1, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII), unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, conditioned or delayed), Sellers shall not:

(i)      other than transactions among the Sellers or the Acquired Entities, (A) issue, sell, encumber or grant any shares of the capital stock or other equity or voting interests of the Acquired Entities, or any securities or rights convertible into, exchangeable or exercisable for, or evidencing the right to subscribe for any shares of such capital stock or other equity or voting interests, or any rights, warrants or options to purchase any shares of such capital stock or other equity or voting interests, (B) redeem, purchase or otherwise acquire any of the outstanding shares of capital stock or other equity or voting interests of the Acquired Entities, or any rights, warrants or options to acquire any shares of such capital stock or other equity or voting interests, (C) establish a record date for, declare, set aside for payment or pay any dividend on, or make any other distribution in respect of, any shares of the capital stock or other equity or voting interests of the Acquired Entities, other than dividends and distributions by an Acquired Entity to another Acquired Entity or to any Seller, or (D) split, combine, subdivide or reclassify any shares of the capital stock or other equity or voting interests of the Acquired Entities;

(ii)      adopt any plan of complete or partial liquidation, dissolution, consolidation, restructuring, reclassification or reorganization with respect to the Acquired Entities;

(iii)      (A) incur, assume or otherwise become liable for any indebtedness for borrowed money, issue or sell any debt securities or rights to acquire any debt securities of Sellers, guarantee any such indebtedness or any debt securities of another Person or enter into any "keep well" or other agreement to maintain any financial statement condition of another Person (collectively, "Indebtedness"), except (1) for intercompany Indebtedness among Sellers and their Affiliates, and (2) for Indebtedness incurred under existing arrangements (including in respect of letters of credit) in an amount not to exceed $1,000,000 outstanding at any time or pursuant to the DIP Facility;

(iv)      sell or lease to any Person, in a single transaction or series of related transactions, any of its properties or assets for consideration, individually or in the aggregate, in excess of $5,000,000, except (A) dispositions of obsolete, surplus or worn out assets or assets that are no longer used or useful in the conduct of the business of Sellers, (B) transfers among the Sellers, (C) leases or subleases of real property under which a Seller is a tenant or a subtenant and voluntary terminations or surrenders of such leases or subleases, in each case, following prior good faith consultation with Purchaser, and (D) other sales and leases in the Ordinary Course;

(v)      make or authorize capital expenditures, including for property, plant and Equipment, except for those (A) in connection with the repair or replacement of facilities, properties or assets destroyed or damaged due to casualty or accident (whether or not covered by insurance) or (B) otherwise in accordance with the Approved Budget under the DIP Facility;

(vi)      make any acquisition of, or investment in, any properties, assets, securities or business (including by merger);

(vii)    except   to the extent required by the terms of any Seller Plan, or expressly permitted under the RSA, (1) grant to any employee any material increase in compensation (including bonus or long-term incentive opportunities), (2) grant to any current or former employee any increase in severance, retention or termination pay, or implement any retention, transaction or incentive award programs, (3) grant or amend any equity or other incentive awards, (4) hire any employee whose base salary exceeds $300,000 per annum, (5) establish, adopt, enter into, materially amend or terminate any Seller Plan or (6) take any action to accelerate any rights or benefits under any Seller Plan; provided, that the foregoing shall not restrict any Seller from entering into or making available, to newly hired employees or to employees in the context of promotions based on job performance or workplace requirements, plans, agreements, benefits and compensation arrangements (including incentive grants) that have a value that is consistent with the past practice of making compensation and benefits available to newly hired or promoted employees in similar positions;

(viii)    (1) implement any plant closings or mass layoffs of employees or (2) enter into, extend, modify or terminate any collective bargaining or other agreement with a union;

(ix)    make any material changes in financial accounting methods, principles or practices materially affecting the consolidated assets, Liabilities or results of operations of Sellers, except insofar as may be required (A) by GAAP (or any interpretation thereof), (B) by any applicable Law or (C) by any Governmental Body or quasi-governmental authority (including the Financial Accounting Standards Board or any similar organization);

(x)    to the extent relating to the Acquired Assets, (A) make, revoke or change any material Tax election, (B) adopt or change any Tax accounting method or period, (C) file any material amended Tax Return, (D) enter into any closing agreement or settlement with respect to a material amount of Taxes, (E) settle any claim or assessment for a material amount of Taxes, (F) consent to any extension or waiver of the statute of limitations period applicable to any such Tax claim or assessment or (G) surrender any right to claim a refund of a material amount of Taxes;

(xi)    grant any Encumbrance (other than Permitted Encumbrances) on any material Acquired Asset other than to secure Indebtedness and other obligations in existence at the date of this Agreement (and required to be so secured by their terms) or permitted under Section 6.1(b)(i);

(xii)    settle any pending or threatened Action against any Seller other than any such matters relating to an Excluded Liability, or any such settlements (a) in an amount not to exceed $250,000 and (b) which do not place any restrictions on the operations of the business of the Sellers or its assets or properties (other than customary confidentiality, non-disparagement and release obligations);

(xiii)    lease, license, surrender, relinquish, sell, transfer, convey, assign or otherwise dispose of any interest in any Acquired Assets;

33

(xiv)   mortgage, pledge or subject to Liens (other than Permitted Liens) any of the Acquired Assets;

(xv)   modify, amend, terminate, waive any rights or obligations under or otherwise seek to reject any Assumed Contract or other Contract that is material to the Sellers, or enter into any Contract that is material to the Sellers;

(xvi)   fail to maintain in full force and effect insurance policies consistent, in all material respects, with the Ordinary Course;

(xvii)   subject to termination, abandonment, suspension, abrogation or lapse, or enter into, amend or modify, any Permit, other than lapses in the Ordinary Course that are not material to the business of the Sellers; or

(xviii)   make any material changes or modifications to the quality management systems, design or intended purpose with respect to the medical devices manufactured by Sellers that are subject to the Medical Devices Directive 93/42/EEC and its replacement, the Medical Devices Regulation (EU) 2017/745; or

(xix)   authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions.

(c)   In the event Sellers take any action prior to the Closing Date as permitted by (i) Purchaser's consent or (ii) an explicit exception in the Schedules, in each case, with respect to the matters set forth in Section 6.1(b)(ii), the Parties shall promptly consult in good faith and jointly approve a related amendment to increase the Wind-down Amount. Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct any Seller's operations or business prior to the Closing, and nothing contained in this Agreement is intended to give any Seller, directly or indirectly, the right to control or direct Purchaser's or its Subsidiaries' operations. Prior to the Closing, each of Purchaser and Sellers shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its and its Subsidiaries' respective operations.

6.2   <u>Access to Information</u>.

(a)   From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to <u>Article VIII</u>), Sellers will, and will cause the Seller Parties and their respective Representatives, to provide Purchaser and its authorized Advisors with reasonable access and upon reasonable advance notice and during regular business hours to the offices, properties, appropriate officers, employees, accountants, auditors, counsel and other representatives, books and records of Sellers, the Acquired Assets or the Assumed Liabilities, in order for Purchaser and its authorized Advisors to access such information regarding the Acquired Assets and the Assumed Liabilities as is reasonably necessary in order to consummate the transactions contemplated by this Agreement and in connection with transitional and operational planning purposes; <u>provided</u>, that (i) such access does not unreasonably interfere with the normal operations of any Seller, (ii) such access will occur in such a manner as Sellers reasonably determine to be appropriate to protect the confidentiality of the transactions contemplated by this

Agreement, (iii) all requests for access will be directed to Centerview or such other Person(s) as Sellers may designate in writing from time to time and (iv) nothing herein will require Sellers to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would waive any legal privilege or (B) would be in violation of applicable Laws (including Competition Laws) or the provisions of any agreement to which Sellers are bound or would violate any fiduciary duty; provided, that, in the event the Sellers withhold access to any such information, the Sellers will (1) inform Purchaser that such information has been withheld, and (2) use reasonable best efforts to provide such information in a manner which would not be prohibited or which would not violate appliable Law or cause the loss of any privilege.

(b)    The information provided pursuant to this <u>Section 6.2</u> will be governed by all the terms and conditions of the Confidentiality Agreement, which Confidentiality Agreement shall not terminate upon the execution of this Agreement notwithstanding anything to the contrary therein, and the Parties agree that the terms of the Confidentiality Agreement shall continue in full force and effect until the Closing. Purchaser will, and will cause its Advisors to, abide by the terms of the Confidentiality Agreement with respect to such access and any information furnished to Purchaser or any of its Advisors. Sellers make no representation or warranty as to the accuracy of any information, if any, provided pursuant to this <u>Section 6.2</u>, and Purchaser may not rely on the accuracy of any such information, in each case, other than the Express Representations.

(c)    For a period of three years following the Closing Date (or, if later, the closing of the Bankruptcy Cases), Purchaser will provide Sellers and their Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, at Sellers' expense, to the books and records, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings and other documents (for the purpose of examining and copying) relating to the Acquired Assets, the Acquired Entities, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities with respect to periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to employees, officers, Advisors, accountants, offices and properties of Purchaser (including for the purpose of better understanding the books and records), in each case, in connection with the wind-down and liquidation of Sellers, the preparation or amendment of tax returns, claims or obligations relating to Excluded Liabilities, the preparation of financial statements, or for other bona fide legal compliance purpose; provided, that Purchaser shall not be required to provide Sellers with any such access to the extent necessary to (i) ensure Purchaser's compliance with any applicable Law or an Order of the Bankruptcy Court, (ii) preserve the attorney-client privilege of Purchaser and its counsel or (iii) comply with any contractual confidentiality obligations (provided, that Purchaser shall use its reasonable best efforts to allow for such access in a way that would not have any of the foregoing effects); provided, further, that such access shall not unreasonably interfere with the business or operations of the business of Purchaser following Closing; provided, further, that Purchaser shall not be required to provide Sellers with any such access related to any Legal Proceeding between Purchaser or any of its Affiliates, on the one hand, and any Seller or any of its Affiliates, on the other hand. Unless otherwise consented to in writing by Sellers, Purchaser will not, for a period of three years following the Closing Date, destroy, alter or otherwise dispose of any of such books and records without first offering to surrender to Sellers such books and records or any portion thereof that Purchaser may intend to destroy, alter or dispose of. From and after the Closing, Purchaser will, and will cause its employees to, provide Sellers with reasonable assistance, support and cooperation with Sellers' wind-down and related activities

35

(*e.g.*, helping to locate documents or information related to preparation of Tax Returns or prosecution or processing of insurance/benefit claims).

(d)     Purchaser will not, and will not permit any member of the Purchaser Group to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder or other material business relation of any Seller prior to the Closing with respect to any Seller, its business or the transactions contemplated by this Agreement without the prior written consent of Seller (which shall not be unreasonably withheld, conditioned or delayed) or its Representatives for each such contact.

(e)     From and after the date of this Agreement, the Sellers shall keep confidential non-public information in its possession (other than information which was or becomes available to the Sellers on a non-confidential basis from a source other than Purchaser or any of its Affiliates relating to Purchaser and its Affiliates; provided, however, that the Sellers shall not be liable hereunder with respect to any disclosure to the extent such disclosure is required pursuant to legal process (including pursuant to the assertion of the Sellers' rights under this Agreement) (by interrogatories, subpoena, civil investigative demand or similar process), regulatory process or request, or to the extent such disclosure is reasonably necessary for purposes of compliance by Sellers or their respective Affiliates with applicable Law, including tax or regulatory reporting requirements; provided that in the event of any disclosure pursuant to legal process the Sellers exercise commercially reasonable efforts to preserve the confidentiality of the non-public information disclosed, including by cooperating with Purchaser (at Purchaser's sole cost) to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded the non-public information required to be disclosed.

6.3     Employee Matters.

(a)     At least 15 Business Days prior to Closing, Purchaser shall extend to each employee of Sellers a written offer of employment reviewed by Sellers, and which Sellers have had an opportunity to comment on, which comments Purchaser shall consider in good faith, providing for a position that is the same or no less favorable than such employee's position immediately prior to the Closing (including primary location of employment ) on the terms set forth in this Section 6.3, and which offers will provide for an acknowledgement from the applicable employee that if he or she accepts such offer of employment from Purchaser (by commencing employment with the Purchaser), he or she shall not be entitled to receive any severance payments or benefits from Sellers upon such employee's termination of employment with Sellers at the Closing ("Transfer Offer"). Each Transfer Offer that is accepted shall become effective immediately after the Closing. Employees who accept such Transfer Offers and begin active employment with Purchaser in accordance with this Section 6.3(a) shall be referred to herein as "Transferred Employees." Purchaser and Sellers shall each notify the other in a reasonable timeframe with respect to whether each such offer has been accepted or rejected. Nothing herein shall be construed as a representation or guarantee by any Seller or any of their respective Affiliates that any or all of the employees of Sellers will accept the Transfer Offer or will continue in employment with Purchaser following the Closing for any period of time. Purchaser shall take all reasonable steps necessary to effect the timely transfer of employment to it of each such Transferred Employee who has accepted a Transfer Offer. Effective as of the Closing, each Transferred Employee shall cease to be an employee of each Seller or its respective Affiliates.

36

(b)     Sellers shall retain all obligations, Liabilities and commitments in respect of current or former employees of Sellers who do not become Transferred Employees, including any claims for severance or other termination benefits (including claims for wrongful dismissal, notice of termination of employment, pay in lieu of notice or breach of Contract) arising out of, relating to or in connection with any failure of Purchaser to offer employment to such employee(s), any failure of Purchaser to assume any Seller Plan, or otherwise in connection with the Closing.

(c)     For  the period beginning on the Closing Date and ending on December 31, 2025 (but in no event beyond the date on which the applicable Transferred Employee's employment with Purchaser ends), Purchaser shall provide each Transferred Employee, or cause each Transferred Employee to be provided, with: (i) a base compensation or wage rate, as applicable, that is no lower than that provided to such Transferred Employee as of immediately prior to the Closing; (ii)  cash bonus opportunities that are no less favorable than those provided to such Transferred Employee as of immediately prior to the Closing (but excluding any long-term incentive, retention, exit, transaction, or other special or one-time bonus payments); and (iii) other employee benefits (including severance benefits described on Schedule 6.3(c), but excluding any long-term incentive, deferred compensation, defined benefit pension or retiree medical or death benefits) that are no less favorable than those provided by Sellers to such Transferred Employees as of immediately prior to the Closing. For purposes of eligibility, vesting and determining level of benefits under the benefit plans and programs maintained by Purchaser or any of its Affiliates after the Closing Date (the "Purchaser Plans"), each Transferred Employee shall be credited with his or her years of service with Sellers (and any predecessor thereof) before the Closing Date, except to the extent such credit would result in a duplication of benefits.

(d)     Purchaser shall assume, honor and be solely responsible for paying, providing and satisfying when due the following: (i) all accrued and unused vacation, personal days, sick pay and other paid time off for Transferred Employees the extent earned but unused as of the Closing Date; (ii) account balances under Exactech's non-qualified deferred compensation plan unpaid immediately prior to the Closing, and (iii) to the extent unpaid as of the Closing, 2024 annual bonuses for Transferred Employees, in the amounts earned pursuant to terms thereof, but in no event to exceed the amount accrued by Exactech for such 2024 annual bonuses through the end of the 2024 calendar year, with the amounts described in subclauses (i)-(iii) to be paid as and when such amounts become payable pursuant to the terms of the applicable plan, program or policy of Exactech. Except to the extent expressly provided for under this Section 6.3(d), all Liabilities for, or relating to, any Seller Plans that are not Assumed Benefit Plans shall be Excluded Liabilities, and Purchaser shall have no obligation or liability with respect to such Seller Plans or obligations thereunder.

(e)     Purchaser will, or will cause its Affiliates to, provide any required notice under the Worker Adjustment and Retraining Notification Act of 1988 or any similar Laws ("WARN Act") and to otherwise comply with the WARN Act with respect to any "plant closing" or "mass layoff" or group termination or similar event under the WARN Act affecting employees of Sellers or Transferred Employees (including as a result of the consummation of transactions contemplated by this Agreement) and occurring on and after the Closing. Purchaser will not, and will cause its Affiliates not to, take any action on or after the Closing Date that would cause any termination of employment of any employees by Sellers or their Affiliates occurring prior to or at the Closing to constitute a "plant closing," "mass layoff" or group termination or similar event

under the WARN Act, or to create any Liability or penalty to Sellers or any of their Affiliates for any employment terminations under Law.

(f)     With respect to the Transferred Employees, Purchaser shall be solely responsible for any and all obligations and Liabilities arising under Section 4980B of the Tax Code with respect to all "M&A qualified beneficiaries" as defined in 26 C.F.R. § 54.4980B-9.

(g)     For any Transferred Employees who are principally based outside the United States, the provisions of this Section 6.3 shall apply to such employees *mutatis mutandis* to the maximum extent permitted by applicable Law.

(h)     All provisions contained in this Agreement with respect to employee benefit plans or compensation of Transferred Employees are included for the sole benefit of the respective parties hereto.  Nothing contained herein (i) shall confer upon any former, current or future employee of Seller or Purchaser or any legal representative or beneficiary thereof any rights or remedies, including any right to employment or continued employment, of any nature, for any specified period, (ii) shall cause the employment status of any former, present or future employee of Seller or Purchaser to be other than terminable at will, (iii) shall confer any third party beneficiary rights upon any current or former employee of Seller, including any Transferred Employee or any dependent or beneficiary thereof or any heirs or assigns thereof or (iv) shall be construed to establish or be treated as an amendment or modification of any employee benefit plan, program, agreement, arrangement, or policy.

6.4     Regulatory Approvals.

(a)     Subject to Section 6.5, Sellers will (i) make or cause to be made all filings and submissions required to be made by any Seller under any applicable Laws for the consummation of the transactions contemplated by this Agreement, if any, (ii) cooperate with Purchaser in exchanging such information and providing such assistance as Purchaser may reasonably request in connection with any filings made by the Purchaser Group pursuant to Section 6.4(b), (iii) supply promptly any additional information and documentary material that may be requested in connection with the filings made pursuant to this Section 6.4(a) or Section 6.4(b), and (iv) use reasonable best efforts to take all actions necessary to obtain all required clearances in connection with such filings.

(b)     Subject to Section 6.5, Purchaser will, and will cause its Affiliates and Advisors to, (i) make or cause to be made all filings and submissions required to be made by any member of the Purchaser Group under any applicable Laws for the consummation of the transactions contemplated by this Agreement, if any, (ii) cooperate with Sellers in exchanging such information and providing such assistance as Sellers may reasonably request in connection with any filings made by a Seller pursuant to Section 6.4(a), (iii) supply promptly any additional information and documentary material that may be requested in connection with the filings made pursuant to this Section 6.4(b) or Section 6.4(a), and (iv) use reasonable best efforts to take all actions necessary to obtain all required clearances.

38

6.5    Competition and FDI Notifications.

(a)    Purchaser will as soon as reasonably possible after the date hereof conduct the analysis with respect to required notifications, filings, registrations or other materials required or necessary under Competition and FDI Laws for the transactions contemplated by this Agreement, whereby Sellers shall in good faith cooperate with Purchaser with a view to enabling Purchaser to receive all information reasonably necessary to conduct the analysis, and Purchaser shall propose to, and consult with, Sellers a list of such required notifications, filings, registrations or other materials ("List of Required Regulatory Filings"). Notwithstanding the foregoing, Seller's consent is required for the addition of any voluntary notifications, filings, registrations or other materials to the final List of Required Regulatory Filings. Sellers and Purchaser will (i) as promptly as reasonably practicable, but no later than ten (10) Business Days following the date hereof file with the United States Federal Trade Commission and the United States Department of Justice, the notification form required pursuant to the HSR Act (if applicable), and (ii) as promptly as reasonably practicable following the date hereof, make all other notifications, filings, registrations or other materials required or necessary under the Competition and FDI Laws according to the List of Required Regulatory Filings. Each Seller and Purchaser shall (and shall cause their respective Affiliates to) furnish to each other's counsel such necessary information and reasonable assistance as the other may request in connection with the completion of the List of Regulatory Filings and its preparation of any filing or submission that is necessary under such Competition and FDI Laws, and will respond to any requests made for any supplemental information by any Governmental Body as promptly as practicable. Sellers and Purchaser shall not extend any waiting period or enter into any agreement or understanding with any Governmental Body without the prior written consent of the other; provided, that such consent shall not be unreasonably withheld, conditioned or delayed. Purchaser will be solely responsible for payment of all filing fees payable in connection with such filings.

(b)    Subject to the immediately following sentence, Sellers and Purchaser will use their reasonable best efforts to as promptly as practicable (and in any event prior to the Outside Date) obtain any clearances, Consents, approvals, waivers, actions, waiting period expirations or terminations, non-actions or other authorizations required under such Competition and FDI Laws for the consummation of this Agreement and the transactions contemplated hereby and will keep each other apprised of the status of any communications with, and any inquiries or requests for additional information from, any Governmental Body and will comply promptly with any such inquiry or request. Purchaser will take, and will cause its Affiliates to take, any and all steps necessary to avoid or eliminate each and every impediment under any Law that may be asserted by any Governmental Body or any other Person so as to enable the Parties to expeditiously close the transactions contemplated by this Agreement, including (i) opposing at Purchaser's cost and expense any motion or action for a temporary, preliminary or permanent Order against, or preventing or delaying, the consummation of the transactions contemplated by this Agreement, and exhausting all avenues of appeal, including appealing properly any adverse decision or Order by any Governmental Body, (ii) entering into a consent decree, consent agreement, settlement or other agreement or arrangement (including any customary ancillary agreements) containing Purchaser's agreement to hold separate, license, sell, transfer, dispose or divest (pursuant to such terms as may be required by any Governmental Body) such assets (whether tangible or intangible), rights, properties, products or businesses of Purchaser and its Affiliates (including, after the Closing, the Acquired Assets), (iii) agreeing to the termination, modification or assignment of

39

existing relationships, joint ventures, contracts or obligations of Purchaser and its Affiliates and (iv) agreeing to such limitations on conduct or actions of members of Purchaser and its Affiliates after the Closing as may be required in order to obtain satisfaction of the closing conditions set forth in <u>Section 7.1(a)</u> prior to the Outside Date, in each case, so as to allow the consummation of this Agreement and the transactions contemplated hereby as soon as practicable and, in any event, prior to the Outside Date.

(c)    The Parties commit to instruct their respective counsel to cooperate with each other and use reasonable best efforts to facilitate and expedite obtaining any clearances, Consents, approvals, waivers, actions, waiting period expirations or terminations, non-actions or other authorizations under Competition and FDI Laws at the earliest practicable dates and, in any event, prior to the Outside Date. Such reasonable best efforts and cooperation shall include each Party and its respective counsel undertaking to (i) promptly notify the other Parties or their counsel of, and, if in writing, furnish the other Parties or their counsel with copies of (or, in the case of oral communications, advise the other Parties or its counsel of the contents of), any communication received by such Person from a Governmental Body in connection with the filings made pursuant to this <u>Section 6.5</u> and (ii) keep the other Parties or its counsel informed with respect to the status of any applicable submissions and filings to any Governmental Body in connection with this Agreement and the transactions contemplated hereby and any developments, meetings or discussions with any Governmental Body in respect thereof, including with respect to (A) the receipt of any non-action, action, clearance, Consent, approval, waiver or other authorizations, (B) the expiration or termination of any waiting period, (C) the commencement or proposed or threatened commencement of any investigation, litigation or administrative or judicial Action or proceeding under applicable Laws, including any proceeding initiated by a private party, and (D) the nature and status of any objections raised or proposed or threatened to be raised by any Governmental Body with respect to this Agreement and the transactions contemplated hereby. Neither Sellers nor Purchaser will participate in any meeting or discussion with any Governmental Body with respect of any such filings, applications, investigation or other inquiry without giving the other Parties reasonable prior notice of the meeting or discussion and, to the extent permitted by the relevant Governmental Body, the opportunity to attend and participate in such meeting or discussion. Each Party will have the right to review and approve the content of any draft notifications, formal notifications, filing, submission or other written communication (and any analyses, memoranda, presentations, white papers, correspondence or other written materials submitted therewith) to be submitted by the other Party to any Governmental Body in advance of any such submission. Each Party acknowledges that, with respect to any non-public information provided by a Party to the other Parties under this <u>Section 6.5</u>, each Party may (1) designate such material as restricted to "outside counsel only" and any such material shall not be shared with employees, officers or directors or their equivalents of the receiving Party without approval of the disclosing Party and (2) make appropriately limited redactions necessary to satisfy contractual confidentiality obligations, preserve attorney-client privilege or protect material relating to the valuation of the Acquired Assets. The Parties shall jointly consult in good faith and make all strategic and practical decisions as to the manner in which to obtain all clearances, Consents, approvals, actions, waivers, waiting period expirations or terminations, non-actions or other authorizations under any Competition and FDI Law from any Governmental Body necessary to consummate the transactions contemplated by this Agreement.

(d)    Purchaser will not, and will not permit any member of the Purchaser Group or their respective Affiliates to, engage in any action or enter into any transaction or permit any action to be taken or transaction to be entered into that could reasonably be expected to (i) impose any material delay in the obtaining of, or materially increase the risk of not obtaining, any clearances, Consents, approvals, waivers, actions, waiting period expirations or terminations, non-actions or other authorizations under Competition and FDI Laws from any Governmental Body necessary to consummate the transactions contemplated by this Agreement, (ii) materially increase the risk of any Governmental Body entering an Order preventing, delaying or prohibiting the consummation of the transactions contemplated by this Agreement or (iii) materially delay the consummation of the transactions contemplated by this Agreement.

6.6    Reasonable Efforts; Cooperation.

(a)    Subject to the other terms of this Agreement, each Party shall, and shall cause its Advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable to cause the transactions contemplated herein to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with each other Party and its Advisors in connection with any step required to be taken as a part of its obligations hereunder. The "reasonable best efforts" will not require any Party or any of their respective Affiliates or Advisors to expend any money not set forth in, or in excess of, the Wind-Down Amount.

(b)    The obligations of Sellers pursuant to this Agreement, including this Section 6.6, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Cases), Sellers' debtor-in-possession financing, and Sellers' obligations as debtors in possession to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order and the Plan Confirmation and Sale Order).

6.7    Further Assurances. From time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated by this Agreement.

6.8    Insurance Matters. Purchaser acknowledges that, upon Closing, all nontransferable insurance coverage provided in relation to any Seller and the Acquired Assets that is maintained by such Seller or its Affiliates (whether such policies are maintained with third party insurers or with Seller or its Affiliates) shall cease to provide any coverage to Purchaser and the Acquired Assets, and no further coverage shall be available to Purchaser or the Acquired Assets under any such policies.

6.9    Receipt of Misdirected Assets; Liabilities.

(a)    From and after the Closing, if any Seller or any of its respective Affiliates receives any right, property or asset that is an Acquired Asset, the applicable Seller shall promptly

transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchaser, and such asset will be deemed the property of Purchaser held in trust by such Seller for Purchaser until so transferred. From and after the Closing, if Purchaser or any of its Affiliates receives any right, property or asset that is an Excluded Asset, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks, or other documents) to the applicable Seller, and such asset will be deemed the property of such Seller held in trust by Purchaser for such Seller until so transferred.

(b)    From and after the Closing, if any Seller or any of its respective Affiliates is subject to a Liability that should belong to Purchaser pursuant to the terms of this Agreement, such Seller shall promptly transfer or cause such of its Affiliates to transfer such Liability to Purchaser, and Purchaser shall assume and accept such Liability. From and after the Closing, if Purchaser or any of its Affiliates is subject to a Liability that should belong to a Seller pursuant to the terms of this Agreement, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such Liability to the applicable Seller, and such Seller shall accept such Liability.

6.10    Directors' and Officers' Indemnification.

(a)    Following the Closing until the sixth anniversary thereof, Purchaser shall (a) cause the Acquired Entities not to amend, repeal or otherwise modify the Acquired Entities' constitutive documents as in effect at the Closing, in any manner that would adversely affect the rights thereunder of individuals who are or were directors or officers of the Acquired Entities (the "Indemnified Persons") and (b) cause the Acquired Entities to honor and pay pursuant to the indemnification, advancement of expenses and exculpation provisions of each of the Acquired Entities' constitutive documents as in effect at the Closing, in any manner; provided, that all rights to indemnification in respect of any Action pending or asserted or any claim made within such period shall continue until the disposition of such Action or resolution of such claim; provided, further, that no Acquired Entity shall be required to indemnify or advance any expenses in connection with any claim made against any director or officer of the Acquired Entities (i) arising out of any Excluded Litigation, including any Excluded Product Liability Claims, in an amount that exceeds $500,000 in the aggregate, (ii) for which payment is available under or has actually been made to or on behalf of such director or officer under any insurance policy issued to the Acquired Entities or other indemnity from the Acquired Entities, except with respect to any excess beyond the amount paid under any insurance policy issued to the Acquired Entities or other indemnity from the Acquired Entities (provided, however, that no Indemnified Person shall be required to pursue any other insurance or indemnity prior to seeking indemnity from the Acquired Entities); and (iii) to the extent any claim or suit is finally adjudicated to have arisen out of or resulted from such director or officer's fraud, gross negligence, or willful misconduct. Purchaser shall not cancel or otherwise reduce coverage under any "tail" insurance policies purchased by the Acquired Entities prior to the Closing; provided, that no further premium payments shall be required of the Acquired Entities or the Purchaser Group with respect to such policies after the Closing (for the avoidance of doubt, Acquired Entities and/or the Purchaser Group shall be responsible for any retention or other deductibles and exclusions under such "tail" insurance policies).

(b)     This <u>Section 6.10</u> is intended to be for the benefit of each of the Indemnified Persons and may be enforced by any such Indemnified Person as if such Indemnified Person were a party to this Agreement. The obligations of the Purchaser under this <u>Section 6.10</u> will not be terminated or modified in such a manner as to adversely affect any Person to whom this <u>Section 6.10</u> applies without the consent of such affected Person.

6.11    <u>Manufacture of Medical Devices</u>. Immediately following Closing, Exactech shall use its reasonable best efforts to cause the condition set forth in Section 7.2(g) to be satisfied within six months following Closing.

6.12    <u>Australian Proceedings</u>.

(a)     The Seller shall promptly provide all due diligence and other information reasonably requested by Purchaser in connection with:

(i)     the Federal Court of Australia proceedings number NSD1224/2024 ("<u>Australian Class Action Proceeding</u>") and any related settlement negotiations with the Australian Class Action Proceeding plaintiffs;

(ii)     the potential restructuring of Exactech Australia Pty Ltd ("<u>Exactech Australia</u>") (which may include, among other things, a voluntary administration process together with a Deed of Company Arrangement ("<u>DOCA</u>") or asset sale) in form and substance acceptable to Purchaser in its reasonable discretion (the "<u>Australian Corporate Restructuring</u>"), including without limitation, in relation to any material contracts, assets, and liabilities of Exactech Australia, and any relevant regulatory and tax considerations; or

(iii)     comments and/or information (as applicable), in respect of the proposed Australian Corporate Restructuring including in respect of any documentation relevant to the effectuation of such a transaction, such as the form of any DOCA or asset sale agreement;

*provided,* that Seller shall have no obligation to provide any information under this <u>Section 6.12</u> to the extent that Seller reasonably determines that doing so would waive attorney-client privilege, the protection of any attorney work product doctrine, or any similar privileges or doctrines under applicable law.

(b)     If requested in writing by the Purchaser or any of its Representatives, within twenty (20) days of such request, the Seller shall use commercially reasonable efforts to:

(i)     obtain legal advice from local Australian counsel in relation to the nature and scope of claims to be compromised by way of any: (A) voluntary administration process in respect of Exactech Australia; or (B) settlement in respect of the Australian Class Action Proceeding, and provide Purchaser with copies of any such advice; *provided, that* the Seller will have no obligation to provide copies of any such advice to the extent that the Seller reasonably determines that doing so would waive attorney-client privilege, the protection of any attorney work product doctrine, or any similar privileges or doctrines under applicable law; and

43

(ii)    provide analysis to Purchaser outlining the Seller's reasonable view regarding the nature of any claims that may arise from the matters connected with the Australian Class Action Proceeding that may not be compromised by Section 6.12(b)(i)(A) or (B), including with respect to the potential number and quantum of such claims.

(c)    Upon written request by Purchaser, the Seller shall take all reasonable steps to develop a detailed plan with respect to the preparation for  the Australian Corporate Restructuring including a budget and estimate for fees, costs, taxes, and other expenses resulting from any such detailed plan.

(d)    The Seller shall consult with Purchaser with respect to (i) the identity of any proposed voluntary administrator to Exactech Australia (the "Voluntary Administrator(s)") and shall seek Purchaser's prior written consent (not to be unreasonably withheld) to the identity of such voluntary administrator and (ii) the identity of any directors proposed to be appointed to Exactech Australia.

(e)    During the period from the date hereof through the Closing, the Seller shall not undertake any steps to amend, assign, terminate or provide any consents or notices with respect to that certain license between Exactech and Exactech Australia without Purchaser's prior written consent.

(f)    The Seller shall seek recognition of the Chapter 11 cases with respect to Exactech and any associated stay of the class action in Australia with respect to Exactech.

(g)    The Seller shall use commercially reasonable efforts, and shall procure that its direct and indirect subsidiaries including, without limitation, Exactech International Operations AG ("Exactech International Operations"), use their respective commercially reasonable efforts, from time to time to take all steps necessary to support the Australian Corporate Restructuring; *provided, that* in no event shall any Seller, Exactech International Operations, or Exactech Australia or any director, officer, manager, or member of any such entity be required to take any action or to refrain from taking any action to the extent inconsistent with applicable Law or its fiduciary obligations under applicable Law (as determined in good faith after consultation with outside legal counsel).

(h)    if Voluntary Administrator(s) are appointed to Exactech Australia Pty Ltd, the Company will request that the Voluntary Administrator(s) consult with the Ad Hoc Group with respect to the voluntary administration of Exactech Australia Pty Ltd.

6.13    UK Proceedings.

(a)    If Purchaser is determined to be the Winning Bidder (as defined in the RSA), subject to Purchaser providing the UK Restructuring Funding (as defined in the RSA), Purchaser will begin to effectuate the UK Corporate Restructuring Steps Plan (as defined in the RSA) on the date Purchaser is declared the Winning Bidder.

(b)    After the Sellers and the Purchaser agree on the UK Corporate Restructuring Steps Plan and so long as Purchaser is declared the Winning Bidder, Sellers shall cause Exactech

UK Limited to promptly commence discussions with third-party contract counterparties regarding the restructuring and corporate reorganization of Exactech UK limited and consult with and provide regular updates to Purchaser in connection therewith.

(c)    After the Sellers and the Purchaser agree on the UK Corporate Restructuring Steps Plan and so long as Purchaser is declared the Winning Bidder, Sellers shall use all commercially reasonable efforts to complete the UK Corporate Restructuring Steps Plan as expeditiously as possible and shall consult with and provide regular updates to Purchaser in connection therewith.

## ARTICLE VII
## CONDITIONS TO CLOSING

7.1    <u>Conditions Precedent to the Obligations of Purchaser and Seller</u>. The respective obligations of each Party to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers and Purchaser), on or prior to the Closing Date, of each of the following conditions:

(a)    the expiration or termination of any waiting period, and any extension thereof (including any agreement with a Governmental Body to delay the Closing), under the Competition and FDI Laws set forth in the List of Required Regulatory Filings related to the transactions contemplated by this Agreement, and receipt of any necessary approval related to the transactions contemplated by this Agreement under the Competition and FDI Laws or other regulations set forth in the List of Required Regulatory Filings;

(b)    no court of competent jurisdiction shall have issued, enacted, entered, promulgated or enforced any Order (including any temporary restraining Order or preliminary or permanent injunction) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement that is still in effect, and no action seeking to restrain, enjoin, or otherwise prohibit the transactions contemplated by this Agreement shall be pending;

(c)    the Bankruptcy Court shall have entered the Plan Confirmation and Sale Order and this Agreement shall become effective in accordance with its terms (in the case of the Plan Confirmation and Sale Order, unless the election in <u>Section 5.1(h)</u> is made);

(d)    The Plan Confirmation and Sale Order shall be entered in form and substance consistent with the RSA and this Agreement, shall otherwise contain terms and conditions reasonably acceptable to the Purchaser and the Sellers and shall have not been stayed, reversed, revoked, modified or vacated; and

(e)    Unless the election in <u>Section 5.1(h)</u> is made, each of the conditions to the effective date of the Plan shall have been satisfied (or shall become effective concurrent with the Closing Date hereunder) or waived in accordance with therewith.

7.2    <u>Conditions Precedent to the Obligations of Purchaser</u>. The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or

to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)     (i) the representations and warranties made by Sellers in Article III (in each case, other than the Fundamental Representations) shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date, except (A) that representations and warranties that are made as of a specified date need be true and correct only as of such date and (B) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had a Material Adverse Effect (provided, that for purposes of the foregoing clauses, the qualifications as to materiality and Material Adverse Effect contained in such representations and warranties shall not be given effect (other than those contained in the second sentence of Section 3.5 or in Section 3.8)) and (ii) the representations and warranties set forth in Section 3.1(a), Section 3.2, and Section 3.17 (collectively, the "Fundamental Representations") shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that such Fundamental Representations that are made as of a specified date need be true and correct in all material respects only as of such date;

(b)     The Sellers shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by them on or prior to the Closing;

(c)     The Plan Confirmation and Sale Order shall expressly permit Purchaser to credit bid all or a portion of the Prepetition Obligations for the Acquired Assets, and there shall be no cause under section 363(k) of the Bankruptcy Code prohibiting Purchaser from credit bidding all (or such lower amount necessary to satisfy the Purchase Price) of Prepetition Obligations for the Acquired Assets;

(d)     No condition, occurrence, state of facts or event constituting a Material Adverse Effect shall have occurred that is continuing;

(e)     Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 2.3 (to the extent required thereunder);

(f)     (i) All Required Permits shall have been transferred to Purchaser or (ii) a suitable arrangement has been made for the replacement of any Required Permit that is not transferable to Purchaser, which provides for the continued operation of the business of the Sellers in the same manner as previously conducted prior to Closing, except, in each case, as would not cause a Material Adverse Effect (provided that for these purposes, clause (vi) of the definition of Material Adverse Effect will not apply);

(g)     Either (i) the applicable Notified Body shall have given written guidance that as of Closing, the Purchaser shall be the manufacturer of the medical devices manufactured by Sellers as such date that are subject to the Medical Devices Directive 93/42/EEC and its replacement, the Medical Devices Regulation (EU) 2017/745, or (ii) Exactech shall have executed a binding agreement with the Purchaser to serve as the manufacturer of such medical devices until such time as either (x) the conditions set forth in clause (i) are satisfied in full, or (y) Purchaser otherwise holds the applicable EU Certifications, or (iii) Purchaser and Sellers shall have entered

into such other arrangements with respect to such EU Certifications and medical devices as are mutually agreed; and

(h)    Subject to Sellers and/or Exactech or an Affiliate of Exactech receiving the UK Restructuring Funding, the UK Corporate Restructuring Steps Plan shall have been completed..

7.3    <u>Conditions Precedent to the Obligations of Seller</u>. The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers in their sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    the representations and warranties made by Purchaser in <u>Article IV</u> shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that representations and warranties that are made as of a specified date need be true and correct only as of such date;

(b)    Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing; and

(c)    Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in <u>Section 2.4</u>.

7.4    <u>Waiver of Conditions</u>. Upon the occurrence of the Closing, any condition set forth in this <u>Article VII</u> that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. None of Purchaser or Sellers may rely on the failure of any condition set forth in this <u>Article VII</u>, as applicable, to be satisfied if such failure was caused by such Party's failure to perform any of its obligations under this Agreement including its obligation to use its reasonable best efforts to consummate the transactions contemplated hereby as required under this Agreement.

## ARTICLE VIII
## TERMINATION

8.1    <u>Termination of Agreement</u>. This Agreement may be terminated only in accordance with this <u>Section 8.1</u>. This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of Sellers and Purchaser;

(b)    by written notice of either Purchaser or Sellers, upon the issuance of an Order by a court of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or declaring unlawful the transactions contemplated by this Agreement, and such Order having become final, binding and non-appealable; <u>provided</u>, that no Party may terminate this Agreement under this <u>Section 8.1(b)</u> if the issuance of such Order was caused by such Party's failure to perform any of its obligations under this Agreement;

47

(c)    by written notice of either Purchaser or Sellers, if the Closing shall not have occurred on or before the Effective Date (as defined in the RSA) (the "Outside Date") (or such later date as provided in the Bidding Procedures Order); provided, that a Party shall not be permitted to terminate this Agreement pursuant to this Section 8.1(c) if the failure of the Closing to have occurred by the Outside Date was caused by such Party's failure to perform any of its obligations under this Agreement;

(d)    by written notice from Sellers to Purchaser, upon a breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser will have become untrue, in each case, such that the conditions set forth in Section 7.3(a) or 7.3(b) would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; provided, that (i) if such breach is curable by Purchaser, then Sellers may not terminate this Agreement under this Section 8.1(d) unless such breach has not been cured by the date that is the earlier of (A) two Business Days prior to the Outside Date and (B) 30 days after Sellers notify Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(d) will not be available to Sellers at any time that Sellers are in material breach of any covenant, representation or warranty hereunder;

(e)    by written notice from Purchaser to Sellers, upon a breach of any covenant or agreement on the part of Sellers, or if any representation or warranty of the Sellers will have become untrue, in each case, such that the conditions set forth in Section 7.2(a) or 7.2(b) would not be satisfied; provided, that (i) if such breach is curable by Sellers then Purchaser may not terminate this Agreement under this Section 8.1(e) unless such breach has not been cured by the date that is the earlier of (A) two Business Days prior to the Outside Date and (B) 30 days after Purchaser notifies Sellers of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(e) will not be available to Purchaser at any time that Purchaser is in material breach of any covenant, representation or warranty hereunder;

(f)    by written notice from Sellers to Purchaser, if (i) all of the conditions set forth in Sections 7.1 and 7.2 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and (ii) Purchaser fails to complete the Closing at the time required by Section 2.2;

(g)    by written notice from Sellers to Purchaser, if any Seller or the board of directors (or similar governing body) of any Seller determines that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties in accordance with the terms and conditions of the RSA;

(h)    by written notice of either Purchaser or Sellers, if (i) any Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser or the Successful Bidder or the Backup Bidder at the Auction or (ii) the Bankruptcy Court approves an Alternative Transaction other than with the Purchaser as the Successful Bidder or the Backup Bidder;

(i)    by written notice from Purchaser to Sellers, if (i) Purchaser is not the Successful Bidder or the Backup Bidder at the Auction or (ii) the Purchaser is unable, pursuant to Bankruptcy Code section 363(k), to Credit Bid all or any portion of the Credit Bid Amount; provided, that Purchaser shall not be permitted to terminate this Agreement pursuant to this Section 8.1(i) until after the 25th day following entry by the Bankruptcy Court of an Order authorizing and approving an Alternative Transaction with the Successful Bidder (and, notwithstanding Purchaser not having been the Successful Bidder or the Backup Bidder at the Auction, until such time (if any) as Purchaser terminates this Agreement pursuant to this Section 8.1(i), the obligations of Purchaser to consummate the transactions contemplated by this Agreement shall remain unaffected by Purchaser's right to terminate this Agreement pursuant to this Section 8.1(i));

(j)    by Purchaser if either of the DIP Orders or RSA are amended, modified, or terminated without Purchaser's express written consent; provided, in the case of any such amendment, modification or termination of the DIP Orders is made in a manner that is materially inconsistent with the RSA, and otherwise without Purchaser's express written consent, such consent not to be unreasonably withheld, conditioned or withheld; or

(k)    by written notice of either Purchaser or Sellers, if the Bankruptcy Cases are dismissed or converted to cases under chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of Sellers is appointed in the Bankruptcy Cases.

Notwithstanding anything to the contrary, failure to assign the assets set forth in Section 1.1(h) shall not constitute a breach of or inaccuracy in, failure or non-satisfaction of any condition to, or termination event of this Agreement or any other Transaction Agreement to the extent the Bankruptcy Court, pursuant to a final Order, determines that the assets in Section 1.1(h) cannot be transferred on account of TPG VII Osteon Holdings, LP's refusal to consent.

8.2    Effect of Termination.

(a)    In the event of termination of this Agreement pursuant to Section 8.1, this Agreement shall forthwith become void, and no Party nor any of its partners, officers, directors, managers or equityholders will have any Liability under this Agreement; provided, that Section 2.2, Section 6.2(b), this Section 8.2 and Article X shall survive any such termination; provided, further, (i) that no termination will relieve any Purchaser from any Liability for damages, losses, costs or expenses (which the Parties acknowledge and agree shall not be limited to reimbursement of expenses or out-of-pocket costs, and would include, in the cause of fraud or Willful Breach by the Purchaser, the benefits of the transactions contemplated by this Agreement lost by Sellers (taking into consideration all relevant matters, including other combination opportunities and the time value of money), which shall be deemed in such event to be damages of Sellers) resulting from fraud or any Willful Breach of this Agreement prior to the date of such termination and (ii) no such termination shall relieve the Sellers from their obligation to pay the Expense Reimbursement, if applicable, pursuant to Section 8.2(c) (other than with respect to a termination by Sellers pursuant to Section 8.1(b), 8.1(d), 8.1(f) or 8.1(g)). Subject to Section 10.12, nothing in this Section 8.2 will be deemed to impair the right of any Party to be entitled to specific performance or other equitable remedies to enforce specifically the terms and provisions of this Agreement.

49

(b)      Subject in all cases to Section 10.12, prior to the applicable Closing, in the event of any breach by Sellers of this Agreement, Purchaser may, as its sole and exclusive remedy at law or in equity, either: (i) terminate this Agreement in accordance with Section 8.1, in which event the Parties shall have no further obligations to each other except for (A) the payment, if payable, of the Expense Reimbursement, (B) the Confidentiality Agreement and, (C) as applicable following a termination pursuant to this Agreement, Article X, which, in each case, expressly survive the termination of this Agreement, (ii) waive such breach by Sellers and consummate the transactions contemplated hereby in accordance with the terms of this Agreement, or (iii) specifically enforce Sellers' obligation to consummate the transactions contemplated hereunder in accordance with the terms and conditions of this Agreement.

(c)      In the event that this Agreement is terminated for any reason other than a termination by Sellers pursuant to Section 8.1(b), 8.1(d), 8.1(f) or 8.1(g), Sellers shall reimburse Purchaser for all of the actual, documented and reasonable out of pocket costs, fees and expenses incurred or to be incurred by Purchaser or its Affiliates up to an amount not to exceed $[●][1], including reasonable and documented fees, costs and expenses of any professionals (including financial advisor, outside legal counsel, accountants, experts and consultants) retained by Purchaser or its Affiliates in connection with or related to the authorization, preparation, investigation, negotiation, execution and performance of this Agreement, the transactions hereunder, including the Bankruptcy Cases and other judicial and regulatory proceedings related to such transactions, in each case, less any expenses that the Bankruptcy Court determines not to be reasonable (such costs, fees and expenses, the "Expense Reimbursement"). Sellers acknowledge and agree that (i) the payment of the Expense  Reimbursement is an integral part of the transactions contemplated hereunder, (ii) in the absence of Sellers' obligations to make these payments, Purchaser would not have entered into this Agreement, (C) time is of the essence with respect to the payment of the Expense  Reimbursement and (D) to the extent authorized by the Bankruptcy Court, pursuant to the Bidding Procedures Order and Plan Confirmation and Sale Order, and subject to approval by the Bankruptcy Court, the Expense Reimbursement shall constitute allowed superpriority administrative expense claims against Sellers' estates pursuant to sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code with priority over all other administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code; provided, that such expense claims shall be junior to any obligations incurred under the DIP Facility, any superpriority claim granted under the order approving the DIP Facility (whether as adequate protection or otherwise), and any claims senior to the obligations incurred pursuant to the DIP Facility (including, for the avoidance of doubt, any "Carve Out" or similar provision granted pursuant to the DIP Order). To the extent that all amounts due in respect of the Expense Reimbursement have actually been paid by Sellers to Purchaser, or if the Sellers and Purchaser shall consummate the transactions contemplated hereunder, Purchaser shall not have any additional recourse against the Sellers or their Affiliates for the Expense Reimbursement. In the event of any consummation of the transactions contemplated hereunder, Purchaser shall disgorge to the applicable Seller(s) the amount of any Expense Reimbursement actually paid by the Sellers to the Purchaser promptly following such consummation.

---

[1] **Note to Draft**: Equal to 1% of the Purchase Price.

# ARTICLE IX
# TAXES

9.1    <u>Transfer Taxes</u>. The Sellers and Purchaser agree to use commercially reasonable efforts to cooperate in good faith to timely sign and deliver (or cause to be timely signed and delivered) such agreements, certificates or forms as may be necessary or appropriate and otherwise to reasonably cooperate to establish any available exemption from (or otherwise reduce) Transfer Taxes. The Parties expect that all Transfer Taxes will be exempt under Section 1146(a) of the Bankruptcy Code, but to the extent any Transfer Taxes are incurred in connection with the transactions contemplated by this Agreement, any Transfer Taxes incurred in connection with the transactions contemplated hereunder will be borne and timely paid by Purchaser, and Purchaser shall timely file all Tax Returns related to any Transfer Taxes.

9.2    <u>Allocation of Purchase Price</u> and Alternative Tax Treatment. For U.S. federal and applicable state and local income Tax purposes, Purchaser, Sellers, and their respective Affiliates shall allocate the Purchase Price (and any Assumed Liabilities or other amounts treated as part of the purchase price for U.S. federal income Tax purposes) among the Acquired Assets in accordance with Section 1060 of the Tax Code and this <u>Section 9.2</u>; <u>provided</u> that the amount to be allocated to depreciable real and personal property shall not exceed such property's net book value as determined under GAAP as reported in the Sellers' audited financial statements (or, if the Sellers do not have audited financial statements as of immediately prior to the Closing, the Sellers' GAAP books and records) as of immediately prior to the Closing. As soon as commercially practicable, but no later than 45 days following the determination of the final Purchase Price, Purchaser shall provide a proposed allocation to Sellers setting forth the allocation of the Purchase Price (and other amounts treated as part of the purchase price for U.S. federal income Tax purposes) among the Acquired Assets (the "<u>Allocation</u>"). If Sellers deliver a written objection within 30 days after receipt of the draft Allocation proposed by Purchaser, then Purchaser and Sellers shall negotiate in good faith to resolve any such objection, and, if Sellers and Purchaser cannot resolve such dispute within 30 days of Purchaser's receipt of Sellers' objection, then a nationally recognized accounting firm mutually acceptable to Purchaser and Sellers shall resolve such dispute, with the costs of such resolution to be evenly split by Purchaser, on the one hand, and Sellers, on the other hand, and the resolution of such dispute shall be final and binding on the Parties. The Parties and their respective Affiliates shall file all Tax Returns in accordance with such Allocation (as finally determined under this <u>Section 9.2</u>) and not take any Tax related action inconsistent with the Allocation, in each case, unless otherwise required by a "determination" within the meaning of Section 1313(a) of the Tax Code. Notwithstanding the foregoing, if Purchaser determines to implement the transactions effected pursuant to this Agreement in a manner intended by Purchaser to qualify as a "reorganization" as defined in Section 368(a) of the Tax Code and the corresponding Treasury Regulations, the Parties shall cooperate, including amending the Transaction Agreements to the extent necessary, to cause the transactions effected pursuant to this Agreement to be treated as a "reorganization" for such purposes and, in such case, the allocation provisions of this <u>Section 9.2</u> shall not apply.

9.3    <u>Cooperation</u>. Purchaser and Sellers shall reasonably cooperate, as and to the extent reasonably requested by the other, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes.

9.4    <u>Retroactive Tax Elections</u>.  Purchaser shall not make any Tax election with respect to any Acquired Entity (including, for the avoidance of doubt, an election under section 338(g) of the Code or an entity classification election) that would have retroactive effect to a Pre-Closing Tax Period (including a portion of a Straddle Period) of Sellers or any of their Affiliates without the prior written consent of Sellers, such consent not to be unreasonably withheld, conditioned or delayed.

9.5    <u>Tax Treatment</u>. Unless otherwise instructed by the Purchaser, Exactech shall treat the transactions contemplated hereunder as a taxable transfer of Exactech's assets for U.S. federal income tax purposes (and the Parties shall cooperate to cause such transactions to be so treated) and shall report the worthless stock deduction available to the U.S. consolidated federal income tax group as an ordinary loss that arises in the same taxable year as any income or gain from the transactions contemplated hereunder.

**ARTICLE X**
**MISCELLANEOUS**

10.1    <u>Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers</u>. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for five years following the Closing Date, and nothing in this <u>Section 10.1</u> will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Purchaser and Sellers acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or the Seller Parties, as the case may be, that the agreements contained in this <u>Section 10.1</u> (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for five years and (b) are an integral part of the transactions contemplated hereby and that, without the agreements set forth in this <u>Section 10.1</u>, none of the Parties would enter into this Agreement. The Purchaser Group hereby waives all rights and remedies with respect to the Seller Parties in connection with any environmental, health or safety matters (other than, for the avoidance of doubt, relating to the Excluded Liabilities), including those arising under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, or any other Environmental Laws, relating to this Agreement or the transactions contemplated hereby.

10.2    <u>Expenses</u>. Whether or not the Closing takes place, except as otherwise provided herein (including, for the avoidance of doubt, <u>Section 8.2</u>), all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that (a) all fees in connection with any filing or submission that is

necessary under any Competition Laws will be allocated pursuant to <u>Section 6.5</u>, (b) all Transfer Taxes will be allocated pursuant to <u>Section 9.1</u> and (c) all Cure Costs will be allocated pursuant to <u>Section 5.2</u>.

      10.3   <u>Notices</u>. Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail (provided no message of non-delivery is received), (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Parties.

              <u>Notices to Purchaser</u>:

              EI Bidco, LLC
              c/o Watiga Trust Ltd
              600 North Bridge Road #08-01 Parkview Square, Singapore 188778
              Attention:    Matthew Richards
              Email:        matt@watiga.com

              <u>with a copy to (which shall not constitute notice)</u>:

              Milbank LLP
              55 Hudson Yards
              New York, NY 10001
              Attention:    Evan Fleck; Nelly Almeida; Andrew Fadale
              Email:        EFleck@milbank.com
                            NAlmeida@milbank.com
                            AFadale@milbank.com

              <u>Notices to Sellers</u>:

              Exactech, Inc.
              2320 NW 66th Court
              Gainesville, Florida 32653
              Attention:    Donna Edwards, General Counsel
              E-mail:       Donna.Edwards@exac.com

with copies to (which shall not constitute notice):

Ropes & Gray LLP
191 N Wacker Dr.
Chicago, IL 60606
Attention:      Ryan Preston Dahl; Benjamin Rhode; James C. Davis
Email:          ryan.dahl@ropesgray.com;
                benjamin.rhode@ropesgray.com;
                james.davis@ropesgray.com

10.4    Binding Effect; Assignment. This Agreement shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Plan Confirmation and Sale Order, Sellers, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Cases or any successor Chapter 7 cases; provided, that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchaser and Sellers, as applicable, and any attempted assignment or delegation without such prior written consent shall be null and void; provided, further, that Purchaser may assign its rights and obligations to one or more Affiliates so long as Purchaser remains primarily liable for its obligations.

10.5    Amendment and Waiver. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and Sellers or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

10.6    Third Party Beneficiaries. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement.

10.7    Non-Recourse. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any Party will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Agreement Dispute.

10.8    Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

10.9    <u>Construction</u>. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person. The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.10    <u>Schedules</u>. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; <u>provided</u>, that each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules in which it is readily apparent on the face of such disclosure that the information is required to be included in such other section of the Schedules, and any disclosure in the Schedules will be deemed a disclosure against any representation or warranty set forth in this Agreement. Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the exhibits hereto is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules or exhibits hereto in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Schedules or exhibits hereto is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course. In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement or item which terms will be deemed disclosed for all purposes of this Agreement. The information contained in this Agreement, the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

10.11    <u>Complete Agreement</u>. This Agreement, together with the Confidentiality Agreements and any other agreements expressly referred to herein or therein, contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated by this Agreement and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated by this Agreement. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control, and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this

Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

10.12    <u>Specific Performance</u>. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement. It is accordingly agreed that (a) Sellers and Purchaser will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in <u>Section 10.13</u> without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither Sellers nor Purchaser would have entered into this Agreement. The Parties acknowledge and agree that either Sellers or Purchaser pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this <u>Section 10.12</u> will not be required to provide any bond or other security in connection with any such Order. The remedies available to Sellers and Purchaser pursuant to this <u>Section 10.12</u> will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Seller or Purchaser from seeking to collect or collecting damages. If, prior to the Outside Date, Purchaser or any Seller brings any action, in each case in accordance with <u>Section 10.13</u>, to enforce specifically the performance of the terms and provisions hereof by the other, the Outside Date will automatically be extended (i) for the period during which such action is pending, <u>plus</u> ten Business Days or (ii) by such other time period established by the court presiding over such action, as the case may be. In no event will this <u>Section 10.12</u> be used, alone or together with any other provision of this Agreement, to require any Seller to remedy any breach of any representation or warranty made by any Seller herein.

10.13    <u>Jurisdiction and Exclusive Venue</u>. Each of the Parties irrevocably agrees that any Action of any kind whatsoever, including a counterclaim, cross-claim or defense, regardless of the legal theory under which any Liability or obligation may be sought to be imposed, whether sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Agreement or the negotiation, execution, or performance of this Agreement or the transactions contemplated hereby and any questions concerning the construction, interpretation, validity and enforceability of this Agreement (each, an "<u>Agreement Dispute</u>") brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Delaware Chancery Court and any state court sitting in the State of Delaware to which an appeal from the Delaware Chancery Court may be validly taken (or, if the Delaware Chancery Court declines to accept jurisdiction over a particular matter, any state or federal court within the state of Delaware) ((a) and (b), the "<u>Chosen Courts</u>"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute. Each of the Parties agrees not to commence any Agreement Dispute except

in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Courts, and no Party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of any Agreement Dispute. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 10.3. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

10.14    Governing Law; Waiver of Jury Trial.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and any Agreement Dispute will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such state without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY AGREEMENT DISPUTE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY AGREEMENT DISPUTE. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH AGREEMENT DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY AGREEMENT DISPUTE, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.15    Counterparts and PDF. This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a .PDF or other electronic transmission, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party or pursuant to any such Contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such Contract will raise the

use of a .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

10.16   <u>Publicity</u>. Neither Sellers nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other, which approval will not be unreasonably withheld, conditioned or delayed, unless, in the reasonable judgment of Purchaser or Sellers, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or Sellers (or their respective Affiliates) lists securities; <u>provided</u>, that the Party intending to make such release shall use its reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other with respect to the text thereof.

10.17   <u>Bulk Sales Laws</u>. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws except Permitted Encumbrances, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Plan Confirmation and Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement.

10.18   <u>Time of Essence</u>. With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

10.19   <u>Sellers' Representative</u>.   Each Party agrees that Exactech has the power and authority to unilaterally act on behalf of all or any of the Sellers for the purposes specified under this Agreement. Such power will include the power to make all decisions, actions, Consents and determinations on behalf of the Sellers, including to make any waiver of any Closing condition or agree to any amendment to this Agreement. No Seller shall have any right to object, dissent, protest or otherwise contest the same. Purchaser shall be entitled to rely on any action or omission taken by Exactech on behalf of the Sellers.

### ARTICLE XI
### ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

11.1   <u>Certain Definitions</u>.

(a)      "<u>Action</u>" means any action, claim (including a counterclaim, cross-claim, or defense), cause of action, demand, complaint, summons, suit, litigation, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), audit, examination or investigation, of any kind whatsoever, regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in contract or tort, or

whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before any Governmental Body.

(b)    "Advisors" means, with respect to any Person, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

(c)    "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management, affairs and policies of such Person, whether through ownership of greater than 50% of the voting securities, by Contract or otherwise.

(d)    "Alternative Transaction" means any transaction (or series of transactions), whether direct or indirect, whereby any Person or group of Persons (other than Sellers and their Affiliates or Purchaser and its Affiliates) acquires (i) beneficial ownership of a majority of the equity interests of Sellers or (ii) a material portion of the Acquired Assets, in each case, whether by merger, sale of assets or equity, recapitalization, plan of reorganization or otherwise. Notwithstanding the foregoing, a liquidation or wind-down of Sellers' estates shall not be an Alternative Transaction.

(e)    "Distribution Agreement" means that Amended and Restated Distribution Agreement dated as of August 23, 2023, by and between Exactech and JointMedica Limited.

(f)    "Auction" shall have the meaning ascribed to such term in the Bidding Procedures Order.

(g)    "Backup Bidder" means the next highest bidder after the Successful Bidder at the Auction.

(h)    "Bidding Procedures" means the bidding procedures attached as an Exhibit to the Bidding Procedures Order and approved by the Bankruptcy Court pursuant to the Bidding Procedures Order and as amended and supplemented.

(i)    "Bidding Procedures Order" means the final order granting the Bidding Procedures Motion.

(j)    "Business Day" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

(k)    "Carve-Out" has the meaning specified in the DIP Orders.

(l)    "Cash and Cash Equivalents" means all of Sellers cash (including checks and deposits in transit, demand deposits, money markets or similar accounts), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity

accounts, government securities, and any other cash equivalents whether on hand, in transit, in banks or other financial institutions, or otherwise held.

(m)     "Centerview" means Centerview Partners LLC, the Sellers' investment banker.

(n)     "Confidentiality Agreements" means those certain letter agreements, dated on or about July 17, 2024, by and between Exactech and the respective holders of first lien secured claims against Exactech and equity interests in Purchaser.

(o)     "Confirmation Order" means an Order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

(p)     "Consent" means either (i) any approval, consent, ratification, permission, waiver or authorization or (ii) an Order of the Bankruptcy Court that deems or renders the same unnecessary.

(q)     "Contract" means any contract, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, or other agreement that is binding upon a Person or its property, in each case, other than a purchase order, service order, or sales order.

(r)     "DIP Credit Agreement" means the Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of October 28, 2024, by and among Exactech, as the borrower, the other Debtors as guarantors, GLAS USA LLC, as agent, and the lenders party thereto

(s)     "DIP Facility" means the debtor-in-possession financing facility provided to Debtors under that certain DIP Credit Agreement.

(t)     "DIP Orders" means, as applicable, the interim and final orders of the Bankruptcy Court approving and authorizing the Sellers to enter into the DIP Facility.

(u)     "Documents" means all of Sellers' written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.) and other similar materials, in each case, whether or not in electronic form.

(v)     "Encumbrance" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, Orders, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

(w)    "Environmental Laws" means all applicable Laws concerning pollution or protection of the environment or human health and safety.

(x)    "Equipment" means any and all equipment, computers, furniture, furnishings, fixtures, office supplies, vehicles and all other fixed assets.

(y)    "ERISA" means the Employee Retirement Income Security Act of 1974.

(z)    "ERISA Affiliate" means any trade or business, whether or not incorporated, that, together with any Seller, is or would be considered a "single employer" within the meaning of Section 414 of the Code or Section 4001 of ERISA.

(aa)   "EU Certifications" means those licenses, registrations, certifications or other Permits held by Exactech or its Subsidiaries that are required for the distribution, sale, application or use of their products or otherwise for the lawful conduct of their business in the European Union.

(bb)   "Excluded Environmental Liabilities" means all Liabilities of any Seller arising from or relating to (i) fines or penalties associated with noncompliance with Environmental Law, (ii) the presence of Hazardous Substances at any real property that is not a Leased Real Property, (iii) any Action alleging exposure prior to the Closing to Hazardous Substances.

(cc)   "Excluded Tax Refunds" means refunds of Taxes that (i) are not paid to Sellers or their Affiliates in cash or (ii) were specifically taken into account in calculating the Wind-down Amount, including a U.S. federal income tax overpayment for taxable year 2023 estimated at $36,000.

(dd)   "FDA" means the U.S. Food and Drug Administration.

(ee)   "GAAP" means United States generally accepted accounting principles as in effect from time to time.

(ff)   "GDPR" means Regulation (EU) 2016/679 and section 3 of the European Union (Withdrawal) Act 2018 and the UK Data Protection Act 2018.

(gg)   Government Bid" means any bid, proposal, offer or quotation, whether solicited or unsolicited, made by Sellers, that, if accepted, would reasonably be expected to lead to the award of a Government Contract.

(hh)   "Government Contract" means any Contract between any Seller or any of their Affiliates, on the one hand, and (a) any Governmental Body; (b) any prime contractor of any Governmental Body in its capacity as a prime contractor to any Governmental Body; or (c) any higher-tier subcontractor with respect to any Contract of a type described in the foregoing clauses (a) or (b), on the other hand.

(ii)   "Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued,

61

granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

(jj)    "Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator of applicable jurisdiction.

(kk)    "GUC Reserve" means $500,000 cash payment that shall be an Excluded Asset and reserved for distributions to general unsecured creditors in accordance with the Plan.

(ll)    Hazardous Substance" means any material, substance or waste regulated under any Environmental Laws due to its harmful or deleterious properties.

(mm)    "HSR Act" means the Hart Scott Rodino Antitrust Improvements Act of 1976 and the rules and regulations promulgated thereunder.

(nn)    "HIPAA" means the Health Insurance Portability and Accountability Act of 1996, including the Standards for Privacy of Individually Identifiable Health Information (45 CFR Part 160 and Part 164, Subparts A, D and E), the Transactions and Code Set Standards (45 CFR Part 162), and Security Standards for the Protection of Electronic Protected Health Information (45 CFR Part 164, Subparts A and C), and all other implementing regulations.

(oo)    "Intellectual Property" means all worldwide intellectual property rights, including the following: (i) patents, patent applications and patent disclosures; (ii) trademarks, service marks, trade dress, corporate names and Internet domain names, together with all goodwill associated with each of the foregoing; (iii) copyrights; (iv) registrations and applications for any of the foregoing; (v) trade secrets; and (vi) rights in computer software.

(pp)    "Information Privacy and Security Laws" means all applicable Laws concerning the use, collection, protection, storage, transfer, privacy and/or security of Personal Data, and all regulations promulgated thereunder, including, where applicable, HIPAA, state data privacy and breach notification laws, state social security number protection laws, any applicable Laws concerning requirements for website and mobile application privacy policies and practices, data or web scraping, call or electronic monitoring or recording or any outbound communications (including, outbound calling and text messaging, telemarketing, and e-mail marketing), the European Union Directive 95/46/EC, the GDPR, the European Union ePrivacy Directive (Directive 2002/58/EC) and applicable implementing laws, the Federal Trade Commission Act, the Gramm Leach Bliley Act, the Fair Credit Reporting Act, the Fair and Accurate Credit Transaction Act, the CAN-SPAM Act, the Telephone Consumer Protection Act, Children's Online Privacy Protection Act, and state consumer protection laws.

(qq)    "Inventory" means, to the extent related to the business of the Seller, all inventory (including raw materials, products in-process and finished products) owned by any of the Sellers, whether in transit to or from the Sellers and whether in the Sellers' warehouses, distribution facilities, held by any third parties or otherwise.

(rr)   "IT Assets" means all information technology and computer systems (including software, information technology and telecommunication hardware (including workstations, servers, routers, and firewalls) and other Equipment) relating to the transmission, storage, maintenance, organization, presentation, generation, processing or analysis of data and information whether or not in electronic format, in each case, owned, leased or licensed by Sellers.

(ss)   "Knowledge of Seller", "Knowledge of Sellers", or words of like import means the actual knowledge without independent verification (and in no event encompass constructive, imputed or similar concepts of knowledge) of Darin Johnson, Tony Collins, and Donna Edwards, none of whom, for the sake of clarity and avoidance of doubt, shall have any personal Liability or obligations regarding such knowledge.

(tt)   "Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, Order, requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

(uu)   "Leasehold Improvements" means all buildings, structures, improvements and fixtures that are owned by a Seller and located on any Leased Real Property, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the lease for such Leased Real Property.

(vv)   "Liability" means, as to any Person, any claim (as defined by 11 USC 101(5)), debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine or contribution obligation of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(ww)   "Material Adverse Effect" means any matter, event, change, development, occurrence, circumstance or effect (each, an "Effect") that, individually or in the aggregate (taking into account all other such changes, effects, events, occurrences, circumstances, states of facts or developments), (a) has had, or would reasonably be expected to have, a material adverse effect on the ability of Sellers to consummate the transactions contemplated hereby or (b) has had, or would reasonably be expected to have, a material adverse effect on the Acquired Assets, the business of the Sellers, condition (financial or otherwise) or results of operations of the business of the Sellers; provided, none of the following (or consequences thereof), either alone or in combination, shall constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: (i) any Effect in, arising from or relating to general business or economic conditions affecting the industry in which Sellers and their Affiliates operate, including Effects arising from or relating to competition or ordinary course matters and other Effects within such industry, new entrants into such industry, new products from other participants in such industry, changes in product pricing due to such competition, changes in market share or financial results due to such competition and other related changes resulting from such competition; (ii) Effects in,

63

arising from or relating to national or international political or social conditions, including tariffs, riots, protests, the engagement by the United States or any other country, including Ukraine and Poland, in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist (whether or not state-sponsored) attack upon the United States or any other country, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, Equipment or personnel of the United States or of any other country; (iii) Effects in, arising from or relating to any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), viral outbreak (including "Coronavirus" or "COVID-19" or the worsening thereof) or any quarantine or trade restrictions related thereto or any other *force majeure*; (iv) Effects in, arising from, or relating to financial, banking, or securities markets (including (A) any disruption of any of the foregoing markets, (B) any change in currency exchange rates, (C) any decline or rise in the price of any security, commodity, Contract or index, and (D) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the transactions contemplated by this Agreement); (v) Effects in, arising from or relating to changes in GAAP or the interpretation thereof; (vi) Effects in, arising from or relating to changes in Laws or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Body (including, for the avoidance of doubt, any such items related to <u>Section 6.5</u>) and any increase (or decrease) in the terms or enforcement of (or negotiations or disputes with respect to) any of the foregoing; (vii) Effects in, arising from or relating to (A) the taking of any action expressly permitted by this Agreement or at the express request of Purchaser or its Affiliates, (B) the failure to take any action if such action is prohibited by this Agreement, or (C) the negotiation, announcement or pendency of this Agreement or the transactions contemplated hereby, the identity, nature or ownership of Purchaser or Purchaser's plans with respect to the Acquired Assets and Assumed Liabilities, including the impact thereof on the relationships, contractual or otherwise, of the business of Seller with employees, customers, lessors, suppliers, vendors or other commercial partners; (viii) Effects in, arising from or relating to any action required to be taken under any existing Contract to which Seller (or any of its assets or properties) is bound; (ix) Effects that arise from any seasonal fluctuations in the business; (x) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Advisors) and any other failure to win or maintain customers or business (provided that this clause (xi) shall not prevent a determination that any Effects giving rise to such failure to achieve budgets, projects, forecasts or predictions has resulted in a Material Adverse Effect); (xii) the Effect of any action taken by Purchaser or its Affiliates with respect to the transactions contemplated by this Agreement or the financing thereof or any material breach by Purchaser of this Agreement; or (xiii) (A) the commencement or pendency of the Bankruptcy Cases; (B) any objections filed in the Bankruptcy Court to (1) this Agreement or any of the transactions contemplated hereby or thereby, (2) the Plan Confirmation and Sale Order or the Confirmation Order (if different) or (3) the assumption or rejection of any Assigned Contract, including any disputes with respect to the Cure Costs; or (C) any Order of the Bankruptcy Court or any actions or omissions of Sellers in compliance therewith; provided, that any Effect, referred to in clauses (i) – (vii) or (ix) will be taken into account for purposes of determining whether there has been a Material Adverse Effect to the extent such Effect adversely affects the business of the Seller, the Acquired Assets or the Assumed Liabilities, taken as a whole, in a

disproportionately adverse manner relative to other companies operating in the same industries in which the business of the Seller operates.

(xx)    "Notified Body" means the body (designated by the Governmental Body) legally in charge of carrying out the conformity assessment procedures required for placing on the market for medical devices in the European Union pursuant to the Medical Devices Directive 93/42/EEC, and its replacement, the Medical Devices Regulation (EU) 2017/745.

(yy)    "Open Source Software" means any Software (in source or object code form) that is subject to (a) a license commonly referred to as an "open source" or "free software" license (including any software licensed under the GNU General Public License, GNU Lesser General Public License, BSD License, or Apache Software License, or any other public source code license arrangement or any license defined as an open source license by the Open Source Initiative as set forth on www.opensource.org) or any other public source code license arrangement or any license defined as an open source license by the Open Source Initiative as set forth on www.opensource.org or (b) any other license or other agreement that requires, as a condition of the use, modification or distribution of Software subject to such license or agreement, that such Software or other Software linked with, called by, combined or distributed with such Software be (i) disclosed, distributed, made available, offered, licensed or delivered source code form, (ii) licensed for the purpose of making derivative works, (iii) licensed under terms that allow reverse engineering, reverse assembly, or disassembly of any kind, or (iv) redistributable at no charge.

(zz)    "Order" means any order, injunction, order, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body, including any order entered by the Bankruptcy Court in the Bankruptcy Cases (including the Plan Confirmation and Sale Order).

(aaa)    "Ordinary Course" means the ordinary and usual course of operations of the business of Seller taken as a whole consistent with past practice and taking into account the contemplation, commencement and pendency of the Bankruptcy Cases and past practice in light of the current pandemic, epidemic or disease outbreak; provided, that any action taken, or omitted to be taken, that relates to, or arises out of, any pandemic, epidemic or disease outbreak shall be deemed to be in the ordinary course of business.

(bbb)    "Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date and the portion of any Straddle Period ending on the Closing Date.

(ccc)    "Pre-petition Obligations" means all Obligations on account of the Prepetition First Lien Term Loans (as defined in the First Lien Credit Agreement) and the Prepetition Sidecar Term Loans (as defined in the Prepetition Sidecar Credit Agreement).

(ddd)    "Prepetition First Lien Credit Agreement" means that certain credit agreement dated February 14, 2018 (as amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date among Exactech, as borrower, Osteon Intermediate Holdings II, Inc., as holdings, Goldman Sachs Bank USA, as administrative and collateral agent, the guarantors party thereto, and the lender parties thereto.

(eee)    "<u>Prepetition Sidecar Credit Agreement</u>" means that certain credit agreement dated September 19, 2023 (as amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date) among Exactech, as borrower, TPG VII Osteon Holdings, LP, as administrative and collateral agent, and as the sole lender.

(fff)    "<u>Permitted Encumbrances</u>" means (i) Encumbrances for utilities and Taxes not yet due and payable or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, materially and adversely affect the operation of the Acquired Assets and, in the case of the Leased Real Property, which do not, materially interfere with the use or occupancy of such Leased Real Property as it relates to the operation of the Acquired Assets, (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law which do not impair the current use or occupancy of such Leased Real Property, as applicable, (iv) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course for amounts not yet due and payable, (v) licenses granted on a non-exclusive basis in the Ordinary Course, (vi) Encumbrances imposed under any Seller's certificate of incorporation, certificate of formation, bylaws, operating agreement or similar organizational documents, or under federal or state securities Laws; and (vii) solely prior to Closing, any Encumbrances that will be removed or released by operation of the Plan Confirmation and Sale Order.

(ggg)    "<u>Person</u>" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body or other entity or group.

(hhh)    "<u>Personal Data</u>" means, as applicable, any information that alone or in combination with other information in the Sellers' possession or control, identifies, or could be reasonably used to identify, a natural person, and including information that is defined as "personal data," "personally identifiable information," "individually identifiable health information," "protected health information" or "personal information" under any applicable Information Privacy and Security Laws, including without limitation, Protected Health Information as defined under HIPAA.

(iii)    "<u>Plan Confirmation and Sale Order</u>" means the Order (i) approving this Agreement and the terms and conditions hereof, including pursuant to sections 363 and 365 of the Bankruptcy Code, (ii) approving and authorizing Sellers to consummate the transactions contemplated hereby, and (iii) confirming the Plan.

(jjj)    "<u>Plan</u>" means the joint plan of liquidation filed by the Sellers under Chapter 11 of the Bankruptcy Code implementing the restructuring transactions, including the transaction contemplated in this Agreement for the Sellers.

(kkk)    "<u>Privacy Policy</u>" means any published or publicly-facing policies and procedures relating to Personal Data.

(lll)    "Purchaser Group" means Purchaser, any Affiliate of Purchaser and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns.

(mmm)"Required Permits" means any material permits required for the operation of the business of the Sellers.

(nnn)    "Riveron" means Riveron RTS, LLC, the Sellers' financial advisor.

(ooo)    "RSA" means that certain restructuring support agreement (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms hereof, including all exhibits) dated October 28, 2024 entered into by and among the signatories thereto.

(ppp)    "Schedules" means the disclosure schedules and any other schedule to this Agreement.

(qqq)    "Securities Act" means the Securities Act of 1933 and the rules and regulations promulgated thereunder.

(rrr)    "Security Breach" means any unauthorized access, acquisition, disclosure, or loss of Personal Data that compromises the security, integrity, or confidentiality of Personal Data.

(sss)    "Seller Intellectual Property" means all Intellectual Property owned or purported to be owned by any Seller.

(ttt)    "Seller Parties" means each Seller and its former, current or future Affiliates, officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns.

(uuu)    "Seller Plan" means each (i) employee welfare benefit plan within the meaning of Section 3(1) of ERISA (whether or not subject to ERISA), (ii) employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not subject to ERISA), (iii) stock option, stock purchase, stock appreciation right or other equity or equity-based agreement, program or plan, (iv) employment, individual consulting, severance or retention agreement or (v) bonus, incentive, deferred compensation, profit-sharing, retirement, post-termination health or welfare, vacation, severance or termination pay, fringe or any other compensation or benefit plan, program, policy, Contract, agreement or other arrangement, in each case that is sponsored, maintained or contributed to by Sellers, to which any Seller is obligated to contribute or with respect to which any Seller has any Liability.

(vvv)    "Straddle Period" means any taxable period that includes but does not end on the Closing Date.

(www)"Seller Software" means any Software included int the Seller Intellectual Property.

67

(xxx)   "<u>Subsidiary</u>" or "<u>Subsidiaries</u>" means, with respect to any Person, any corporation, limited liability company or other entity of which a majority of the total voting power of shares of stock or other equity interests entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees or other governing body or Person thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

(yyy)   "<u>Successful Bidder</u>" means the prevailing party at the conclusion of the Auction.

(zzz)   "<u>Tax</u>" or "<u>Taxes</u>" means any federal, state, local, foreign or other income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem/personal property, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative minimum or estimated tax, including any interest, penalty or addition thereto.

(aaaa)   "<u>Tax Code</u>" means the United States Internal Revenue Code of 1986, as amended.

(bbbb)   "<u>Tax Return</u>" means any return, declaration, report, claim for refund, or information return or statement filed or required to be filed with any Governmental Body relating to any Tax, including any schedule or attachment thereto, and including any amendment thereof, and, further, including any information return, claim for refund, amended return or declaration of estimated Tax, and including, where permitted or required, combined, consolidated or unitary returns for any group of entities that includes any Seller.

(cccc)   "<u>Transaction Agreements</u>" means this Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement.

(dddd)   "<u>Transfer Taxes</u>" means any sales, use, transfer, documentary, stamp, value added, real property, withholding or similar Taxes and related notary and other fees imposed on or payable in connection with the transactions effectuated (or deemed effectuated) pursuant to this Agreement.

(eeee)   "<u>Treasury Regulations</u>" means the regulations issued under the Tax Code by the United States Department of the Treasury, as amended.

(ffff)   "<u>Willful Breach</u>" shall mean a deliberate act or a deliberate failure to act regardless of whether breaching was the conscious object of the act or failure to act (which, for the avoidance of doubt, will be deemed to include any failure by Purchaser to consummate the Closing if and when it is obligated to do so hereunder).

(gggg)   "<u>Wind-Down Amount</u>" means cash in an amount equal to $2,250,000.

11.2   <u>Index of Defined Terms</u>.

Acquired Assets ......................................... 2
Acquired Cash ........................................... 3
Acquired Entities ...................................... 3
Acquired Leased Real Property ................. 2
Agreement .................................................. 1
Agreement Dispute ................................. 56
Allocation ................................................ 51
Assigned Contracts ................................... 8
Assumed Benefit Plans ............................. 3
Assumed Liabilities .................................. 6
Audited Financial Statements ................. 15
Australian Class Action Proceeding .......... 3
Australian Corporate Restructuring ........... 3
Available Contracts................................... 8
Bankruptcy Cases..................................... 1
Bankruptcy Code ...................................... 1
Bankruptcy Court...................................... 1
Bankruptcy Rules...................................... 1
Bill of Sale ............................................. 12
Chosen Courts ......................................... 56
Closing ................................................... 11
Closing Date............................................ 12
Copyright Assignment Agreement ........... 12
Counterparties .......................................... 8
Credit Bid ............................................... 11
Credit Bid Amount................................... 11
Cure Costs ................................................ 6
Dataroom ................................................ 26
Debtors ..................................................... 1
Designation Deadline................................. 9
Designation Notice.................................... 8
Disputed Contract ..................................... 8
DOCA ....................................................... 3
Effect....................................................... 63
Employee Census..................................... 23
Enforceability Exceptions........................ 13
Environmental Permits............................. 18
Exactech .................................................... 1

Exactech Australia .................................... 3
Excluded Assets ........................................ 4
Excluded Contracts ................................... 4
Excluded Liabilities .................................. 7
Express Representations ........................... 26
Extended Contract Period .......................... 8
Financial Statements ............................... 15
Foreign Competition Laws ...................... 14
Fundamental Representations .................. 46
Indebtedness............................................ 34
Indemnified Persons................................ 44
Information Presentation.......................... 26
Laws........................................................ 18
Leased Real Property .............................. 15
Material Contract .................................... 16
Material Customer ................................... 25
Outside Date............................................ 47
Parties....................................................... 1
Party ......................................................... 1
Patent Assignment Agreement................. 12
Permits .................................................... 18
Petition Date............................................. 1
Purchase Price ......................................... 11
Purchaser .................................................. 1
Purchaser Designee ................................. 12
Purchaser Plans ....................................... 39
Registered Seller Intellectual Property ..... 18
Reversionary Interest ................................ 4
Seller ........................................................ 1
Sellers ....................................................... 1
Top Vendor ............................................. 25
Trademark Assignment Agreement ......... 12
Transfer Offer ......................................... 38
Transferred Employees ............................ 38
Transferred Subsidiaries ........................... 3
Unaudited Financial Statements .............. 15
Voluntary Administrator.......................... 44
WARN Act............................................... 39

11.3    <u>Rules of Interpretation</u>. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)    Accounting terms which are not otherwise defined in this Agreement have the meanings given to them under GAAP consistently applied. To the extent that the definition of

146401332_6
146401332_8
146401332_11
146401332_13
146401332_16

an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement will control.

(b)     The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)     Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(d)     The words "to the extent" shall mean "the degree by which" and not simply "if."

(e)     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(f)     Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(g)     The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h)     All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(i)     All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(j)     Any document or item will be deemed "delivered," "provided" or "made available" by Sellers, within the meaning of this Agreement if such document or item is (i) included in the Dataroom, (ii) actually delivered or provided to Purchaser or any of Purchaser's Advisors or (iii) made available upon request, including at Sellers' offices.

(k)     Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(l)     Any reference to any particular Bankruptcy Code or Tax Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided, that for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance

70

with, or alleged violation of or non-compliance with, any Bankruptcy Code or Tax Code section or Law, the reference to such Bankruptcy Code or Tax Code section or Law means such Bankruptcy Code or Tax Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(m)    A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and assigns, but only if such successors and assigns are not prohibited by this Agreement.

(n)    A reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

*[Signature pages follow.]*

146401332_19

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

<u>**PURCHASER:**</u>

**EI BIDCO, LLC**

By: _____

Name:  Matthew Richards

Title:   Authorized Person

*[Signature Page to Asset Purchase Agreement]*

**SELLERS:**

**OSTEON INTERMEDIATE HOLDINGS II, INC.**

By: _____

Name:   Tony Collins

Title:   Chief Financial Officer


**EXACTECH, INC.**

By: _____

Name:   Tony Collins

Title:   Chief Financial Officer


**XPANDORTHO, INC.**

By: _____

Name:   Tony Collins

Title:   Chief Financial Officer

## EXHIBIT A

**FORM OF BILL OF SALE**

[*See attached.*]

[*Intentionally Omitted*]

**<u>EXHIBIT B</u>**

**FORM OF TRADEMARK ASSIGNMENT AGREEMENT**

[*See attached.*]

[*Intentionally Omitted*]

## <u>EXHIBIT C</u>

### FORM OF COPYRIGHT ASSIGNMENT AGREEMENT

[*See attached.*]

[*Intentionally Omitted*]

## **EXHIBIT D**

### **FORM OF PATENT ASSIGNMENT AGREEMENT**

[*See attached.*]

[*Intentionally Omitted*]

*Execution Version*

## Exhibit E

**DIP Credit Agreement**

[*Intentionally Omitted*]

*Execution Version*

## <u>Exhibit F</u>

**Interim DIP Order**

[*Intentionally Omitted*]