**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Exactech Inc., *et al.*,[1] | Case No. 24-12441 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date:  May 28, 2025 at 10:00 a.m. (ET)** |
| | **Objection Deadline:  May 21, 2025 at 4:00 p.m. (ET)** |

**MOTION OF THE OFFICIAL COMMITTEE**
**OF UNSECURED CREDITORS TO APPOINT A**
**CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C. § 1104(A),**
**OR, ALTERNATIVELY, SECOND MOTION TO TERMINATE THE**
**DEBTORS' EXCLUSIVE PERIOD PURSUANT TO 11 U.S.C. § 1121(D)(1)**

The Official Committee of Unsecured Creditors (the "Official Committee") of Exactech, Inc. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors"), by and through undersigned counsel, hereby submits these motions (collectively, the "Motion") seeking entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"), appointing a chapter 11 trustee pursuant to section 1104(a) of the Bankruptcy Code, or, alternatively, terminating the Debtors' exclusive periods to file and solicit a plan pursuant to section 1121(d) of the Bankruptcy Code.  In support of the Motion, the Official Committee respectfully states as follows.

---

[1]  The above-captioned debtors and debtors in possession in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Osteon Holdings, Inc. (7042); Osteon Intermediate Holdings I, Inc. (7778); Osteon Intermediate Holdings II, Inc. (1292); Exactech, Inc. (3930); and XpandOrtho, Inc. (4250).  The Debtors' service address is 2320 NW 66th Court, Gainesville, Florida 32653.

**INTRODUCTION**

1. On March 31, 2025, the Court denied the Official Committee's motion to terminate exclusivity and granted the Debtors' motion to extend their exclusive period to file a plan.

2. Following this ruling, the Court observed that if there is no resolution of the pending disputes between the Official Committee, on the one hand, and TPG and the Debtors, on the other hand, then the Court will have to consider whether the Debtors' Plan[2] is confirmable, which will include a review of the TPG settlement. *See* Mar. 31, 2025 Hr'g Tr. at 8:17-23. **The Court further observed that if the Plan is not confirmed, then the parties will have to reassess where these bankruptcy cases should go**. *See id.* at 9:10-13.

3. The Debtors intend to seek confirmation of TPG's Plan, which effectively zeros out unsecured creditors and deprives holders of personal injury claims of their right to a trial by jury against non-debtor defendants TPG and its affiliates. The Official Committee will file its objection to the Plan prior to the deadline. As plan discovery progresses, it is now clear to the Official Committee that the Debtors' Plan is unconfirmable, that the TPG settlement is a sham, and that the parties will have to assess where these bankruptcy cases should go next.

4. Given the fees incurred to date on account of TPG's quixotic pursuit of a third-party release in these cases, the Official Committee is prepared to offer the Court an alternative path forward should the Court find that the Plan should not be confirmed.

5. That path forward should include the appointment of a chapter 11 trustee (to end the fee burn by the Debtors' and the Special Committee's professionals) and the termination of

---

[2]  Capitalized terms used but not otherwise defined herein have the meanings given to them in the *Third Amended Joint Chapter 11 Plan of Exactech, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (Dkt. No. 830) (the "Plan").

exclusivity so that the Official Committee can file and move forward with the confirmation of its chapter 11 plan.  Recent discovery in these cases has confirmed several key facts regarding TPG.

6.      **First**, TPG played a role in negotiating the Restructuring Support Agreement (*see* Dkt. No. 18 at Exhibit B), which contemplates the Stalking Horse Bidder's purchase of the company free and clear of the Debtors' liabilities, including the Debtors' tort liability.[3]  TPG has an economic interest in the Stalking Horse Purchaser.[4]

7.      **Second**, TPG currently is a major client of Ropes & Gray, the Debtors' bankruptcy counsel.  Ropes & Gray reported that "[t]otal revenues received by Ropes & Gray from TPG and its affiliates in the twelve months prior to the Petition Date total approximately 1.70% of firm revenues generated over that period, including revenues generated by Ropes & Gray's representation of other portfolio companies of TPG."  *See* Dkt. No. 157-3 ¶ 19.

8.      Based on publicly available data, Ropes & Gray reported gross revenue in 2023 of $2,992,831,000.[5]  If the year prior's number is any indication of 2024 revenue, then TPG represents approximately $51 million in gross revenue for Ropes & Gray.

9.      **Third**, the Restructuring Support Agreement and an October 9th Side Letter[6] tie the Debtors and the Consenting Lenders to a Plan that, if confirmed, would release TPG and certain directors and officers of their liability arising from the Debtors' sale of defective products, including breach of fiduciary duty and aiding and abetting claims.  As set forth in the Official

---

3      *See* Pohl Transcript (Dkt. No. 876 at **Exhibit W**) (the "Pohl Tr.") at 123:6-124:20.

4      *See* Dkt. No 145 at 13 ("The Prepetition Sidecar Lender and the Prepetition Sidecar Agent is Sponsor, and therefore the Sponsor, the majority equity holder of Debtor Osteon Holdings, Inc., will receive a minority interest in the Stalking Horse Purchaser on account of the loans under the Prepetition Sidecar Facility.").

5      *See* Ropes & Gray, Law Firm Profile, Law.com, *available at* https://www.law.com/law-firm-profile/?id=259&name=Ropes-%26-Gray.

6      *See* Dkt. No. 876 at **Exhibit N** (the "Side Letter").

Committee's standing motion (*see* Dkt. No. 780) (the "Standing Motion"), and the draft complaint attached thereto (the "Draft Complaint"),[7] these causes of action involve potentially in excess of a billion dollars in damages.

10.     **Fourth**, if all goes according to TPG's plan, (a) the Debtors' assets will be delivered on a "free and clear" basis to a purchaser in which TPG holds an economic interest, (b) TPG and certain related parties will receive a release that would enjoin claimants from pursuing their legal, equitable, and constitutional rights against TPG and its related parties, including their right to a trial by jury, and (c) unsecured creditors will receive nothing or virtually nothing.  TPG's objectives will be achieved if the Plan on which the Debtors are now soliciting votes is confirmed by this Court.

11.     **But the Debtors have fiduciary duties to the unsecured creditors in these cases**. This raises an important question:  how can the Debtors pursue TPG's objectives here and, at the same time, act in a manner consistent with their fiduciary duties to creditors?  Recent discovery has revealed the answer to this question.  Simply put, the Debtors cannot do so, and their efforts in connection with TPG run wholly afoul of their fiduciary duties to their creditors.

12.     The Official Committee deposed the Debtors' CEO, Mr. Darin Johnson, on Sunday, April 6, 2025—a deposition that the Debtors' counsel insisted go forward on a Sunday even though the Debtors were and are still withholding key documents from the Official Committee (including board minutes and presentations that the Debtors saw fit to produce just hours *after* Mr. Johnson's deposition ended).  The Official Committee learned several things at this deposition.

---

[7]     The Official Committee is preparing an Amended Draft Complaint to conform the factual allegations asserted therein to the evidence discovered to date.

13.     Mr. Johnson believes that Ropes & Gray is his or the company's bankruptcy counsel.[8]  This fact was already apparent to the Official Committee.  However, what the Official Committee did not fully appreciate is that Mr. Johnson relies on Ropes & Gray for what his "personal views are" with respect to these bankruptcy cases.  Johnson Tr. 181:14-18.  This is an important fact given that TPG currently is a major client of Ropes & Gray.

14.     So that the Court can fully appreciate Mr. Johnson's testimony given on Sunday, April 6, 2025, starting at 4:53PM, it is set forth below without commentary:

> Q.     Okay.  Are you aware that in the bankruptcy case, the company's assets can be sold without tort claimants losing their ability to pursue claims against TPG?
>
> [OBJECTION]
>
> **A.     I don't know that.**
>
> Q.     One way or the other, you just don't know?
>
> **A.     Yeah, I don't know that.**
>
> Q.     Let me ask you a different way.  Is it your understanding that the company's assets must be sold in the bankruptcy case with -- and that TPG must get it released?
>
> [OBJECTION]
>
> **A.     I couldn't hear the end of the -- the end of it.**
>
> Q.     Is it your understanding, Mr. Johnson, that as part of the resolution of this bankruptcy case, that TPG must receive a release?
>
> [OBJECTION]
>
> **A.     I'm not an expert in bankruptcy.  I don't know that.**

---

[8]     *See* Johnson Transcript (Dkt. No. 876 at **Exhibit C**) (the "Johnson Tr.") at 47:22-24 ("Q.  Just so we're clear, Ropes & Gray was your counsel, right?  A. Yes."); *id.* at 52:11-18 (Q.  And you, as the CEO of the company, instruct your lawyers at Ropes & Gray, correct?  A.  Yes.  Q.  Is there anyone else other than you who instructs Ropes & Gray?  A.  No, not that I can – not that I can think of.").

Q.     Do you have an understanding one way or the other of whether something has to happen in the bankruptcy case with respect to claims against TPG?

[OBJECTION]

A.     **I'm not – I'm not aware of that.**

Q.     Do you understand that the chapter 11 plan that the Debtors have put forth that includes the potential sale also includes a settlement that would release claims against TPG?

[OBJECTION]

A.     **I'm not fluent in those details.**

Q.     Do you have any understanding at all about what settlement has been reached with respect to TPG?

[OBJECTION]

A.     **I'm not fluent in those details.**

Q.     I'm going to ask a different question.  My question is, do you have any understanding at all about what the settlement that has been reached with respect to TPG provides?

[OBJECTION]

A.     **No.**

Q.     Do you know one way or the other as you sit here today whether or not the current plan that the Debtors are proposing provides for claims to continue -- the claims against TPG to be released?

A.     **I'm not sure.**

[OBJECTION]

Q.     Are you aware of any positions the Official Committee of Unsecured Creditors have taken in the case?

[OBJECTION]

A.     **No.**

Q.     So are you un-- are you aware of whether or not the Official Committee of Unsecured Creditors supports the current plan proposed by the Debtors?

[OBJECTION]

A.    **I'm unsure.**

Q.    So it's possible in your mind that the Official Committee of Unsecured Creditors supports the plan; is that right?

[OBJECTION

A.    **I'm unsure.**

Q.    You just don't know what the Official Committee of Unsecured Creditors' position is?

A.    **I don't know.**

Q.    Does it matter to you as the CEO of the company in bankruptcy what the creditors think the plan ought to provide for?

[OBJECTION]

A.    **I'm not an expert on bankruptcy, and I rely on counsel.**

      * * *

Q.    Mr. Johnson, my question was different.  My question to you, sir, is, does it matter to you what the Unsecured Creditors in this bankruptcy case think a plan ought to provide for?

[OBJECTION]

A.    **I don't -- I don't have an answer for that.**

Q.    Why is that?

A.    **I don't know.**

Q.    Well, you are the only "you" there is, Mr. Johnson.  So does it matter to you what the Unsecured Creditors in this case think the plan ought to provide for?

[OBJECTION]

A.    **I don't have an opinion on that.**

Q.    Have you asked anybody what the Unsecured Creditors think of the proposed plan?

[OBJECTION]

7

A.      **I have not asked that.**

Q.      Are you aware that the Official Committee of Unsecured Creditors in these cases wants the Debtors to be able to sell their operating assets so that the company can operate free from bankruptcy? Is that something you are aware of?

[OBJECTION]

A.      **I'm not fluent in these bankruptcy details.**

Q.      Has anyone advised you about what the Official Committee wants to see happen in these bankruptcy cases?

[OBJECTION]

A.      **I'm not fluent in any of those bankruptcy details.**

Q.      Are you aware that the Official Committee has publicly stated that it supports a chapter 11 plan that would allow the Debtors to sell their operating assets and transfer the litigation claims against TPG to a trust?

[OBJECTION]

A.      **I'm not aware.**

Q.      Are you personally opposed to a chapter 11 plan that would allow the Debtors to sell their operating assets and transfer the litigation claims against TPG to a trust?

[OBJECTION]

A.      **I rely on outside counsel for that expertise.**

Q.      So as you sit here today, you can't articulate a personal opposition to the concept I just outlined, correct?

[OBJECTION]

A.      **I rely on outside counsel for that expertise.**

Q.      So my question -- just to clarify, I think we are on the same page, I don't think we are talking past each other. But just to clarify. As you sit there today in that chair, do you have a personal objection to the notion that the chapter 11 plan could allow the Debtors to sell their operating assets and transfer the litigation claims against TPG to a trust?

[OBJECTION]

**A.**    **I rely on outside counsel for that expertise.**

Q.    Do you think it's good for the Debtors for the sale of the Debtors operating assets to be tied to TPG obtaining a release?

[OBJECTION]

**A.**    **I rely on outside counsel for that expertise.**

Q.    Let me just ask you about your factual understanding. Do you have a factual understanding that the chapter 11 plan proposed by the Debtors would release claims against TPG and related parties?

[OBJECTION]

**A.**    **I'm not fluent in those details.**

Q.    So you just don't know one way or the other whether what I just said is true, correct?

A.    I don't know.

**Q.**    **With respect to the bankruptcy case -- this bankruptcy case, do you rely on outside counsel with respect to what your personal views are?**

**A.**    **Yes.**

Q.    Do you understand the impact of TPG's demand for a release is having on these chapter 11 cases?

[OBJECTION]

**A.**    **I'm not an expert in bankruptcy, no.**

Q.    Just a few more questions, Mr. Johnson. Do you have a personal view of whether it would be better for the company if the company could complete a sale and leave the claims against TPG to be decided outside of a plan?

[OBJECTION]

**A.**    **I rely on outside counsel for that expertise.**

Q.    We talked a little bit earlier about the fact that outside counsel is instructed by you in -- your company is the outside counsel client, correct?

9

A.   **Yes.**

Q.   Have you instructed counsel --strike that.  Has anyone said to you that the Debtors could sell their operating assets without granting TPG a release?

[OBJECTION]

A.   **I don't recall that.**

Q.   Just you personally, sir, do you think it's important to grant TPG a release?

[OBJECTION]

A.   **I rely on outside counsel for that expertise.**

Q.   Have you met with the Official Committee of Unsecured Creditors?

A.   **No.**

Q.   Do you know who is on the Official Committee of Unsecured Creditors?

A.   **No.**

Q.   Have you asked any of the Official Committee of Unsecured Creditors?

A.   **No.**

Q.   Do you think that the view of Committee of the Unsecured Creditors are important in these cases?

[OBJECTION]

A.   **I don't have an opinion on that.**

Q.   Do you understand that some of the unsecured creditors in these cases are individuals who assert that they were physically harmed by your company's products?

A.   **Yes.**

Q.   Does it matter to you what those individuals' views are with respect to this bankruptcy case?

[OBJECTION]

> **A.      Within the context of a bankruptcy, that's too complex for me to opine.**
>
> Q.      Are the views of the Unsecured Creditors in these cases important to you?
>
> [OBJECTION]
>
> **A.      I don't have an opinion on that.**

*Id.* at 171:13-184:3.

15.      It was the endorsement of Mr. Binder, an individual against whom the Official Committee seeks standing to assert claims for, *inter alia*, breach of fiduciary duty, that made TPG comfortable with Mr. Johnson serving as the CEO of Exactech.  *Id.* at 186:6-11.

16.      Similarly, the so-called Special Committee's support for the TPG settlement does not take into consideration the unsecured creditors' views or whether unsecured creditors will receive a distribution if the TPG settlement is approved.  Mr. Pohl's testimony given on Monday, May 2, 2025, starting at 12:53PM, is set forth below:

> Q.      As you sit here today, Mr. Pohl, would you agree that if the Plan is confirmed and the TPG settlement is approved, that it is likely that Unsecured Creditors will receive no recovery from the Debtors in these cases?
>
> [OBJECTION]
>
> **A.      No, I don't know that.**
>
> Q.      And why is it that you say that you don't know that?
>
> [OBJECTION]
>
> **A.      The reason I don't know is because I don't know.**
>
> * * *
>
> Q.      I'm trying to understand, Mr. Pohl, how you -- strike that.  Strike that.  Let me ask you a question a different way, Mr. Pohl.  Am I correct, then, that fairness, in your view, doesn't depend on potential distributions to Claimants?

11

[OBJECTION]

A.   **It does not.**

Q.   Mr. Pohl, I take it, then, in your view, you didn't need to know the amount that Unsecured Creditors would recover under this plan if this settlement was approved in order to vote to approve the settlement, correct?

A.   **All of the money that's going to be spent is going to go to a Claimant of some type.  It's just a question of what type of Claimant.  So did I need to know how the last priority on the bankruptcy priority scale set by the statute would fare in the waterfall in order to determine that at least with respect to the fairness of what TPG is willing to pay in exchange for release of estate claims against them, I didn't need to know exactly how the waterfall would shake out.  If that's helpful.**

* * *

Q.   You testified just now that it was your assumption that every settlement dollar would not be spent on administrative claims and that you'd have to think about that more, whether or not that was appropriate.  Do you recall saying that?

A.   **I do.**

Q.   Did you request any analysis on that issue before you voted to approve the TPG settlement?

[OBJECTION]

A.   **No, for the reason that I just articulated.**

Q.   If it turned out that your assumption was incorrect, do you think it would have been appropriate to vote to approve the TPG settlement and support this plan?

[OBJECTION]

A.   **I do.**

* * *

Q.   Mr. Pohl, can you think of any reason why a personal injury Claimant in this case would agree with the Special Committee's decision to enter into this settlement with TPG?

12

[OBJECTION]

**A.    Can I think of a reason why a Claimant might agree?**

Q.    Yes.

**A.    I don't know.  I'd have to think -- I don't know.  I don't know why.  I don't know.  I don't know the answer to your question. I never thought about it.**

*See* May 1, 2025 Pohl Tr. (attached hereto as **Exhibit B**) at 156:5-156:21, 162:18-164:3, 166:8-22, 174:9-24.

17.    Estate fiduciaries are supposed to think about what is in the unsecured creditors' best interest.  They are supposed to care if every dollar will be spent paying administrative costs and whether unsecured creditors will actually receive nothing, especially when there is an alternative—not settling with TPG—that could result in potentially more than a billion dollars of value for unsecured creditors.  Estate fiduciaries are not supposed to support settlements designed to zero out claimants and prevent them from exercising their right to a trial by jury.

18.    So, returning to the question posed above:  how can the Debtors pursue TPG's objectives here and act in a manner consistent with their fiduciary duties to creditors?  The answer is simple:  so long as TPG is permitted to run its playbook here, the views of unsecured creditors are not important in these chapter 11 cases.  This must end.

## BACKGROUND

19.    Mr. Johnson's and Mr. Pohl's testimony did not occur in a vacuum.

## I.    The Product Defects

20.    As set forth in the Draft Complaint, Exactech made defective products.  *See* Draft Compl. at § IV.  These products caused injuries to thousands of patients, and those claimants are presently creditors of the Debtors.  *Id.* at § VII.

21.     While defects in Exactech's products date back to at least 2004, Exactech actively continued to sell defective products for years after TPG acquired Exactech in February 2018. While Exactech and certain officers and directors were aware of the product defects as early as the summer of 2005, such officers and directors engaged in a years' long scheme to suppress public disclosure of the defects, and that conduct continued under and was actively adopted by officers and directors installed by TPG, including Mr. Binder (who served as Co-Executive Chairman, and thereafter CEO, and Director of Exactech).

22.     Simply put, Exactech had a choice:  pull the products from the market and face insolvency (and effectively cause TPG to realize a complete loss of its own substantial investment in Exactech) or hide the defects and place blame on other parties.  *Id.* at §§ V & VI.

23.     Exactech's directors and officers made the wrong choice.  In the years that followed Exactech's discovery of such product defects, Exactech engaged in a pattern of practices designed to hide the defects in an attempt to preserve TPG's investment at the cost of damage to thousands of current and future patients.  These practices included (a) efforts to chill or deter public disclosure of such product defects and failures (*e.g.*, via lucrative consulting agreements with surgeons), (b) fraudulent marketing practices (which caused false claims to be submitted to Medicare), and (c) efforts to (i) mislead surgeons and patients, (ii) provide inaccurate and misleading information to the FDA, and (iii) conduct (under TPG's direction) a series of deficient recalls designed, inter alia, to allow Exactech to continue to sell defective products.  As a result, many thousands of patients—the Debtors' creditors—have suffered real, demonstrable injuries.

24.     Joint replacements are typically necessary for older patients.  The harm caused skews toward elderly populations, veterans, and those whose work and life experience caused joint

issues.  Many patients have suffered disabling complications necessitating one or more corrective surgeries.  Rather than enjoy retirement, they suffer in pain.

25.    Exactech's practices, as orchestrated by Dr. Petty and others, were very lucrative. Exactech earned substantial revenue from the sale of its devices.  The Company's founders amassed a fortune and lived in luxury.  Then, in August of 2017, Dr. William "Bill" Petty ("Dr. Petty")—Exactech's co-founder and, later, for certain relevant times post-TPG acquisition, its Co-Executive Chairman—and other shareholders had an opportunity to cash out and walk away with substantial wealth.

## II.    The TPG Acquisition

26.    In 2017, TPG Inc., previously known as Texas Pacific Group and TPG Capital, a private equity firm based in Fort Worth, Texas, expressed an interest in acquiring the Company. Draft Compl. at § VIII.  Led by Senior TPG Advisor, Mr. Binder, TPG conducted its due diligence. *Id.* at § IX.  During this process, TPG ignored red flags, which if explored would have revealed the extent of Exactech's product liability and insolvency.  *Id.* at § IX.A.

27.    TPG decided nonetheless to move forward with the acquisition.  Various parties profited handsomely when this sale closed on February 14, 2018.  Mr. Binder, for example, earned a $1 million success fee.  *Id*. at § IX.B.  But this fee pales in comparison to the $600 million in cash paid to Exactech's Selling Shareholders, including Dr. Petty, who received over $8 million personally plus his share of the approximately $38 million paid to Prima Investments LP (a Petty family investment vehicle), while also retaining material ownership in the go-forward Exactech entity alongside TPG.

28.     Post-sale, Exactech was saddled with over $200 million of secured debt.   The aggregate impact of the transactions impaired the ability of holders of product liability claims against Exactech to recover from Exactech on account of their injuries.

### A.     TPG's Awareness of the Product Defects

29.     After the acquisition closed in February 2018, TPG and Mr. Binder became aware of the full scope of product defect issues with the Exactech devices and the regulatory issues facing the Company.  *See* Draft Compl. at § XI.  The record, as set forth in the Draft Complaint, shows that Mr. Binder (installed as Co-Executive Chairman of Exactech following the TPG takeover), when confronted with these product defects, elected to "buy in" and extend Exactech's scheme to conceal disclosure of such defects and delay any proper corrective action, including recalls.

30.     Mr. Binder's and TPG's motivation was apparent:  to protect the TPG investment at all costs, at the expense of engaging in proper conduct, all at the expense of the ultimate victims of such scheme.

31.     Mr. Binder participated in Exactech's efforts to obstruct an investigation by the Hospital for Special Surgery ("HSS"), which may have been Exactech's largest domestic "customer" for Exactech knee devices until HSS ceased using certain of Exactech's devices in early 2021.  He also participated in Exactech's efforts to obstruct the pleas of a prominent Maryland surgeon—who himself had been one of Exactech's largest single domestic users of Exactech devices until he finally refused to perform further knee replacement surgeries with Exactech devices—to recall or suspend further sales of one such Exactech product.

32.     By August 2019, if not well before, after a qui tam action filed in Alabama was unsealed, there was little doubt that Exactech was insolvent and faced substantial product liability. *Id.* at § XIV.A.  TPG had a choice:  pull the products from the market, recognize a substantial or

complete investment loss, and initiate litigation against Dr. Petty and the former directors and officers, or hide the defects and place blame on other parties.

33.     TPG's Exactech-installed directors and officers, in close coordination with TPG, made the wrong decision in breach of their fiduciary duties to Exactech and its victims/creditors, and pointed the finger at others, such as the surgeons or the patients themselves.

### B.     TPG Takes Control of the Company

34.     Post-closing, TPG went into full panic mode.  This led to TPG adopting an all-hands-on deck approach to controlling the Company in an attempt to mitigate TPG's loss.  *Id*. at § XII.  TPG, which already had control over the Exactech board, dictated Company strategy, and ran Exactech's day-to-day operations, literally displacing Exactech management in making all key recall decisions, including responses to the FDA.  *Id.*  Such was the extent of TPG's involvement that a high-ranking executive described the involvement of TPG's Senior Advisor Jeffrey Binder as "overwhelming" and "paralyzing."

35.     In the years that followed, TPG engaged in a pattern of practices designed to hide the defects, which in effect was a continuation of the scheme operated by prior management.

36.     These practices included, *inter alia*, the continued use of consulting agreements with surgeons to deter public complaints about Exactech's defective products, fraudulent marketing practices, and efforts to obstruct or impede the FDA's investigation.  As a result, patients continued to suffer severe injuries.  Patients who could have had their devices recalled sooner instead sat in continued ignorance, all while their joints and bodies deteriorated.

### C.     Product Recalls and Litigation

37.     However, the day of reckoning eventually came, and the Company's practices eventually led to product recalls.  On June 29, 2021, the Company initiated its first Poly Recall

associated with non-conforming packaging.  Over the ensuring years, six more recalls due to non-conforming packaging followed, the most recent of which occurred on December 31, 2024—two months after the Debtors filed for bankruptcy.

38.  ██████████████████████████████████████████████████████ ██████████████████████████████████ The Company and TPG were named in multiple lawsuits filed by patients.  *Id.* at § XIII.  As of the Petition Date, the Debtors faced more than 2,500 product-related lawsuits filed in multiple federal, state, and non-U.S. courts.

39.  Approximately 1,840 pending lawsuits have been consolidated into the MDL.  The Florida Master Case included no less than 740 pending lawsuits filed in Florida.  The first Bellwether hip case in the Florida state court Master Case was scheduled to go to trial in December 2024, with fact and expert discovery having been completed.  The Debtors' bankruptcy filing prevented this trial from going forward—one of TPG's key objectives.

**D.**     **TPG's Search for an Exit Strategy**

40.  With the tide turning, TPG needed an exit strategy and a way to stop the litigation. *Id.* at § XV.  An IPO or out-of-court sale was not an option.  Due to the recalls and the litigation, TPG could not hide Exactech's condition and quietly exit the business.  Further, it was now clear that TPG and its Exactech-designated officers and directors, and the Debtors and their officers and directors, faced significant liability due to their own misconduct.  TPG turned to its advisors for a strategy—a bankruptcy strategy—to unload the Company and attempt to obtain a release for TPG. *Id.* at § XVII.

18

**III.**    **The Sidecar Facility**

41.    As a threshold matter, Exactech needed liquidity to serve as a bridge to an eventual bankruptcy filing. *Id*. at § XVII.A. Exactech's financial issues were not a secret. The Alabama qui tam action and the product liability actions were public.

42.    Exactech was now viewed by the market as a significant credit risk. TPG provided Exactech with liquidity through the Sidecar Facility, at a time when the existing secured debt was trading at around fifty cents on the dollar. There was no situation when the Sidecar Facility was entered into where it would be repaid. Rather, the Sidecar Facility was, in substance, an equity infusion designed to facilitate a bankruptcy filing and to elevate TPG into a position above the unsecured mass tort creditors where TPG could then exert power to obtain a release for itself of the claims by those mass tort creditors. *Id.*

**IV.**    **The Free and Clear Sale and the TPG Release**

43.    Bankruptcy was also desirable for another constituency. The First Lien Lenders wanted to exit their credit position. But Exactech could not repay the loan absent a sale transaction. No buyer would acquire Exactech's assets outside of bankruptcy and risk stepping into Exactech's shoes under successor liability theories. The First Lien Lenders required a section 363 sale and the protections that such a sale can offer to a "good faith" purchaser. *Id.* at § XVII.B.

44.    However, TPG knew that a pure bankruptcy filing would not necessarily yield its desired release, the release of non-debtor TPG and its non-debtor affiliates. Once in bankruptcy, the Debtors could elect to sell their assets to the First Lien Lenders (or another purchaser) outside of a plan or through a plan that did not include releases for TPG. TPG's solution was to lock the First Lien Lenders into a sale transaction that would take place through a plan that provided TPG with its desired releases (whether through a sale, waiver, or settlement of estate claims). This

19

agreement was memorialized in the October 9, 2024, Side Agreement and the October 29, 2024 RSA. *See id.*

45.  The First Lien Lenders are bound to this structure—providing a release to TPG in and through a plan—even if they terminate the RSA.  The First Lien Lenders' only true "out" arises if (a) the Court terminates exclusivity and permits the Committee to file a plan, or (b) the Special Committee recommends to the Company's board that the Company should not grant such releases.  TPG's control of the Special Committee is a key part of TPG's bankruptcy strategy.

## V.      The Sham Investigation

46.  On July 24, 2024, TPG directed the formation of the Special Committee.  *Id.* at § XVIII.  For its first six months, the Special Committee did very little.

47.  TPG may have believed that it could secure its release by including the Estates' causes of action against it in the assets sold to the Stalking Horse Bidder.  But due to the Official Committee's objection (*see* Dkt. No. 228), this route was not viable, and the Debtors never even bothered to market these causes of action for sale alongside their operating assets, as confirmed by the sworn testimony of the Debtor's CRO,[9] CEO,[10] and Investment Banker.[11]

48.  Between July 24, 2024, and February 1, 2025, the Special Committee did not conduct a single deposition and interviewed three people not at the heart of any of the core issues, one of whom was the Debtors' banker at Centerview.  *Id.*

49.  The Special Committee investigation was a sham from the outset.  Critical issues do not appear to have been investigated.  Key witnesses were not interviewed.  Those who were interviewed were crammed into a short period of time literally days before the Special Committee

---

[9]   *See* Dkt. No. 876 at **Exhibit A**, York Tr. at 68:9-18.
[10]  *See* Dkt. No. 876 at **Exhibit C**, Johnson Tr. at 164:21-165:8.
[11]  *See* Dkt. No. 876 at **Exhibit B**, Chopra Tr. at 30:12-25, 82:11-13.

concluded its purported investigation, and such interviews were only conducted after the Committee had noticed several of the same individuals to be deposed, but the Committee's efforts to depose all but one of them were obstructed. The Committee's request to attend the interviews of those individuals interviewed by the Special Committee was categorically rejected.

50. The scope of the Special Committee's investigation was insulated to provide cover for TPG, and to protect TPG. For example, the Special Committee failed to investigate, *inter alia*, the claims against Exactech's former officers and directors who ran the Company between 2002 and February 14, 2018 (the date TPG acquired Exactech), and the critical implications of that for TPG's liability for its complicity in such misconduct after TPG's acquisition of Exactech. *Id.*

51. These claims, and information pertaining thereto, bear directly on TPG's own liability to the Company. The restrictions on the investigation meant that the Special Committee did not examine the critical issues of whether there was a fraudulent scheme operated by Exactech's former officers and directors, when TPG learned of the details of such scheme, and how TPG responded to such discovery.

52. When the Special Committee began its investigation in earnest the week of February 10, 2025, after this Court declined to approve the Debtors' Disclosure Statement in the course of the February 4, 2025 hearing, the Special Committee crammed seventeen (17) interviews into the week of February 10th-14th, days prior to its targeted substantial completion date. *Id.* The Special Committee's investigation was conducted entirely behind closed doors. *Id.*

53. The Official Committee, despite its requests to listen to the interviews, as noted, was excluded. *Id.* These "interviews" were perfunctory at best. *Id.* The Committee confirmed that the Special Committee did not even ask Mr. Binder about most of the basic and critical topics necessary for the most rudimentary of investigations. *Id.*

21

54.    The Committee further has confirmed that the interview of Exactech senior engineer Laurent Angibaud lasted mere minutes.  The Special Committee also does not appear to have vetted the most basic of misstatements made by various witnesses to the Special Committee.

55.    The Special Committee failed to interview key witnesses, including Dr. Petty and engineer Luis Alvarez.  *Id.*  The Special Committee also failed to review the entire documentary record, including thousands of documents that the Debtors had not yet produced in response to the Official Committee's December 2024 document and other requests, as well as documents from the Special Committee's purported target—TPG.  *Id.*

56.    In addition, TPG has not produced the due-diligence related documents or post-Merger documents bearing on its decision to double down on Exactech's scheme after the February 14, 2018 acquisition.  *Id.*

57.    It also is apparent, as reflected in the Draft Complaint, that the factual conclusions reached by the Special Committee were fundamentally flawed and contrary to the record that was made available to the Committee during discovery.  The Special Committee, it appears, turned a blind eye to any evidence pointing to the complicity of TPG, Mr. Binder, and others affiliated with TPG in the fraudulent scheme of the Exactech's former directors and officers.

58.    But performing a real investigation would have been inconsistent with TPG's objectives.  The Special Committee was created to reach a preordained conclusion—namely, that the Debtors' claims against insiders and affiliates can be settled for nominal consideration thereby effectuating TPG's desired cheap release.  This conclusion was pre-written into the plan filed on December 31, 2024, which provides such release even prior to the Special Committee's interviews of virtually all the witnesses which, as previously noted, began in earnest the week of February 10, 2025.

59.     Due to uncertainty in case law over what is (and what is not) an estate claim, TPG hopes to leverage any settlement here to put an end to all litigation against it in the civil justice system.  As structured by TPG, these bankruptcy cases are and remain a liability management tool; indeed, nothing more than a coarse and brazen litigation tactic.  If TPG is successful, these bankruptcy cases will be used to wipe out unsecured creditors' claims against TPG and its affiliates worth potentially over a billion dollars for the benefit of equity holders that are not in financial distress.

## VI.     The Official Committee's Efforts to Protect the Unsecured Creditors

60.     The Official Committee moved to terminate exclusivity so that it can file a plan that does not release TPG.  On March 31, 2025, the Court denied that motion and granted the Debtors an extension of time to file and solicit votes on their Plan.  *See* Dkt. No. 828.

61.     The Committee has sought standing to deprive parties controlled by TPG—*i.e.*, the Debtors and the Special Committee—of the ability to attempt to settle or release the Causes of Action.  This Court has yet to consider the Standing Motion.

62.     The professional fee spend in these cases is substantial and is driven by TPG's pursuit of its desired releases for itself.  Based on information available as of April 23, 2025 (which does not include, among other things, the Ad Hoc Group's fees for November 2024 or March 2025), the Debtors' professionals have incurred **$31.42** million in fees and expenses, the Ad Hoc Group has incurred **$19.98** million in fees and expenses, the Special Committee's professionals have incurred **$13.11** million in fees and expenses, and the Official Committee's professional have incurred **$10.17** million in fees and expenses.

63.     The investigation led by White & Case into the estate causes of action against TPG has now cost the Debtors' estates over **$13.11** million and resulted in TPG offering approximately

$10 million in consideration—which consists of $5 million in cash and $5 million in theoretical value TPG expects to receive under the Plan in exchange for certain claims under the Sidecar Facility that the Official Committee contends should be recharacterized as equity—to secure a release for itself and certain directors and officers, including Mr. Binder.

64.     Thus, the cost of the Special Committee's so-called investigation is *greater* than the proposed settlement that that investigation generated, underscoring the sham nature of both the Special Committee's investigation and the proposed settlement when measured against the claims potentially worth over a billion dollars that the Official Committee seeks standing to pursue against TPG.

65.     **Had the Special Committee never been appointed, not only would the Estates have over $8 million more in cash ($13.11 million in professional fees less $5 million in cash to be received from TPG), but the valuable claims against TPG would also be preserved**.

66.     The Debtors are now soliciting votes on a Plan that faces opposition from the unsecured creditors that will receive ***virtually*** ***no*** ***recovery*** if the Plan is confirmed.  The litigation over the Debtors' Plan will be expensive, and that is because of the Debtors' pursuit of their bankruptcy plan and case strategy, the goal of which is to provide TPG with a release of substantial liability that TPG faces as a consequence of its own actions.

67.     **First**, TPG, the Debtors, and the Special Committee have refused to produce documents responsive to the Official Committee's requests at virtually every turn in these cases. This has resulted in multiple discovery disputes.

68.     **Second**, because the Debtors' Plan includes a settlement of the Estates' claims against TPG and certain directors and officers for effectively no consideration to the unsecured creditors, the confirmation hearing will necessarily involve litigation over the value and merits of

those claims potentially worth in excess of a billion dollars.  The Debtors' Plan puts at issue whether TPG and others can be held liable and, if so, what is the measure of damages.

69.     TPG prefers to litigate these issues in bankruptcy because in bankruptcy TPG does not face the same risk regarding an adverse ruling that it faces in the civil justice system.  If the proposed Rule 9019 settlement is not approved, TPG can go on to fight another day.  If the proposed Rule 9019 settlement is approved as part of the Plan, TPG will have won the bankruptcy lottery, effectively wiping out potentially over a billion dollars in damages for a *de minimis* payment.

70.     But TPG is litigating on the Ad Hoc Group's dime.  The Ad Hoc Group has been pressed into service to aid TPG in its pursuit of its releases.  But if the discovery over the KEIP Investigation is any indication of what the future holds, it is highly unlikely that TPG will be successful.  This means that after spending tens of millions of dollars in professional fees, the Ad Hoc Group could be left standing in the aftermath of a contested confirmation hearing with no end in sight.  This is not fair to any of the creditors in these cases.  The Official Committee has been pressing for the ability to present an alternative chapter 11 plan for months.

71.     **The views of the unsecured creditors are important in these cases**.  And, since the appointment of a trustee automatically terminates exclusivity under section 1121(c)(1) of the Bankruptcy Code, the appointment of a chapter 11 trustee will free the Official Committee to file its chapter plan to resolve these cases in a manner consistent with the Bankruptcy Code.

## JURISDICTION AND VENUE

72.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are section 1104(a) of the Bankruptcy Code and section 1121(d) of the Bankruptcy Code.

## RELIEF REQUESTED

73.     By this Motion, the Official Committee seeks an order appointing a chapter 11 trustee under section 1104(a) of the Bankruptcy Code or, in the alternative, terminating the Debtors' exclusive period to file a chapter 11 plan and solicit acceptances thereof under section 1121(a) so that the UCC can file its chapter 11 plan.

## ARGUMENT

74.     The Court should appoint a chapter 11 trustee under section 1104(a).  Since the appointment of a trustee terminates exclusivity under section 1121(c)(1), the Official Committee would then be free to file its plan *immediately* and work with the chapter 11 trustee and other groups to obtain a result that is in the best interest of all creditors.

75.     Section 1104(a)(2) provides that the Court "shall order the appointment of a trustee" if such appointment "is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor."  11 U.S.C. § 1104(a)(2).

76.     The section 1104(a)(2) standard is "flexible" and allows the Court to engage in a "cost-benefit analysis."  *In re Circulatory Ctrs. of Am., LLC*, 579 B.R. 752, 758 (Bankr. W.D. Pa. 2017).  Factors courts have considered include (a) whether the debtor's principals are advancing their own personal interests at the expense of creditors in the bankruptcy case,[12] (b) conflict and

---

[12]     *See Circulatory Ctrs. of Am.*, 579 B.R. at 760; *In re Morningstar Marketplace, Ltd.*, 544 B.R. 297, 305 (Bankr. M.D. Pa. 2016) ("A court is more likely to appoint a trustee under § 1104(a)(2) when reorganization is not possible, and a Debtor's principal may be motivated to protect his own interests rather than the interests of creditors."); *In re Eurospark Indus., Inc.*, 424 B.R. 621, 629 (Bankr.

acrimony between the debtor and creditors,[13] (c) the risks of incurring overwhelming litigation costs,[14] and (d) whether appointing an independent trustee would help ensure that value is preserved and maximized for creditors.[15]   Here, each of these factors counsels in favor of the appointment of a chapter 11 trustee.

### A.      TPG Is Advancing Its Own Interests at the Creditors' Expense

77.      TPG is advancing its own interests at the expense of the creditors in these cases. Indeed, "a common theme runs through" section 1104(a)(2) cases: "instances where principals actively elevate their own interests above those of the debtor to the point that it causes or is substantially likely to cause significant damage to the bankruptcy estate." *Circulatory Ctrs. of Am.*, 579 B.R. at 760.  This is precisely the circumstance that is before this Court.

78.      Here, the Debtors' business and operating assets can be sold without granting TPG and its affiliates releases.  *See* May 1, 2025 Pohl Tr. 329:13-25 ("Q.  Could the secured debt be satisfied through a credit bid that didn't involve the TPG settlement?  [Objection].  A.  It could, yes.  Q.  Is the TPG settlement necessary for the Debtors to sell their assets?  [Objection].  **A.  No, it's not necessary to sell your assets.**") (emphasis added).

---

E.D.N.Y. 2010) ("It is well established that courts may appoint a chapter 11 trustee where a debtor-in-possession's management has a conflict of interest that interferes with its ability to fulfill its fiduciary duties to the estate.").

[13]   *See In re Marvel Entm't Group, Inc.*, 140 F.3d 463, 472 (3d Cir. 1998) (holding that the district court did not abuse its discretion in ordering the appointment of a chapter 11 trustee based on "acrimony" and unresolved "conflicts" between the debtor and creditors); *In re Taub*, 427 B.R. 208, 227–28 (Bankr. E.D.N.Y. 2010) *aff'd*, No. 08 BK 44210 ESS, 2011 WL 1322390 (E.D.N.Y. Mar. 31, 2011) (finding that acrimonious relationship between debtor and estranged spouse and other family members who held claims against the estate supported appointment of trustee).

[14]   *See In re Shubh Hotel Pittsburgh, LLC*, No. 10-26337, 2011 WL 7145601, at *4 (Bankr. W.D. Pa. Feb. 1, 2011).

[15]   *See Circulatory Centers of America*, 579 B.R. at 764 (appointing chapter 11 trustee where appointment is in the "best interests" of creditors" and would "ensure that value is preserved in each estate").

79.     When the Debtors' operating assets are removed from the equation, the Debtors' plan is not focused on preserving a "going concern,"[16] but on transferring value from creditors to shareholders.  The Debtors argue that the claimants' rights to recover from TPG and other non-debtor affiliates on theories of alter-ego liability or corporate veil piercing constitute "estate causes of action" that are assets the Debtors' estates can pursue and maximize for creditors under section 541(a).  But this argument is flawed and, more importantly, shows that TPG is pursuing its own interests at the expense of the Debtors' creditors.

80.     **First**, "estate causes of action" should only include those that seek redress for an injury to the debtor that the debtor had standing to assert under state law prior to its bankruptcy.[17] The Debtors have no standing to assert claims against themselves or claims against TPG based on alter ego or veil piercing theories under state law prior to its bankruptcy.

81.     **Second**, the Third Circuit has explicitly rejected, as an impermissible litigation tactic, attempts to use bankruptcy to gain control over and settle derivative claims asserted against a debtor's insiders and affiliates.  *See In re 15375 Mem'l Corp.*, 589 F.3d 605, 626 (3d Cir. 2009).

82.     So, even if causes of action—based on particularized injuries and harms suffered by claimants (and **not** the Debtors)—to the extent asserted against TPG on alter ego or veiling piercing theories of liability, could ever constitute "estate causes of action" under section 541(a),

---

[16]   *See Mem'l Corp.*, 589 F.3d at 619 (finding the debtor did not maintain a going concern where it had no employees, office, or business other than the handling of certain litigation); *In re Zamora-Quezada*, 622 B.R. 865, 885-86 (Bankr. S.D. Tex. 2017) (debtor ineligible for Chapter 11 where, among other things, debtor's "few assets," "virtually no income," and lack of additional business prospects raised question of "what is Debtor being rehabilitated for").

[17]   *See Caplin v. Marine Midland Grace Trust Co. of New York*, 406 U.S. 416, 434 (1972); *In re Emoral, Inc.*, 740 F.3d 875, 879 (3d Cir. 2014) (causes of action are considered property of the bankruptcy estate "if the claim existed at the commencement of the filing and the debtor could have asserted the claim on his own behalf under state law."); *Board of Trustees of Teamsters Local 863 v. Foodtown, Inc.*, 296 F.3d 164, 169 n.5 (3d Cir. 2002) ("A cause of action is considered property of the estate if the claim existed at the commencement of the filing and the debtor could have asserted the claim on his own behalf under state law.").

permitting TPG to remain in control of these cases to prosecute and settle such "causes of action" would be perverse.  *See id.*

83.     TPG would, in substance, function as both *plaintiff* and *defendant* in such litigation and would have no incentive to maximize recoveries.  TPG's incentive would be precisely the opposite since it would be the defendant in that litigation, which is the exact point made by the Third Circuit in *Memorial Corp.*  589 F.3d at 626.  This is the definition of bad faith and an abuse of the bankruptcy process.  *See id.*  TPG is advancing its own interests so that it does not have to pay claimants what they would otherwise recover in the tort system.

84.     The Debtors' and TPG's reason for pursuing their plan is not to help or assist creditors.  TPG is an economically rational actor.  TPG is seeking to minimize its liability and thereby maximize profits that it can distribute to its shareholders.

85.     These cases are a liability management tool for TPG and its directors and officers.  And the liability TPG is seeking to manage are the efforts undertaken by claimants to recover on account of their injuries.  These creditors do better when they have access to the civil justice system, whether directly or indirectly through an independent litigation trust.  If this were not true, there would be no reason for the Debtors to implement TPG's bankruptcy strategy.

86.     But, again, this is not a proper bankruptcy purpose.  The Supreme Court has instructed that bankruptcy has two "twin objectives[:] 'preserving going concerns and maximizing property available to satisfy creditors.'"  *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 50 (2008).  Neither objective is served by permitting TPG to run this case for its own benefit.  And the fact that TPG is attempting to run these cases in this manner constitutes proper and ample grounds for the Court to appoint a chapter 11 trustee.

87.     Further, as discovery has now shown, the personal views of the Debtors' CEO are those of TPG's own counsel—Ropes & Gray. *See* Johnson Tr. at 181:12-18 ("Q.  With respect to the bankruptcy case – this bankruptcy case, do you rely on outside counsel with respect to what your personal views are?  A.  Yes.").

88.     It should come as no surprise that a CEO selected by Mr. Binder himself would not have an "opinion" as to whether the views of unsecured creditors in these cases are "important." *Id.* at 184:21-185:3.   These are the same creditors that are seeking to pursue claims against Mr. Binder.  Mr. Binder and TPG do **not** want the creditors here to obtain a recovery in these cases because such a recovery would come *at their expense*.  This is a classic example of a debtor and its owner placing their interests ahead of claimants.

**B.      There Is Conflict and Acrimony between the Debtors and Creditors**

89.     There is clear acrimony between the Debtors and creditors.  TPG's effort to zero-out the unsecured creditors has this constituency united against the Debtors' Plan.

90.     Claimants believe that they have meritorious claims in the tort system and do not want their legal, equitable, and constitutional rights taken from them, including their right to a jury trial, in the manner that TPG proposes.

91.     Further, the Official Committee believes that a litigation trust can secure litigation financing to prosecute causes of action for breach of fiduciary duty and aiding and abetting breach of fiduciary duty.  TPG's, the Debtors', and the Special Committee's efforts to destroy this source of recovery for claimants is a major a source of both conflict and acrimony.

**C.      The Risk of Incurring Substantial Costs Is Significant**

92.     The risk of incurring substantial costs is significant.  Parties have already expressed concerns that the professional fees and expenses in these cases are somewhat "high" relative to the

value of the Debtors' business assets.  The Court should ponder the costs and time associated with confirming TPG's desired plan, which will involve contested litigation over the approval of an insider settlement, and the confirmation of a contested chapter 11 plan.

93.     TPG supports this litigation taking place here because it is not funding these bankruptcy cases.  It is litigating on the Ad Hoc Group's dime.  TPG does not care if $100 million in professional fees is spent in these cases pursuing its objectives because it is not presently paying the bill.  Indeed, TPG desires this result.  Permitting the Debtors, as controlled by TPG, to remain in control of these cases will generate significant professional fees and expenses that can be avoided by simply pursuing a different path that resolves these cases on a shorter timeline.

**D.     Appointing an Independent Trustee Will Maximize Value for Creditors**

94.     Appointing a chapter 11 trustee would take control over the Debtors' estates away from TPG and vest it with an independent trustee who could maximize value for creditors.

95.     This should lead to the confirmation of a plan that transfers the Estates' claims against TPG and the directors and officers to a litigating trust.  A world where an independent trust controls the causes of action against TPG is far better than a world where TPG can attempt to effectuate an insider settlement with itself that harms claimants.

96.     This Court must understand the conflict that exists here.  The Court should appoint a chapter 11 trustee, terminate TPG's control over these cases, and permit the Official Committee to file its plan to produce a value maximizing outcome to these cases.

**RENEWED REQUEST TO TERMINATE EXCLUSIVITY**

97.     Assuming, *arguendo*, that the Court is not prepared to grant the Motion and appoint a chapter 11 trustee, the Official Committee respectfully renews its request that the Court terminate exclusivity for the reasons set forth in the Official Committee's prior motion for the entry of an

31

order allowing the Official Committee to file and prosecute a chapter 11 plan (*see* Dkt. No. 439) and developments in these cases since the Court denied that motion.

98.     **The Official Committee's chapter 11 plan is ready to be filed with this Court**. If the Court permits, the Official Committee is prepared to file its chapter 11 plan under seal to remove any doubt that such a plan exists and is readily confirmable by this Court in the near term.

## NOTICE

99.     Notice of this Motion has been served on: (i) the U.S. Trustee; (ii) counsel to the Debtors; and (iii) all persons who have formally appeared in these chapter 11 cases and requested service pursuant to Bankruptcy Rule 2002. Considering the nature of the relief requested herein, the Official Committee respectfully submits that no other or further notice need be provided.

## CONCLUSION

**WHEREFORE**, based on the foregoing, the Official Committee respectfully requests that this Court grant the Motion, and grant such other and further relief as the Court deems necessary and appropriate.

Dated: May 7, 2025                    Respectfully submitted,

**HOGAN♦MCDANIEL**

/s/ *Daniel K. Hogan*
Daniel K. Hogan (DE No. 2814)
Garvan F. McDaniel (DE No. 4167)
Daniel C. Kerrick (DE No. 5027)
1311 Delaware Avenue
Wilmington, DE 19806
(302) 656-7540; (302) 656-7599 (f)
dkhogan@dkhogan.com
gfmcdaniel@dkhogan.com
dckerrick@dkhogan.com

*Local Counsel for the*
*Official Committee of Unsecured Creditors*

32

-AND-

**BROWN RUDNICK LLP**
David J. Molton (admitted pro hac vice)
Sigmund S. Wissner-Gross (admitted pro hac vice)
Gerard T. Cicero (admitted pro hac vice)
Susan Sieger-Grimm (admitted pro hac vice)
D. Cameron Moxley (admitted pro hac vice)
7 Times Square
New York, NY 10036
(212) 209-4800; (212) 209-4801 (f)
dmolton@brownrudnick.com
swissner-gross@brownrudnick.com
gcicero@brownrudnick.com
ssieger-grimm@brownrudnick.com
cmoxley@brownrudnick.com

-AND-

Eric R. Goodman, Esquire
1900 N Street NW 4th Floor
Washington, D.C. 20036
(202) 536-1700; (202) 536-1701 (f)
egoodman@brownrudnick.com

*Counsel for the*
*Official Committee of Unsecured Creditors*

## **EXHIBIT A**

PROPOSED ORDER

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Exactech, Inc. et al.,[1] | Case No. 24-12441 (LSS) |
| Debtors. | Jointly Administered |

**ORDER GRANTING THE MOTION OF THE
OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO
APPOINT A CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C. § 1104(A)**

This matter coming before the Court on the *Motion of the Official Committee of Unsecured Creditors to Appoint a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a), or, Alternatively, Second Motion to Terminate the Debtors' Exclusive Period Pursuant to 11 U.S.C. § 1121(d)(1)* (the "Motion")[2] filed by the Official Committee of Unsecured Creditors (the "Official Committee"); the Court having reviewed the Motion and having heard the statements of counsel and the evidence introduced with respect to the Motion at a hearing before the Court (the "Hearing"); the Court having found that (a) the Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; (b) venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; (c) this is a core proceeding pursuant to 28 U.S.C. § 157(b); and (d) the appointment of a trustee is in the best interest of creditors within

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Osteon Holdings, Inc. (7042); Osteon Intermediate Holdings I, Inc. (7778); Osteon Intermediate Holdings II, Inc. (1292); Exactech, Inc. (3930); and XpandOrtho, Inc. (4250). The Debtors' service address is 2320 NW 66th Court, Gainesville, Florida 32653.

[2]   Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Motion.

the meaning of 11 U.S.C. § 1104(a)(2); and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein;

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED.

2.      A chapter 11 trustee shall be appointed to assume control over the Debtors' estates.

3.      The exclusive periods of section 1121(d) of the Bankruptcy Code are hereby terminated pursuant to section 1121(c)(1) of the Bankruptcy Code.

4.      The Official Committee may file its plan, disclosure statement and motion to approve the disclosure statement and solicitation procedures.

5.      This Court shall retain jurisdiction to hear and determine all matters arising from or related to the interpretation, implementation, or enforcement of this Order.

**EXHIBIT B**

Excerpts from Deposition of Timothy Pohl, dated May 1, 2025

Deposition of Timothy Pohl                                    In re: Exactech, Inc., et al.

Page 1

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
---------------------------------------------X

In Re:  Exactech, Inc., et al.

                    Debtors.


Case No. 24-12441 (LSS)
---------------------------------------------X



       VIDEOTAPED DEPOSITION OF TIMOTHY POHL






DATE:  May 2, 2025

TIME:  10:09 a.m. ET

PLACE:  ***REMOTE***

BEFORE:  Rebecca Schaumloffel, RPR, CCR-NJ

JOB NO:  1301

Page 2

A P P E A R A N C E S:


     ROPES & GRAY LLP
          Attorneys for the Debtor
          1211 Avenue of the Americas
          New York, New York 10036-8704
          BY:  GREGG GALARDI, ESQ
               ANI-RAE LOVELL, ESQ.



     BROWN RUDNICK LLP
          Attorneys for the Official Committee
          of Unsecured Creditors of Exactech
          7 Times Square
          New York, New York 10036
          BY:  CAMERON MOXLEY, ESQ.
               ERIC GOODMAN, ESQ.
               SUSAN SIEGER-GRIMM, ESQ.
               SIGMUND WISSNER-GROSS, ESQ.
               HELENA MAN, ESQ.

               -

          One Financial Center
          Boston, Massachusetts 02111
          BY:  MELANIE D. BURKE, ESQ.




     HOGAN MCDANIEL
          Attorneys for the Official Committee
          of Unsecured Creditors of Exactech
          1311 Delaware Avenue
          Wilmington, Delaware 19806
          BY:  DANIEL HOGAN, ESQ.

Page 3

Appearances (continued):


     MILBANK LLP
          Attorneys for the Ad Hoc Group Lien
          Lenders
          1850 K Street, NW, Suite 1100
          Washington, D.C.  20006
          BY:  PHIL GASPERETTI, ESQ.



     SIDLEY AUSTIN LLP
          Attorneys for the TPG entities
          1501 K Street, N.W.
          Washington, D.C. 20005
          BY:  JOSEPH S. KATZ, ESQ.



     WHITE & CASE LLP
          Attorneys for the Special Committee
          of the Boards of Osteon Intermediate
          Holdings II, Inc., Exactech, Inc.,
          and Xpandortho, Inc.
          111 South Wacker Drive, Suite 5100
          Chicago, Illinois 60606
          BY:  MICHAEL C. ANDOLINA, ESQ.
               PATRICK CONLON, ESQ.

               -

          701 13th Street NW
          Suite 800
          Washington, DC 20005
          BY:  ZACH WILLIAMS, ESQ.

               -

          1221 Avenue of the Americas
          New York, New York 10020
          BY:  JADE YOO, ESQ.

Page 4

Appearances (continued):


     WEITZ & LUXENBERG
          Attorneys for Gale Tarloff
          700 Broadway
          New York, New York 10003
          BY:  JOSEPH OSBORNE, ESQ.


     ALSO PRESENT:


          Dennis Ricci, committee member

          Carlos Lovera, Province

          Alyssa Schaumloffel, document
          technician

          Paul Baker, videographer


          *           *           *

Page 153

T. POHL

and the TPG settlement is approved?

MR. ANDOLINA:  Objection to form.

MR. GASPERETTI:  Objection to form.

A.    No.

Q.    And I take it the same is true with respect to your understanding as you sit here today; is that right?

MR. ANDOLINA:  Objection to form.

MR. GASPERETTI:  Objection.

A.    Correct.

Q.    When you voted to approve the TPG settlement, Mr. Pohl, did you have an understanding as to what the total amount of unsecured claims in the Debtors' chapter 11 case was?

MR. ANDOLINA:  Objection to form.

MR. GASPERETTI:  Objection.

A.    The total estimated allowed amount or the total face amount or both?

Q.    The total estimated allowed

Page 154

T. POHL

amount.

A.    No.

Q.    The same is true with respect to the total face amount?

A.    Yes.

Q.    And is the same true as you sit here today?

A.    Yes.

Q.    So, Mr. Pohl, just to make sure that I understand, when you voted to approve the TPG settlement, did you, as a member of the Special Committee, have any expectation that Unsecured Creditors would receive anything under this plan?

MR. ANDOLINA:  Objection to form.

MR. GASPERETTI:  Objection.

A.    Yes.

Q.    What was your expectation?

A.    The expectation was that some portion of the settlement proceeds would be available to creditors with allowed claims.

Q.    What was your expectation as to what the amount of that portion would be?

Page 155

T. POHL

A.    I didn't say I had an expectation about the amount.  I said I had an expectation that some, and maybe all, but not more refined than that.

Q.    And you can't put a dollar figure on that, correct?

A.    No.

Q.    And what was that expectation that some portion of the settlement proceeds would be available to creditors with allowed claims based on?

MR. ANDOLINA:  Objection to form.

MR. GASPERETTI:  Objection.

A.    Well, I knew that there was negotiations going on with respect to a wind-down budget and funding to be left behind to -- for an appropriate wind-down, and I presumed that the wind-down budget and the wind-down cost estimates would, you know, line up within reason, and as a result, there would be some, if not all, the settlement proceeds available for Unsecured Creditors.

Q.    Did you receive any other advice,

Page 156

T. POHL

other than what you set forth in your last answer?

A.    No.

Q.    As you sit here today, Mr. Pohl, would you agree that if the Plan is confirmed and the TPG settlement is approved, that it is likely that Unsecured Creditors will receive no recovery from the Debtors in these cases?

MR. ANDOLINA:  Objection to form.

MR. GASPERETTI:  Objection to form.

A.    No, I don't know that.

Q.    And why is it that you say that you don't know that?

MR. ANDOLINA:  Objection.

MR. GASPERETTI:  Objection.

A.    The reason I don't know is because I don't know.

Q.    Okay.  I'm trying to understand. Do you have an expectation that they will receive a recovery?

MR. ANDOLINA:  Objection.  Asked

Page 161

T. POHL

Wind-Down Trust in order to determine if the TPG settlement would result in Unsecured Creditors receiving a meaningful recovery?

MR. ANDOLINA:  Objection to form.

MR. GASPERETTI:  Objection.

A.    Again, I'm not sure I know how to answer that.  If you're asking me what I would need to perform a math function, I would need a lot of data.  If you're asking me what I would need to know in order to determine if I think the settlement is fair, I wouldn't need to know any of those things.

Q.    How would you make -- just so I understand, sir, from your approach, how would you make the fair determination in your mind without any of the inputs we've discussed?

MR. GALARDI:  Objection.

MR. ANDOLINA:  Objection to form.

MR. GASPERETTI:  Objection to form.

A.    The way that we did, which we

Page 162

T. POHL

talked about before.  We analyzed the strength and weakness of the estate causes of action against third parties and measured that against the value that we were able to negotiate to be provided in exchange for a release of those claims against third parties.

And we determined, based on our assessment of the strength and weakness of the likelihood of success on the merits of asserting those estate claims against third parties, that the $10 million ultimately being offered to settle those claims against third parties that are owned by the Debtors was fair and reasonable.  That was the analysis.

Q.    I'm trying to understand, Mr. Pohl, how you -- strike that.  Strike that.

Let me ask you a question a different way, Mr. Pohl.  Am I correct, then, that fairness, in your view, doesn't depend on potential distributions to Claimants?

A.    It does not.

Page 163

T. POHL

MR. GASPERETTI:  Objection to form.

A.    It does not.

Q.    So in your view --

MR. ANDOLINA:  Let me object to the last question.

Go ahead, Cameron.

Q.    Mr. Pohl, I take it, then, in your view, you didn't need to know the amount that Unsecured Creditors would recover under this plan if this settlement was approved in order to vote to approve the settlement, correct?

A.    All of the money that's going to be spent is going to go to a Claimant of some type.  It's just a question of what type of Claimant.

So did I need to know how the last priority on the bankruptcy priority scale set by the statute would fare in the waterfall in order to determine that at least with respect to the fairness of what TPG is willing to pay in exchange for release of estate claims against them, I didn't need to know exactly

Page 164

T. POHL

how the waterfall would shake out.  If that's helpful.

Q.    It is.

I want to just understand the facts and your approach, Mr. Pohl.  I appreciate your answers.

Mr. Pohl, what if -- what if everything, though, were to go to pay administrative claims, would that impact your analysis?

MR. ANDOLINA:  Objection to form.

MR. GASPERETTI:  Objection to form.

A.    Well, you know, administrative claims are administrative claims and it -- you know, I'm not sure, I'd have to think about that.  It was not my assumption.  It was not my assumption that every settlement dollar would be spent in administrative claims.  But if you ask me that hypothetical question, I'd have to think about that.

I mean, they are entitled to be paid.  And they're valid.  And the waterfall

Deposition of Timothy Pohl                                    In re: Exactech, Inc., et al.

Page 165

T. POHL

is set by law and not by me. And the priority scale is the priority scale. If the settlement -- the settlement is between the estate and a third party that is not responsible for paying claims against the company other than and unless a litigation theory to hold them responsible is valid in the eyes of a court of competent jurisdiction.

Those claims, based on our analysis, are extremely weak. And so the amount of value being paid by that putative defendant in exchange for release of those weak claims we think is fair.

The estate is getting fair value for the release of assets that it owns in our judgment. And the estate is getting the benefit of the asset value if the settlement is approved. And it will go to pay claims in accordance with the law and the Plan if the Plan is confirmed by the judge. That's our analysis.

Q.   And, Mr. Pohl, I very much appreciate that answer. I want to ask you a

Page 166

T. POHL

couple of questions about it, because I think it goes to what I've been trying to understand was your and the Special Committee's process in getting comfortable with voting to approve the TPG settlement.

A.   Okay.

Q.   You testified just now that it was your assumption that every settlement dollar would not be spent on administrative claims and that you'd have to think about that more, whether or not that was appropriate.

Do you recall saying that?

A.   I do.

Q.   Did you request any analysis on that issue before you voted to approve the TPG settlement?

MR. ANDOLINA:   Objection to form.

MR. GASPERETTI:   Objection.

A.   No, for the reason that I just articulated.

Q.   If it turned out that your assumption was incorrect, do you think it would have been appropriate to vote to

Page 167

T. POHL

approve the TPG settlement and support this plan?

MR. ANDOLINA:   Objection to form.

A.   I do.

MR. GASPERETTI:   Objection.

A.   I do, yes. For the reason that I just articulated.

Q.   Now, you believe that the claims against TPG are extremely weak, right?

A.   I do.

Q.   You, of course, understand that the Claimants here disagree with you on that, right?

MR. ANDOLINA:   Objection to form.

MR. GASPERETTI:   Objection.

A.   I understand that the Claimants' counsel believes that, yes. I don't know what the Claimants think.

Q.   In your view, why should your views on that matter prevail over the views of the Claimants?

MR. GALARDI:   Objection.

Page 168

T. POHL

MR. ANDOLINA:   Objection.

MR. GASPERETTI:   Objection.

A.   Well, I don't know that I necessarily think that they should or shouldn't. I think that we are -- we are, whether we like it or not, directors of the company. The company does own estate causes of action. It is our responsibility to decide in the first instance whether to recommend that those assets be settled or not settled if they're litigation assets.

We did a very thorough analysis, aided by very able legal counsel. We reached our business judgment conclusion about the fairness of the settlement. And we don't unilaterally get to decide. We've proposed it, in essence, to the Court and the Court will decide. That's our job and we did it.

If the Court thinks that the settlement isn't fair, it won't be approved and you'll have your day in court to articulate why you think it isn't fair. We think it's fair. We're not the deciders.

Q.   So based on that last answer,

Deposition of Timothy Pohl                                          In re: Exactech, Inc., et al.

Page 173

T. POHL

consideration for the release of the litigation claims that are being released in exchange for that consideration, which has nothing to do with how many cents on the dollar a Creditor class will receive upon the distribution of those proceeds.

Q.   You're right, Mr. Pohl.  I misspoke.  I misspoke.  I will ask my question a different way and rephrase it.

My question is, if the amount that the Debtors owed to Unsecured Creditors was $1 billion, would you agree with me that a $10 million distribution would be too low?

MR. ANDOLINA:  Objection to form.

MR. GASPERETTI:  Objection.

A.   Too low for what?  I agree that it would be a small percentage.  I agree that the math, if you put 10 in the numerator, 10 million in the numerator and 1 billion in the denominator and you calculate what that fraction is, it is a small number relative to bigger numbers.

Q.   Certainly not a meaningful and

Page 174

T. POHL

robust recovery, right?

MR. GASPERETTI:  Objection to form.

MR. ANDOLINA:  Objection to form.

A.   It's all relevant.  It depends on what -- compared to what.

Q.   Mr. Pohl, can you think of any reason why a personal injury Claimant in this case would agree with the Special Committee's decision to enter into this settlement with TPG?

MR. ANDOLINA:  Objection to form.

MR. GASPERETTI:  Objection to form.

A.   Can I think of a reason why a Claimant might agree?

Q.   Yes.

A.   I don't know.  I'd have to think -- I don't know.  I don't know why.  I don't know.  I don't know the answer to your question.  I never thought about it.

Q.   Do you think that the estates have

Page 175

T. POHL

no viable claims against TPG?

MR. ANDOLINA:  Objection to form.

MR. GASPERETTI:  Objection to form.

A.   It depends on what you mean by "viable."  As I think I testified earlier, I think there are some claims that would -- if they were actually brought, we would be swatted away quickly and easily on a motion to dismiss, and there are some claims that might not be swatted away so easily.  And so there would be costs incurred by TPG to deal with those claims.

And although I don't think any of the claims that we looked at do we believe that, if litigated to conclusion, we didn't believe that any of the claims are strong claims in terms of likelihood of success on the merits against TPG.

Q.   I think you testified earlier that some claims that you've looked at were -- the phrase I think you used -- were spurious or no potential for recovery.

Page 176

T. POHL

Do you recall that?

A.   About --

MR. ANDOLINA:  Objection.  And misstates prior testimony.

MR. GASPERETTI:  Objection.

MR. ANDOLINA:  I think that was your comment, Mr. Moxley.

MR. MOXLEY:  Let's not -- let's not do the talking, Mr. Andolina.

MR. ANDOLINA:  Well, don't -- don't -- don't mislead the witness with your questions and I won't have to talk.

BY MR. MOXLEY:

Q.   I'm going to carry on.

Mr. Pohl, my question, sir, is, with respect to the claims for causes of action that the Special Committee investigated, potentially against the directors and officers, do you have a view as to whether any of those claims are -- have a potential for recovery?

A.   We did, and we thought --

MR. ANDOLINA:  Objection.

Deposition of Timothy Pohl                                    In re: Exactech, Inc., et al.

Page 329

T. POHL

other corporation, this one just happens to be in bankruptcy.

Q.   And is the TPG settlement necessary for the secured debt to be satisfied through a credit bid?

MR. GASPERETTI:  Objection; form.

MR. GALARDI:  Objection.  Sorry, I was on mute.

MR. ANDOLINA:  Same objection.

A.   What do you mean by "necessary"?

Q.   Could the secured debt be satisfied through a credit bid that didn't involve the TPG settlement?

MR. GALARDI:  Objection.

MR. ANDOLINA:  Same objection.

A.   It could, yes.

Q.   Is the TPG settlement necessary for the Debtors to sell their assets?

MR. GASPERETTI:  Objection; form.

MR. ANDOLINA:  Same objection.

A.   No, it's not necessary to sell your assets.

Page 330

T. POHL

MR. MOXLEY:  Thank you, Mr. Pohl.  Give me one moment just to check my notes.

Okay.  Sir, thank you very much.  I have no further questions.  Appreciate your time today.

Same reservations as before, just to note for the record.

THE WITNESS:  Okay.

MR. GALARDI:  Thank you.

MR. ANDOLINA:  Thanks.

THE VIDEOGRAPHER:  Stand by.  This concludes today's testimony.  The time is 5:04 p.m.  We are off the record.

(Whereupon, at 5:04 p.m., the Examination of this Witness was concluded.)

_____
TIMOTHY POHL

Subscribed and sworn to before me this _____ day of _____ 2025.

_____
NOTARY PUBLIC

Page 331

E X H I B I T S

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Transcript of Hearing Before the Honorable Laurie Selber Silverstein United States Bankruptcy Judge, Dated March 27, 2025 | 20 |
| Exhibit 2 | Summary Report and Conclusions of the Special Committee Regarding Independent Investigation of Potential Causes of Action Against Related Parties and Summary of Proposed Settlement with the Sponsor | 77 |

Page 332

| Exhibit 3 | Notice of Filing of (I) Third Amended Joint Chapter 11 Plan of Exactech, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code and (II) Blackline of the Same | 107 |
| Exhibit 4 | TPG_EXACTECH-UCC053984 through '3985 | 277 |
| Exhibit 5 | TPG_DOJ003812 through '3837 | 296 |

I N D E X

| EXAMINATION BY | PAGE |
|---|---|
| MR. MOXLEY | 5 |
| MR. GALARDI | 323 |
| MR. MOXLEY | 324 |
| MR. ANDOLINA | 325 |
| MR. MOXLEY | 326 |

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Exactech, Inc., et al.,[1]<br><br>　　　　　　　Debtors. | Chapter 11<br><br>Case No. 24-12441 (LSS)<br><br>(Jointly Administered)<br><br>Hearing Date: May 28, 2025 at 10:00 a.m. (ET)<br>Objection Deadline: May 21, 2025 at 4:00 p.m. (ET) |

**NOTICE OF MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED**
**CREDITORS TO APPOINT A CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C.**
**§ 1104(A), OR, ALTERNATIVELY, SECOND MOTION TO TERMINATE THE**
**DEBTORS' EXCLUSIVE PERIOD PURSUANT TO 11 U.S.C. § 1121(D)(1)**

**PLEASE TAKE NOTICE THAT**, on May 7, 2025, the Official Committee of Unsecured Creditors (the "Committee"), filed the *Motion of the Official Committee of Unsecured Creditors to Appoint a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(A), or, Alternatively, Second Motion to Terminate the Debtors' Exclusive Period Pursuant to 11 U.S.C. § 1121(D)(1)* (the "Motion"), with the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801 (the "Court").

**PLEASE TAKE FURTHER NOTICE** that any objection or response to the Motion must be made in writing and be filed with the Court on or before **May 21, 2025 at 4:00 p.m., prevailing Eastern Time** (the "Objection Deadline"). At the same time, you must also serve a copy of any objection or response upon the undersigned counsel to the Committee so as to be received on or before the Objection Deadline.

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Osteon Holdings, Inc. (7042); Osteon Intermediate Holdings I, Inc. (7778); Osteon Intermediate Holdings II, Inc. (1292); Exactech, Inc. (3930); and XpandOrtho, Inc. (4250). The Debtors' service address is 2320 NW 66th Court, Gainesville, Florida 32653.

**PLEASE TAKE FURTHER NOTICE** THAT A HEARING ON THE MOTION WILL BE HELD ON **May 28, 2025 at 10:00 a.m. prevailing Eastern Time** BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN, IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 NORTH MARKET STREET, 6TH FLOOR, COURTROOM NO. 2, WILMINGTON, DELAWARE 19801.

Dated: May 7, 2025

**HOGAN♦McDANIEL**

/s/ *Daniel K. Hogan*
Daniel K. Hogan (No. 2814)
HOGAN♦MCDANIEL
1311 Delaware Avenue
Wilmington, DE 19806
Telephone: (302) 656-7540
Facsimile: (302) 656-7599
dkhogan@dkhogan.com

*Local Counsel to the Official*
*Committee of Unsecured Creditors*

-and –

**BROWN RUDNICK LLP**

David J. Molton (*admitted pro hac vice*)
Gerard T. Cicero (*admitted pro hac vice*)
Sigmund S. Wissner-Gross (*pro hac vice pending*)
D. Cameron Moxley (*admitted pro hac vice*)
Susan Sieger-Grimm (*admitted pro hac vice*)
Brown Rudnick LLP
7 Times Square
New York, New York 10036
Telephone: (212) 209-4800
dmolton@brownrudnick.com
gcicero@brownrudnick.com
swissner-gross@brownrudnick.com
dmoxley@brownrudnick.com
ssieger-grimm@brownrudnick.com

-and-

Eric R. Goodman (*admitted pro hac vice*)
Brown Rudnick LLP
601 Thirteenth Street NW, Ste. 600
Washington, D.C. 20005
Telephone: (202) 536-1700
egoodman@brownrudnick.com

*Counsel to the Official*
*Committee of Unsecured Creditors*

3