**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Exactech, Inc., *et al.*,[1] | Case No. 24-12441 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date:** May 28, 2025 at 10:00 a.m. (ET) |
| | **Objection Deadline:** May 21, 2025 at 4:00 p.m. (ET) |

## NOTICE OF MOTION

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") filed the attached *Debtors' Motion for Entry of an Order (I) Approving Settlement Agreement Related to Qui Tam Litigation Among Exactech, Inc., the United States of America, and Certain Relators, (II) Authorizing the Debtors to Take Any and All Actions Necessary to Effectuate the Terms Thereto, and (III) Granting Related Relief* (the "Motion") with the United States Bankruptcy Court for the District of Delaware (the "Court").

**PLEASE TAKE FURTHER NOTICE** that responses, if any, to the Motion, must be filed on or before **May 21, 2025 at 4:00 p.m. (ET)** (the "Objection Deadline") with the Court, 824 North Market Street, 6th Floor, Wilmington, Delaware 19801.  At the same time, you must serve a copy of the objection upon the undersigned counsel to the Debtors so as to be received on or before the Objection Deadline.

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Motion will be held on May 28, 2025, at 10:00 a.m. (ET) before the Honorable Laurie Selber Silverstein, in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Courtroom No. 2, Wilmington, Delaware 19801.

**PLEASE TAKE FURTHER NOTICE THAT IF NO OBJECTIONS TO THE MOTION ARE TIMELY FILED, SERVED, AND RECEIVED IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.**

*[Remainder of Page Intentionally Left Blank]*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  Osteon Holdings, Inc. (7042); Osteon Intermediate Holdings I, Inc. (7778); Osteon Intermediate Holdings II, Inc. (1292); Exactech, Inc. (3930); and XpandOrtho, Inc. (4250).  The Debtors' service address is 2320 NW 66th Court, Gainesville, Florida 32653.

Dated: May 7, 2025
      Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Elizabeth S. Justison*
Ryan M. Bartley (No. 4985)
Elizabeth S. Justison (No. 5911)
Andrew M. Lee (No. 7078)
1000 North King Street
Rodney Square
Wilmington, Delaware 19801
Tel.: (302) 571-6600
Facsimile: (302) 571-1253
Email: rbartley@ycst.com
      ejustison@ycst.com
      alee@ycst.com

-and-

**ROPES & GRAY LLP**
Ryan Preston Dahl (admitted *pro hac vice*)
Benjamin M. Rhode (admitted *pro hac vice*)
Luke Smith (admitted *pro hac vice*)
191 N. Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
E-mail: ryan.dahl@ropesgray.com
      benjamin.rhode@ropesgray.com
      luke.smith@ropesgray.com

-and-

Gregg M. Galardi (No. 2991)
Lindsay Barca (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, NY 10036
Telephone: (212) 596-9000
Facsimile: (646) 728-1652
Email: gregg.galardi@ropesgray.com
      lindsay.barca@ropesgray.com

*Co-Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Exactech, Inc., *et al*,[1] | Case No. 24-12441 (LSS) |
| | (Jointly Administered) |
| Debtors. | |
| | <u>Hearing Date</u>:  **May 28, 2025 at 10:00 a.m. (ET)** |
| | <u>Objection Deadline</u>:  **May 21, 2025 at 4:00 p.m. (ET)** |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING
SETTLEMENT AGREEMENT RELATED TO QUI TAM LITIGATION AMONG
EXACTECH, INC., THE UNITED STATES OF AMERICA, AND CERTAIN
RELATORS, (II) AUTHORIZING THE DEBTORS TO TAKE ANY AND ALL
ACTIONS NECESSARY TO EFFECTUATE THE TERMS THERETO,
<u>AND (III) GRANTING RELATED RELIEF</u>**

Exactech, Inc. ("<u>Exactech</u>") and its affiliated debtors and debtors in possession (each, a "<u>Debtor</u>" and collectively, the "<u>Debtors</u>") in the above-captioned chapter 11 cases (the "<u>Chapter 11 Cases</u>"), by and through their undersigned counsel, hereby submit this motion (this "<u>Motion</u>") for entry of an order (the "<u>Proposed Order</u>") granting the relief requested below.  In support hereof, the Debtors respectfully represent as follows:

**JURISDICTION AND VENUE**

1.      The United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  Pursuant to Rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), the Debtors confirm their consent to the

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  Osteon Holdings, Inc. (7042); Osteon Intermediate Holdings I, Inc. (7778); Osteon Intermediate Holdings II, Inc. (1292); Exactech, Inc. (3930); and XpandOrtho, Inc. (4250).  The Debtors' service address is 2320 NW 66th Court, Gainesville, Florida 32653.

entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of the Chapter 11 Cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

3.      The legal bases for the relief requested herein are sections 105(a) and 363(b) of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**RELIEF REQUESTED**

4.      By this Motion, the Debtors seek entry of the Proposed Order, in substantially the form attached hereto as **Exhibit A**, (i) authorizing the Debtors to enter into that certain settlement agreement (the "Settlement Agreement"),[2] by and among (a) Exactech, (b) the United States of America, acting through the United States Department of Justice, and on behalf of the Office of Inspector General of the Department of Health and Human Services, and the United States Department of Veterans Affairs (collectively, the "United States"), and (c) certain relators, as set forth in the Settlement Agreement (the "Relators") ((a)-(c), collectively, the "Settlement Parties"), a copy of which is attached to the Proposed Order as Exhibit 1; (ii) approving the terms of the Settlement Agreement and authorizing the Debtors to take any and all actions necessary to effectuate the terms thereto, including, but not limited to, ███████████████████ ███████████████████ and (iii) granting related relief.

---

[2]   Exactech expects that the material economic and other terms of the Settlement Agreement will not change, but, as of the filing of the Motion, was continuing to revise and finalize the final form of the Settlement Agreement with the Settlement Parties.  The Debtors will file the final, executed Settlement Agreement prior to the hearing to consider the relief requested in the Motion.

**BACKGROUND**[3]

**A.      General Background**

5.      On October 29, 2024, each Debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code.  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the official committee of unsecured creditors (the "Committee") on November 18, 2024 [Docket No. 171].  No request has been made for the appointment of a trustee or an examiner in these Chapter 11 Cases.

6.      Founded in 1985, the Debtors, together with their non-Debtor subsidiaries (collectively, the "Company"), are a global medical device company that designs, manufactures, and markets joint replacement implants and related surgical instruments to help surgeons worldwide make patients more mobile.  The Company's broad and innovative products include hip implants, knee implants, extremity implants, and ExactechGPS systems, among others.  The Company directs commercial operations in the United States as well as nine international markets, including Spain, Australia, Japan, the United Kingdom, and Italy.  The Company is headquartered in Gainesville, Florida and employs approximately 900 individuals worldwide.  Since its founding in 1985, the Company has expanded its distribution to over 30 countries.

---

[3]    Additional factual background regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to the filing of these Chapter 11 Cases, is set forth in detail in the *Declaration of Jesse York, Chief Restructuring Officer of Exactech, Inc., in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 18], and incorporated herein by reference.  Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Plan (defined below).

**B.      The Debtors' Entry into the RSA and the Stalking Horse APA**

7.      The Debtors' ability to resolve their financial situation outside of formal chapter 11 proceedings was, in part, frustrated by the overhang of certain claims asserted pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b) (the "FCA Liabilities"), and additional products liability claims.  Prior to commencing these Chapter 11 Cases, the Debtors, with the assistance of their advisors, explored various alternatives to obtain additional liquidity. Despite diligently working to access additional capital to refinance their existing indebtedness at maturity and address litigation costs, capital providers refused to provide incremental capital to the Debtors without a resolution of the FCA Liabilities and products liability claims.

8.      On October 29, 2024, prior to the commencement of these Chapter 11 Cases, the Ad Hoc Group and Debtors executed a restructuring support agreement (the "RSA"), which armed the Debtors with a path towards implementing a value-maximizing sale strategy and clear path towards a confirmable chapter 11 plan.  Under the RSA, a new entity formed by the Ad Hoc Group, EI Bidco, LLC (the "Stalking Horse Purchaser"), agreed to provide a stalking horse bid (the "Stalking Horse Bid"), which includes a credit bid of all of the DIP Claims and all of the Prepetition First Lien Claims.  The Debtors and the Stalking Horse Purchaser entered into the stalking horse asset purchase agreement (as amended, the "Stalking Horse APA") contemporaneous with entry into the RSA.

9.      The Stalking Horse Bid is the cornerstone of the Debtors' chapter 11 strategy, and the resolution of the FCA Liabilities on the terms set forth in the Settlement Agreement is crucial to the Stalking Horse Purchaser, and Exactech, because it removes the cloud of uncertainty on the Debtors' business related to the FCA Liabilities.  Exactech has spent considerable resources defending itself in connection with the FCA Liabilities and through the subsequent settlement

4

negotiations.  After years of costly litigation of the FCA Liabilities, the Debtors now contemplate a full, fair, and consensual resolution of the FCA Liabilities on the terms set forth in the Settlement Agreement.

**C.      Amended Plan**

10.      On December 31, 2024, the Debtors filed the *Joint Chapter 11 Plan of Exactech, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 390], which was subsequently amended on February 3, 2025 [Docket No. 534], March 20, 2025 [Docket No. 731], and March 24, 2025 [Docket No. 763] (as amended, the "Plan"), and a related disclosure statement [Docket No. 391], which was subsequently amended on February 3, 2025 [Docket No. 535], March 20, 2025 [Docket No. 732], March 24, 2025 [Docket No. 764] and April 1, 2025 [Docket No. 817] (as amended, the "Disclosure Statement").

11.      On April 3, 2025, the Court entered an order [Docket No. 829] approving (i) the adequacy of the Disclosure Statement, (ii) solicitation procedures in connection with the Plan, and (iii) a confirmation schedule, including scheduling a confirmation hearing for May 28, 2025.  A hearing on approval of the sale to the Stalking Horse Purchaser is also scheduled for May 28, 2025.

12.      Subject to Court approval, the Debtors anticipate closing on the sale to the Stalking Horse Purchaser on the terms set forth in the Stalking Horse APA.  Pursuant to the Stalking Horse APA, the FCA Liabilities are not Assumed Liabilities, meaning they will remain with the Debtors' estates following the closing of the sale transaction.  Under the Plan, "Qui Tam Claims" are General Unsecured Claims and are defined to include "any Claims or Causes of Action arising from any actions that have been or could be brought against, threatened, asserted, or commenced against any of the Debtors under the False Claims Act, 31 U.S.C. §§ 3729-3733, or other similar

5

or related local, state, federal, or foreign statutes and common law." Plan Art. I.76, 122. Consequently, the FCA Liabilities are General Unsecured Claims under the Plan.

**D.      The FCA Liabilities**

13.     On June 29, 2018, Brooks Wallace, Robert Farley, and Manuel Fuentes (collectively, the "Alabama Relators") filed a *qui tam* action against Exactech in the United States District Court for the Northern District of Alabama captioned *United States ex rel. Wallace v. Exactech, Inc.*, No. 7:18-cv-1010 (N.D. Ala.), pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b) (the "Alabama Action").  Among other things, the Alabama Relators alleged Exactech's Optetrak system with the Finned Tibia Tray was defective.  The Alabama Relators alleged, among other things, that Exactech caused false claims to be submitted for reimbursement from the federal government by selling allegedly misbranded knee devices and allegedly defective knee devices that were not medically reasonable and necessary.

14.     On August 7, 2019, the United States declined to intervene in the Alabama Action; however, the Alabama Relators proceeded with the case.  Exactech expended considerable resources defending the case while also engaging in several attempts to settle the dispute, including mediations with the Alabama Relators beginning in April 2022 and engagement with the United States in settlement negotiations beginning in late-October 2023 and throughout mid-2024.

15.     ███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

16.    ███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

## E.    Settlement Negotiations and Agreement

17.    The Debtors began settlement discussions to reach a consensual resolution of the FCA Liabilities with the Relators in April 2022 and with the United States in October 2023. The Debtors are seeking approval of the Settlement Agreement that is the product of these negotiations, which resolves the relevant claims and causes of action against and among the Settlement Parties in respect of the FCA Liabilities.

18.    The Debtors believe that the Settlement Agreement provides a net benefit to their estates and creditors and that, without the Settlement Agreement, the Debtors' go-forward business would be plagued with many of the challenges that prevented the Debtors from being successful prepetition. The effectiveness of the Settlement Agreement is conditioned on the closing of the

---

[4]    ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

Sale, and the amounts payable by the Debtors pursuant to the Settlement Agreement are being assumed in full as Assumed Liabilities under the Stalking Horse APA. The Settlement Agreement provides a benefit to the Debtors' estates, including by removing substantial claims from the General Unsecured Claims pool and thereby increasing the pro rata share for remaining General Unsecured Claims, and by enhancing the value of the go-forward business, without reducing any current contemplated recoveries under the Plan.

19.    To reach a resolution beneficial to all parties that also maximizes the value of the Debtors' estates, the Settlement Parties engaged in extensive good-faith, arm's-length negotiations, and Exactech expects the Settlement Parties will enter into the Settlement Agreement, subject to the United States receiving all required governmental approvals. The terms of the expected Settlement Agreement include the following:[5]

- On or before the Approved Plan Effective Date,[6] and subject to the Court's approval for Exactech to perform under the Settlement Agreement, the closing of the Sale Transaction, and the Settlement Agreement remaining in full force and effect, the Stalking Horse Purchaser, on behalf of Exactech, shall pay to the United States ███████████ ████████████████████████ $8,000,000 (the "Settlement Amount"). Exactech shall make the payments as follows: $7,640,000 to the United States ("Federal Settlement Amount"), of which $7,640,000 is restitution, by wire transfer pursuant to written instructions provided by the Civil Division of the United States Department of Justice ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

[5]    The following summary is provided for illustrative purposes only and is qualified in its entirety by reference to the Settlement Agreement, attached to the Proposed Order as Exhibit 1. In the event of any inconsistency between the summary and Settlement Agreement, the Settlement Agreement controls in all respects. Capitalized terms used but not otherwise defined in this section shall have the meanings ascribed to such terms in the Settlement Agreement.

[6]    "Approved Plan Effective Date" is defined in the Settlement Agreement as "the date on which the Approved Plan becomes effective in accordance with its terms." Settlement Agreement, Exh. A. "Approved Plan" is defined as "a chapter 11 plan for Exactech that is consistent in all material respects with this Agreement and incorporates the settlement set forth in this Agreement." Id.

- Conditioned upon the United States receiving the Federal Settlement Amount, and as set forth more fully in the Settlement Agreement, the Settlement Agreement provides that the United States shall make certain payments to the Relators by electronic funds transfer (each such share, the "Relators' Share").

- Subject to the entry of the Proposed Order, the closing of the Sale Transaction, and the Settlement Agreement remaining in full force and effect, the Stalking Horse Purchaser, on behalf of Exactech, shall pay the Relators' reasonable expenses, attorneys' fees and costs, up to $660,000 in the aggregate, in full and final satisfaction of such reasonable expenses, attorneys' fees, and costs.

- Subject to approval of the Settlement Agreement by the Court, the Settlement Parties expect to agree to various mutual releases, as set forth below and more fully in the Settlement Agreement:

  ° Subject to certain exceptions set forth in the Settlement Agreement, and upon the United States' receipt of the Federal Settlement Amount, the Settlement Agreement provides that the United States will release Exactech, together with its current and former parent corporations; direct and indirect subsidiaries; brother or sister corporations; divisions; current or former corporate owners; and the corporate successors and assigns of any of them, from any civil or administrative monetary claim the United States has for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; or the common law theories of payment by mistake, unjust enrichment, and fraud.

  ° Subject to certain exceptions set forth in the Settlement Agreement, and upon the United States' receipt of the Federal Settlement Amount, Relators, for themselves and for their heirs, successors, attorneys, agents, and assigns, release Exactech, together with its current and former parent corporations; direct and indirect subsidiaries, brother or sister corporations, divisions, any acquirers of Exactech's assets or business (including any successful bidder in the Bankruptcy Proceedings and its owners, members, or partners (including any investment managers thereof)), each of the foregoing's direct or indirect subsidiaries, the corporate successors and assigns of any of the foregoing, and each of the foregoing's respective current and former directors, officers, and employees (the "Exactech Releasees") from claims for relief, actions, rights, causes of action, suits, debts, obligations, liabilities, demands, losses, damages, costs and expenses of any kind, whether known or unknown as of the Approved Plan Effective Date that any Relator has, may have, could have asserted, or may assert in the future against the Exactech Releasees on their behalf, on behalf of the United States, on behalf of any state or local government or sovereign, or on behalf of any other person or entity, including but not limited to any claim relating to in any way the Covered Conduct, the allegations in ▮▮▮▮▮▮▮▮▮▮▮▮, the investigation and prosecution of this matter, or the negotiation of the Settlement Agreement, any claims for attorneys' fees, costs, or expenses, including under 31 U.S.C. § 3730(d) or any other state or local law that is similar, comparable, or equivalent to 31 U.S.C. § 3730(d) (including, without limitation, the law governing each claim set forth in the qui tam complaint),

including all liability, claims, demands, actions or causes of action existing as of the Approved Plan Effective Date, fixed or contingent, in law or in equity, in contract or in tort, or under any federal or state statute, regulation, or common law, and from any civil monetary claim the Relators have on behalf of the United States for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733.

° Conditioned upon the Relators' receipt of their respective Relators' Share, the Relators and their heirs, successors, attorneys, agents, and assigns fully and finally release, waive, and forever discharge the United States, its agencies, officers, agents, employees, and servants, from any claims arising from the filing of the Civil Action or under 31 U.S.C. § 3730, and from any claims to a share of the proceeds of this Agreement and/or the FCA Liabilities (as set forth in the Settlement Agreement).

° The Relators, for themselves, and for their heirs, successors, attorneys, agents, and assigns, release the Exactech Releasees from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated, outside of those contemplated in a separate agreement that Exactech and Relators will enter into contemporaneously with the Settlement Agreement) that Relators have asserted, could have asserted, or may assert in the future against Exactech related to the FCA Liabilities (as set forth in the Settlement Agreement) or the Covered Conduct and Relators' investigation thereof, or any liability to the Relators arising from the filing of the FCA Liabilities (as set forth in the Settlement Agreement), or under 31 U.S.C. § 3730(d) for expenses or attorneys' fees and costs.

° Exactech will fully and finally release the United States, its agencies, officers, agents, employees, and servants from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that Exactech has asserted, could have asserted, or may assert in the future against the United States, its agencies, officers, agents, employees, and servants related to the Covered Conduct or the United States' investigation or prosecution thereof.

° Conditioned on the effectiveness of the releases in Paragraphs 4 and 5 of the Settlement Agreement and subject to the reservation at the end of this Paragraph, Exactech fully and finally releases the Relators and their heirs, successors, attorneys, agents, and assigns from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that Exactech has asserted, could have asserted, or may assert in the future against Relators related to the Covered Conduct and Relator's investigation or prosecution thereof; *provided* that the releases described in this paragraph shall be withdrawn and rescinded without need for further action by Exactech if the Relators' releases described in Paragraph 5 of the Settlement Agreement are rescinded for any reason.

• Exactech agrees not to charge Unallowable Costs directly or indirectly to any contracts with the United States or any States Medicaid project and to identify any Unallowable Costs included in payments that were previously sought.  The United States, at a minimum, shall be entitled to recoup from Exactech any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously submitted cost reports, information reports, cost statements, or requests for payment.

10

- Upon receipt by the United States of the Federal Settlement Amount, the Relators and Exactech shall promptly sign and file in the Alabama Action ███████████████ a Joint Stipulation of Dismissal of Exactech pursuant to Rule 41(a)(1).

- The Settlement Agreement is expressly conditioned on the Court's approval.

**BASIS FOR RELIEF**

**I.    Approval of the Settlement Agreement Is Warranted Pursuant to Bankruptcy Rule 9019**

20.    Bankruptcy Rule 9019(a) provides, in relevant part:

> On motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement.  Notice shall be given to creditors, the United States trustee, … and indenture trustee as provided in Rule 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019(a).

21.    Settlements and compromises are "a normal part of the process of reorganization." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 428 (1968).  It is well settled that in order to "minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy.'" *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (quoting 9 *Collier on Bankruptcy* ¶ 9019.03[1] (15th ed. 1993)); *see also Will v. Northwestern Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006) (finding that "[s]ettlements are favored [in bankruptcy]"); *In re Adelphia Commc'n Corp.*, 361 B.R. 337, 348 (Bankr. D. Del. 2007) (same).  Accordingly, when required, "courts are able to craft flexible remedies that, while not expressly authorized by the [Bankruptcy] Code, affect the result the [Bankruptcy] Code was designed to obtain." *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003).

22.    Pursuant to Bankruptcy Rule 9019(a), a bankruptcy court may, after appropriate notice and a hearing, approve a compromise or settlement so long as the proposed settlement is fair, reasonable, and in the best interest of the estate.  *See In re Marvel Entm't Grp., Inc.*, 222 B.R.

243, 249 (D. Del 1998) ("[T]he ultimate inquiry [is] whether 'the compromise is fair, reasonable, and in the interest of the estate.'" (citation omitted)); *In re Northwestern Corp.*, 2008 WL 2704341, at *6 (Bankr. D. Del. July 10, 2008) ("[T]he bankruptcy court must determine whether the compromise is fair, reasonable, and in the best interests of the estate.") (citation omitted); *In re Key3Media Grp., Inc.*, 336 B.R. 87, 92 (Bankr D. Del. 2005) ("[T]he bankruptcy court has a duty to make an informed, independent judgment that the compromise is fair and equitable."). "Ultimately, the decision whether or not to approve a settlement agreement lies within the sound discretion of the Court." *In re Nortel Networks, Inc.*, 522 B.R. 491, 510 (Bankr. D. Del. 2014).

23.     In *Martin*, the United States Court of Appeals for the Third Circuit set forth a four-factor balancing test under which bankruptcy courts are to analyze proposed settlements.  The factors the Court must consider are: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Martin,* 91 F.3d at 393; *see also In re Nutraquest,* 434 F.3d at 645 ("[T]here are several cases applying these four factors to settlements of claims against debtors"); *Key3Media*, 336 B.R. at 93 (when determining whether a compromise is in the best interests of the estate, courts must "assess and balance the value of the claim that is being compromised against the value of the estate of the acceptance of the compromise proposal").  No one factor is determinative, and a court should "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." *Martin*, 91 F.3d at 393.

24.     Courts should consider the best interest of creditors, with proper deference to their reasonable views, and consider the extent to which the settlement is truly the product of arms-length bargaining and not of fraud or collusion. *See Cajun Elec. Power Coop., Inc. v. Official*

*Comm. of Unsecured Creditors (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 356 (5th Cir. 1997).    The bankruptcy court does not engage in an independent investigation into the reasonableness of the proposed settlement, but instead "relies heavily on" the trustee or debtor in possession and the court generally defers to the trustee's or debtor in possession's judgment provided there is "a legitimate business justification" for the settlement. *Martin*, 91 F.3d at 395. Courts should approve a debtor's settlement if the settlement is in the best interest of the estate. *See In re Marvel Ent. Grp., Inc.*, 222 B.R. 243, 249 (D. Del. 1998).

25.    Importantly, it is well-established that a settlement proponent need not convince the court that a settlement is the best possible compromise, but only that the settlement falls "within the reasonable range of litigation possibilities somewhere above the lowest point in the range of reasonableness." *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 833 (Bankr. D. Del. 2008); *see also In re W.R. Grace & Co.*, 475 B.R. 34, 77-78 (Bankr. D. Del. 2012) ("In analyzing the compromise or settlement agreement under the *Martin* factors, courts should not have a 'mini-trial' on the merits, but rather should canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness."); *Nortel*, 522 B.R. at 510 ("The Court finds that there are persuasive arguments and authorities on both sides and is convinced that the Settlement Agreement, which effectively splits the [dispute] down the middle, falls within the reasonable range of litigation possibilities.") (internal citation omitted).

26.    The Settlement Agreement satisfies the *Martin* factors and should be approved. *First*, the Settlement Agreement resolves myriad legal issues and claims among the Settlement Parties, the probability of success of which is highly speculative.  The outcome with the highest probability under the circumstances of these Chapter 11 Cases is mutually-assured destruction that would result in millions of dollars spent on litigating various claims, the result of which would put

the Settlement Parties in no better place—and indeed, a much worse place—than the Settlement Agreement affords. The Debtors anticipate closing on a sale of substantially all of their assets in the coming months to the Stalking Horse Purchaser. The FCA Liabilities are not Assumed Liabilities under the Stalking Horse APA, meaning they would remain with the Debtors' estates following the closing. The claims related to the FCA Liabilities are General Unsecured Claims under the Debtors' proposed Plan. Absent the Settlement Agreement, the Debtors anticipate that the United States and the Relators would file significant claims that would cut into the already limited pool of assets available for distribution to holders of General Unsecured Claims. Accordingly, the probability of success factor weighs heavily in favor of the settlement.

27. The second factor—the likely difficulties in collection—is irrelevant here because, if not for the Settlement Agreement, the Debtors would not be seeking to collect from a third party. *See, e.g., In re Nutraquest*, 434 F.3d 639 (applying only the first, third, and fourth *Martin* factors when considering a settlement of claims against the debtors). Instead, the United States and the Relators would be seeking to collect from the Debtors.

28. *Third*, the issues that are likely to arise in the course of litigation are complex, multi-party issues. Litigating the FCA Liabilities would magnify the duration and complexity of these Chapter 11 Cases and severely strain the resources available to the Debtors. Further, the Settlement Agreement would allow the Debtors, with the consent of the DIP Lenders, to pivot from a sale of substantially all assets to a plan of reorganization if such a pivot were necessary due to certain potential issues regarding the Debtors' overseas certifications and licensing.[7] Absent a

---

[7] *See* Disclosure Statement at 24-25 (disclosing that, "[a]lthough there is not present intention to do so, the Debtors may, with the consent of the Required Consenting Lenders, modify the Plan to provide for a reorganization of the Debtors rather than a sale of substantially all assets. In the event the Debtors pivot to a reorganization of the Debtors and away from a sale of all or substantially all assets, the Debtors anticipate that the treatment of all Claims and Interests would remain as currently set forth in the Plan with the exception of the treatment of (1) DIP

settlement, the Debtors may not have an avenue to discharge the FCA Liabilities, therefore complicating their ability to pursue a reorganization as it would leave the go-forward entity saddled with the same litigation. If the Debtors need to pursue a reorganization rather than a sale to address potential certification and licensing issues, the settlement of the FCA Liabilities is therefore a potential prerequisite to this pivot and accomplishing this settlement now prevents any attendant delay in these Chapter 11 Cases. The Settlement Parties are all sophisticated parties represented by experienced legal counsel. The litigation involved in adjudicating the myriad issues and claims among those parties would undoubtedly be complex and exceedingly cost-intensive. What is more, certain of these issues could jeopardize the Debtors' go-forward business.

29.     Lastly, the settlement is in the best interest of creditors. The FCA Liabilities were one of the Debtors' biggest challenges to successfully implementing an out-of-court restructuring. The Settlement Agreement enhances the value of the Debtors' business, which is clearly in the best interest of the Debtors' secured lenders, go-forward vendors, contract counterparties, and employees. The Settlement Agreement ensures that one of the Debtors' most significant and consistent challenges is resolved, such that the Debtors' go-forward operations will not be plagued by costly and time-consuming litigation needed to resolve the FCA Liabilities outside of this Settlement Agreement. Further, the Settlement Agreement is a key stepping stone towards ensuring a cooperative relationship with the government. Working with government regulators is a constant requirement in the Debtors' industry, and maintaining a positive working relationship with the government is undeniably beneficial for the Debtors' go-forward business. The Stalking Horse Purchaser, as the future owner of substantially all of the Debtors' assets (subject to Court

---

Claims, and (2) Prepetition Pari 1L Claims, which claims would receive takeback debt issued by the reorganized Debtors and 100% of the equity interests of the reorganized Debtors.").

approval of the sale transaction), is in full support of the Settlement Agreement, and the effectiveness of the Settlement Agreement is conditioned on the closing of the sale to the Stalking Horse Purchaser.  Additionally, the Settlement Agreement is in the best interest of the General Unsecured Creditors.  Without the Settlement Agreement, the claims arising from the FCA Liabilities will constitute General Unsecured Claims under the Plan, thereby reducing the resources available for other holders of General Unsecured Claims.  Through the proposed settlement, subject to certain conditions, the Stalking Horse Purchaser will assume the liability related to the Settlement Amount, so no estate resources will be expended towards the Settlement Amount, even though it will result in a direct reduction of claims against the Debtors' estates.  As a result, holders of General Unsecured Claims will be better off as a result of the Settlement Agreement.

30.     In sum, in the Debtors' business judgment, the terms set forth in the Settlement Agreement are reasonable and in the best interests of the Debtors, their estates, and creditors and other parties in the Chapter 11 Cases.  The Settlement Agreement, and the Debtors' decision to enter into it, paves the way for the Debtors to be successful post-emergence.  The compromise embodied in the Settlement Agreement is the product of extensive good-faith and arm's-length negotiations between the Settlement Parties and should be approved.

31.     Accordingly, the Debtors respectfully submit that the *Martin* factors are met, the Settlement Agreement falls well within the "range of reasonableness," and, therefore, the Settlement Agreement should be approved pursuant to Bankruptcy Rule 9019.

**II.     The Settlement Agreement Should be Approved Pursuant to Sections 105 and 363 of the Bankruptcy Code**

32.     The Debtors seek authority to enter into the Settlement Agreement and take all necessary actions to effectuate its terms as contemplated therein, including, but not limited to, the

granting of mutual releases between the Settlement Parties as provided for under the Settlement Agreement pursuant to sections 105(a) and 363(b) of the Bankruptcy Code.

33. Section 105(a) grants bankruptcy courts broad authority to enforce the provisions of the Bankruptcy Code under equitable common law doctrines, providing, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

34. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under applicable law in this Circuit, if a debtor's proposed good faith use of the debtor's assets pursuant to section 363(b) is supported by the debtor's reasonable business judgment, such use should be approved. *See In re Abbotts Dairies of Penn., Inc.,* 788 F.2d 143, 149-50 (3d Cir. 1986) (requiring a finding of "good faith" to approve a sale under § 363(b)); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp.* (*In re Montgomery Ward Holding Corp.*), 242 B.R. 147, 153 (D. Del. 1999) (applying sound business judgment standard under section 363(b) of the Bankruptcy Code); *In re Decora Indus., Inc.*, No 00-4459, 2002 WL 32332749 (D. Del. May 20, 2002) ("[g]enerally, a debtor may sell assets outside of the ordinary course of business when it has demonstrated that the sale of such assets represents the sound exercise of business judgment"); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (examining the history of the standard required for a sale of assets under section 363(b) and opining that the Third Circuit has implicitly abandoned the "emergency" test under earlier precedent and has adopted the "sound business judgment" test).

35. Substantial business justification exists for the Debtors' entry into the Settlement Agreement. Specifically, entry into the Settlement Agreement brings finality and closure to the

17

Settlement Parties' outstanding disputes and benefits the Debtors' estates by resolving what would otherwise be expensive, time-consuming litigation in favor of an efficient, expeditious, and value-maximizing resolution.

36.    Further, the resolution of the FCA Liabilities via the Settlement Agreement is beneficial to the Debtors even if the Debtors would not incur substantial litigation costs.  Without the resolution of the FCA Liabilities, the Debtors' go-forward business would be harmed through, for example, a strained relationship with the government.  In the context of these Chapter 11 Cases, the Settlement Agreement is particularly valuable because it allows the Debtors to preserve flexibility with regards to the conclusion of these Chapter 11 Cases and it preserves value for the Debtors' creditors, whose interests are of paramount importance.  The Settlement Agreement will be funded through assets contributed directly by the Stalking Horse Purchaser; without the Settlement Agreement, claims of the FCA Liabilities would be General Unsecured Claims, and such claims would substantially decrease the pool of resources available for other holders of General Unsecured Claims.  Consequently, significant business justification exists for the Debtors to enter the Settlement Agreement in the context of both the Debtors' go-forward business and these Chapter 11 Cases.  Overall, the consensual resolution of the Settlement Parties' issues pursuant to the Settlement Agreement provides for a far more favorable result for the Debtors in the long-term than if the Settlement Agreement was not approved.

37.    The Settlement Parties entered into the Settlement Agreement after extensive negotiations and with the assistance of counsel and professional advisors.  The Debtors believe that the terms set forth in the Settlement Agreement are the most favorable terms the Debtors could obtain under the circumstances.  Under these circumstances, the Debtors, in their business

judgment, have determined that entering into the Settlement Agreement, is necessary to maximize value for their estates.

**Waiver of Fourteen-Day Stay Period Under Fed. R. Bankr. P. 6004(h)**

38.     Bankruptcy Rule 6004(h) provides, in relevant part, that an "order authorizing the use, sale, or lease of property … is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." The Debtors request that the Proposed Order be effective immediately by providing that the fourteen-day stay period under Bankruptcy Rule 6004(h) is waived.

39.     The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, Collier on Bankruptcy suggests that the fourteen-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev., ¶ 6004.10 (L. King, 15th rev. ed. 1988). Promptly executing and implementing the Settlement Agreement is of critical importance to the Debtors' efforts to successfully and efficiently exit chapter 11. There will be no prejudice to any party from the waiver of the fourteen-day stay.

**<u>NOTICE</u>**

40.     The Debtors will provide notice of this Motion to: (a) the U.S. Trustee; (b) counsel to the Prepetition First Lien Agent and the DIP Agent; (c) counsel to the Ad Hoc Group; (d) counsel to the Sponsor; (e) counsel to the Committee; (f) the Settlement Parties; and (g) any party that has

requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature

of the relief requested, no other or further notice need be given.

*[Remainder of Page Intentionally Left Blank]*

20

**WHEREFORE**, the Debtors respectfully request entry of the Proposed Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other relief as is just and proper.

Dated: May 7, 2025
Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

/s/ Elizabeth S. Justison
Ryan M. Bartley (No. 4985)
Elizabeth S. Justison (No. 5911)
Andrew M. Lee (No. 7078)
1000 North King Street
Rodney Square
Wilmington, Delaware 19801
Tel.: (302) 571-6600
Facsimile: (302) 571-1253
Email: rbartley@ycst.com
        ejustison@ycst.com
        alee@ycst.com

-and-

**ROPES & GRAY LLP**
Ryan Preston Dahl (admitted *pro hac vice*)
Benjamin M. Rhode (admitted *pro hac vice*)
Luke Smith (admitted *pro hac vice*)
191 N. Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
E-mail: ryan.dahl@ropesgray.com
        benjamin.rhode@ropesgray.com
        luke.smith@ropesgray.com

-and-

Gregg Galardi (No. 2991)
Lindsay Barca (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, NY 10036
Telephone: (212) 596-9000
Facsimile: (646) 728-1652
Email: gregg.galardi@ropesgray.com
        lindsay.barca@ropesgray.com

*Co-Counsel to the Debtors and Debtors in Possession*

**EXHIBIT A**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Exactech, Inc., *et al*,[1] | Case No. 24-12441 (LSS) |
| Debtors. | (Jointly Administered) |
| | Ref. Docket No. __ |

**ORDER (I) APPROVING SETTLEMENT AGREEMENT RELATED TO QUI TAM
LITIGATION AMONG EXACTECH, INC., THE UNITED STATES OF AMERICA,
AND CERTAIN RELATORS, (II) AUTHORIZING THE DEBTORS TO TAKE ANY
AND ALL ACTIONS NECESSARY TO EFFECTUATE THE TERMS THERETO,
AND (III) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "Motion")[2] of the above-captioned debtors and

debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"), pursuant to

sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019, approving the

Settlement Agreement, a copy of which is attached hereto as Exhibit 1; and it appearing that this

Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 1334 and 157, and the

*Amended Standing Order of Reference* from the United States District Court for the District of

Delaware, dated February 29, 2012; and it appearing that this is a core matter pursuant to 28 U.S.C.

§ 157(b)(2) and that this Court may enter a final order consistent with Article III of the United

States Constitution; and it appearing that venue of the Chapter 11 Cases and of the Motion is proper

pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that due and adequate notice of the

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
      number are:  Osteon Holdings, Inc. (7042); Osteon Intermediate Holdings I, Inc. (7778); Osteon Intermediate
      Holdings II, Inc. (1292); Exactech, Inc. (3930); and XpandOrtho, Inc. (4250).  The Debtors' service address is
      2320 NW 66th Court, Gainesville, Florida 32653.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the
      Motion.

Motion has been given under the circumstances, and that no other or further notice need be given; and this Court having determined that the relief requested in the Motion, and the settlement and compromises set forth in the Settlement Agreement, are fair, reasonable, and in the best interests of the Debtors, their estates, their creditors, and all other parties in interest; and having determined that the Settlement Agreement was negotiated in good faith and at arm's length between the Settlement Parties and that entry into the Settlement Agreement is an appropriate exercise of the Debtors' business judgment; and having determined that the Settlement Agreement falls above the lowest point in the range of reasonableness and meets the standard of approval under section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1. The Motion is GRANTED as set forth herein.

2. Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019, (a) the Debtors are authorized to enter into the Settlement Agreement; and (b) the Debtors are authorized to take any and all actions necessary to effectuate the terms contemplated by the Settlement Agreement, including, but not limited to, by entering into ████████████ ████████████ without further order of this Court.

3. Notwithstanding anything in this Order or the Settlement Agreement to the contrary, the Settlement Agreement shall not be effective until the Sale Transaction to the Stalking Horse Purchaser closes.

4. To the extent this Court approves the Sale Transaction, and the Settlement Agreement remains in full force and effect, the Debtors' obligation to pay (i) the Settlement Amount and (ii) the Relators' reasonable expenses, attorneys' fees, and costs, solely in an amount

of $660,000, pursuant to the Settlement Agreement shall be Assumed Liabilities (as defined in the Stalking Horse APA) under the Stalking Horse APA and shall be paid by the Stalking Horse Purchaser or its designees at the closing of the Sale Transaction.

5.      Notwithstanding any provision in the Bankruptcy Rules to the contrary: (a) this Order shall be effective immediately and enforceable upon its entry; (b) the Debtors are not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order; and (c) the Debtors are authorized and empowered to, and may in their discretion and without further delay, execute and deliver all instruments and documents, and take such other action as may be necessary or appropriate, to implement and effectuate the relief granted by this Order.

6.      This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Order or the Settlement Agreement.

## Exhibit 1

**Settlement Agreement**

SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into among the United States of America, acting through the United States Department of Justice, and on behalf of the Office of Inspector General ("OIG-HHS") of the Department of Health and Human Services ("HHS"), and the United States Department of Veterans Affairs ("VA") (collectively, the "United States"); Exactech, Inc. ("Exactech"); Brooks Wallace, Robert Farley, and Manuel Fuentes (collectively, the "Alabama Relators"); ████████████████████████████ (collectively, "the Parties"), through their authorized representatives.

RECITALS

A.      Exactech is a medical device company based in Gainesville, Florida, that develops and markets joint-replacement implants.  Among the implants that Exactech has marketed are the Optetrak, Logic, and Truliant knee prostheses systems, which are used in total-knee replacement surgery.

B.      On June 29, 2018, the Alabama Relators filed a *qui tam* action against Exactech in the United States District Court for the Northern District of Alabama captioned *United States ex rel. Wallace v. Exactech, Inc.*, No. 7:18-cv-1010 (N.D. Ala.), pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b) (the "Alabama Action").  Among other things, the Alabama Relators alleged the Optetrak system with the Finned Tibia Tray was defective.  On August 7, 2019, the United States declined to intervene in the Alabama Action.

C.      The Alabama Relators contend that Exactech submitted or caused to be submitted claims for payment to the Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395lll ("Medicare"); the Medicaid Program, 42 U.S.C. §§ 1396-1396w-5 ("Medicaid"); and the VA, 38 U.S.C. Chapter 17.

D.      The Alabama Relators contend that the United States has certain civil claims against Exactech arising from false claims that Exactech submitted or caused to be submitted to Medicare, Medicaid, and the VA based on the following alleged conduct (referred to herein as the "Alabama Action Covered Conduct"):

> Starting in 1994, Exactech marketed and sold the Optetrak family of total knee replacement systems.  One component of a total knee replacement system is the "tibial tray," which is a metal component that fits into a patient's tibia.  Exactech offered a tibial tray with fins, which Exactech called the "Finned Tibial Tray," as part of the Optetrak system.
>
> By January 1, 2008, Exactech allegedly was aware that the Finned Tibial Tray failed prematurely at a higher than acceptable rate and was not reasonable and necessary for use during total-knee replacement surgeries performed on Medicare, Medicaid, and VA beneficiaries.  Exactech continued to market and sell the Finned Tibial Tray for use during total-knee replacement surgeries for Medicare, Medicaid, and VA beneficiaries.  The relevant Finned Tibial Tray components are those that were used in knee replacement surgeries of Medicare, Medicaid, and VA beneficiaries between January 1, 2008, and December 31, 2018.

E.

F.      On October 29, 2024, Exactech and certain of its affiliated debtors each filed voluntary petitions for relief pursuant to chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") in the case styled, *In re Exactech, Inc., et al*, Bankruptcy Case No. 24-12441 (LSS) (Bankr. Del.)(the "Bankruptcy Proceedings").  Only the Exactech debtor is a party

to this Agreement.  Exactech is operating its business and managing its properties as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.





I.    This Settlement Agreement is neither an admission of liability by Exactech nor a concession by the United States that its claims are not well founded.

J.    Together the Alabama Relators ████████████████ are referred to as "Relators."  Relators claim entitlement under 31 U.S.C. § 3730(d) to a share of the proceeds of this Settlement Agreement and to Relators' reasonable expenses, attorneys' fees, and costs.

K.    The Parties have negotiated this Agreement in good faith and at arm's length and will seek approval of the Agreement, with the consent of the DIP Lenders, by the  Bankruptcy Court overseeing the  Bankruptcy Proceedings, which approval may be included in the Bankruptcy Court's order confirming the Approved Plan, which will incorporate the terms of this Agreement and the transactions contemplated hereunder.

To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, and in consideration of the mutual promises and obligations of this Settlement Agreement, the Parties agree and covenant as follows:

TERMS AND CONDITIONS

1.      On or before the Approved Plan Effective Date, and subject to the Bankruptcy Court's approval for Exactech to perform under this Agreement, Exactech shall pay to the United States ███████████████████████████████████, $8,000,000 as specified in this Paragraph 1 (the "Settlement Amount").  Exactech shall make the payment due under this Paragraph 1 as follows:  $7,640,000 to the United States ("Federal Settlement Amount"), of which $7,640,000 is restitution, by wire transfer pursuant to written instructions provided by the Civil Division of the United States Department of Justice ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████.

2.      Conditioned upon the United States receiving the Federal Settlement Amount, the United States agrees that it shall pay:

a.      $____ to Alabama Relators by electronic funds transfer ("Alabama Relators' Share") as soon as feasible after receipt of the payment from Exactech.

████████████████████████████████████████████████████████

████████████████████████████████████

3.      **[Relators negotiate**: Exactech has agreed to pay Relators' reasonable expenses, attorneys' fees and costs, as contemplated by 31 U.S.C. § 3730(d) and comparable provisions of any applicable state statutes and will do so subject to terms set forth in a separate agreement that

Exactech and Relators will enter into contemporaneously with this agreement.  Notwithstanding anything in this Agreement to the contrary, neither Exactech nor any of the Exactech Releasees (as defined below) shall be obligated to pay any of the Relators' expenses, attorneys' fees, and costs in excess of $660,000 in the aggregate in full and final satisfaction of such expenses, attorneys' fees, and costs.  No additional attorneys' fees, expenses, or costs, whether related to 31 U.S.C. § 3730(d) or otherwise, shall be paid to or claimed by Relators or their counsel.

4.      Subject to the exceptions in Paragraph 6 (concerning reserved claims) below, and subject to Paragraph 11 (concerning disclosure of assets), Paragraph 20 (concerning default), and Paragraph 21 (concerning bankruptcy) below, and upon the United States' receipt of the Federal Settlement Amount, the United States releases Exactech, together with its current and former parent corporations; direct and indirect subsidiaries; brother or sister corporations; divisions; current or former corporate owners; and the corporate successors and assigns of any of them ("Exactech Federal Releasees"), from any civil or administrative monetary claim the United States has for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; or the common law theories of payment by mistake, unjust enrichment, and fraud.

5.      **[Relators negotiate:**  Subject to the exceptions in Paragraph 6 below, and subject to Paragraph 11 (concerning disclosure of assets), Paragraph 20 (concerning default), and] Paragraph 21 (concerning bankruptcy) below, and upon the United States' receipt of the Settlement Amount, Relators, for themselves and for their heirs, successors, attorneys, agents, and assigns, releases Exactech, together with its current and former parent corporations; direct and indirect subsidiaries, brother or sister corporations, divisions, any acquirers of Exactech's

6

assets or business (including any successful bidder in the Bankruptcy Proceedings and its owners, members, or partners (including any investment managers thereof)), each of the foregoing's direct or indirect subsidiaries, the corporate successors and assigns of any of the foregoing, and each of the foregoing's respective current and former directors, officers, and employees (the "Exactech Releasees") from claims for relief, actions, rights, causes of action, suits, debts, obligations, liabilities, demands, losses, damages, costs and expenses of any kind, whether known or unknown as of the Approved Plan Effective Date that any Relator has, may have, could have asserted, or may assert in the future against the Exactech Releasees on their behalf, on behalf of the United States, on behalf of any state or local government or sovereign, or on behalf of any other person or entity, including but not limited to any claim relating to in any way the Covered Conduct, the allegations in ██████████████, the investigation and prosecution of this matter, or the negotiation of this Agreement, any claims for attorneys' fees, costs, or expenses, including under 31 U.S.C. § 3730(d) or any other state or local law that is similar, comparable, or equivalent to 31 U.S.C. § 3730(d) (including, without limitation, the law governing each claim set forth in the qui tam complaint), including all liability, claims, demands, actions or causes of action existing as of the Approved Plan Effective Date, fixed or contingent, in law or in equity, in contract or in tort, or under any federal or state statute, regulation, or common law, and from any civil monetary claim the Relators have on behalf of the United States for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733.

6.      Notwithstanding the releases given in Paragraph 4  of this Agreement, or any other term of this Agreement, the following claims and rights of the United States are specifically reserved and are not released:

    a.      Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

7

b.  Any criminal liability;

c.  Except as explicitly stated in this Agreement, any administrative liability or enforcement right, including mandatory or permissive exclusion from Federal health care programs;

d.  Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

e.  Any liability based upon obligations created by this Agreement; and

f.  Any liability of individuals or entities other than the Exactech Federal Releasees, including any liability of TPG, Inc. and its current and former parent corporations; direct and indirect subsidiaries; brother or sister corporations; divisions; current or former corporate owners; and the corporate successors and assigns of any of them;

g.  Any liability for failure to deliver goods or services due; and

h.  Any liability for personal injury or property damage or for other consequential damages arising from the Covered Conduct.

7.  Relators, for themselves and for their heirs, successors, attorneys, agents, and assigns shall not object to this Agreement but agree and confirm that this Agreement is fair, adequate, and reasonable under all the circumstances, pursuant to 31 U.S.C. § 3730(c)(2)(B).

8.  Conditioned upon the Alabama Relators' receipt of the Alabama Relators' Share, the Alabama Relators and their heirs, successors, attorneys, agents, and assigns fully and finally release, waive, and forever discharge the United States, its agencies, officers, agents, employees, and servants, from any claims arising from the filing of the Civil Action or under 31 U.S.C.

8

§ 3730, and from any claims to a share of the proceeds of this Agreement, the Alabama Civil Action ███████████████████████.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████

10.     **[Relators negotiate:  The Relators, for themselves, and for their heirs, successors, attorneys, agents, and assigns, release the Exactech Releasees from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated, outside of those contemplated in a separate agreement that Exactech and Relators will enter into contemporaneously with this agreement) that Relators have asserted, could have asserted, or may assert in the future against Exactech related to the Alabama Civil Action ███████████ ████ or the Covered Conduct and Relators' investigation thereof, or any liability to the Relators arising from the filing of the Alabama Civil Action █████████████████, or under 31 U.S.C. § 3730(d) for expenses or attorneys' fees and costs.]**

11.     Exactech has provided sworn financial disclosures and supporting documents (together "Financial Disclosures") to the United States and the United States has relied on the accuracy and completeness of those Financial Disclosures in reaching this Agreement.  Exactech warrants that the Financial Disclosures are complete, accurate, and current as of the Effective Date of this Agreement.  If the United States learns of asset(s) in which Exactech had an interest of any kind as of the Effective Date of this Agreement (including, but not limited to, promises by

insurers or other third parties to satisfy Exactech's obligations under this Agreement) that were not disclosed in the Financial Disclosures, or if the United States learns of any false statement or misrepresentation by Exactech on, or in connection with, the Financial Disclosures, and if such nondisclosure, false statement, or misrepresentation changes the estimated net worth set forth in the Financial Disclosures by $5,000,000 or more, the United States may at its option:  (a) rescind this Agreement and reinstate its suit or file suit based on the Covered Conduct or (b) collect the full Settlement Amount in accordance with the Agreement plus one hundred percent (100%) of the net value of Exactech's previously undisclosed assets.  Exactech agrees not to contest any collection action undertaken by the United States pursuant to this provision, and agrees that it will immediately pay the United States the greater of (i) a ten-percent (10%) surcharge of the amount collected in the collection action, as allowed by 28 U.S.C. § 3011(a), or (ii) the United States' reasonable attorneys' fees and expenses incurred in such an action.  In the event that the United States, pursuant to this paragraph rescinds this Agreement, Exactech waives and agrees not to plead, argue, or otherwise raise any defenses under the theories of statute of limitations, laches, estoppel, or similar theories, to any civil or administrative claims that (a) are filed by the United States within 120 calendar days of written notification to Exactech that this Agreement has been rescinded, and (b) relate to the Covered Conduct, except to the extent these defenses were available on June 29, 2018.

12.     Exactech waives and shall not assert any defenses Exactech may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment

10

of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action.

13.     Exactech fully and finally releases the United States, its agencies, officers, agents, employees, and servants from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that Exactech has asserted, could have asserted, or may assert in the future against the United States, its agencies, officers, agents, employees, and servants related to the Covered Conduct or the United States' investigation or prosecution thereof.

14.     Conditioned on the effectiveness of the releases in Paragraphs 4 and 5 of this Agreement and subject to the reservation at the end of this Paragraph, Exactech fully and finally releases the Relators and their heirs, successors, attorneys, agents, and assigns from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that Exactech has asserted, could have asserted, or may assert in the future against Relators related to the Covered Conduct and Relator's investigation or prosecution thereof; *provided* that the releases described in this paragraph shall be withdrawn and rescinded without need for further action by Exactech if the Relators' releases described in Paragraph 5 of this Agreement are rescinded for any reason.

15.     The Settlement Amount shall not be decreased as a result of the denial of claims for payment now being withheld from payment by any Medicare contractor (e.g., Medicare Administrative Contractor, fiscal intermediary, carrier, the VA, or any state payer), related to the Covered Conduct; and Exactech agrees not to resubmit to any Medicare contractor, the VA, or any state payer any previously denied claims related to the Covered Conduct, agrees not to appeal any such denials of claims, and agrees to withdraw any such pending appeals.

16.     Exactech agrees to the following:

11

a.      Unallowable Costs Defined:  All costs (as defined in the Federal Acquisition

Regulation, 48 C.F.R. § 31.205-47; and in Titles XVIII and XIX of the Social Security Act, 42

U.S.C. §§ 1395-1395lll and 1396-1396w-5; and the regulations and official program directives

promulgated thereunder) incurred by or on behalf of Exactech, its present or former officers,

directors, employees, shareholders, and agents in connection with:

(1)     the matters covered by this Agreement;

(2)     the United States' audit(s) and civil investigation(s) of the matters covered by this

Agreement;

(3)     Exactech's investigation, defense, and corrective actions undertaken in response

to the United States' audit(s) and civil investigation(s) in connection with the

matters covered by this Agreement (including attorneys' fees);

(4)     the negotiation and performance of this Agreement; and

(5)     the payments Exactech makes to the United States pursuant to this Agreement and

any payments that Exactech may make to Relators, including costs and attorneys'

fees.

are unallowable costs for government contracting purposes and under the Medicare Program,

Medicaid Program, TRICARE Program, and Federal Employees Health Benefits Program

(FEHBP) (hereinafter referred to as Unallowable Costs).

b.      Future Treatment of Unallowable Costs:  Unallowable Costs shall be separately

determined and accounted for by Exactech, and Exactech shall not charge such Unallowable

Costs directly or indirectly to any contracts with the United States or any State Medicaid

program, or seek payment for such Unallowable Costs through any cost report, cost statement,

12

information statement, or payment request submitted by Exactech or any of its subsidiaries or affiliates to the Medicare, Medicaid, TRICARE, or FEHBP Programs.

        c.        <u>Treatment of Unallowable Costs Previously Submitted for Payment</u>:  Exactech further agrees that within 90 days of the Effective Date of this Agreement it shall identify to applicable Medicare and TRICARE fiscal intermediaries, carriers, and/or contractors, and Medicaid and FEHBP fiscal agents, any Unallowable Costs (as defined in this paragraph) included in payments previously sought from the United States, or any State Medicaid program, including, but not limited to, payments sought in any cost reports, cost statements, information reports, or payment requests already submitted by Exactech or any of its subsidiaries or affiliates, and shall request, and agree, that such cost reports, cost statements, information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the Unallowable Costs  Exactech agrees that the United States, at a minimum, shall be entitled to recoup from Exactech any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously-submitted cost reports, information reports, cost statements, or requests for payment.

Any payments due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice and/or the affected agencies.  The United States reserves its rights to disagree with any calculations submitted by Exactech or any of its subsidiaries or affiliates on the effect of inclusion of Unallowable Costs (as defined in this paragraph) on Exactech or any of its subsidiaries or affiliates' cost reports, cost statements, or information reports.

d.      Nothing in this Agreement shall constitute a waiver of the rights of the United States to audit, examine, or re-examine Exactech's books and records to determine that no Unallowable Costs have been claimed in accordance with the provisions of this paragraph.

17.     Exactech agrees to cooperate fully and truthfully with the United States' investigation of individuals and entities not released in this Agreement.  Upon reasonable notice, Exactech shall encourage, and agrees not to impair, the cooperation of its directors, officers, and employees, and shall use its best efforts to make available, and encourage, the cooperation of former directors, officers, and employees for interviews and testimony, consistent with the rights and privileges of such individuals.  Exactech further agrees to furnish to the United States, upon request, complete and unredacted copies of all non-privileged documents, reports, memoranda of interviews, and records in its possession, custody, or control concerning any investigation of the Covered Conduct that it has undertaken, or that has been performed by another on its behalf.

18.     This Agreement is intended to be for the benefit of the Parties only.  The Parties do not release any claims against any other person or entity, except to the extent provided for in Paragraph 19 (waiver for beneficiaries paragraph), below.

19.     Exactech agrees that it waives and shall not seek payment for any of the health care billings covered by this Agreement from any health care beneficiaries or their parents, sponsors, legally responsible individuals, or third-party payors based upon the claims defined as Covered Conduct.

20.     The Settlement Amount represents the amount the United States is willing to accept in compromise of its civil claims arising from the Covered Conduct due solely to Exactech's financial condition as reflected in the Financial Disclosures referenced in Paragraph 11.

a.      In the event that Exactech fails to pay the Settlement Amount as set forth in Paragraph 1 above, Exactech shall be in Default of Exactech's payment obligations ("Default").  The United States will provide a written Notice of Default, and Exactech shall have an opportunity to cure such Default within seven calendar days from the date of receipt of the Notice of Default by making the payment due.  Notice of Default will be delivered to Exactech, or to such other representative as Exactech shall designate in advance in writing.  If Exactech fails to cure the Default within seven calendar days of receiving the Notice of Default and in the absence of an agreement with the United States to a modified payment schedule ("Uncured Default"), the remaining unpaid balance of the Settlement Amount shall become immediately due and payable, and interest on the remaining unpaid balance shall thereafter accrue at the rate of 12% per annum, compounded daily from the date of Default, on the remaining unpaid total (principal and interest balance).

b.      In the event of Uncured Default, Exactech agrees that the United States, at its sole discretion, may (i) retain any payments previously made, rescind this Agreement in its entirety and pursue the Alabama Civil Action, ███████████████, or any civil and/or administrative claim, action, or proceeding against Exactech for the claims that would otherwise be covered by the releases provided in Paragraphs 4 and 5 above, with any recovery reduced by the amount of any payments previously made by Exactech to the United States under this Agreement; (ii) take any action to enforce this Agreement in a new action or by reinstating the Alabama Civil Action ███████████████; (iii) offset the remaining unpaid balance from any amounts due and owing to Exactech and/or affiliated companies by any department, agency, or agent of the United States at the time of Default or subsequently; and/or (iv) exercise any other right granted by law, or under the terms of this Agreement, or

15

recognizable at common law or in equity.  The United States shall be entitled to any other rights granted by law or in equity by reason of Default, including referral of this matter for private collection.  In the event the United States pursues a collection action, Exactech agrees immediately to pay the United States the greater of (i) a ten-percent (10%) surcharge of the amount collected, as allowed by 28 U.S.C. § 3011(a), or (ii) the United States' reasonable attorneys' fees and expenses incurred in such an action.  In the event that the United States opts to rescind this Agreement pursuant to this paragraph, Exactech waives and agrees not to plead, argue, or otherwise raise any defenses of statute of limitations, laches, estoppel or similar theories, to any civil or administrative claims that are (i) filed by the United States against Exactech within 90 days of written notification that this Agreement has been rescinded, and (ii) relate to the Covered Conduct, except to the extent these defenses were available on June 29, 2018.  Exactech agrees not to contest any offset, recoupment, and/or collection action undertaken by the United States pursuant to this paragraph, either administratively or in any state or federal court, except on the grounds of actual payment to the United States.

c.      In the event of Uncured Default, OIG-HHS may exclude Exactech from participating in all Federal health care programs until Exactech pays the Settlement Amount, with interest, as set forth above (Exclusion for Default).  OIG-HHS will provide written notice of any such exclusion to Exactech.  Exactech waives any further notice of the exclusion under 42 U.S.C. § 1320a-7(b)(7) and agrees not to contest such exclusion either administratively or in any state or federal court.  Reinstatement to program participation is not automatic.  If at the end of the period of exclusion, Exactech wishes to apply for reinstatement, it must submit a written request for reinstatement to OIG-HHS in accordance with the provisions of 42 C.F.R. §§ 1001.3001-.3005.  Exactech will not be reinstated unless and until OIG-HHS approves such

16

request for reinstatement.  The option for Exclusion for Default is in addition to, and not in lieu of, the options identified in this Agreement or otherwise available.

21.     In exchange for valuable consideration provided in this Agreement, Exactech and Relators acknowledge the following:

a.      Exactech shall file a motion or other appropriate request (an "Approval Motion") seeking approval to enter into and perform this Agreement, which may include seeking such approval as part of an Approved Plan. Before filing such Approval Motion, Exactech shall obtain the United States' consent as to form of such Approval Motion or the applicable provisions of any Approved Plan related to approval of this Agreement (not to be unreasonably withheld).

b.      The Definitive Documents related to the Bankruptcy Proceedings with respect to Exactech and its subsidiaries shall be consistent in all material respects with this Agreement and shall not, by their terms, contain any provisions that amend, modify, supplement, supersede or conflict with, any of the provisions of this Agreement in any manner that is materially adverse to, or materially prejudicial to the United States or the Relators, in each case, with respect to their rights under this Agreement.  The Definitive Documents shall be in form and substance reasonably acceptable to the United States with respect to the subject matter of this Agreement. In addition, Exactech shall take such actions as may be reasonably necessary or appropriate in the Bankruptcy Proceedings (including, without limitation, seeking approval of this Agreement with consent of the DIP Lenders) to ensure Exactech will be able to comply with its obligations under this Agreement.

c.      If the Bankruptcy Proceedings of Exactech, Inc. are converted or dismissed, Exactech, the United States, █████████████████████████ shall have the right to rescind this Agreement.

d. Exactech and the United States each have the option to rescind this Agreement in all respects in the event of any of the following:

i. the Bankruptcy Court does not grant the Approval Motion;

ii. the Approved Plan Effective Date does not occur on or before December 31, 2025, or such later date to which the United States may consent;

iii. the Bankruptcy Court (or other court of competent jurisdiction) enters an order, converting the Bankruptcy Proceedings of Exactech to a case under chapter 7 of the Bankruptcy Code;

iv. the Bankruptcy Court (or other court of competent jurisdiction) enters an order, the effect of which would render the Approved Plan incapable of consummation on the terms set forth in this Agreement and such order remains in effect for fifteen (15) business days after its entry;

v. issuance by the Bankruptcy Court or any other court of competent jurisdiction of any ruling, judgment or order enjoining the consummation of this Agreement or the Approved Plan, or denying approval of this Agreement, and such order remains in effect for fifteen (15) business days after its entry;

vi. the Bankruptcy Court enters an order denying confirmation of the Approved Plan, and such order remains in effect for fifteen (15) business days after its entry;

vii. any court of competent jurisdiction has entered a final judgment or order declaring this Agreement to be unenforceable; and

viii. if, upon the exercise of its fiduciary duties, Exactech withdraws or abandons any Approved Plan.

18

22.     Upon receipt by the United States of the Federal Settlement Amount, the Alabama Relators and Exactech shall promptly sign and file in the Alabama Civil Action a Joint Stipulation of Dismissal of Exactech pursuant to Rule 41(a)(1).  The dismissal shall be with prejudice as to Relators and with prejudice to the United States as to the Alabama Action Covered Conduct and without prejudice as to all other claims, subject to the terms and conditions of this Agreement.  The United States shall file a separate consent to dismissal of the action.



24.     The United States and Exactech shall bear their own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

25.     Each Party and signatory to this Agreement represents that it freely and voluntarily enters into this Agreement without any degree of duress or compulsion.

26.     This Agreement is governed by the laws of the United States. ██████████ ██████████████████████████████████████████████████████████████ ████████████████, except that any dispute relating solely to the Alabama Action shall be brought in the United States District Court for the Northern District of Alabama; provided that,

19

to the extent any dispute arises while the Bankruptcy Proceedings are still pending, such dispute may also be heard in the Bankruptcy Court.

27.    For purposes of construing this Agreement, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

28.    This Agreement constitutes the complete agreement between the Parties.  This Agreement may not be amended except by written consent of the Parties.  Forbearance by the United States from pursuing any remedy or relief available to it under this Agreement shall not constitute a waiver of rights under this Agreement.

29.    Nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of the United States to protect and preserve its rights, remedies and interests, including any other claims against Exactech or other parties, or its full participation in the Bankruptcy Proceedings.  Furthermore, nothing in this Agreement shall be construed to prohibit the United States (or Relators with respect to their respective claims for expenses, attorneys' fees and costs) from appearing as a creditor or a party-in-interest in any matter to be adjudicated in the Bankruptcy Proceedings so long as any appearance by the United States or Relator and the positions advocated by the United States or Relator in connection therewith are consistent with this Agreement.

30.    As to the United States, its agencies or any instrumentalities thereof, notwithstanding anything contained in the Agreement, Plan, Sale Order, or Confirmation Order to the contrary, nothing herein shall:

    i.    limit or be intended to or be construed to bar the United States from pursuing any police or regulatory action or any criminal action released under this Agreement;

20

ii. discharge, release, exculpate, impair or otherwise preclude: (a) any obligation or liability to the United States that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (b) any Claim of the United States arising on or after the Confirmation Date; (c) any liability of the Debtors under police or regulatory statutes or regulation to the United States as the owner, lessor, or lessee or operator of property that such Entity owns, operates or leases after the Effective Date; or (d) any liability owed to the United States, including but not limited to any liabilities arising under the federal environmental, criminal, civil or common law, by any non-Debtor, including the released parties and the exculpated parties; *provided, however*, that the foregoing shall not diminish the scope of any exculpation to which any Person is entitled under section 1125(e) of the Bankruptcy Code;

iii. enjoin or otherwise bar the United States from asserting or enforcing, outside the Bankruptcy Court, any obligation or liability described in the preceding clause (ii); *provided, however,* that the non-bankruptcy rights and defenses of all Entities with respect to (a)—(d) in clause (ii) are likewise fully preserved;

iv. affect any right of setoff or recoupment of the United States against any of the Debtors; *provided, however,* that the rights and defenses (other than any rights or defenses based on language in the Plan or the Confirmation Order that may extinguish or limit setoff or recoupment rights) of the Debtors with respect thereto are fully preserved;

v. authorize the assumption, assignment, sale or other transfer of any federal (a) grants, (b) grant funds, (c) contracts, (d) agreements, (e) awards, (f) task orders,

21

(g) property, (h) intellectual property, (i) patents, (j) leases, (k) certifications, (l) applications, (m) registrations, (n) billing numbers, (o) national provider identifiers, (p) provider transaction access numbers, (q) licenses, (r) permits, (s) covenants, (t) inventory, (u) guarantees, (v) indemnifications, (w) data, (x) records, (y) any other interests belonging to the United States (collectively, "Federal Interests") without compliance and will all terms of the Federal Interests and with all applicable non-bankruptcy law;

vi. be interpreted to set cure amounts related to any Federal Interests or to require the United States to novate, approve or otherwise consent to the assumption assignment, sale or other transfer of any Federal Interests;

vii. constitute or be deemed an approval or consent by the United States;

viii. waive, alter, or otherwise limit the United States' property rights;

ix. modify the scope of section 525 of the Bankruptcy Code;

x. cause Rejection Damage Claims to have to be filed before the Governmental Bar Date or alter the priority and treatment of such Rejection Damage Claims under the Bankruptcy Code.

31. In the event of any conflict among the terms and provisions in Definitive Documents, on the one hand, and this Agreement, on the other hand, the terms and provisions of this Agreement and federal law shall control.

32. The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

33. This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

22

34.     This Agreement is binding on Exactech's successors, transferees, heirs, and assigns.

35.     This Agreement is binding on Relators' successors, transferees, heirs, and assigns.

36.     All Parties consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

37.     This Agreement is effective on the latter of the following dates: (1) the date that the Bankruptcy Court approves Exactech's performance hereunder and (2) the Approved Plan Effective Date; ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████.

**THE UNITED STATES OF AMERICA**

DATED: _____        BY: _____
                             Michael Hoffman
                             Trial Attorney
                             Commercial Litigation Branch
                             Civil Division
                             United States Department of Justice

████████████████████████████████████████████

DATED: ____        BY: _____
                       Don B. Long III
                       Assistant United States Attorney
                       Northern District of Alabama

DATED: _____        BY: _____
                             Susan E. Gillin
                             Assistant Inspector General for Legal Affairs
                             Office of Counsel to the Inspector General
                             Office of Inspector General
                             United States Department of Health and Human Services

*{Remainder of page intentionally blank – signatures continue next page}*

24

**EXACTECH**

DATED: _____     BY: _____
[NAME OF OFFICER TO BE ADDED]
[TITLE OF OFFICER TO BE ADDED]


DATED: _____     BY: _____
Thomas Beimers
Counsel for Exactech

*{Remainder of page intentionally blank – signatures continue next page}*

25

**ALABAMA RELATORS**

DATED: _____      BY:   _____
                                           Brooks Wallace


DATED: _____      BY:   _____
                                           Robert Farley


DATED: _____      BY:   _____
                                           Manuel Fuentes


DATED: _____      BY:   _____
                                           Dee Miles
                                           Counsel for Alabama Relators

*{Remainder of page intentionally blank – signatures continue next page}*

26



*{Last page of signatures}*

**Exhibit A**

As used in this Agreement, the following terms have the following meanings:

a) "**Approved Plan**" means a chapter 11 plan for Exactech that is consistent in all material respects with this Agreement and incorporates the settlement set forth in this Agreement.

b) "**Approved Plan Effective Date**" means the date on which the Approved Plan becomes effective in accordance with its terms.

c) "**Definitive Documents**" means all of the definitive documents implementing this Settlement Agreement, including the material agreements, schedules, and Bankruptcy Court or other judicial or regulatory orders that are necessary, including the Sale and Confirmation Order and the Approved Plan.

d) "**DIP Lenders**" means the lenders to Exactech, Inc. under that certain Debtor-in-Possession Credit Agreement, dated as of October 31, 2024, by and among Exactech, Inc., as borrower, GLAS USA LLC, as administrative and collateral agent, and the other parties thereto from time to time (as amended by that certain Amendment No. 1 to Debtor-in-Possession Credit Agreement, dated as of March 6, 2025, and as may be amended from time to time).