**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Exactech, Inc., *et al*,[1] | Case No. 24-12441 (LSS) |
| | (Jointly Administered) |
| Debtors. | **Re: Docket Nos. 145, 776, 783, 876, 1144 & 1145** |

**DEBTORS' REPLY IN SUPPORT**
**OF THE SALE MOTION, ENTRY OF THE PROPOSED**
**SALE ORDER, AND THE QUI TAM SETTLEMENT MOTION**

Exactech, Inc. and its affiliated debtors and debtors in possession (each, a "Debtor" and

collectively, the "Debtors") in the above-captioned chapter 11 cases, by and through their

undersigned counsel, hereby submit this reply (the "Reply") in further support of the relief

requested by their Sale Motion[2] and entry of the *Order (I) Authorizing the Sale of the Debtors'*

*Assets Free and Clear of All Liens, Claims, Interests, and Other Encumbrances, (II) Authorizing*

*the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and*

*(III) Granting Related Relief,* substantially in the form filed as Exhibit A to Docket No. 1223 (the

"Proposed Sale Order"), in opposition to *The Official Committee of Unsecured Creditors'*

*Objection to Entry of Proposed Order (I) Authorizing the Sale of the Debtors' Assets Free and*

*Clear of All Liens, Claims, Interests, and Other Encumbrances, (II) Authorizing the Assumption*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  Osteon Holdings, Inc. (7042); Osteon Intermediate Holdings I, Inc. (7778); Osteon Intermediate Holdings II, Inc. (1292); Exactech, Inc. (3930); and XpandOrtho, Inc. (4250).  The Debtors' service address is 2320 NW 66th Court, Gainesville, Florida 32653.

[2]    "Sale Motion" means the *Debtors' Motion for Entry of an Order Approving (I) Bidding Procedures, the Sale Timeline, and the Form and Manner of Notice Thereof; (II) the Debtors' Entry Into and Performance Under the Stalking Horse APA; (III) Assumption and Assignment Procedures; and (IV) Granting Related Relief* [Docket No. 145].  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion.

*and Assignment of Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. 876] (the "Committee Sale Objection")[3] and *The Official Committee of Unsecured Creditors' Objection and Reservation of Rights to the Debtors' Motion for Entry of an Order (I) Approving Settlement Agreement Related to Qui Tam Litigation Among Exactech, Inc., the United States of America, and Certain Relators, (II) Authorizing the Debtors to Take Any and All Actions Necessary to Effectuate the Terms Thereto, and (III) Granting Related Relief* [Docket No. 1195] (the "Committee Qui Tam Settlement Objection"), and in response to the *United States Trustee's Reservation of Rights Regarding the Proposed Sale of the Debtors' Assets* [Docket No. 1144] (the "U.S. Trustee Reservation of Rights"), and respectfully state as follows:

## PRELIMINARY STATEMENT[4]

1.      The Debtors take seriously the concerns raised by the Committee in the Committee Sale Objection as well as the concerns raised by the Court at the hearing on March 27, 2025 (the "March 27 Hearing").   The Committee Sale Objection centers on concerns regarding the findings of good faith included in the Proposed Sale Order (the "Good Faith Findings").   The Committee's concerns with the Good Faith Findings stem from communications between Mr. Darin Johnson, the Company's Chief Executive Officer and a Sale Incentive KEIP Participant,[5] and William de Wulf, Managing Director of Strategic Value Partners ("SVP"), a member of the Ad Hoc Group, regarding compensation-related matters (the "Communications").   As discussed in more

---

[3]     To the extent the *Objection of the Official Committee of Unsecured Creditors to the Debtors' Joint Chapter 11 Plan of Exactech, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1145] raises additional objections to the Sale Motion and Proposed Sale Order, this Reply is also in opposition thereto.

[4]     Capitalized terms used but not defined in this Preliminary Statement have the meanings ascribed to such terms later in this Reply.

[5]     As defined in the *Debtors' Motion for Entry of an Order (I) Authorizing the Implementation of a Key Employee Incentive Program, (II) Approving Payments to Participants in the Debtors' Key Employee Incentive Program, and (III) Granting Related Relief* [Docket No. 349] (the "KEIP Motion").

detail below, shortly after the Debtors' counsel became aware of the Communications, Debtors' counsel disclosed these matters to counsel to the Committee, the Ad Hoc Group, and the Office of the United States Trustee.  The Special Committee also commenced the KEIP Investigation.  The facts reviewed by the Special Committee in the KEIP Investigation, which were subsequently confirmed by discovery in these chapter 11 cases, support the conclusion that the Debtors and the Stalking Horse Bidder acted in good faith, and that the Debtors' management team and its advisors' efforts to vigorously market the assets were unaffected.

2.      In short, the Debtors believe that the Sale to the Stalking Horse Bidder should be approved pursuant to the Proposed Sale Order, including the Good Faith Findings included therein. Additionally, the Court should make a finding that the sale of the Debtors' assets is "free and clear" of any successor liability under 11 U.S.C. § 363(f).

## PROCEDURAL BACKGROUND

3.      On October 29, 2024 (the "Petition Date"), each Debtor filed a voluntary petition for relief pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On November 18, 2024, the Office of the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors [Docket No. 171] (the "Committee").

4.      On November 12, 2024, the Debtors filed the Sale Motion.  On December 10, 2024, the Court entered the *Order Approving (I) Bidding Procedures, the Sale Timeline, and the Form and Manner of Notice Thereof; (II) the Debtors' Entry Into and Performance Under the Stalking Horse APA; (III) Assumption and Assignment Procedures; and (IV) Granting Related Relief* [Docket

3

No. 321], which, among other things, approved the Bidding Procedures and scheduled the hearing on approval of the Sale for the March 27 Hearing.

5.      On March 6, 2025, the Debtors filed the *Notice of Cancellation of Auction and Designation of Stalking Horse Bid as the Winning Bid* [Docket No. 684] (the "Notice of Winning Bidder"), cancelling the Auction and designating the Stalking Horse Bidder as the Winning Bidder. On March 10, 2025, the Debtors filed the *Notice of Proposed Order (I) Authorizing the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Interests, and Other Encumbrances, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. 697], approving the Sale to the Stalking Horse Bidder.  On March 25, 2025, the Debtors filed the *Notice of Revised Proposed Order (I) Authorizing the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Interests, and Other Encumbrances, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. 776], which incorporated changes to address certain informal objections from the Office of the United States Trustee.  On May 23, 2025, the Debtors filed the *Notice of Further Revised Proposed Order (I) Authorizing the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Interests, and Other Encumbrances, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. 1223], which attached as Exhibit A thereto the Proposed Sale Order, which the Debtors had revised to address certain formal and informal objections the Debtors received from the contract counterparties.

6.      On March 26, 2025, the Committee filed *The Official Committee of Unsecured Creditors' Limited Objection to Entry of Proposed Order (I) Authorizing the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Interests, and Other Encumbrances, (II) Authorizing*

*the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. 783], raising, for the first-time, objections to the Good Faith Findings included in the Proposed Sale Order.[6]  For the reasons discussed on the record, the March 27 Hearing's consideration of the sale was continued to April 15, 2025.  Then, on April 10, 2025, the Committee filed the Committee Sale Objection.  That same day, the Debtors filed the *Notice of Adjournment of Sale Approval Hearing and (II) Status Conference Regarding the Sale* [Docket No. 878], adjourning the hearing considering the sale.  On April 23, 2025, the Debtors filed the *Notice of Rescheduled Sale Approval Hearing* [Docket No. 948], rescheduling consideration of the sale to the hearing set to take place on May 28, 2025 (the "Sale Hearing").  On May 7, 2025, the Debtors filed the *Notice of Filing of Plan Supplement for the Third Amended Joint Chapter 11 Plan of Exactech, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1061], which includes (a) the Assigned Executory Contract and Unexpired Lease List, (b) the Schedule of Retained Causes of Action, (c) the Restructuring Transactions Memorandum, and (d) the Wind-Down Trust Agreement (each as defined in the Plan).

## THE ROLE OF THE SPECIAL COMMITTEE AND ROPES & GRAY LLP IN THE CHAPTER 11 CASES

7.    The Special Committee was formed by the Governing Bodies (as defined in the July 23 UWC) of each of Osteon Intermediate Holdings II, Inc., Exactech, Inc., and XpandOrtho, Inc. on July 23, 2024 and delegated the full power and decision-making authority of those Governing Bodies to negotiate, approve, or decline any restructuring transactions and to take any other actions that the Special Committee deems necessary to discharge its duties, including any

---

[6]    For the avoidance of doubt, the Good Faith Findings included in the Proposed Sale Order have been included since the original version of the proposed Sale Order was filed on March 10, 2025.

actions concerning any Restructuring Transactions.[7]  Through this delegation of authority, the Special Committee is the governing body of each of Osteon Intermediate Holdings II, Inc., Exactech, Inc., and XpandOrtho, Inc. responsible for overseeing the chapter 11 cases, including, without limitation, the sale process and the KEIP (as defined in the KEIP Motion).

8.    Ropes & Gray LLP ("Ropes & Gray") was retained as counsel to the Debtors.[8]  In accordance with its delegations of authority, the Special Committee oversees and directs Ropes & Gray as general bankruptcy counsel to the Debtors, including with respect to the sale process and the KEIP.[9]  As such, the Special Committee directed Ropes & Gray to conduct the KEIP Investigation, as detailed below.[10]

### THE COMMITTEE'S OBJECTIONS TO THE SALE AND THE QUI TAM SETTLEMENT SHOULD BE OVERRULED

**I.    The Debtors' Sale to the Stalking Horse Bidder was a Good Faith Sale Under Section 363(m) of the Bankruptcy Code.**

9.    Section 363(m) of the Bankruptcy Code provides that "the reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal."[11]  Section 363(m)

---

[7]    *See Joint Action by Unanimous Written Consent of the Governing Bodies Appointing the Special Committee*, p. 3, (July 23, 2024) (the "July 23 UWC").

[8]    *See Order Authorizing the Retention and Employment of Ropes & Gray LLP as Attorneys for the Debtors Effective as of the Petition Date* [Docket No. 309].

[9]    *See e.g. Voluntary Chapter 11 Petition for Exactech Inc.* at 18.

[10]    As is common with investigations conducted by boards of directors or committees thereof, the Special Committee did not directly collect and review documents or directly conduct interviews.  Instead, the Special Committee directed their advisors, Ropes & Gray, to implement an approved investigation plan, which the Special Committee oversaw with regular updates from the Ropes & Gray team.

[11]    11 U.S.C. § 363(m).

"reflects the salutary policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely."[12]  As detailed below, the Stalking Horse Bidder is entitled to a determination by the Court that its purchase of the Debtors' business was "in good faith."

### A.    The Stalking Horse Bidder is Entitled to a 363(m) Good Faith Finding Under Existing Third Circuit Jurisprudence.

### i.    The Facts Support a Good Faith Finding.

10.    The Bankruptcy Code does not define "good faith."  In the Third Circuit, as in other circuits, "good faith" under section 363(m) "encompasses one who purchases in "good faith" and for "value."[13]

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

*Abbotts Dairies* at 147.

11.    The actions of a potential good faith purchaser are evaluated to determine "whether the conduct of the purchaser has had an impact on the bidding process."[14]

12.    On Sunday, February 9, 2025, the Special Committee convened and attorneys from Ropes & Gray informed the Special Committee of the Communications, which Ropes & Gray had learned of on February 7, 2025.  The Special Committee directed Ropes & Gray to (a) promptly

---

[12]    *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (internal citations omitted).  *See also United States v. Salerno*, 932 F.2d 117, 123 (2d Cir. 1991) (noting that section 363(m) furthers the policy of finality in bankruptcy sales and "assists bankruptcy courts in maximizing the price for assets sold in such proceedings"); *In re Pursuit Cap. Mgmt., LLC*, 874 F.3d 124, 133 (3d Cir. 2017).

[13]    *Id.* (*citing In re Bel Air Assocs.*, 706 F.2d 301, 305 (10th Cir. 1983); *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1197 (7th Cir. 1978)).

[14]    *In re Advanced Contracting Sols., LLC*, 582 B.R. 285, 320 (Bankr. S.D.N.Y. 2018); *see also In re Pursuit Cap. Mgmt.*, 874 F.3d at 137.

disclose the Communications to counsel to the Committee, the Office of the United States Trustee, and the Ad Hoc Group, and (b) assess the circumstances surrounding the Communications, including with respect to any implications for, among other the things, the relief granted by the KEIP Order.

13.     On the morning of Monday, February 10, 2025, Ropes & Gray advised the parties of the Communications and provided each of these parties with copies of related written correspondence (the "Correspondence") immediately following these calls.

14.     On February 14, 2025, the Special Committee convened again and formally directed Ropes & Gray to conduct an investigation on the Special Committee's behalf into matters related to communications between the Sale Incentive KEIP Participants and the Ad Hoc Group regarding potential compensation for management in connection with the closing of the Stalking Horse APA (the "KEIP Investigation").  The Special Committee's KEIP Investigation revealed the facts detailed herein.

15.     On December 18, 2024, the Debtors filed the KEIP Motion without the support of the Ad Hoc Group, as detailed therein.  The Debtors continued to engage with the Ad Hoc Group on the structure of the KEIP prior to the hearing before the Bankruptcy Court to consider the KEIP Motion in an effort to resolve the Ad Hoc Group's outstanding issues with the KEIP.  In late December 2024, the Ad Hoc Group made a proposal to the Debtors for a modified Sale Incentive KEIP structure, which would provide payment to Sale Incentive KEIP Participants if the sale transaction contemplated by the Stalking Horse APA was consummated with the Stalking Horse Bidder.  Shortly thereafter, Mr. Johnson and Mr. de Wulf had at least four (4) calls between December 19, 2024 and January 6, 2025, during which they discussed, among other things, the Ad Hoc Group's proposed Sale Incentive KEIP structure.

16.     On January 12, 2025, Ropes & Gray, at the direction of the Special Committee, informed Milbank LLP ("Milbank"), counsel to the Ad Hoc Group, that the Debtors would be moving forward with seeking Bankruptcy Court approval of the Sale Incentive KEIP structure originally proposed by the Debtors, which did not provide for payments in connection with the closing of the sale transaction contemplated by the Stalking Horse APA to the Stalking Horse Bidder.

17.     After January 12, 2025, Mr. Johnson and Mr. de Wulf engaged in three (3) additional phone calls regarding potential incentive compensation structures for management in connection with the closing of the sale transaction contemplated by the Stalking Horse APA. These calls were memorialized in the Correspondence.   On the final phone call between Mr. Johnson and Mr. de Wulf, which took place during the week of February 3, 2025, Mr. Johnson and Mr. de Wulf agreed that Mr. Johnson would discuss with Ropes & Gray how best to document the proposal for an incentive compensation program that Mr. de Wulf and Mr. Johnson had discussed, but which neither Mr. de Wulf nor Mr. Johnson had yet agreed to.   Mr. Johnson then disclosed the Correspondence to Ropes & Gray and Ropes & Gray promptly informed the Special Committee of the Correspondence.   For the avoidance of doubt, Ropes & Gray did not document the proposed incentive program Mr. de Wulf and Mr. Johnson had discussed.

18.     The Qualifying Bid Deadline[15] for the Debtors' sale process was February 24, 2025.  No Qualifying Bids were received by the Qualifying Bid Deadline.  On March 6, 2025, the Debtors filed the Notice of Winning Bidder.  Because the Stalking Horse Bid was named the

---

[15]     As defined in the *Debtors' Motion for Entry of an Order Approving (I) Bidding Procedures, the Sale Timeline, and the Form and Manner of Notice Thereof; (II) the Debtors' Entry Into and Performance Under the Stalking Horse APA; (III) Assumption and Assignment Procedures; and (IV) Granting Related Relief* [Docket No. 145] (the "Bidding Procedures Motion").

Winning Bid, the Sale Incentive KEIP was not triggered, and no incentive bonuses will be paid to Sale Incentive KEIP Participants.

19.    Mr. Johnson was the only member of the Debtors' management team and the only Sale Incentive KEIP Participant who engaged in any conversations with any member of the Ad Hoc Group regarding potential incentive compensation.  There was no pre-existing relationship between the Company's management and SVP prior to these chapter 11 cases.  Further, the facts are clear and the evidence at the Sale Hearing will show that the Company's management team, including Mr. Johnson, did not unfairly favor the Stalking Horse Bidder over other potential bidders and put in strong efforts to identify other bidders and encourage such parties to submit potential bids.  Mr. Johnson testified that the information provided to interested parties was not a function of who the audience was, but rather "what's relevant on that particular week from an update perspective."[16]  He clarified that although SVP may have received information that others did not, this occurred solely "because they asked for it," and not as a result of any favoritism or bias.[17]  Mr. Johnson further confirmed that the Company responded to all information requests from potential buyers and that, to his knowledge, no potential bidder requested information that the Company was unable or unwilling to provide.[18]  Moreover, the Company's management worked with the Debtors' advisors to respond to all diligence requests received from other interested parties and participated in management meetings with any interested party interested in

---

[16]    **Exhibit 26**, Transcript of the Deposition of Darin Johnson (Apr. 6, 2025) ("Johnson Tr.") at 36:8-11.  Exhibits referenced herein are attached to the *Declaration of Luke Smith in Support of Confirmation of Fourth Amended Joint Chapter 11 Plan of Exactech, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code and the Sale Reply*, dated May 23, 2025, filed contemporaneously herewith.

[17]    *Id.* at 36:17.

[18]    *Id.* at 167:22-25 ("[Q.] To your knowledge, did any potential buyer ask for any information that the company was unable to provide? A. No.").  Ryan Bouley, as the Managing Director of the Committee's investment banker, Huron Transaction Advisory LLC ("Huron") also testified that he was similarly not aware of any instances of interested parties complaining that the Company was not providing the diligence materials requested or needed by interested parties.  *See* **Exhibit 2**, Transcript of the Deposition of Ryan Bouley (May 20, 2025) at 31:22-33:13.

a management meeting.  The Special Committee concluded that the Company's management team, including Mr. Johnson, (a) put in strong efforts to develop potential bids, (b) did not unfairly favor the Stalking Horse Bidder over other potential bidders, and (c) did not provide information to the Stalking Horse Bidder that other potential bidders did not or would not have received had they requested such information.

### ii.      The Committee's Objections are Inapposite.

20.      In the Committee Sale Objection, the Committee urges the Court to forgo making a good faith finding.  *First*, the Committee states such a finding should not be made until after discovery is completed and the factual record is fully developed.[19]  This objection is no longer timely—the factual record is now fully developed and supports the requested factual findings.

21.      *Second*, the Committee asserts that known facts weigh against a good faith finding. In doing so, the Committee makes a series of allegations:  (a) that the Stalking Horse Bidder's engagement with the Debtor's CEO regarding a bonus payment made the Debtors' KEIP a "sham" "doomed to failure" such that the Debtors' management team was not incentivized to wholeheartedly engage other bidders and, perhaps, was incentivized to deter other bidders; (b) that the Stalking Horse Bidder manifested signs of control over the Debtors which "might have extended to post-petition influence over the board" in such a way as to "chill bidding;" and (c) that there was a "cloud over the auction itself" requiring the Debtors show "additional evidence that the price paid is fair and reasonable," which the Debtors did not do because "[they] are a $1 billion company."[20]  The Committee asserts that each allegation indicates collusion between the Stalking

---

[19]   Committee Sale Objection at ¶ 91.

[20]   Committee Sale Objection at ¶¶ 95–101.

Horse Bidder and the Debtors so as to preclude a section 363(m) good faith finding. As demonstrated by the record, each allegation is unfounded.

22.     There is no evidence that the discussions between the Stalking Horse Bidder and the Debtors' CEO caused anything less than the full participation in and support of the Debtors' sale process efforts by the Debtors' management team. In fact, following entry into non-disclosure agreements with 30 prospective bidders, the Debtors provided each such bidder with access to a virtual data room, participated in numerous calls with and responded to diligence requests from those parties, and made themselves available for management meetings with potential bidders.[21] Ultimately, there was, unfortunately, limited interest from third-party bidders. Third-party bidders did not submit significant diligence requests for the Debtors to respond to and only two third-party bidders agreed to participate in management meetings. To be clear, the Debtors did not refuse to participate in management meetings with any interested party, nor did the Debtors refuse to allow a site visit from any interested party or refuse to respond to diligence requests from any interested party.[22] The testimony at the Sale Hearing will show that management's conduct was constructive in the Debtors' sale process and supports, not opposes, a section 363(m) good faith finding.

23.     There is also no evidence that the Stalking Horse Bidder controlled the Debtors' board so as to chill bidding. In making this contention, the Committee relies on a tenuous connection between its sparse factual support and its conspiratorial insinuations. The Committee

---

[21]   *See, e.g.*, Transcript of the Deposition of Ryan Bouley (May 20, 2025) at 33:18-34:6 ("Q. And at any time did you find Centerview or the Debtors at all reluctant to pursue a transaction, as you say, a sum-of-the-parts? […] A. No. Only in that I believe they expressed some concern that a sum-of-the-parts may not be the highest value. Q. But did you ever -- did they ever not explore it as opposed to worrying about whether the value would be sufficient? A. No.").

[22]   *See In re Filtercorp, Inc.*, 163 F.3d 570, 577 (9th Cir. 1998) (affirming the bankruptcy court's decision that a purchaser was a good faith purchaser finding that an interested party's time and opportunity to submit their own bid was limited only by circumstances specific to that interested party, not by actions taken by the debtor or purchaser).

points to the Stalking Horse Bidder's conducting of "pre-petition diligence," "informal channels of information flow with Management", "tendrils into the CEO," holding of "themselves out pre-petition as the new owners," "attend[ance] [at] global sales meetings [with the Debtors] as if they had already owned the business," and "re-negotiation [of] employment agreements."[23]

24.     Taking these in turn, a prospective stalking horse performing diligence and engaging in communications with a target's management, as any reasonably prudent interested party would do when engaging with a target, is clearly no sign of control over the target's board. The "informal channels of information flow with Management" resulted not from inappropriate favorable treatment of the Stalking Horse Bidder, but from negotiated reporting requirements under the Stalking Horse APA.[24]   The "tendrils into the CEO" the Stalking Horse Bidder ostensibly

---

[23]   Committee Sale Objection at ¶ 97.

[24]   The Stalking Horse Bidder is an entity formed by the Ad Hoc Group. The Ad Hoc Group comprises the Debtors' secured prepetition lenders and the Debtors' DIP Lenders in these chapter 11 cases. Due to the multiple hats worn by the Ad Hoc Group in these cases, the Ad Hoc Group is entitled to certain reporting and access to the Debtors that other bidders do not have direct rights to. For example, pursuant to the DIP Credit Agreement the Debtors are required to provide certain financial statements to the DIP Lenders on a schedule specified in the DIP Credit Agreement. *See* DIP Credit Agreement, §6.01. Further, the DIP Credit Agreement also requires that the Debtors' senior management and legal and financial advisors be available for a conference call with the DIP Lenders at least once every two calendar weeks. *See* DIP Credit Agreement, §6.17. In addition to requirements directly provided for in the DIP Credit Agreement, there are also reporting and other requirements included in various orders entered by the Bankruptcy Court in these chapter 11 cases. By way of example, the *Final Order (I) Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors, (II) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests, and (III) Granting Related Relief* [Docket No. 250] (the "Final Critical Vendor Order"), the Debtors are required to, among other things, provide advance notice to the Ad Hoc Group prior to making any single critical vendor payment over $250,000 and provide a matrix summarizing all critical vendor payments made to the Ad Hoc Group no less than once every two weeks. *See* Final Critical Vendor Order, ¶¶2,7. The Debtors do not dispute that the Ad Hoc Group, and therefore the Stalking Horse Bidder, received different treatment than every other bidder in the sale process. However, as a bidder in the sale process, the Debtors did not favor the Stalking Horse Bidder, provide the Stalking Horse Bidder with information that would give the Stalking Horse Bidder an advantage over other bidders in the sale process, or provide the Stalking Horse Bidder with information or access to information that the Debtors denied to other bidders. That there are benefits attendant to serving as the stalking horse purchaser and setting the floor price for the assets for sale is not unique to these cases. Break-ups fees and expense reimbursement are common for stalking horse bidders because the stalking horse bidders often spend far more time and money on their diligence than other bidders in the process do because subsequent bidders can rely to an extent on the stalking horse bidder's diligence. While the Stalking Horse Bidder here was not entitled to a break-up fee or expense reimbursement in the event the Stalking Horse Bid was not the Winning Bid, the Debtors do not deny that the Stalking Horse Bidder did receive some benefit from serving as the Stalking Horse Bidder. Stalking horse bidders also have the benefit of generally drafting the asset purchase agreement, subject to negotiations with the sellers. *See e.g.*, Peter C.

possessed stem from the fact that the Stalking Horse Bidder was "a new entrant into the business and [was] likely to retain management."[25]  If such a rationale indicates control over a target's board, then every debtor filing chapter 11 with a stalking horse purchase agreement in hand from a non-strategic bidder would arguably have their board "controlled" by such stalking horse purchaser.

25.     Additionally, the Committee's evidence that the Stalking Horse Bidder held itself out as the owners of the business relies on a misunderstanding of sale timelines and related elements:  prospective owners engage PR firms *ahead* of sale closing to prepare external communications *in advance*.[26]  In order to preserve the value of the Debtors' business as a going concern for the benefit of all stakeholders, it was important from the outset of these chapter 11 cases that the Debtors' surgeon customers understood that there was a clear path forward through these chapter 11 cases that maintained the Debtors' business operations and could provide continuity to the surgeon customers.  Informing surgeon customers that the Debtors have a signed asset purchaser agreement with the Stalking Horse Bidder that would provide for such continuity is not evidence of collusion but is a market standard practice in chapter 11 cases to reassure stakeholders and minimize the uncertainty caused by the chapter 11 process.  Likewise, Mr. Johnson's prepared remarks for the January 31, 2025 Exactech Global Sales Meeting made clear there were "no guarantees" of SVP taking ownership, only that "indications continue[d] to point

---

Blain, Let's Make a Deal: Sales of Distressed Businesses in Insolvency Proceedings, in Buying and Selling Distressed Businesses 137 (2010).  Drafting the asset purchase agreement that serves as the floor other bidders will be bidding against does give a stalking horse bidder some competitive advantage. *See id.*  However, a competitive advantage for a stalking horse purchaser is not indicative of collusion nor does it support an argument that the Debtors and Stalking Horse Bidder did not act in good faith in the sale process.

[25]  Committee Sale Objection at ¶ 97.

[26]  *See id*. at ¶ 98, n. 88.

to" that outcome.[27] At all times prior to the filing of the Notice of Winning Bidder, the Stalking Horse APA remained subject to higher and better bids in accordance with the Bidding Procedures.

26. Finally, the Stalking Horse Bidder's involvement with Mr. Binder's employment agreement was similarly much more mundane than the Committee alleges. Mr. Binder's agreement with the Debtors was set to expire during the pendency of these cases, and the DIP Credit Agreement included restrictions on the amount of payments that the Debtors could make to Mr. Binder as well as the other independent board members of the Board of Directors of the HoldCo Debtors (as defined in the DIP Credit Agreement) during the chapter 11 cases.[28] The Ad Hoc Group is wearing two hats in these chapter 11 cases and naturally in its roles as DIP Lenders, engaged with the Debtors with respect to changes to an agreement that could require a waiver under the DIP Credit Agreement and could result in the incurrence of an administrative expense claim against the Debtors if the obligation were not assumed by the Stalking Horse Bidder. Additionally, contrary to the Committee's allegations, the Debtors' management team was not negotiating for their own retention.[29]

27. Finally, there is no evidence that the Debtors' business is worth $1 billion. The Committee relies on Mr. Johnson's statement regarding management's aspirations to increase the Company's valuation over time[30] as evidence that the Debtors' business is currently worth $1

---

[27] *See* Exhibit J to Committee Sale Objection.

[28] *See* DIP Credit Agreement §7.05(A)(iii).

[29] The Stalking Horse APA provides that the Stalking Horse Bidder "shall extend to each employee of Sellers a written offer of employment […] providing for a position that is the same or no less favorable than such employee's position immediately prior to the Closing." *See* Stalking Horse APA § 6.3. There has never been a question that if the Stalking Horse Bidder was the Winning Bidder, the Debtors' management team, and all of the Debtors other employees, would be "retained" by the Stalking Horse Bidder following the Closing. The "retention" of management was not negotiated in the shadows as the Committee seems to claim. Retention of not just the Debtors' management team but all of the Debtors' employees has been fully provided for and disclosed since the first day of these chapter 11 cases when the Stalking Horse APA was filed.

[30] *See* Transcript of the Deposition of Darin Johnson (Apr. 6, 2025) at 157:20-158:2.

billion.[31]   However, Mr. Johnson himself merely stated, "It's hard to perfectly predict the future, but we aspire to, at some point in the future, be worth over—you know, more than double 500 million."[32]  A CEO's musings over his company's potential future value are not accurate, present-day valuations, and such aspirational remarks about potential future value are inherently speculative and cannot be equated with an objective assessment of the Company's present worth. Crucially, in this case, these statements are not supported by the outcome of the comprehensive sale process run by the Debtors' investment banker, who engaged with 118 parties, including dozens of the most sophisticated financial sponsors in the world and all likely strategic purchasers. Of these parties, 30 of them executed non-disclosure agreements and were granted full access to a virtual data room, along with the opportunity to conduct due diligence and submit bids.  Despite this robust process,[33] no party besides the Stalking Horse Bidder made an offer, much less one for $1 billion.[34]

28.     As Mr. Chopra explained, ". . . we believe [the sale process] was run appropriately, it was run comprehensively, anybody who was interested in the assets had an opportunity to receive

---

[31]   *See* Committee Sale Objection at ¶ 7.

[32]   *Id.*

[33]   The sale process here was robust, as even the Committee's investment banker agrees.  *See* Transcript of the Deposition of Ryan Bouley (May 20, 2025) at 62:2-4 ("I observed Centerview do everything that they should have done.").

[34]   The near-universal view of courts in this district is that a market check is the best indication of value.  *In re Submicron Systems Corp.*, 432 F.3d 448, 461 (3d Cir. 2006) ("Section 363 attempts to avoid the complexities and inefficiencies of valuing collateral altogether by substituting the theoretically preferable mechanism of a free market sale to set the price.  The provision is premised on the notion that the market's reaction to a sale best reflects the economic realities of assets' worth.") (emphasis in original); *Allonhill, LLC v. Stewart Lender Servs., Inc. (In re Allonhill, LLC)*, No. 14-10663 (KG), at *94 (Bankr. D. Del. Apr. 25, 2019) ("As this Court has previously written, a market test - reflecting the actual price a willing buyer agrees to pay - is the best determination of fair market value."); *Official Comm. of Unsecured Creditors of Champion Enters., Inc. v. Suisse (In re Champion Enters., Inc.)*, No. 09-14019 (KG), at *77 (Bankr. D. Del. Aug. 30, 2012) ("A market test is the best evidence of a company's value at a given point in time."); *Id.* at *56 ("The sales process overseen by the Court was a thorough and arm's length market test, which represents the best evidence of Champion's fair market value at the time of the § 363 sale.").

information and bid on the asset. The result of the sale process is the Stalking Horse Bid. As a result of the sale process and the Stalking Horse Bid, I believe that is the best indication of value for the enterprise."[35] This testimony underscores that the market, after a thorough and competitive process, has determined the current value of the Debtors' business, and that value falls short of the $1 billion figure suggested by the Committee. Even putting aside the fact that the value in the sale has been tested by the market, the Committee's own investment banker agrees that the Stalking Horse Bid represents a reasonable value for the Debtors' assets.[36] Assertions to the contrary are unsupported by both the facts and the outcome of the sale process. For the avoidance of doubt, the fact that the sale price constitutes a credit bid makes it no less capable of constituting "value" warranting a "good faith" finding under section 363(m).[37]

29.     The Debtors' sale process was conducted in good faith, as were the actions of the Stalking Horse Bidder. The Debtors engaged thoroughly with numerous prospective bidders. The Committee's objections rely on hollow inferences based on sparse, misconstrued facts.[38] The

---

[35]   **Exhibit 28**, Transcript of the Deposition of Karn Chopra (Apr. 4, 2025) at 100:7-18.

[36]   Transcript of the Deposition of Ryan Bouley (May 20, 2025) at 70:19-71:3 ("Q. Okay. And during the course of the month of February, did you come up with a determination of whether or not the Stalking Horse bid was within the range of a reasonable valuation? A. I believe we did. Q. And what was your conclusion? I believe we concluded that this was a reasonable valuation.").

[37]   *See, e.g., In re Stream TV Networks, Inc.*, 666 B.R. 299, 312 (Bankr. E.D. Pa 2025) ("[T]here were no other bidders, and the Trustee testified that his settlement negotiations . . . were robust, in good faith, and arms'-length. That credit bid right then served as the foundation of the Stalking Horse Bid, which was the only bid. The Court finds, in light of those facts, that [the purchaser] is entitled to a finding that it acted in good faith in connection with the Sale.")

[38]   Though of course, sparse, misconstrued facts are all that is available to the Committee given that (a) as discussed above, the Committee's own investment banker agrees that the Stalking Horse Bid is in fact a reasonable value for the assets and (b)  the Committee never bothered to ask Huron, its professional advisor that it hired to advise with respect to valuation, to perform a valuation or what Huron determined was a reasonable value for the assets. *See Application for Order Authorizing the Employment and Retention of Huron Transaction Advisory LLC as Investment Banker to the Official Committee of Unsecured Creditors of Exactech, Inc., et al., Nunc Pro Tunc to November 27, 2024* [Docket No. 348], ¶6(h); Transcript of the Deposition of Ryan Bouley (May 20, 2025) at 67:9-11 ("Q. Did the Committee ever ask for that high-level sniff test number? A. No.").

Debtors' sale to the Stalking Horse Bidder should therefore be deemed to have been in good faith under section 363(m).[39]

### iii. The Debtors Are Not Relying on the Special Committee's KEIP Investigation to Support a Good Faith Finding.

30. The Committee asserts that the Debtors "lean heavily (indeed, exclusively) on the Special Committee's investigation to show good faith," while "withhold[ing] documents" and "evidence [which] has not been produced."[40] To the contrary, the Debtors have produced all evidence uncovered during the KEIP Investigation, which the Committee has had ample time to review.[41] It is this very evidence which the Debtors offer in support of a "good faith" finding. The "cloud" the Committee perceived over the Debtors' sale process has been lifted. The evidence only supports the fact that the Debtors conducted an extensive sale process in good faith, upon which the Court may find that the sale was also for "value." As a result, the Stalking Horse Bidder is entitled to a "good faith" finding under section 363(m).

---

[39] To the extent the Committee is challenging the good faith finding pursuant to section 363(m) on the grounds that the sale is conditional on releases being granted by the Debtors to the Sponsor, this is simply not the case here. *See contra In re Exaeris, Inc.*, 380 B.R. 741 (Bankr. D. Del. 2008). The releases in the Plan are not tied to the sale. The Debtors filed the original version of the Disclosure Statement and Plan on December 31, 2024. *See* Docket Nos. 390, 391. The original version of the Plan did not include releases of claims against the Sponsor by the Debtors. Rather, any such releases were made explicitly subject in all respects to the conclusion of the Special Committee's Independent Investigation (as defined in the Disclosure Statement), as the Independent Investigation was still ongoing at that time. *See* Article VIII.B of the *Joint Chapter 11 Plan of Exactech, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 390].

[40] Committee Sale Objection at ¶¶ 102, 105, 107.

[41] Bizarrely, the Committee asserts that "the factual record is still in the process of being developed," and, therefore, "it would be better off if [a good faith] finding were made after discovery is completed." Committee Sale Objection at ¶ 91. The Debtors produced all evidence in connection with the KEIP Investigation and the Committee took six related depositions, all before the Committee filed the Committee Sale Objection. *See* Docket Nos. 835, 842–846.

**II.     The Stalking Horse Bidder is Entitled to Take the Debtors' Business Free and Clear of any Successor Liability Under Section 363(f) of the Bankruptcy Code.**

> **A.     The Sale Should be Approved "Free and Clear" of Successor Liability Under Section 363(f).**

31.     Section 363(f) of the Bankruptcy Code provides that estate property may be sold "free and clear of any interest in such property of an entity other than the estate" if any one of five of its requirements enumerated therein is satisfied.[42]  As discussed in the next paragraph, successor liability is included among the interests which such sale may be free and clear of, provided that the underlying claim giving rise to the successor liability arose prepetition.  Courts have regularly included express findings stating as much, including in the mass tort context.[43]

32.     In the Committee Sale Objection, the Committee cites to *Lefever v. K.P. Hovanian Enterprises, Inc.*[44] as support for its contention that "applicable state law may allow claims to pass through to the purchaser given the circumstances here."[45]  However, the Committee ignores the Third Circuit's holding in *In re Trans World Airlines*:[46]  "[T]he Third Circuit's binding decision in *TWA* rejected the legal premise of the *Lefever* majority's analysis of section 363(f)[.]"[47]  The *Lefever* court held that a section 363(f) sale did not cut off product liability claims because, in the *Lefever* court's analysis, the personal injury claimant "had no 'interest' in the sense of a lien or

---

[42]     11 U.S.C. § 363(f)(1)–(5); *See also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

[43]     *See, e.g., In re Imerys Talc America, Inc.*, No. 19-10289-LSS (Bankr. D. Del. Nov. 17, 2020) [Docket No. 2539] at ¶¶ 29–31 ("the Buyer shall have no successor or vicarious liability of any kind or character . . ."); *Independent Pet Partners Holdings, LLC*, No. 23-10153-LSS (Bankr. D. Del. Apr. 4, 2023) [Docket No. 374] at ¶ 22; *In re PhaseBio Pharmaceuticals, Inc.*, No. 22-10995-LSS (Bankr. D. Del. Feb. 2, 2023) [Docket No. 433] at ¶¶ 13–14; *In re Winc, Inc.*, No. 22-11238-LSS (Bankr. D. Del. Jan. 18, 2023) [Docket No. 203] at ¶ 17.

[44]     160 N.J. 307 (1999).

[45]     Committee Sale Objection at ¶ 111.

[46]     322 F.3d 283 (3d Cir. 2003).

[47]     *In re East Orange General Hospital, Inc.*, 587 B.R. 53, 82 (D.N.J. 2018);  *see also In re Ormet Corporation*, 2014 WL 3542133 (Bankr. D. Del. 2014) ("It is the express language of section 363(f) that allows the sale of these assets free and clear of the successor liability claim[.]").

encumbrance on the property."[48]   This analysis is expressly at odds with the Third Circuit's holding in *TWA* that "to equate interest in property with only *in rem* interests such as liens would be inconsistent with section 363(f)(3), which contemplates that a lien is but only one type of interest."[49]   Instead, where "the claims against [the selling debtor] [are] connected to or arise from the assets sold," the sale may be approved "'free and clear' of successor liability."[50]   In *TWA*, the Third Circuit found that this standard was met where the debtor was selling its airline assets, and the debtor's initial investment in those assets necessitated the employment of the airline workers who, as a result of such employment, came to possess the claims at issue.[51]   The connection between the Debtors' assets being sold in these chapter 11 cases and the personal liability claims held against the Debtors is far more obvious here than in *TWA*—the Debtors are selling the entirety of their business, which includes the equipment, operations, contracts, and intellectual property that gave rise to the production of the products which serve as the basis of the personal injury claimants' claims.   Therefore, under the *TWA* standard, the Debtors may sell their assets free and clear of successor liability claims.

33.      Under section 363(f)(4), a sale free and clear is appropriate where the interests are subject to a bona fide dispute.   Courts have held that "a bona fide dispute" exists when "there is an objective basis for a factual or a legal dispute as to the validity of the alleged property interest."[52]   Here, the Debtors litigated for years over legal and factual issues that would form the basis of any

---

[48]   *Lefever* at ¶¶ 317, 320.

[49]   *TWA* at ¶ 290.

[50]   *Id*. at ¶ 285.

[51]   *Id*. at ¶¶ 289–290.

[52]   *In re Vortex Fishing Sys., Inc.*, 277 F.3d 1057, 1064 (9th Cir. 2002).

successor liability claim, and no judgments have been entered with respect to the underlying products liability or other tort claims.[53]

34.    Additionally, the Debtors respectfully submit that 363(f)(5) of the Bankruptcy Code is satisfied because tort claims, if ultimately proven and liquidated, are precisely the type of interests that may be compelled to accept a money satisfaction.[54]  Section 363(f)(5) expressly authorizes the sale of a property in which a debtor's estate has an interest free and clear of the interests of any third party so long as the third party "could be" compelled to accept a money satisfaction in "a legal or equitable proceeding."[55]  In this instance, the relief sought by the tort claimants is monetary damages, as evidenced by their own pleadings in the underlying litigation.[56] Their asserted interests are therefore fully reducible to, and compensable by, money damages. Notably, section 363(f)(5) does not require that the Plan provide them a direct "money satisfaction."[57]  It is sufficient that the law allows for the possibility of such remedy.[58] Accordingly, the tort claims fall squarely within the ambit of section 363(f)(5), and the Debtors are entitled to sell their assets free and clear of such interests, subject to the claimants' right to seek monetary recovery from the proceeds or otherwise in accordance with the Bankruptcy Code.

---

[53]    *See* First Day Declaration at ¶¶ 50–54.

[54]    11 U.S.C. § 363(f)(5).  Under 11 U.S.C. § 365(f)(5), property may be sold free and clear of unliquidated claims that would be converted to dollar amounts in a chapter 7 liquidation.  *See Trans World Airlines* at ¶ 291. 11 U.S.C. § 502(c) provides that "any contingent or unliquidated claim" "shall be estimated."  Tort claims may be contingent and unliquidated.  *See, e.g., In re Federal-Mogul Global, Inc.*, 330 B.R. 133, 154 (D. Del. 2005) ("It is undisputed that the Personal Injury Claims are contingent and unliquidated . . .").

[55]    11 U.S.C. § 363(f)(5).

[56]    *See e.g., In re: Exactech Polyethylene Orthopedic Products Liability Litigation*, MDL No: 3044, Case No. 1:22-md-03044-NGG-MMH.

[57]    11 U.S.C. § 363(f)(5).

[58]    *Id.*

35.    Failure to find that the Stalking Horse Bidder is entitled to take the Debtors' business free and clear of successor liability will leave the Debtors unable to satisfy a condition to closing under the Stalking Horse APA and the Debtors expect that the Stalking Horse Bidder would terminate the Stalking Horse APA, causing extreme harm to the Debtors' stakeholders.[59] Indeed, it is highly unlikely that the Debtors could ever find a purchaser willing to purchase their assets without a determination that such purchase is free and clear of successor liability.  Without such a determination, the Stalking Horse Bidder could (and almost certainly would) terminate the transaction, significantly undermining the Debtors' reorganization efforts and adversely affecting all stakeholders involved.

36.    Accordingly, the Debtors submit that the sale should be approved free and clear of any interest in such property under section 363(f) because tort claimants may be compelled to accept a money satisfaction of their interests and such interests are subject to a bona fide dispute.

**B.    The Causes of Action Are Being Released, Not Sold.**

37.    The Committee states that the Proposed Sale Order "is unclear regarding the status of the Estates' claims and causes of action against current and former Insiders and Affiliates" and questions whether the Debtors intend to sell these causes of action in contradiction to the agreement reached between the Committee and the Ad Hoc Group to carve out the causes of action from the sale.  This agreement is now irrelevant.  The Stalking Horse APA always provided that causes of action against the Debtors current and former directors and officers would be sold to the

---

[59]    The Stalking Horse APA includes as a condition to closing the entry by the Court of the Sale Order "in form and substance consistent with the RSA," requiring that the Sale Order "find that the Purchaser shall have no Liability or responsibility for any obligation of any Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liability of any kind of character, including any theory of antitrust, environmental, successor or transferee Liability, labor law, de facto merger or substantial continuity[.]"  §§ 7.1(c)–(d), 5.3(f).  Failure to satisfy this condition to closing would allow either the Purchaser or the Seller to terminate the Stalking Horse APA.  § 8.1(d).

Stalking Horse Bidder only if not released.[60]  These causes of action are not being sold to the Stalking Horse Bidder; they are being released pursuant the settlement reached among the Special Committee and the Sponsor (as defined in the Plan).  Causes of action against the Debtors' former directors, officers and affiliates who are not "Released Parties" (as defined in the Plan) are being transferred to the Wind-Down Trust (as defined in the Plan).

## III.    The Qui Tam Settlement Should Be Approved.

38.    The Committee's Qui Tam Settlement Objection seeks to defer the hearing on the Debtors' Qui Tam Settlement Motion [61] on the basis that (a) the Settlement Agreement is conditioned on the Approved Plan Effective Date, (b) the Settlement Agreement is conditioned on the closing of the Sale, and (c) the Committee has not had the opportunity to conduct independent diligence into the Settlement Agreement. [62]  There is no basis to delay the hearing on the approval of the Qui Tam Settlement Motion.  The Debtors have been clear since the start of these chapter 11 cases, both in written filings[63] and conversations with the Committee, that the Debtors were pursuing a settlement with the Settlement Parties.  Further, in accordance with Bankruptcy Rule 2002(a)(3), the Debtors provided twenty-one days notice of the hearing on the Qui Tam Settlement Motion.

---

[60]    Stalking Horse APA, Art. 1.1(n).

[61]    *Debtors' Motion for Entry of an Order (I) Approving Settlement Agreement Related to Qui Tam Litigation Among Exactech, Inc., the United States of America, and Certain Relators, (II) Authorizing the Debtors to Take Any and All Actions Necessary to Effectuate the Terms Thereto, and (III) Granting Related Relief* [Docket No. 1059] (the "Qui Tam Settlement Motion").  Capitalized terms used in this Section III but not otherwise defined herein shall have the meanings ascribed to such terms in the Qui Tam Settlement Motion.

[62]    Committee Qui Tam Settlement Objection at ¶¶1, 5.

[63]    *See, e.g., Declaration of Jesse York, Chief Restructuring Officer of Exactech, Inc., in Support of Debtors' Chapter 11 Petitions and First Day Motion* [Docket No. 18] ("The Company and its advisors intend to continue working diligently with the DOJ during these chapter 11 cases to fully, fairly, and consensually resolve the Qui Tam Claims."); *Fourth Amended Disclosure Statement Relating to the Third Amended Joint Chapter 11 Plan of Exactech, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* at Art. VI.C ("The Debtors and their advisors have continued to work diligently during these Chapter 11 Cases to achieve, if possible, a full, fair, and consensual resolution to the Qui Tam Claims.").

39.     As set forth in more detail in the Qui Tam Settlement Motion, the Settlement Agreement only benefits the Debtors and their Estates.  The Settlement Agreement (a) liquidates the FCA Liabilities which are meaningful claims against the Debtors which would otherwise constitute General Unsecured Claims under the Plan and be entitled to a *pro rata* share of the distributions available for Holders of General Unsecured Claims, and (b) provides for no consideration to be paid by the Debtors, with the Settlement Amount instead being an Assumed Liability under the Stalking Horse APA.

40.     Approval of the Settlement Agreement is important to the Stalking Horse Bidder to ensure a smooth transition following the closing of the Sale.  Delaying the hearing on the Qui Tam Settlement Motion would result in the Debtors' incurring additional, unnecessary expenses for a further hearing on a matter related to the Sale and could result in either a delay in the closing of the Sale or even preclude the ability of the Debtors to enter into the Settlement Agreement if the Settlement Agreement is not approved prior to the Sale closing.  Any alleged prejudice to the Committee by its purported lack of diligence is due only to the Committee's failure to conduct such diligence and should not be held against the Debtors to the detriment of the Debtors and their Estates.

**CONCLUSION**

41.     For the foregoing reasons, the Debtors respectfully request that the Court overrule the Committee Sale Objection, the Committee Qui Tam Settlement Objection, and the U.S. Trustee Reservation of Rights and approve the Sale pursuant to the Proposed Sale Order, including the Good Faith Findings and a finding that the Stalking Horse Bidder is entitled to purchase the Debtors' business free and clear of any successor liability pursuant to section 363(f).

*[Remainder of This Page Intentionally Left Blank]*

Dated: May 23, 2025
Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Elizabeth S. Justison*
Ryan M. Bartley (No. 4985)
Elizabeth S. Justison (No. 5911)
Andrew M. Lee (No. 7078)
1000 North King Street
Rodney Square
Wilmington, Delaware 19801
Tel.: (302) 571-6600
Facsimile: (302) 571-1253
Email: rbartley@ycst.com
ejustison@ycst.com
alee@ycst.com

-and-

**ROPES & GRAY LLP**
Ryan Preston Dahl (admitted *pro hac vice*)
Benjamin M. Rhode (admitted *pro hac vice*)
Luke Smith (admitted *pro hac vice*)
191 N. Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
E-mail: ryan.dahl@ropesgray.com
benjamin.rhode@ropesgray.com
luke.smith@ropesgray.com

-and-

Gregg M. Galardi (No. 2991)
Lindsay Barca (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, NY 10036
Telephone: (212) 596-9000
Facsimile: (646) 728-1652
Email: gregg.galardi@ropesgray.com
lindsay.barca@ropesgray.com

*Co-Counsel to the Debtors and Debtors in Possession*