**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Exactech, Inc., *et al*,[1]<br><br>              Debtors. | Chapter 11<br><br>Case No. 24-12441 (LSS)<br><br>(Jointly Administered)<br><br>**Ref. Docket Nos. 1059, 1095 & 1554** |

**DECLARATION OF ELIZABETH ABRAMS IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING SETTLEMENT AGREEMENT RELATED TO QUI TAM LITIGATION AMONG EXACTECH, INC., THE UNITED STATES OF AMERICA, AND CERTAIN RELATORS, (II) AUTHORIZING THE DEBTORS TO TAKE ANY AND ALL ACTIONS NECESSARY TO EFFECTUATE THE TERMS THERETO, AND (III) GRANTING RELATED RELIEF**

I, Elizabeth Abrams, declare pursuant to 28 U.S.C. § 1746 as follows:

1. I am a member of the Special Committee (the "Special Committee") of the Boards of Directors of Osteon Intermediate Holdings II, Inc., Exactech, Inc., and XpandOrtho, Inc. In such capacity, I am authorized to submit this declaration (the "Declaration").

2. I have more than 20 years of experience in corporate finance, working with boards, investors, and management teams to develop strategies for navigating transformational changes. Since 2023, I have served as an independent director on the boards of several companies. I have advised on many complex restructuring transactions across sectors. Prior to becoming an independent director, between 2021 and 2022 I served as the Chief Financial Officer for K Health, an AI-driven growth-stage healthcare company at which I developed the company's finance function from scratch and implemented rigorous financial reporting, systems, and processes. Prior

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Osteon Holdings, Inc. (7042); Osteon Intermediate Holdings I, Inc. (7778); Osteon Intermediate Holdings II, Inc. (1292); Exactech, Inc. (3930); and XpandOrtho, Inc. (4250). The Debtors' service address is 2320 NW 66th Court, Gainesville, Florida 32653.

to K Health, I spent my career as an investment banker. Most recently, from 2018 to 2021, I was a Senior Managing Director at Guggenheim Securities, where I advised stressed and distressed companies and their stakeholders in executing value-maximizing restructuring and liability-management transactions. From 2012 to 2018, I was a Managing Director at Millstein & Co., a financial advisory firm, where I originated, structured, and executed complex restructuring, capital markets, and M&A transactions.

3.      I submit this Declaration in support of the *Debtors' Motion for Entry of an Order (I) Approving Settlement Agreement Related to Qui Tam Litigation Among Exactech, Inc., the United States of America, and Certain Relators, (II) Authorizing the Debtors to Take Any and All Actions Necessary to Effectuate the Terms Thereto, and (III) Granting Related Relief* [Docket No. 1059] (the "Motion").[2]

4.      In my capacity as a member of the Special Committee, I have been actively involved in these cases, including in the formulation of the proposed Settlement Agreement. Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents and the Debtors' books and records, my discussions with members of the Debtors' senior management, my opinion based upon my experience and knowledge related to the Debtors' operations, business, and financial condition, or upon information supplied to me by the Debtors' professionals and advisors. If called upon to testify, I would testify competently to the facts set forth herein.

5.      In my view, for the reasons set forth herein and in the Motion, the resolution embodied in the Settlement Agreement is in the best interests of the Debtors, their estates, their creditors, and other parties in interest and should be approved.

---

[2]    Capitalized terms used but not defined in this Declaration have the meanings ascribed to them in the Motion.

**THE FCA LIABILITIES AND SETTLEMENT NEGOTIATIONS**

6.    As discussed more fully in the First Day Declaration, the Debtors' ability to resolve their financial situation outside of formal chapter 11 proceedings was, in part, frustrated by the overhang of certain claims asserted pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b) (the "FCA Liabilities"), including the Alabama Action and the Maryland Action, and additional products liability claims.  The Alabama Action was commenced on June 29, 2018, by Brooks Wallace, Robert Farley, and Manuel Fuentes (collectively, the "Alabama Relators") who filed a *qui tam* action against Exactech in the United States District Court for the Northern District of Alabama captioned *United States ex rel. Wallace v. Exactech, Inc.*, No. 7:18-cv-1010 (N.D. Ala.), pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b). Among other things, the Alabama Relators alleged Exactech's Optetrak system with the Finned Tibia Tray was defective.  The Alabama Relators alleged, among other things, that Exactech caused false claims to be submitted for reimbursement from the federal government by selling allegedly misbranded knee devices and allegedly defective knee devices that were not medically reasonable and necessary.

7.    On August 7, 2019, the United States declined to intervene in the Alabama Action; however, the Alabama Relators proceeded with the case.  Exactech expended considerable resources defending the case while also engaging in several attempts to settle the dispute, including mediations with the Alabama Relators beginning in April 2022 and engagement with the United States in settlement negotiations beginning in late-October 2023 and throughout mid-2024.

8.    On December 31, 2021, Pasquale Petrera (the "Maryland Relator") commenced the Maryland action by filing a *qui tam* action against Exactech and TPG Capital, L.P. in the United States District Court for the District of Maryland captioned *United States ex rel. Petrera v.*

*Exactech, Inc.*, Civil No. 21-3325-SAG (D. Md.), pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b).  Among other things, the Maryland Relator alleged that certain Exactech knee systems were defective.  Certain states also have or may have claims based on the conduct covered by the FCA Liabilities under those states' false claims act or other statutes.

9.     The Debtors began settlement discussions to reach a consensual resolution of the FCA Liabilities with the Relators in April 2022 and with the United States in October 2023, and the Settlement Agreement is the product of those extensive negotiations.  Resolution of the FCA Liabilities on the terms set forth in the Settlement Agreement is crucial to the Stalking Horse Purchaser, and Exactech, because it removes the cloud of uncertainty on the Debtors' business related to the FCA Liabilities.  Pursuant to the Stalking Horse APA, the FCA Liabilities are not Assumed Liabilities, meaning they will remain with the Debtors' estates following the closing of the sale transaction.

## THE SETTLEMENT AGREEMENT

10.     I believe that the Settlement Agreement provides a net benefit to the Debtors' estates and creditors and that, without the Settlement Agreement, the Debtors' go-forward business would be plagued with many of the challenges that prevented the Debtors from being successful prepetition.  The effectiveness of the Settlement Agreement is conditioned on the closing of the Sale, and the amounts payable by the Debtors pursuant to the Settlement Agreement are being assumed in full as Assumed Liabilities under the Stalking Horse APA.  The Settlement Agreement provides a benefit to the Debtors' estates, including by removing substantial claims from the General Unsecured Claims pool and thereby increasing the pro rata share for remaining General Unsecured Claims, and by enhancing the value of the go-forward business, without reducing any current contemplated recoveries under the Plan.

4

11.    To reach a resolution beneficial to all parties that also maximizes the value of the Debtors' estates, the Settlement Parties engaged in extensive good-faith, arm's-length negotiations, and entered into the Settlement Agreement, which,  subject to the closing of the Sale Transaction and the Settlement Agreement remaining in full force and effect, provides for (i) the Stalking Horse Purchaser's payment of $8 million to the United States and the Medicaid Participating States, (ii) releases by Exactech of the applicable Medicaid Participating States, (iii) conditioned upon the United States receiving the Federal Settlement Amount, the United States' payment of certain amounts to the Relators, (iv) the Stalking Horse Purchaser's payment, on behalf of Exactech, of the Relators' reasonable expenses, attorneys' fees and costs, up to $810,000 in the aggregate, in full and final satisfaction of such reasonable expenses, attorneys' fees, and costs, and (v) various mutual releases by and among the Settlement Parties, as set forth more fully in the Motion and the Settlement Agreement.[3]

12.    I believe that entry into the Settlement Agreement is in the best interests of the Debtors' estates and creditors and that the Settlement Agreement should be approved.  The Settlement Agreement resolves myriad legal issues and claims among the Settlement Parties, the probability of success of which is highly speculative.  The outcome with the highest probability under the circumstances of these Chapter 11 Cases is mutually-assured destruction that would result in millions of dollars spent on litigating various claims, the result of which would put the Settlement Parties in no better place—and indeed, a much worse place—than the Settlement Agreement affords.

---

[3]    This summary is qualified in its entirety by reference to the Settlement Agreement, filed at Docket No. 1554.  In the event of any inconsistency between the summary and Settlement Agreement, the Settlement Agreement controls in all respects.  Capitalized terms used but not otherwise defined in this section shall have the meanings ascribed to such terms in the Settlement Agreement.

13.    The Debtors anticipate closing on a sale of substantially all of their assets in the coming months to the Stalking Horse Purchaser.  The FCA Liabilities are not Assumed Liabilities under the Stalking Horse APA, meaning they would remain with the Debtors' estates following the closing.  The claims related to the FCA Liabilities are General Unsecured Claims under the Debtors' proposed Plan.  Absent the Settlement Agreement, the Debtors anticipate that the United States and the Relators would file significant claims that would cut into the already limited pool of assets available for distribution to holders of General Unsecured Claims.  As noted above, through the proposed settlement, subject to certain conditions, the Stalking Horse Purchaser will assume the liability related to the Settlement Amount, so no estate resources will be expended towards the Settlement Amount, even though it will result in a direct reduction of claims against the Debtors' estates.  As a result, holders of General Unsecured Claims will be better off as a result of the Settlement Agreement.

14.    The FCA Liabilities were one of the Debtors' biggest challenges to successfully implementing an out-of-court restructuring.  The Settlement Agreement enhances the value of the Debtors' business, which is clearly in the best interest of the Debtors' secured lenders, go-forward vendors, contract counterparties, and employees.  The Settlement Agreement ensures that one of the Debtors' most significant and consistent challenges is resolved, such that the Debtors' go-forward operations will not be plagued by costly and time-consuming litigation needed to resolve the FCA Liabilities outside of this Settlement Agreement.  Further, the Settlement Agreement is a key stepping stone towards ensuring a cooperative relationship with the government.  Working with government regulators is a constant requirement in the Debtors' industry, and maintaining a positive working relationship with the government is undeniably beneficial for the Debtors' go-forward business.

15.    I understand that the Stalking Horse Purchaser, as the future owner of substantially all of the Debtors' assets (subject to Court approval of the sale transaction), is in full support of the Settlement Agreement, and the effectiveness of the Settlement Agreement is conditioned on the closing of the sale to the Stalking Horse Purchaser.

16.    In sum, I believe that the terms set forth in the Settlement Agreement are reasonable and in the best interests of the Debtors, their estates, and creditors and other parties in the Chapter 11 Cases, and that entry into the Settlement Agreement is a sound exercise of the Debtors' business judgment.  The Settlement Agreement, and the Debtors' decision to enter into it, paves the way for the Debtors to be successful post-emergence.  The compromise embodied in the Settlement Agreement is the product of extensive good-faith and arm's-length negotiations between the Settlement Parties and should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: September 11, 2025                              /s/ Elizabeth Abrams
                                                                      Elizabeth Abrams
                                                                      Member of the Special Committee