**Exhibit 1**

**Settlement Agreement**

<u>SETTLEMENT AGREEMENT</u>

This Settlement Agreement ("Agreement") is entered into among the United States of America, acting through the United States Department of Justice, and on behalf of the Office of Inspector General ("OIG-HHS") of the Department of Health and Human Services ("HHS"), and the United States Department of Veterans Affairs ("VA") (collectively, the "United States"); Exactech, Inc. ("Exactech"); Brooks Wallace, Robert Farley, and Manuel Fuentes (collectively, the "Alabama Relators"); and Pasquale Petrera (the "Maryland Relator") (collectively, "the Parties"), through their authorized representatives.

<u>RECITALS</u>

A.      Exactech is a medical device company based in Gainesville, Florida, that develops and markets joint-replacement implants.  Among the implants that Exactech has marketed are the Optetrak, Logic, and Truliant knee prostheses systems, which are used in total-knee replacement surgery.

B.      On June 29, 2018, the Alabama Relators filed a *qui tam* action against Exactech in the United States District Court for the Northern District of Alabama captioned *United States ex rel*. *Wallace v. Exactech, Inc.*, No. 7:18-cv-1010 (N.D. Ala.), pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b) (the "Alabama Action").  Among other things, the Alabama Relators alleged the Optetrak system with the Finned Tibia Tray was defective.  On August 7, 2019, the United States declined to intervene in the Alabama Action.

C.      The Alabama Relators contend that Exactech submitted or caused to be submitted claims for payment to the Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395lll ("Medicare"); the Medicaid Program, 42 U.S.C. §§ 1396-1396w-5 ("Medicaid"); and the VA, 38 U.S.C. Chapter 17.

D.    The Alabama Relators contend that the United States has certain civil claims against Exactech arising from false claims that Exactech submitted or caused to be submitted to Medicare, Medicaid, and the VA based on the following alleged conduct (referred to herein as the "Alabama Action Covered Conduct"):

> Starting in 1994, Exactech marketed and sold the Optetrak family of total knee replacement systems.  One component of a total knee replacement system is the "tibial tray," which is a metal component that fits into a patient's tibia.  Exactech offered a tibial tray with fins, which Exactech called the "Finned Tibial Tray," as part of the Optetrak system.

> By January 1, 2008, Exactech allegedly was aware that the Finned Tibial Tray failed prematurely at a higher than acceptable rate and was not reasonable and necessary for use during total-knee replacement surgeries performed on Medicare, Medicaid, and VA beneficiaries.  Exactech continued to market and sell the Finned Tibial Tray for use during total-knee replacement surgeries for Medicare, Medicaid, and VA beneficiaries.  The relevant Finned Tibial Tray components are those that were used in knee replacement surgeries of Medicare, Medicaid, and VA beneficiaries between January 1, 2008, and December 31, 2018.

E.    On December 31, 2021, the Maryland Relator filed a *qui tam* action against Exactech and TPG Capital, L.P. in the United States District Court for the District of Maryland captioned *United States ex rel. Petrera v. Exactech, Inc.*, Civil No. 21-3325-SAG (D. Md.), pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b) (the "Maryland Action").  Among other things, the Maryland Relator alleged that Exactech's Logic and Truliant TKA (Total Knee Arthroplasty) systems were defective.

F.    On October 29, 2024, Exactech and certain of its affiliated debtors each filed voluntary petitions for relief pursuant to chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") in the case styled,  *In re Exactech, Inc., et al*, Bankruptcy Case No. 24-12441 (LSS) (Bankr. Del.)(the "Bankruptcy Proceedings").  Only the Exactech debtor is a party

2

to this Agreement.  Exactech is operating its business and managing its properties as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

G.    The Maryland Relator contends that the United States has certain civil claims against Exactech arising from false claims submitted or caused to be submitted by Exactech to Medicare, Medicaid, and the VA based on the following alleged conduct (referred to herein as the "Maryland Action Covered Conduct"):

> In 2009, Exactech began marketing and selling the Optetrak Logic system for total knee replacements.  In or around 2017, Exactech transitioned from the Optetrak Logic system to the Truliant system.  The Optetrak Logic and Truliant systems both contained a polyethylene component.
>
> As early as January 1, 2019, Exactech allegedly was aware that the polyethylene component in certain Logic and Truliant knee replacement systems failed prematurely at a higher than acceptable rate and therefore was not reasonable and necessary for use during total-knee replacement surgeries performed on Medicare, Medicaid, and VA beneficiaries. Exactech nonetheless continued to market and sell the Logic and Truliant knee systems with these defective polyethylene components for use during total-knee replacement surgeries for Medicare, Medicaid, and VA beneficiaries.
>
> Exactech represented to the Food and Drug Administration that the failures were the result of a packaging nonconformity in certain lots of the polyethylene component.  Specifically, Exactech represented that certain vacuum bags were non-conforming because they did not contain a secondary barrier layer of ethylene vinyl alcohol, which Exactech asserts provides additional oxygen resistance.  On August 31, 2021, Exactech initiated a limited recall of polyethylene component inserts packaged in non-conforming vacuum bags based on their shelf life.  On February 7, 2022, Exactech expanded the recall to apply to additional polyethylene component inserts packaged in non-conforming vacuum bags regardless of their shelf life.
>
> The relevant polyethylene components are Logic and Truliant knee replacement polyethylene components used in knee replacement surgeries of Medicare, Medicaid, and VA beneficiaries between January 1, 2019, and February 7, 2022.  The Maryland Action Covered Conduct includes any allegedly false claims submitted or caused to be submitted by Exactech to Medicare, Medicaid, and the VA for Logic and Truliant knee replacement polyethylene components used in knee replacement surgeries of Medicare, Medicaid, and VA beneficiaries between January 1, 2019, and February 7, 2022.

The United States intends to intervene in the Maryland Action with respect to the Maryland Action Covered Conduct solely for purposes of settlement with Exactech. The Alabama Action Covered Conduct and the Maryland Action Covered Conduct are jointly referred to below as the "Covered Conduct."

H.      Certain states also have or may have claims based on the Covered Conduct under those states' false claims act or other statutes. Exactech will enter into separate settlement agreements (hereinafter referred to as the "Medicaid State Settlement Agreements") with certain states in settlement of the conduct released in those separate Medicaid State Settlement Agreements. States with which Exactech (with the consent of the DIP Lenders) execute a Medicaid State Settlement Agreement in the form to which they and the States have agreed through a state negotiating team, or in a form otherwise agreed to by them and an individual State, shall be defined as "Medicaid Participating States." Those State Settlement Agreements shall govern Exactech's obligations with respect to the Covered Conduct.

I.      This Settlement Agreement is neither an admission of liability by Exactech nor a concession by the United States that its claims are not well founded.

J.      Together the Alabama Relators and the Maryland Relator are referred to as "Relators." Relators claim entitlement under 31 U.S.C. § 3730(d) to a share of the proceeds of this Settlement Agreement and to Relators' reasonable expenses, attorneys' fees, and costs.

K.      The Parties have negotiated this Agreement in good faith and at arm's length and will seek approval of the Agreement, with the consent of the DIP Lenders, by the Bankruptcy Court overseeing the Bankruptcy Proceedings, which approval may be included in the Bankruptcy Court's order confirming the Approved Plan, which will incorporate the terms of this Agreement and the transactions contemplated hereunder.

To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, and in consideration of the mutual promises and obligations of this Settlement Agreement, the Parties agree and covenant as follows:

### TERMS AND CONDITIONS

1.    On or before the Approved Plan Effective Date, and subject to the Bankruptcy Court's approval for Exactech to perform under this Agreement, Exactech shall pay to the United States and the Medicaid Participating States, collectively, $8,000,000 as specified in this Paragraph 1 (the "Settlement Amount").  Exactech shall make the payment due under this Paragraph 1 as follows:  $7,640,000 to the United States ("Federal Settlement Amount"), of which $7,640,000 is restitution, by wire transfer pursuant to written instructions provided by the Civil Division of the United States Department of Justice, and $360,000 to the Medicaid Participating States ("State Settlement Amount"), of which $360,000 is restitution, pursuant to wire instructions provided by the Medicaid Participating States to Exactech according to the terms of the Medicaid State Settlement Agreements.

2.    Conditioned upon the United States receiving the Federal Settlement Amount, the United States agrees that it shall pay:

   a.    $1,329,360 to Alabama Relators by electronic funds transfer ("Alabama Relators' Share") as soon as feasible after receipt of the payment from Exactech.

   b.    $565,360 to Maryland Relators by electronic funds transfer ("Maryland Relator's Share") as soon as feasible after receipt of the payment from Exactech.

3.    Exactech has agreed to pay Relators' reasonable expenses, attorneys' fees and costs, as contemplated by 31 U.S.C. § 3730(d) and comparable provisions of any applicable state statutes and will do so subject to terms set forth in a separate agreement that Exactech and

5

Relators will enter into contemporaneously with this agreement. No additional attorneys' fees, expenses, or costs, whether related to 31 U.S.C. § 3730(d) or otherwise, shall be paid to or claimed by Relators or their counsel.

4.      Subject to the exceptions in Paragraph 6 (concerning reserved claims) below, and subject to Paragraph 11 (concerning disclosure of assets), Paragraph 20 (concerning default), and Paragraph 21 (concerning bankruptcy) below, and upon the United States' receipt of the Federal Settlement Amount, the United States releases Exactech, together with its current and former parent corporations; direct and indirect subsidiaries; brother or sister corporations; divisions; current or former corporate owners; and the corporate successors and assigns of any of them ("Exactech Federal Releasees"), from any civil or administrative monetary claim the United States has for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; or the common law theories of payment by mistake, unjust enrichment, and fraud.

5.      Subject to the exceptions in Paragraph 6 below, and subject to Paragraph 11 (concerning disclosure of assets), Paragraph 20 (concerning default), and Paragraph 21 (concerning bankruptcy) below, and upon the United States' receipt of the Settlement Amount, Relators, for themselves and for their heirs, successors, attorneys, agents, and assigns, releases Exactech, together with its current and former parent corporations; direct and indirect subsidiaries, brother or sister corporations, divisions, any acquirers of Exactech's assets or business (including any successful bidder in the Bankruptcy Proceedings and its owners, members, or partners (including any investment managers thereof)), each of the foregoing's direct or indirect subsidiaries, the corporate successors and assigns of any of the foregoing, and

6

each of the foregoing's respective current and former directors, officers, and employees (the "Exactech Releasees") from claims for relief, actions, rights, causes of action, suits, debts, obligations, liabilities, demands, losses, damages, costs and expenses of any kind, whether known or unknown as of the Approved Plan Effective Date that any Relator has, may have, could have asserted, or may assert in the future against the Exactech Releasees on their behalf, on behalf of the United States, on behalf of any state or local government or sovereign, or on behalf of any other person or entity, including but not limited to any claim relating to in any way the Covered Conduct, the allegations in the *qui tam* complaints, the investigation and prosecution of this matter, or the negotiation of this Agreement, any claims for attorneys' fees, costs, or expenses, including under 31 U.S.C. § 3730(d) or any other state or local law that is similar, comparable, or equivalent to 31 U.S.C. § 3730(d) (including, without limitation, the law governing each claim set forth in the qui tam complaint), including all liability, claims, demands, actions or causes of action existing as of the Approved Plan Effective Date, fixed or contingent, in law or in equity, in contract or in tort, or under any federal or state statute, regulation, or common law, and from any civil monetary claim the Relators have on behalf of the United States for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733.

6.      Notwithstanding the releases given in Paragraph 4  of this Agreement, or any other term of this Agreement, the following claims and rights of the United States are specifically reserved and are not released:

     a.      Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

     b.      Any criminal liability;

c.     Except as explicitly stated in this Agreement, any administrative liability or enforcement right, including mandatory or permissive exclusion from Federal health care programs;

d.     Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

e.     Any liability based upon obligations created by this Agreement; and

f.     Any liability of individuals or entities other than the Exactech Federal Releasees, including any liability of TPG, Inc. and its current and former parent corporations; direct and indirect subsidiaries; brother or sister corporations; divisions; current or former corporate owners; and the corporate successors and assigns of any of them;

g.     Any liability for failure to deliver goods or services due; and

h.     Any liability for personal injury or property damage or for other consequential damages arising from the Covered Conduct.

7.     Relators, for themselves and for their heirs, successors, attorneys, agents, and assigns shall not object to this Agreement but agree and confirm that this Agreement is fair, adequate, and reasonable under all the circumstances, pursuant to 31 U.S.C. § 3730(c)(2)(B).

8.     Conditioned upon the Alabama Relators' receipt of the Alabama Relators' Share, the Alabama Relators and their heirs, successors, attorneys, agents, and assigns fully and finally release, waive, and forever discharge the United States, its agencies, officers, agents, employees, and servants, from any claims arising from the filing of the Civil Action or under 31 U.S.C. § 3730, and from any claims to a share of the proceeds of this Agreement, the Alabama Civil Action, and/or the Maryland Civil Action.

9.      Conditioned upon the Maryland Relator's receipt of the Maryland Relator's Share, the Maryland Relator and his heirs, successors, attorneys, agents, and assigns fully and finally release, waive, and forever discharge the United States, its agencies, officers, agents, employees, and servants, from any claims arising from the filing of the Civil Action or under 31 U.S.C. § 3730, and from any claims to a share of the proceeds of this Agreement, the Maryland Civil Action, and/or the Alabama Civil Action.

10.     The Relators, for themselves, and for their heirs, successors, attorneys, agents, and assigns, release the Exactech Releasees from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated, outside of those contemplated in a separate agreement that Exactech and Relators will enter into contemporaneously with this agreement) that Relators have asserted, could have asserted, or may assert in the future against Exactech related to the Alabama Civil Action or the Maryland Civil Action or the Covered Conduct and Relators' investigation thereof, or any liability to the Relators arising from the filing of the Alabama Civil Action or the Maryland Civil Action, or under 31 U.S.C. § 3730(d) for expenses or attorneys' fees and costs.

11.     Exactech has provided sworn financial disclosures and supporting documents (together "Financial Disclosures") to the United States and the United States has relied on the accuracy and completeness of those Financial Disclosures in reaching this Agreement. Exactech warrants that the Financial Disclosures are complete, accurate, and current as of the Effective Date of this Agreement. If the United States learns of asset(s) in which Exactech had an interest of any kind as of the Effective Date of this Agreement (including, but not limited to, promises by insurers or other third parties to satisfy Exactech's obligations under this Agreement) that were not disclosed in the Financial Disclosures, or if the United States learns of any false statement or

9

misrepresentation by Exactech on, or in connection with, the Financial Disclosures, and if such nondisclosure, false statement, or misrepresentation changes the estimated net worth set forth in the Financial Disclosures by $5,000,000 or more, the United States may at its option:  (a) rescind this Agreement and reinstate its suit or file suit based on the Covered Conduct or (b) collect the full Settlement Amount in accordance with the Agreement plus one hundred percent (100%) of the net value of Exactech's previously undisclosed assets.  Exactech agrees not to contest any collection action undertaken by the United States pursuant to this provision, and agrees that it will immediately pay the United States the greater of (i) a ten-percent (10%) surcharge of the amount collected in the collection action, as allowed by 28 U.S.C. § 3011(a), or (ii) the United States' reasonable attorneys' fees and expenses incurred in such an action.  In the event that the United States, pursuant to this paragraph rescinds this Agreement, Exactech waives and agrees not to plead, argue, or otherwise raise any defenses under the theories of statute of limitations, laches, estoppel, or similar theories, to any civil or administrative claims that (a) are filed by the United States within 120 calendar days of written notification to Exactech that this Agreement has been rescinded, and (b) relate to the Covered Conduct, except to the extent these defenses were available on June 29, 2018.

12.     Exactech waives and shall not assert any defenses Exactech may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action.

13.     Exactech fully and finally releases the United States, its agencies, officers, agents, employees, and servants from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that Exactech has asserted, could have asserted, or may assert in the future against the United States, its agencies, officers, agents, employees, and servants related to the Covered Conduct or the United States' investigation or prosecution thereof.

14.     Conditioned on the effectiveness of the releases in Paragraphs 4 and 5 of this Agreement and subject to the reservation at the end of this Paragraph, Exactech fully and finally releases the Relators and their heirs, successors, attorneys, agents, and assigns from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that Exactech has asserted, could have asserted, or may assert in the future against Relators related to the Covered Conduct and Relator's investigation or prosecution thereof; *provided* that the releases described in this paragraph shall be withdrawn and rescinded without need for further action by Exactech if the Relators' releases described in Paragraph 5 of this Agreement are rescinded for any reason.

15.     The Settlement Amount shall not be decreased as a result of the denial of claims for payment now being withheld from payment by any Medicare contractor (e.g., Medicare Administrative Contractor, fiscal intermediary, carrier, the VA, or any state payer), related to the Covered Conduct; and Exactech agrees not to resubmit to any Medicare contractor, the VA, or any state payer any previously denied claims related to the Covered Conduct, agrees not to appeal any such denials of claims, and agrees to withdraw any such pending appeals.

16.     Exactech agrees to the following:

a.      Unallowable Costs Defined:  All costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47; and in Titles XVIII and XIX of the Social Security Act, 42

U.S.C. §§ 1395-1395lll and 1396-1396w-5; and the regulations and official program directives promulgated thereunder) incurred by or on behalf of Exactech, its present or former officers, directors, employees, shareholders, and agents in connection with:

(1)    the matters covered by this Agreement;

(2)    the United States' audit(s) and civil investigation(s) of the matters covered by this Agreement;

(3)    Exactech's investigation, defense, and corrective actions undertaken in response to the United States' audit(s) and civil investigation(s) in connection with the matters covered by this Agreement (including attorneys' fees);

(4)    the negotiation and performance of this Agreement; and

(5)    the payments Exactech makes to the United States pursuant to this Agreement and any payments that Exactech may make to Relators, including costs and attorneys' fees.

are unallowable costs for government contracting purposes and under the Medicare Program, Medicaid Program, TRICARE Program, and Federal Employees Health Benefits Program (FEHBP) (hereinafter referred to as Unallowable Costs).

b.    <u>Future Treatment of Unallowable Costs</u>:  Unallowable Costs shall be separately determined and accounted for by Exactech, and Exactech shall not charge such Unallowable Costs directly or indirectly to any contracts with the United States or any State Medicaid program, or seek payment for such Unallowable Costs through any cost report, cost statement, information statement, or payment request submitted by Exactech or any of its subsidiaries or affiliates to the Medicare, Medicaid, TRICARE, or FEHBP Programs.

c.      Treatment of Unallowable Costs Previously Submitted for Payment:  Exactech further agrees that within 90 days of the Effective Date of this Agreement it shall identify to applicable Medicare and TRICARE fiscal intermediaries, carriers, and/or contractors, and Medicaid and FEHBP fiscal agents, any Unallowable Costs (as defined in this paragraph) included in payments previously sought from the United States, or any State Medicaid program, including, but not limited to, payments sought in any cost reports, cost statements, information reports, or payment requests already submitted by Exactech or any of its subsidiaries or affiliates, and shall request, and agree, that such cost reports, cost statements, information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the Unallowable Costs  Exactech agrees that the United States, at a minimum, shall be entitled to recoup from Exactech any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously-submitted cost reports, information reports, cost statements, or requests for payment.

Any payments due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice and/or the affected agencies.  The United States reserves its rights to disagree with any calculations submitted by Exactech or any of its subsidiaries or affiliates on the effect of inclusion of Unallowable Costs (as defined in this paragraph) on Exactech or any of its subsidiaries or affiliates' cost reports, cost statements, or information reports.

d.      Nothing in this Agreement shall constitute a waiver of the rights of the United States to audit, examine, or re-examine Exactech's books and records to determine that no Unallowable Costs have been claimed in accordance with the provisions of this paragraph.

17.     Exactech agrees to cooperate fully and truthfully with the United States' investigation of individuals and entities not released in this Agreement.  Upon reasonable notice, Exactech shall encourage, and agrees not to impair, the cooperation of its directors, officers, and employees, and shall use its best efforts to make available, and encourage, the cooperation of former directors, officers, and employees for interviews and testimony, consistent with the rights and privileges of such individuals.  Exactech further agrees to furnish to the United States, upon request, complete and unredacted copies of all non-privileged documents, reports, memoranda of interviews, and records in its possession, custody, or control concerning any investigation of the Covered Conduct that it has undertaken, or that has been performed by another on its behalf.

18.     This Agreement is intended to be for the benefit of the Parties only.  The Parties do not release any claims against any other person or entity, except to the extent provided for in Paragraph 19 (waiver for beneficiaries paragraph), below.

19.     Exactech agrees that it waives and shall not seek payment for any of the health care billings covered by this Agreement from any health care beneficiaries or their parents, sponsors, legally responsible individuals, or third-party payors based upon the claims defined as Covered Conduct.

20.     The Settlement Amount represents the amount the United States is willing to accept in compromise of its civil claims arising from the Covered Conduct due solely to Exactech's financial condition as reflected in the Financial Disclosures referenced in Paragraph 11.

a.     In the event that Exactech fails to pay the Settlement Amount as set forth in Paragraph 1 above, Exactech shall be in Default of Exactech's payment obligations ("Default").  The United States will provide a written Notice of Default, and Exactech shall have

an opportunity to cure such Default within seven calendar days from the date of receipt of the Notice of Default by making the payment due.  Notice of Default will be delivered to Exactech, or to such other representative as Exactech shall designate in advance in writing.  If Exactech fails to cure the Default within seven calendar days of receiving the Notice of Default and in the absence of an agreement with the United States to a modified payment schedule ("Uncured Default"), the remaining unpaid balance of the Settlement Amount shall become immediately due and payable, and interest on the remaining unpaid balance shall thereafter accrue at the rate of 12% per annum, compounded daily from the date of Default, on the remaining unpaid total (principal and interest balance).

b.      In the event of Uncured Default, Exactech agrees that the United States, at its sole discretion, may (i) retain any payments previously made, rescind this Agreement in its entirety and pursue the Alabama Civil Action, the Maryland Civil Action, or any civil and/or administrative claim, action, or proceeding against Exactech for the claims that would otherwise be covered by the releases provided in Paragraphs 4 and 5 above, with any recovery reduced by the amount of any payments previously made by Exactech to the United States under this Agreement; (ii) take any action to enforce this Agreement in a new action or by reinstating the Alabama Civil Action and/or the Maryland Civil Action; (iii) offset the remaining unpaid balance from any amounts due and owing to Exactech and/or affiliated companies by any department, agency, or agent of the United States at the time of Default or subsequently; and/or (iv) exercise any other right granted by law, or under the terms of this Agreement, or recognizable at common law or in equity.  The United States shall be entitled to any other rights granted by law or in equity by reason of Default, including referral of this matter for private collection.  In the event the United States pursues a collection action, Exactech agrees

immediately to pay the United States the greater of (i) a ten-percent (10%) surcharge of the amount collected, as allowed by 28 U.S.C. § 3011(a), or (ii) the United States' reasonable attorneys' fees and expenses incurred in such an action.  In the event that the United States opts to rescind this Agreement pursuant to this paragraph, Exactech waives and agrees not to plead, argue, or otherwise raise any defenses of statute of limitations, laches, estoppel or similar theories, to any civil or administrative claims that are (i) filed by the United States against Exactech within 90 days of written notification that this Agreement has been rescinded, and (ii) relate to the Covered Conduct, except to the extent these defenses were available on June 29, 2018.  Exactech agrees not to contest any offset, recoupment, and/or collection action undertaken by the United States pursuant to this paragraph, either administratively or in any state or federal court, except on the grounds of actual payment to the United States.

c.        In the event of Uncured Default, OIG-HHS may exclude Exactech from participating in all Federal health care programs until Exactech pays the Settlement Amount, with interest, as set forth above (Exclusion for Default).  OIG-HHS will provide written notice of any such exclusion to Exactech.  Exactech waives any further notice of the exclusion under 42 U.S.C. § 1320a-7(b)(7) and agrees not to contest such exclusion either administratively or in any state or federal court.  Reinstatement to program participation is not automatic.  If at the end of the period of exclusion, Exactech wishes to apply for reinstatement, it must submit a written request for reinstatement to OIG-HHS in accordance with the provisions of 42 C.F.R. §§ 1001.3001-.3005.  Exactech will not be reinstated unless and until OIG-HHS approves such request for reinstatement.  The option for Exclusion for Default is in addition to, and not in lieu of, the options identified in this Agreement or otherwise available.

21.     In exchange for valuable consideration provided in this Agreement, Exactech and Relators acknowledge the following:

a.     Exactech shall file a motion or other appropriate request (an "Approval Motion") seeking approval to enter into and perform this Agreement, which may include seeking such approval as part of an Approved Plan. Before filing such Approval Motion, Exactech shall obtain the United States' consent as to form of such Approval Motion or the applicable provisions of any Approved Plan related to approval of this Agreement (not to be unreasonably withheld).

b.     The Definitive Documents related to the Bankruptcy Proceedings with respect to Exactech and its subsidiaries shall be consistent in all material respects with this Agreement and shall not, by their terms, contain any provisions that amend, modify, supplement, supersede or conflict with, any of the provisions of this Agreement in any manner that is materially adverse to, or materially prejudicial to the United States or the Relators, in each case, with respect to their rights under this Agreement.  The Definitive Documents shall be in form and substance reasonably acceptable to the United States with respect to the subject matter of this Agreement. In addition, Exactech shall take such actions as may be reasonably necessary or appropriate in the Bankruptcy Proceedings (including, without limitation, seeking approval of this Agreement with consent of the DIP Lenders) to ensure Exactech will be able to comply with its obligations under this Agreement.

c.     If the Bankruptcy Proceedings of Exactech, Inc. are converted or dismissed, Exactech, the United States, and the Medicaid Participating States shall have the right to rescind this Agreement.

d.     Exactech and the United States each have the option to rescind this Agreement in all respects in the event of any of the following:

17

i.      the Bankruptcy Court does not grant the Approval Motion;

ii.     the Approved Plan Effective Date does not occur on or before December 31, 2025, or such later date to which the United States may consent;

iii.    the Bankruptcy Court (or other court of competent jurisdiction) enters an order, converting the Bankruptcy Proceedings of Exactech to a case under chapter 7 of the Bankruptcy Code;

iv.     the Bankruptcy Court (or other court of competent jurisdiction) enters an order, the effect of which would render the Approved Plan incapable of consummation on the terms set forth in this Agreement and such order remains in effect for fifteen (15) business days after its entry;

v.      issuance by the Bankruptcy Court or any other court of competent jurisdiction of any ruling, judgment or order enjoining the consummation of this Agreement or the Approved Plan, or denying approval of this Agreement, and such order remains in effect for fifteen (15) business days after its entry;

vi.     the Bankruptcy Court enters an order denying confirmation of the Approved Plan, and such order remains in effect for fifteen (15) business days after its entry;

vii.    any court of competent jurisdiction has entered a final judgment or order declaring this Agreement to be unenforceable; and

viii.   if, upon the exercise of its fiduciary duties, Exactech withdraws or abandons any Approved Plan.

22.     Upon receipt by the United States of the Federal Settlement Amount, the Alabama Relators and Exactech shall promptly sign and file in the Alabama Civil Action a Joint Stipulation of Dismissal of Exactech pursuant to Rule 41(a)(1).  The dismissal shall be with prejudice as to Relators and with prejudice to the United States as to the Alabama Action Covered Conduct and without prejudice as to all other claims, subject to the terms and conditions of this Agreement.  The United States shall file a separate consent to dismissal of the action.

23.     Upon receipt by the United States of the Federal Settlement Amount, the Maryland Relator and the United States shall promptly sign and file in the Maryland Civil Action a Joint Stipulation of Dismissal of Exactech pursuant to Rule 41(a)(1).  The dismissal shall be with prejudice to Relators, with prejudice to the United States as to the Maryland Action Covered Conduct and without prejudice as to all other claims, and subject to the terms and conditions of this Agreement.  The dismissal shall have no effect on claims against any other named defendant(s) in that action.

24.     The United States and Exactech shall bear their own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

25.     Each Party and signatory to this Agreement represents that it freely and voluntarily enters into this Agreement without any degree of duress or compulsion.

26.     This Agreement is governed by the laws of the United States.  The exclusive venues for any dispute relating to this Agreement is the United States District Court for the District of Maryland, except that any dispute relating solely to the Alabama Action shall be brought in the United States District Court for the Northern District of Alabama; provided that, to the extent any dispute arises while the Bankruptcy Proceedings are still pending, such dispute may also be heard in the Bankruptcy Court.

27. For purposes of construing this Agreement, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

28. This Agreement constitutes the complete agreement between the Parties. This Agreement may not be amended except by written consent of the Parties. Forbearance by the United States from pursuing any remedy or relief available to it under this Agreement shall not constitute a waiver of rights under this Agreement.

29. Nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of the United States to protect and preserve its rights, remedies and interests, including any other claims against Exactech or other parties, or its full participation in the Bankruptcy Proceedings. Furthermore, nothing in this Agreement shall be construed to prohibit the United States (or Relators with respect to their respective claims for expenses, attorneys' fees and costs) from appearing as a creditor or a party-in-interest in any matter to be adjudicated in the Bankruptcy Proceedings so long as any appearance by the United States or Relator and the positions advocated by the United States or Relator in connection therewith are consistent with this Agreement.

30. As to the United States, its agencies or any instrumentalities thereof, notwithstanding anything contained in the Agreement, Plan, Sale Order, or Confirmation Order to the contrary, nothing herein shall:

    i. limit or be intended to or be construed to bar the United States from pursuing any police or regulatory action or any criminal action released under this Agreement;

    ii. discharge, release, exculpate, impair or otherwise preclude: (a) any obligation or liability to the United States that is not a "claim" within the meaning of section

101(5) of the Bankruptcy Code; (b) any Claim of the United States arising on or after the Confirmation Date; (c) any liability of the Debtors under police or regulatory statutes or regulation to the United States as the owner, lessor, or lessee or operator of property that such Entity owns, operates or leases after the Effective Date; or (d) any liability owed to the United States, including but not limited to any liabilities arising under the federal environmental, criminal, civil or common law, by any non-Debtor, including the released parties and the exculpated parties; *provided, however*, that the foregoing shall not diminish the scope of any exculpation to which any Person is entitled under section 1125(e) of the Bankruptcy Code;

iii.     enjoin or otherwise bar the United States from asserting or enforcing, outside the Bankruptcy Court, any obligation or liability described in the preceding clause (ii); *provided, however,* that the non-bankruptcy rights and defenses of all Entities with respect to (a)—(d) in clause (ii) are likewise fully preserved;

iv.     affect any right of setoff or recoupment of the United States against any of the Debtors; *provided, however,* that the rights and defenses (other than any rights or defenses based on language in the Plan or the Confirmation Order that may extinguish or limit setoff or recoupment rights) of the Debtors with respect thereto are fully preserved;

v.     authorize the assumption, assignment, sale or other transfer of any federal (a) grants, (b) grant funds, (c) contracts, (d) agreements, (e) awards, (f) task orders, (g) property, (h) intellectual property, (i) patents, (j) leases, (k) certifications, (l) applications, (m) registrations, (n) billing numbers, (o) national provider

21

identifiers, (p) provider transaction access numbers, (q) licenses, (r) permits, (s) covenants, (t) inventory, (u) guarantees, (v) indemnifications, (w) data, (x) records, (y) any other interests belonging to the United States (collectively, "Federal Interests") without compliance and will all terms of the Federal Interests and with all applicable non-bankruptcy law;

    vi.    be interpreted to set cure amounts related to any Federal Interests or to require the United States to novate, approve or otherwise consent to the assumption assignment, sale or other transfer of any Federal Interests;

    vii.    constitute or be deemed an approval or consent by the United States;

    viii.    waive, alter, or otherwise limit the United States' property rights;

    ix.    modify the scope of section 525 of the Bankruptcy Code;

    x.    cause Rejection Damage Claims to have to be filed before the Governmental Bar Date or alter the priority and treatment of such Rejection Damage Claims under the Bankruptcy Code.

31.    In the event of any conflict among the terms and provisions in Definitive Documents, on the one hand, and this Agreement, on the other hand, the terms and provisions of this Agreement and federal law shall control.

32.    The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

33.    This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

34.    This Agreement is binding on Exactech's successors, transferees, heirs, and assigns.

35.   This Agreement is binding on Relators' successors, transferees, heirs, and assigns.

36.   All Parties consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

37.   This Agreement is effective on the latter of the following dates: (1) the date that the Bankruptcy Court approves Exactech's performance hereunder and (2) the Approved Plan Effective Date. Facsimiles and electronic transmissions of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

## THE UNITED STATES OF AMERICA

DATED: _____     BY:     MICHAEL HOFFMAN   Digitally signed by MICHAEL HOFFMAN Date: 2025.05.22 13:14:03 -04'00'
_____
Michael Hoffman
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
United States Department of Justice

DATED: ____     BY:     MATTHEW HAVEN   Digitally signed by MATTHEW HAVEN Date: 2025.05.21 16:35:01 -04'00'
_____
Matthew A. Haven
Assistant United States Attorney
District of Maryland

DATED: 5.21.2025     BY:
_____
Don B. Long III
Assistant United States Attorney
Northern District of Alabama

DATED: _____     BY:
_____
Susan E. Gillin
Assistant Inspector General for Legal Affairs
Office of Counsel to the Inspector General
Office of Inspector General
United States Department of Health and Human Services

*{Remainder of page intentionally blank – signatures continue next page}*

24

**EXACTECH**

DATED: _5-21-25_ BY: _____

Darin Johnson
Chief Executive Officer

DATED: _5-21-25_ BY: _____

Thomas Beimers
Counsel for Exactech

*{Remainder of page intentionally blank – signatures continue next page}*

## ALABAMA RELATORS

DATED: _5/22/25_          BY: _____
                              Brooks Wallace

DATED: _____          BY: _____
                              Robert Farley

DATED: _____          BY: _____
                              Manuel Fuentes

DATED: _____          BY: _____
                              Dee Miles
                              Counsel for Alabama Relators

*{Remainder of page intentionally blank – signatures continue next page}*

**ALABAMA RELATORS**


DATED: _____          BY:   _____
                                 Brooks Wallace


DATED: _____          BY:   _____
                                 Robert Farley


DATED: _____          BY:   _____
                                 Manuel Fuentes


DATED: _____          BY:   _____
                                 Dee Miles
                                 Counsel for Alabama Relators


*{Remainder of page intentionally blank – signatures continue next page}*

**ALABAMA RELATORS**

DATED: _____   BY: _____
Brooks Wallace

DATED: _____   BY: _____
Robert Farley

DATED: May 21, 2025   BY: *Manuel E. Fuentes*
Manuel Fuentes

DATED: _____   BY: _____
Dee Miles
Counsel for Alabama Relators

*{Remainder of page intentionally blank – signatures continue next page}*

## ALABAMA RELATORS

DATED: _____        BY: _____
                            Brooks Wallace

DATED: _____        BY: _____
                            Robert Farley

DATED: _____        BY: _____
                            Manuel Fuentes

DATED: 5-22-25        BY: _____
                            Dee Miles
                            Counsel for Alabama Relators

*{Remainder of page intentionally blank – signatures continue next page}*

## MARYLAND RELATOR

DATED: 05 / 21 / 2025    BY: _____

Pasquale Petrera

DATED: 05 / 21 / 2025    BY: _____

Jim Barger
Counsel for Maryland Relator

*{Last page of signatures}*

**Exhibit A**

As used in this Agreement, the following terms have the following meanings:

a) "**Approved Plan**" means a chapter 11 plan for Exactech that is consistent in all material respects with this Agreement and incorporates the settlement set forth in this Agreement.

b) "**Approved Plan Effective Date**" means the date on which the Approved Plan becomes effective in accordance with its terms.

c) "**Definitive Documents**" means all of the definitive documents implementing this Settlement Agreement, including the material agreements, schedules, and Bankruptcy Court or other judicial or regulatory orders that are necessary, including the Sale and Confirmation Order and the Approved Plan.

d) "**DIP Lenders**" means the lenders to Exactech, Inc. under that certain Debtor-in-Possession Credit Agreement, dated as of October 31, 2024, by and among Exactech, Inc., as borrower, GLAS USA LLC, as administrative and collateral agent, and the other parties thereto from time to time (as amended by that certain Amendment No. 1 to Debtor-in-Possession Credit Agreement, dated as of March 6, 2025, and as may be amended from time to time).